Stephen G. Larson (SBN 145225)
*slarson@ larsonllp.com*
Koren L. Bell (SBN 216684)
*kbell@larsonllp.com*
Paul A. Rigali (SBN 262948)
*prigali@larsonllp.com*
Jonathan D. Gershon (SBN 306979)
jgershon@larsonllp.com
**LARSON LLP**
555 South Flower Street, Suite 4400
Los Angeles, CA  90071
Telephone:   213.436-4888
Facsimile:    213.623-2000

Attorneys for Plaintiffs
MOSAFER INC.;
MOSAFER E-COM, INC.;
AND GOMOSAFER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| MOSAFER INC.; MOSAFER E-COM, INC.; AND GOMOSAFER,<br><br>                                Plaintiffs.<br><br>          vs.<br><br>ELLIOT BROIDY; GEORGE NADER; BROIDY CAPITAL MANAGEMENT, LLC; CIRCINUS, LLC; THE IRON GROUP INC. D/B/A IRONISTIC.COM; SCL SOCIAL LIMITED; PROJECT ASSOCIATES UK LTD; MATTHEW ATKINSON; AND JOHN DOES 1-100,<br><br>                                Defendants. | CASE NO.<br><br>**COMPLAINT FOR:**<br><br>**(1) Violation of California Unfair Competition Law;**<br>**(2) Violation of California False Advertising Law;**<br>**(3) False Advertising in Violation of Section 43(a)(1)(B) of the Lanham Act;**<br>**(4) Trade Libel; and**<br>**(5) Negligence.**<br><br>**DEMAND FOR JURY TRIAL** |

# **INTRODUCTION**

1.      This action arises from convicted felons Elliot Broidy ("Broidy") and George Nader ("Nader") illegally orchestrating and executing a sophisticated—and secret—assault against Qatar and Qatari businesses on behalf of the United Arab Emirates ("UAE").

2.      Defendants in the instant case—Broidy and Nader—are no strangers to unlawful conduct.  Most recently, Broidy—former finance chairman of the Republican National Committee ("RNC"), vice chairman of the Trump Victory Committee, and top fund-raiser for Donald Trump—pled guilty in 2020 to conspiring to violate foreign lobbying laws as part of a covert campaign to influence the Trump administration on behalf of Chinese and Malaysian interests, although he was later pardoned by President Trump.  For his part, Nader—a former adviser to Donald Trump's presidential transition team—also pled guilty in 2020 to a federal felony offense and is currently serving a 10-year sentence in federal prison.

3.      In the case at bar, in exchange for hundreds of millions of dollars, Defendants Broidy and Nader yielded their tremendous political influence to lobby United States government officials to take anti-Qatari positions.  Broidy and Nader's efforts did not stop at mere lobbying, however.  Instead, they spearheaded a widespread disinformation campaign (the "Disinformation Conspiracy") which targeted Qatar and Qatari-American businesses—with the goal of inflicting catastrophic financial loss—using tactics remarkably similar to those employed by the Russians when they interfered with the 2016 Presidential Election.

4.      As a direct result of the Disinformation Conspiracy, Plaintiffs Mosafer entities—which were branded to be synonymous with Qatar and included an integrated network of retail, e-commerce, distribution, and travel companies—lost existing and prospective customers, including many in California.  Revenue declined precipitously—by hundreds of millions of dollars on a global scale, at least twenty percent of which can be attributed to Mosafer's U.S. entities.

5.     To execute their Disinformation Conspiracy with these intended catastrophic effects, Broidy and Nader enlisted Broidy's two companies, Broidy Capital Management, LLC ("BCM") and Circinus, LLC ("Circinus")—as well as a network of contractors and mercenaries: The Iron Group Inc., doing business as Ironistic.com, ("Ironistic"), SCL Social Limited ("SCL"), Project Associates UK Ltd ("Project Associates"), Matthew Atkinson ("Atkinson"), and numerous others contractors, including public affairs, advocacy, and strategic advisory groups, as well as John Does 1-100 (collectively, "Defendants").

6.     Hidden behind aliases, companies, contractors, mercenaries, and agents—and in violation of numerous reporting and labeling obligations under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, and other federal and state laws—Broidy and Nader orchestrated and implemented a vast, sophisticated campaign against Qatar and Qatari-based businesses.

7.     The goal of the Disinformation Conspiracy was simple—drive governmental and private actors away from doing business with Qatar and Qatari-related businesses in an effort to cripple the Qatari economy and usurp its business and political opportunities for the UAE and UAE-related businesses.  To do so, their campaign employed conventional print media, internet websites, and social media accounts to publish false and misleading information regarding the safety, stability, and nature of Qatar and Qatari-based businesses.  Using these mediums, Defendants, along with their co-conspirators, created an ecosystem that funneled American consumers into a vortex designed to drive them *away* from Qatar and any business that was affiliated with it.  The goal was to strangle and starve these businesses of consumers so that in the end, they would crumble.

8.     To accomplish this goal, Defendants ensured that, at each step on the path toward consuming information about Plaintiffs Mosafer entities and like businesses, the individual seeking information would be steered directly to their misinformation.  Defendants implemented a series of steps to achieve this effect.

9.     First, Defendants directly, aggressively, and illegally lobbied members of the United States Government to sever all ties with anything Qatar and effectively boycott its economy.

10.     Second, Defendants paid influencers to create conferences to further engrain falsehoods among influential U.S. consumers.  At the same time, Defendants directed influencers to take to print media to spread the false narrative that they had created in order to ensure that California residents and other consumers were again misinformed.

11.     And, third, Defendants relied on a vast internet network that utilized concocted maligning "hashtags" to ensure that, when a consumer in California, for example, decided to search the internet for information about Plaintiffs and like businesses,  merely including the word "Qatar" in a search bullion would fast track that searcher into a universe of fake news websites, Twitter accounts, YouTube accounts, and other social-media planted information—all of which were creatures of manipulation.

12.     Through these coordinated means, Defendants' Disinformation Conspiracy achieved an extraordinary degree of success—creating, at the behest of the UAE, a toxic ecosystem of pervasive, inflammatory, false, and misleading information about Qatar and Qatari-based businesses and in turn ensuring that this information was widely disseminated in conventional print and broadcast media, internet websites, and social media.

13.     As a direct and intended consequence of this unlawful campaign, devised and executed by Defendants Broidy and Nader on behalf of their client UAE, innocent Qatari-related businesses—including Plaintiffs Mosafer entities—suffered a catastrophic loss.  Through this lawsuit, the Mosafer entities seek to hold Defendants accountable for their anticompetitive, deceptive, unfair, and unlawful conduct and to permanently enjoin them from continuing to perpetuate this conduct.

**JURISDICTION AND VENUE**

14.     This Court has diversity jurisdiction over the claims for relief under 28 U.S.C. § 1332.  Plaintiffs are citizens of Delaware, New York, and Qatar, while, as explained below, Defendants are citizens of California, Virginia, Washington D.C., and the United Kingdom.  Accordingly, Plaintiffs' citizenship is completely diverse from all Defendants in this action.  Further, the amount in controversy exceeds $75,000 dollars.

15.     This court also had federal question jurisdiction over Plaintiffs' claim against all Defendants for violation of Section 43(a) of the Lanham Act pursuant to 28 U.S.C. § 1331.  Moreover, the Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

16.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 84 because it is the district where Broidy and BCM reside and where all Defendants are subject to the Court's general and/or specific personal jurisdiction.

**PARTIES**

17.     Plaintiff Mosafer Inc. is a destination management company for foreign tourists from Asia, the European Union, the U.S., and the Middle East and North Africa region.  Plaintiff Mosafer Inc. operates retail stores which sell high-end luggage and travel accessories, and where customers can not only purchase Mosafer's merchandise but can also book travel in its stores.  It is incorporated under the laws of Delaware and has its principal place of business in New York.  In addition, Mosafer Inc. expanded to include a distribution company, which distributed Mosafer's merchandise to retail stores and directly to consumers from its warehouse located in New Jersey.

18.     Plaintiff Mosafer E-Com, Inc. is a company that operates an online store that sells high-end luggage and travel accessories.  Through the online platform, consumers in all states in the U.S., including California, had the ability to purchase the

same merchandise available in the retail stores and also access Mosafer's online travel booking company.  It is incorporated under the laws of Delaware and has its principal place of business in New York.

19.    Plaintiff GoMosafer, the online division of Mosafer Travel, is a Qatar-based travel agency.  GoMosafer's website (gomosafer.com) was the first, and only online booking portal focused on the Middle East and North Africa region that allowed customers from around the world, including in all states in the U.S., to book travel packages to Qatar and other destinations by traveling through Qatar and also place them on hold and resume on the particular date that was most suitable for the customer to book travel.

20.    Plaintiffs are corporate affiliates and collectively shall be referred to in this Complaint as "Mosafer" or "the Mosafer entities."  The Mosafer brand had a global reach and presence prior to the pointed and intentionally destructive acts by Defendants.

21.    Defendant Broidy is a businessman who resides in Beverly Hills, California, and is a citizen of California.  He is the former finance chairman of the RNC, vice chairman of the Trump Victory Committee, and top fund-raiser for Donald Trump and has twice been convicted of crimes.

22.    Defendant BCM, an investment firm, is a limited liability company owned, operated, and otherwise controlled by Broidy and is incorporated and has its principal place of business in Los Angeles, California.

23.    Defendant Circinus, a private security company, is a limited liability company owned, operated, and otherwise controlled by Broidy and is incorporated and has its principal place of business in Fredericksburg, Virginia.

24.    Defendant Nader is a businessman, lobbyist, and former adviser to Donald Trump's presidential transition team.  He is currently incarcerated in Virginia and also is a citizen of Virginia.

25.     Defendant Ironistic is a full-service digital strategies and marketing company that designs and builds websites and online marketing campaigns.  It is incorporated under the laws of Virginia, and it has its principal office in Alexandria, Virginia.

26.     Defendant SCL is a British company formerly affiliated with Cambridge Analytica and currently affiliated with its successor Emerdata Limited, which provides campaign management and communications services for political customers.

27.     Defendant Project Associates is a British company engaged in strategic communications consulting that maintains offices globally, including in the District of Columbia and New York.

28.     Defendant Atkinson was the Digital Marketing Director at Cambridge Analytica from 2016 to 2018.  Atkinson currently resides in and is a citizen of Washington D.C.

29.     Defendants John Does 1-100 are entities or individuals who, upon information and belief, are otherwise subject to the jurisdiction of this Court.  The specific identities of the various Does are unknown to Mosafer at this time, but Mosafer is informed and believes, and thereon alleges, that each of the Does is responsible in some manner for the occurrences alleged in this Complaint, including anonymously posting false statements on various social media platforms and websites to interfere with business relationships, conspiring with the named Defendants to spread disinformation to the public and create an anticompetitive environment, and that the Does each were the agents, joint venturers, alter egos, partners, representatives, and employees of each other, acting within the course and scope of said agency and employment of each of the other Defendants, participated with, conspired with and aided and abetted each of the other Defendants, and in doing the things herein alleged, were acting within the scope of such partnership, agency, representation or employment with the knowledge, authorization, consent and ratification of the other Defendants.  Mosafer will seek to leave to amend this

Complaint to insert the true names and capacities of each Doe when the same are ascertained.

## FACTUAL ALLEGATIONS

### A.   Before The Disinformation Conspiracy, Mosafer Was An Industry Leading Travel Conglomerate

30.   Mosafer is a global one-stop industry-leading travel conglomerate.  The word "Mosafer" means "traveler" in Arabic, Turkish, Farsi, and Urdu.  As its name suggests, Mosafer's business focus is on the travel industry.  It has long been one of Qatar's leading tourism companies, has been recognized as the market leader on innovation, and GoMosafer's public application was a frequently downloaded online travel application in the Middle East.  Prior to the Disinformation Conspiracy, Mosafer enjoyed a large percentage of the market share of travel originating in the U.S.—including from California—to the Middle East as compared to its competitors.

31.   Mosafer's Qatari heritage is the cornerstone of its branding.  Indeed, Mosafer's branding reflected a deliberate attempt to make Mosafer synonymous with Qatar.  Mosafer spent considerable money in designing its store, its products, its e-commerce website, its online ticketing website, and its company logos and brand details to invoke its Qatari roots.  In connection with this strategy, Mosafer purposefully used elements of the Qatari flag in their branding and specifically chose as their trade dress the same burgundy found on the flag.  Moreover, Mosafer's advertisements contained the Qatari flag and frequently noted Qatari current events (such as referring to Qatari sports victories and Qatari holidays).  Mosafer also frequently advertised trips on Qatar Airways—the primary Qatari airline which uses the Country's name.  In addition, online searches, including its Wikipedia page, identified Mosafer Inc. as a Qatari entity.  In short, Mosafer was intimately associated with Qatar, and a consumer could not go to a Mosafer store or website without being inundated with Qatari symbolism.

32.     Prior to 2015, Mosafer was a recognized global brand synonymous with luxury.  The Mosafer brand had a presence in Qatar, Saudi Arabia, the UAE, Jordan, Turkey, and South Africa.

33.     By 2015, GoMosafer also had a presence in the United States, and in many ways, it served as the gateway for the Mosafer companies.  GoMosafer provided bespoke travel arrangements to its customers through its website and allowed customers from around the world, including the U.S., to book travel to Qatar and other destinations by traveling through Qatar.  Through its travel agency, Mosafer intended to bring Americans to Qatar and use Qatar as a gateway to the Middle East and the rest of the world.

34.     GoMosafer.com was the first, and only booking portal focused on the Middle East that allowed customers to book travel packages and also place them on hold (*i.e.*, place their travel on hold and resume at a particular date that was suitable for the customer).

35.     Because of GoMosafer's success and U.S. clientele, Mosafer made the business decision to have a physical footprint in the United States.

36.     Beginning in or about 2015, based on increased demand from clientele in the United States, and with the emergence of Qatar as both a more likely travel destination and hub for travel in the region, Mosafer made plans to enter the U.S. markets.  Mosafer's effort was thoughtful, planned, and calculated for success.  The brand relied on outside consultants in order to ensure that its vision would prove successful.  Ultimately, they decided on a three-phase approach.

37.     First, they would open a luxury flagship store in Manhattan.  The store would provide both retail merchandise and travel booking.  Then they would open a distribution company in New Jersey to service the retail store, and likewise, to sell merchandise directly to consumers and into departments stores.  The store would also help publicize the online booking company (GoMosafer).

38.    Second, they would take the retail company, Mosafer Inc., online as well to further reach consumers.

39.    And third, they would then expand from the New York retail store, into Las Vegas and Los Angeles, in order to have a presence in the major markets in which they both had current clients and research had shown would prove to be accretive.  So, in 2015, Mosafer Inc. opened its flagship retail store in Manhattan, New York, with a star-studded grand opening event.  The store was a one-stop-shop for travel—not only could consumers purchase high-end luxury travel items (such as bags, luggage, and other accessories, many of which were manufactured by Mosafer), they could also book travel in the store through Mosafer's travel agency.

40.    Around the same time, Mosafer Inc. created an affiliated distribution company, which distributed Mosafer's products to the New York store and also was designed to be a hub, sending merchandise to a planned California retail store location, as well as directly to customers and key partners such as department stores.

41.    In 2017, Mosafer created Mosafer E-com, Inc., an affiliated e-commerce website.  This company offered an online platform accessible to consumers in the United States who could use the website to purchase the same merchandise available in the retail stores and could also access Mosafer's online travel booking company, GoMosafer.

42.    Mosafer enjoyed growing revenue, expansion, and increasing market share in the tourism business.  Mosafer employed over 200 individuals across the globe and recorded millions of dollars in revenue.   The emergence as Qatar being named as host to the 2022 FIFA World Cup further bolstered an upward trajectory for all the Mosafer Companies.

43.    But after Defendants began their systematic attacks, Mosafer was dealt one crippling blow after another.  The net effect was that the companies suffered massive losses domestically and globally, leading to the eventual forced closure of its U.S. flagship store in 2019.

44.     Defendants actively engaged in an elaborate and successful effort to conceal their coordination and participation in these attacks against Mosafer and like businesses.  Defendants' goal was to inflict maximum harm with minimal exposure toward their participation.  They were largely successful until late 2019, following years of information warfare for which they had been paid illicit moneys in excess of $100,000,000.

## B.     The UAE Enlists Nader To Lead Anti-Qatari Efforts In The USA

45.     In June 2017, the UAE attacked Qatar.  The UAE took the drastic step of severing all diplomatic ties with Qatar, expelling all Qatari nationals living in the UAE, prohibiting its citizens from traveling to Qatar, and closing off its airspace and territorial waters to Qatari vessels.  Around the same time, the UAE commenced its anti-Qatar campaign in the United States.  The UAE sought to harm *everything* associated with Qatar, and at the center of that bullseye were Qatar businesses and businesses that served as a gateway between Qatar the United States.  Given the important part that the United States played in this field, the UAE needed U.S. contractors to do its bidding.

46.     The UAE turned to Nader, a Lebanese-born American businessman, and lobbyist.  Nader reportedly has served as an advisor to the UAE's Crown Prince Mohammed bin Zayed Al Nahyan—and has received millions of dollars for the assistance that he has provided to the UAE.

47.     Nader also acted as an advisor on the transition team for President Trump.  Through this affiliation, Nader became acquainted with Broidy.

## C.     Nader Recruits Broidy To Assist In The Anti-Qatari Campaign And The Two Use Their Political Connections To Lobby Against Qatar, In Violation of FARA

48.     Broidy is a wealthy businessman who has previously served as the finance chairman of the RNC from 2005 to 2008 as the deputy finance chairman of

the RNC from 2017 to April 2018, and as a vice-chairman of the Trump Victory Committee.

49.     In 2009, Broidy pled guilty in a public corruption case in New York relating to $1 million in illegal gifts that Broidy gave to New York State pension authorities in exchange for the state pension fund investing $250 million with his private equity firm, Markstone Capital Partners.  As part of his plea deal, Broidy paid $18 million in restitution.

50.     After Trump won the 2016 Presidential election, Broidy leveraged his connections with the White House in exchange for millions of dollars from foreign actors—a fact that Broidy actively tried to bury and conceal, instead insisting as recently as in 2020 that he was never a foreign agent and never acted on behalf of any foreign government.  Notwithstanding his attempts for several years to conceal his actions as a foreign agent on behalf of foreign governments, in October 2020, Broidy pled guilty to Conspiracy to Serve as an Unregistered Agent of a Foreign Principal, based on his unregistered lobbying on behalf of Chinese and Malaysian interests—a felony that carried a possible sentence of five years imprisonment.

51.     FARA requires that persons acting as agents of foreign principals who conduct political activity in the U.S. to disclose the details of their relationship with the foreign principal and report all activities, receipts, and disbursements made on the foreign principal's behalf.  The purpose of FARA disclosures is to give the American people the ability to fully evaluate political communications that are sponsored by a foreign state and to prevent foreign states from concealing their attempts to influence U.S. government policy.

52.     Pursuant to his guilty plea, Broidy admitted to engaging in a lobbying effort aimed at stopping a criminal investigation into a massive fraud scheme at a Malaysian sovereign wealth fund.  Broidy conceded that he attempted to facilitate a meeting between President Trump and the Malaysian Prime Minister in an effort to

resolve the investigation.  He also admitted that he hoped that by arranging this meeting, it would further his goal of securing additional business with Malaysia.

53.     In addition, Broidy admitted that he agreed to lobby on behalf of a Chinese Minister to "use his influence with high-ranking United States government officials to advocate for" the removal and return of the Chinses billionaire that was living in the U.S. to China.

54.     As part of this plea agreement to a felony, Broidy agreed to forfeit $6.6 million.  *See United States v. Broidy*, No. 1:20-cr-00210-CKK, ECF No. 13 ("Transcript of Arraignment and Change of Plea before the Hon. Colleen Kollar-Kotelly, United States District Judge, Held Via Videoconference") (D.C.C. dated Oct. 20, 2020).

55.     Although prosecutors indicated that they intended to present evidence at sentencing regarding Broidy's efforts "to obtain business from a Middle Eastern country and [his] client's efforts to influence U.S. policy towards a second Middle Eastern country in its alleged support of terrorist activities"—believed to be a reference to the UAE and Qatar—Broidy was pardoned by President Trump before this evidence could be presented.

56.     As confirmed by prosecutors, Broidy's unregistered foreign lobbying efforts extended far beyond those that he pled guilty to.  In March and April 2018, hundreds of pages of documents, which included emails, business proposals, and contracts between Broidy and Nader, were provided to various news sources, such as the New York Times and the Associated Press ("AP").  Upon information and belief, these documents show that Broidy and Nader acted as unregistered agents of the UAE in violation of FARA.

57.     Reporting on the contents of these documents was extensive.  According to a New York Times article, these documents establish that Nader "worked for more than a year to turn . . . [Elliot Broidy] into an instrument of influence at the White House for the rulers of Saudi Arabia and the United Arab Emirates."

58.     The documents also reportedly showed that Broidy and Nader (1) pushed the White House to remove Secretary of State Rex W. Tillerson because he did not support a confrontational approach to Qatar and Iran; (2) tried to broker introductions between high-ranking government officials in those foreign nations and their American counterparts; (3) repeatedly pressed President Trump to meet privately outside the White House with the leader of the UAE; and (4) encouraged U.S. politicians to cut ties with Qatar at the UAE's behest.

59.     Broidy was reportedly rewarded handsomely for his efforts.  In April 2018, Nader reportedly wired $2.5 million to Broidy as "part of an effort to persuade the U.S. to take a hard line against Qatar" and "shortly after he received the donation, Broidy sponsored a conference on Qatar's alleged ties to Islamic extremism, and Rep. Ed Royce (R-CA), chairman of the House Foreign Affairs Committee, announced legislation to condemn Qatar as a terror-supporting state."  Broidy and Nader actively tried to bury and conceal these actions from the public and continuously insisted, as recently as in 2020, that they were never foreign agents and never acted on behalf of any foreign government.  Their actions were unknown until recently.  Additionally, in January 2018, Broidy's firm, Circinus, was awarded a contract with the UAE worth over $200 million and Broidy collected a "first installment" of $36 million for an intelligence-gathering contract with the UAE.  Moreover, BCM received payments directly from Nader and/or Nader-controlled entities—a fact that they actively tried to bury and conceal for years.  Indeed, these actions were also unknown to the public until recently and denied by Defendants.

   **D.     Broidy and Nader's Orchestration of the Disinformation Conspiracy**

60.     Broidy and Nader's efforts went far beyond lobbying the White House on behalf of the UAE.  The documents provided to the press also reportedly show that in March 2017, Broidy and Nader provided foreign entities a proposed budget of $12,000,000 to "expose and penalize" Qatar.

61.     Broidy and Nader then set the wheels in motion to orchestrate the Disinformation Conspiracy.  They hired American companies (including Broidy's BCM and Circinus) and American actors to use conventional print media and social media to disseminate disinformation aimed at crippling Qatar businesses, including Qatar's then-thriving tourism businesses—and, principally, Mosafer.  In essence, Defendants engaged in information warfare, intentionally deceiving the media and consumers through the use of internet trolls, fake websites, and influencers to manipulate the U.S. public into falsely thinking Qatari businesses were sponsors of terrorist groups, thereby rendering it impossible for Qatari businesses, including Mosafer, to maintain a customer base.

62.     Through the Disinformation Conspiracy, Broidy and Nader conspired to represent to the public that: (1) Qatar and Qatari businesses were unstable and untrustworthy; (2) the political state of Qatar was extremely unstable, rendering travel to and through Qatar unsafe; and (3) boycotting Qatar businesses was necessary to counteract their terrorism funding activities.

63.     The purpose of the Disinformation Conspiracy was to divert business from Qatar and Qatari-related businesses—including, in particular, Mosafer, given its branding synonymous with Qatar—and instead direct them to the UAE and UAE-related businesses.

64.     In furtherance of the Disinformation Conspiracy, Broidy and Nader executed a "media blitz" in an effort to continue to "hammer Qatar."  For instance, in an April 2017 email from Broidy to Nader, Broidy wrote regarding the spreadsheet titled "Circinus – Progress Report re MB and Q" (MB and Q, a/k/a Mohammed bin Zayed Al Nahyan and Qatar): "You will see that there are many tabs indicating the many ways the issues are being addressed. [E].g. Conference, Documentary, Articles, Op Ed, Social Media . . . etc."

65.     The following month, in May 2017, Broidy sent an email to Nader regarding "what Circinus can do in the future," which stated that "Circinus has been

involved in information and disinformation campaigns using the internet and social media" and that "[w]e have demonstrated through our orchestration of the extraordinary PR campaign against Qatar . . . and in our generation of major, concrete steps toward marginalizing Qatar." Broidy further stated that his "[g]oals, Circinus' goals and the goals of KSA [Saudi Arabia] are completely aligned" and further thanked Nader "for making MBS [a/k/a Mohammed bin Salman bin Abdulaziz Al Saud] aware of all that I and Circinus have to offer as we enter the next phase of our relationship."

66.     As part of the Disinformation Conspiracy, on September 21, 2017, upon information and belief, Broidy orchestrated – through proxies – a full-page advertisement run in the Washington Post. This advertisement, which used the same burgundy color found in both Qatar's flag and Mosafer's branding, stated in big, bold letters, "QATAR IS A SAFE HAVEN FOR TERRORISTS." The advertisement went on to claim that: "It is a well-known fact that Qatar has become a favored safe-haven for terrorists from around the world. Over 60 terrorist organizations, individuals or NGOs . . . are currently either based out of or supported by the government of Qatar." This advertisement was intentionally false and misleading—Qatar did not support terrorists or provide them with a safe haven.

**E.     <u>SCL, Project Associates, and Atkinson Join and Amplify the Disinformation Conspiracy by Expanding Platforms and Accounts: Qatarexposed and Boycott Qatar</u>**

67.     With Broidy and Nader orchestrating, SCL, Project Associates, and Atkinson were recruited to join the Disinformation Conspiracy to expand the Conspiracy's reach to other social media platforms, such as YouTube.

68.     In September 2017, Project Associates, a well-known "global strategic communications consultancy" that provided strategic advisory and public diplomacy services for politicians and governments, engaged SCL to develop and execute a social media campaign on behalf of a foreign principal (*i.e.*, the UAE).

69.     SCL and its former parent entity, Cambridge Analytica (now Emerdata Limited), are infamous for their roles in data mining, mass psychological manipulation, and participating in covert efforts to manipulate elections in numerous countries.  In an administrative complaint against Cambridge Analytica, the Federal Trade Commission ("FTC") alleged, and ultimately found, that Cambridge Analytica and SCL Elections Limited (both of which are part of the SCL Group Ltd.) employed deceptive tactics to harvest personal information from tens of millions of Facebook users for voter profiling and targeting.  For example, the FTC found that "SCL Elections entered into a Services Agreement with Cambridge Analytica whereby SCL Elections agreed, among other things, to (a) acquire, for and on behalf of Cambridge Analytica, demographic, transactional, lifestyle, and behavioral data about consumers in target populations; (b) identify and build target voter lists; (c) apply research techniques to understand better the habits and daily lives of target voter groups, and (d) apply psychological profiles to target groups of voters."  Indeed, Cambridge Analytica manipulated elections in many countries throughout the world.

70.     One of the key actors for Defendant SCL was Defendant Atkinson, an employee of Cambridge Analytica, who agreed to act through SCL and create a YouTube account "Qatar exposed" on May 29, 2017, as well as other social media and internet platform planted content.  The content that Defendants SCL, Atkinson and Project Associates published through this account spread additional disinformation regarding Qatar and Qatari businesses.

71.     The YouTube account had no labels or other indicators that would demonstrate to the American public that any of the Defendants participated in its creation or maintenance.  On the contrary, it was crafted to look independent, legitimate, and authentic.

72.     Notwithstanding FARA requirements, Defendants SCL, Project Associates, and Atkinson did not register this effort until October 2017.  Both filings with FARA, in 2017 and 2018, list SCL Social Limited as the registrant and Atkinson

as an employee who will render services "in furtherance of the interests" of the foreign principals.[1]  In addition, the filings state that "SCL Social Limited is 100% owned by SCL Analytics."[2]  As part of SCL's FARA filing, they included a copy of the "Consultancy Agreement" entered into between SCL Social Limited and Project Associates (UK) Limited in September 2017, which provides, in part, that SCL Social Limited would "provide consulting services as agreed on an ad hoc basis."[3]

73.     Atkinson did not register under FARA until October 2017, disclosing at that time that he was working for the National Media Council of UAE (via Project Associates) and further disclosing that he would be "working as the principal strategist to the registrant [SCL Social Limited] for purposes of developing and executing a global social media campaign on behalf of the foreign principal."[4]  The form further disclosed that he was being compensated by a related company, SCL USA Incorporated, but was, in fact, performing services for Defendant SCL.[5]

74.     In October 2017, SCL Social Limited also registered under FARA and disclosed that Atkinson was an employee engaged in "a global social media campaign

---

[1] *See* https://efile.fara.gov/docs/6473-Registration-Statement-20171006-1.pdf (October 2017 filing); https://efile.fara.gov/docs/6473-Supplemental-Statement-20180531-1.pdf (May 2018 supplemental filing).

[2] *See* https://efile.fara.gov/docs/6473-Registration-Statement-20171006-1.pdf (October 2017 filing); https://efile.fara.gov/docs/6473-Supplemental-Statement-20180531-1.pdf (May 2018 supplemental filing).

[3] *See* https://efile.fara.gov/docs/6473-Exhibit-AB-20171006-1.pdf (referring to the contractual obligations of SCL Social Limited pursuant to the "Consultancy Agreement" between SCL Social Limited and Project Associates (UK) Limited).

[4] https://efile.fara.gov/docs/6473-Short-Form-20171006-2.pdf.

[5] *Id.*

COMPLAINT AND DEMAND FOR JURY TRIAL

on behalf of National Media Council of UAE" who had bought ads on various social media platforms including Facebook, Twitter, YouTube, relating to Boycott-Qatar.[6]

75.     Like the other Defendants discussed above, SCL's FARA filing reveals that SCL, Project Associates, and Atkinson availed themselves of the benefits and protections of California law in furtherance of the Disinformation Conspiracy. Specifically, the FARA filing reveals that SCL purchased advertisements from Facebook, Twitter, YouTube, and other social media platforms—all of whom have their headquarters in the State of California.  Furthermore, SCL, Project Associates, and Atkinson's ads and publications spreading disinformation regarding Qatar and Qatari businesses were published on servers located in California, as Facebook's servers are located in California.  Additionally, these ads were seen by California consumers, as is evidenced by several Mosafer customers canceling their reservations with Mosafer due to the widespread publication of this disinformation.  In point of fact, the very nature of this effort was to use analytics and target consumers in key markets, specifically California, with the intention of having maximum impact.  As previously remarked by a Cambridge Analytica executive, Cambridge Analytica identified "persuadable votes" and targeted blogs, websites, articles, videos, and ads at them "until they saw the world the way we wanted them to."

76.     The Qatar Exposed social media account and the ads that promoted Boycott-Qatar were just part of a robust effort that would be deployed by all Defendants, acting in concert, to specifically damage Qatari-based businesses— including Mosafer.  For example, videos were uploaded on the Qatar Exposed account with the following titles: (i) "How Qatar is destabilising the Gulf"; (ii) "Why does Qatar support terrorism?"; and (iii) "The case for boycotting Qatar".

77.     After joining and perpetuating the Disinformation Conspiracy in 2017, without registering their efforts through FARA filings or otherwise labeling or

---

[6] https://efile.fara.gov/docs/6473-Registration-Statement-20171006-1.pdf.

indicating their participation during the time of their creation, expansion, or maintenance of the media accounts through which they spread disinformation regarding Qatar and Qatari businesses to the American public, several Defendants, including Project Associates, continued to spread disinformation regarding Qatar and Qatari-based businesses throughout 2018 and 2019.

78.     For example, as recently as February 2019, nearly two years after the damage initially caused to Qatari businesses such as Mosafer, Project Associates filed a Supplemental Statement with the Department of Justice in which it disclosed that Project Associates was continuing to render services to the UAE to "create and promote counter-narratives that discourage young people from extremism and promote greater collaboration between the U.S. and UAE on counter-terrorism . . . and to raise awareness about state-sponsored terrorism in the Middle East."[7]

79.     More recently, in August 2019, Project Associates filed another Supplemental Statement with the Department of Justice indicating they had acquired a "new foreign principal," Dubai Department of Tourism & Commerce Marketing, during the "6 month reporting period."[8]  Thus, they have continued to act in furtherance of foreign interests, particularly in the tourism industry, without registering or otherwise disclosing their efforts until after their unfair, unlawful, or fraudulent conduct has already commenced.

---

[7] *See* https://efile.fara.gov/docs/6472-Short-Form-20190215-8.pdf; https://efile.fara.gov/docs/6472-Short-Form-20171006-2.pdf.

[8] *See* https://efile.fara.gov/docs/3634-Supplemental-Statement-20190830-42.pdf (August 2019 FARA filing that states, on behalf of the Dubai Dept of Tourism, they have hired several American individuals, including Sujata Mitra – an individual located in Alexandria, VA, who apparently works as the Senior VP of "Earned Media Strategies.").

**F.** **Along with their Co-conspirators, Ironistic Promotes the Disinformation Conspiracy by Creating Websites and Social Media Accounts: QatarExposed, QatarTruth, and BoycottQatarNow**

80.     Just as SCL, Project Associates, and Atkinson were working in tandem with Broidy and Nader to further the Disinformation Conspiracy, Ironistic also joined in to create other websites – Qaterexposed.com, Qatartruth.com, and BoycottQatarnow.com – to disseminate false information and control the public's perception of Qatari businesses, such as Mosafer.

81.     In each instance, these three websites and social media accounts looked ordinary, organic, and credible.  Each held itself out to provide important news and information to readers seeking help to understand the concerted business embargo to eviscerate Qatari businesses.  But all advertisements and publications contained significant disinformation intended to deceive the public, harm Qatari-related businesses, such as Mosafer, and drive business to the UAE and UAE-related businesses.

82.     As one example of its unfair and deceptive conduct, Ironistic created a Boycott Qatar Airways advertisement, which was uploaded on May 22, 2017, encouraging the public to "Boycott Qatar Airways for their human rights abuses."

83.     As another example, the QatarExposed Facebook and Twitter page claimed to be a "group of concerned citizens who want Qatar's support for global terrorist organisations to end."  On October 12, 2017, a "cover photo" was added to the Facebook and Twitter pages which, used the same burgundy as the Qatari flag and stated, "Expose Qatar's links with extremists. Stop the flow of blood money. #sanctionQatar."  Then, on October 14, 2017, a video was uploaded by QatarExposed Facebook page with the caption "ISIS is just one of Qatar's many pawns. Uncover Qatar's links with extremists."  This video falsely claimed that Qatar financed and promoted terrorism.

84.     Ironistic expressly availed itself of the benefits and protections of California law in carrying out the Disinformation Conspiracy.  Specifically, Ironistic created social media accounts – including accounts on Twitter and Facebook – whereby it took out advertisements that specifically targeted individuals in California. Moreover, it utilized Twitter's and Facebook's servers in California to publish disinformation.

85.     These expansive unlawful efforts, however, are not exhaustive examples. There were other illegal inauthentic hashtag campaigns, fake Twitter accounts, websites, and the like, assembled and deployed, all with the same goal and at the direction.  For instance, Defendants used Bullpen Strategy Group, Inc. doing business as, and formerly known as, Definers Corp. ("Definers") who created the website Qatarcrisisnews.com and in July 2017, Definers created a companion social media account for Qatar Crisis News on Twitter.  Like the website, the Twitter account (@QatarCrisisNews) accused Qatar and its businesses of, among other things, supporting global terrorism.  In short, Defendants embraced Broidy's approach to stop at nothing to harm Plaintiffs and "keep hammering the bastards."

G.     **The Disinformation Conspiracy Caused Mosafer To Lose A Significant Amount Of Business**

86.     In sum, Defendants conspired to create a network of websites that would manipulate the public in an attempt to divert Qatari-related businesses, such as Mosafer's, to the UAE.

87.     Through the use of an aggressive media strategy, fake social media accounts, hashtags, and bots, the false information spread like wildfire and saturated the internet.  For example, a consumer might read about Qatar from a newspaper op-ed that was planted by Broidy and then do an internet search to learn more about Qatar.  At that point, due to the promulgation and re-sharing of various disparaging hashtags and websites, the user would be directed to a website like "Qatar crisis,"

COMPLAINT AND DEMAND FOR JURY TRIAL

which purported to provide impartial news and which looked legitimate and helpful but instead was false propaganda.

88.     The Disinformation Campaign was incredibly successful, and the false information quickly permeated throughout the United States and created a "wallpaper" effect on Qatari businesses, including Mosafer—*i.e.*, anyone who researched anything regarding Qatar was brought to a negative and false article about Qatari businesses.

89.     The key to Broidy and Nader's efforts was ensuring that the American public perceived the Disinformation Conspiracy content as being *authentic*.  To that end, they attempted to erase any connections between Broidy, Nader, and foreign interests (such as the UAE) and the Disinformation Conspiracy.  For example, although Broidy was responsible for the September 21, 2017, Washington Post advertisement, the advertisement provided the contact information for an individual named Andy H. King, not Broidy.

90.     Defendants were so successful at hiding their tracks that Mosafer was unaware that Defendants engaged in a years-long, carefully orchestrated Disinformation Conspiracy that targeted Qatar and Qatar-related businesses.

91.     However, the effects of the Disinformation Conspiracy were almost immediate.  In particular, Mosafer's sales of travel packages originating in the U.S. for travel to or via Qatar declined significantly from mid-2017 through 2019.

92.     Customers canceled reservations that they had with Mosafer as a direct result of the Disinformation Conspiracy carried out by Defendants.  Indeed, on numerous occasions, U.S.-based consumers – including those located in California – contacted Mosafer to ask questions or express concerns over the safety of traveling to Qatar.  This concern was prompted by media that the consumers had viewed, including articles and posts wallpapered across the Internet as part of the Disinformation Conspiracy described herein.  As a result of the waves of false advertisements directed at consumers through social media and conventional media,

Mosafer was inundated with calls and complaints from customers in the U.S. and around the world.

93.     To try and mitigate its losses, Mosafer attempted to reassure its customers and combat the Disinformation Conspiracy.  Mosafer informed these consumers who expressed concern that there was no truth to the "news" reports they had seen regarding the state of political affairs in Qatar or Qatari businesses' alleged support of terrorism or human rights abuses.  Mosafer also briefly tried to combat the Disinformation Conspiracy with a focused series of ad campaigns.

94.     However, due to the substantial impact and far reach of the Disinformation Conspiracy (not to mention its secretive and deceptive nature), Mosafer was unsuccessful in its attempt to gain back the customers and business partners it had lost.  Despite Mosafer's efforts to correct the disinformation that consumers had obtained, many of these customers who had expressed concern, including those who lived in California, still canceled the trips to Qatar that they had booked with Mosafer.  There was no way for Mosafer to "unring the bell" that the Disinformation Conspiracy had tolled.

95.     Once Mosafer started aggressive online marketing campaigns, they began getting online traffic, but their revenue never reached their expectation.  For example, customers logged onto the Mosafer website but did not ultimately proceed with check-out.  In addition, staff at the Mosafer retail store reported that foot traffic reduced dramatically and in-store sales decreased.  And California clients of the Mosafer entities canceled their orders and stopped doing business with the Mosafer entities.

96.     Moreover, the sales from Mosafer's retail and e-commerce stores also dropped significantly.  As a result, Mosafer was forced to close its New York store, cancel its plans to open a retail store in California, and had to pay a substantial penalty to break its New York lease in late-2019.

97.     Thus, Defendants' attacks—orchestrated by Broidy and Nader—crippled Mosafer, causing catastrophic loss.   Indeed, as a direct result of the Disinformation

Conspiracy, Mosafer not only lost existing and prospective travel customers, including many in California, but its revenue declined precipitously—by hundreds of millions of dollars on a global scale.

## FIRST CAUSE OF ACTION

### Violation of California Unfair Competition Law
### (California Business & Professions Code §§ 17200, *et seq.*)
### (All Plaintiffs Against All Defendants)

98.    Mosafer alleges and incorporates herein each and all of the allegations of paragraphs 1 through 97, inclusive.

99.    California Business and Professions Code § 17200, *et. seq* ("UCL") prohibits "any unlawful, unfair[,] or fraudulent business act or practice and unfair deceptive, untrue[,] or misleading advertising."

100.   The Disinformation Conspiracy described herein constitutes unlawful, unfair, and/or fraudulent business acts and practices as set forth in the UCL.

101.   Specifically, Defendants' conduct violated the UCL in several ways:

      a.  Defendants knowingly and intentionally spread disinformation regarding the state of Qatar and Qatari-based businesses—including Mosafer—by, among other tortious acts, creating websites and social media platforms here in the U.S. designed to mislead and deceive the public into believing that (1) Qatar and Qatari businesses were unstable and untrustworthy; (2) the political state of Qatar was extremely unstable, rendering travel to and through Qatar unsafe; and (3) boycotting Qatar businesses was necessary to counteract their terrorism funding activities.   The purpose of the Disinformation Conspiracy was to divert business from Qatar and Qatari-related businesses to the UAE and UAE-related businesses;

      b.  Defendants violated FARA by either: (1) flouting their obligations to register as an "agent" of a "foreign principal"; (2) registering several months after they had launched websites and social media campaigns

spreading disinformation regarding Qatar and Qatari-based businesses; and/or (3) failing to appropriately label their publications in accordance with FARA requirements;

c. Defendants' conduct has, and continues to, threaten and severely harm competition in the travel booking industry, and specifically, the Middle East travel booking industry, as well as in retail sales of high-end luxury travel items; and

d. Defendants' conduct has violated other laws, including Cal. Bus. & Prof. Code § 17500, *et seq.* and the Lanham Act.

102.   Defendants knew, or should have known through the exercise of reasonable care, that the disinformation published in their advertisements through these various channels was false, misleading, and likely to deceive members of the public.

103.   Defendants knew, or should have known through the exercise of reasonable care, that these misrepresentations were material and that a reasonable person would have attached importance to the truth or falsity of the representations made by the Defendants in the Disinformation Conspiracy and would be influenced not to do business with Mosafer as a result of the Disinformation Conspiracy.

104.   The Disinformation Conspiracy carried out by Defendants was oppressive and caused injury to consumers, which outweigh its benefits.  Consumers were fed false information regarding Qatar and Qatari businesses, which resulted in such consumers canceling their reservations with Mosafer and/or otherwise refusing to do business with Mosafer.

105.   Through this cause of action, Mosafer requests equitable and injunctive relief prohibiting Defendants from engaging in the conduct and practices alleged herein.  Furthermore, Mosafer is entitled to attorneys' fees pursuant to California Code of Civil Procedure § 1021.5.

1

## SECOND CAUSE OF ACTION

2

**Violation of California False Advertising Law**
**(California Business & Professions Code §§ 17500, *et seq*.)**
**(All Plaintiffs Against All Defendants)**

3

4      106.   Mosafer alleges and incorporates herein each and all of the allegations of

5   paragraphs 1 through 97, inclusive.

6      107.   Pursuant to California Business and Professions Code § 17500, *et. seq*

7   (the "FAL"):

8
9              It is unlawful for any person, firm, corporation or association, or
               any employee thereof with intent directly or indirectly to dispose
10             of real or personal property to perform services, professional or
               otherwise, or anything of any nature whatsoever or to induce the
11             public to enter into any obligation relating thereto, to make or
               disseminate or cause to be made or disseminated before the
12             public in this state, or to make or disseminate or cause to be made
               or disseminated from this state before the public in any state, in
13             any . . . publication, or any advertising device, or by public
               outcry or proclamation, or any in any other manner or means
14             whatever, including over the Internet, any statement, concerning
               that real or personal property or those services, professional or
15             otherwise, or concerning any circumstance or matter of fact
               connected with the proposed performance or disposition thereof,
16             which is untrue or misleading, and which is known, or which by
               the exercise of reasonable care should be known, to be untrue or
17             misleading[.]
18

19

20      108.   Defendants knowingly and intentionally spread disinformation regarding

21   the state of Qatar and Qatari-based businesses (such as Mosafer) in order to mislead

22   and deceive the public into believing that (1) Qatar and Qatari businesses were

23   unstable and untrustworthy; (2) the political state of Qatar was extremely unstable,

24   rendering travel to and through Qatar unsafe; and (3) boycotting Qatar businesses was

25   necessary to counteract their terrorism funding activities.

26      109.   Through their Disinformation Conspiracy, Defendants disseminated

27   material false and misleading information through advertisements that were likely to

28   deceive members of the public throughout the U.S. through the following methods:

COMPLAINT AND DEMAND FOR JURY TRIAL

a. Conventional media advertising, such as print ads and influencers;

b. The Internet, including the creation of websites, such as Qatarexposed.com, Qatartruth.com, BoycottQatarnow.com, and Qatarcrisisnews.com; and

c. Creating corresponding social media accounts for each website on platforms such as YouTube, Facebook, and Twitter, among other social media platforms.

110. The intent of the Disinformation Conspiracy was to promote the UAE and UAE-based businesses by disparaging Qatar and Qatari-related businesses.

111. Defendants knew, or should have known through the exercise of reasonable care, that these misrepresentations were material and that a reasonable person would have attached importance to the truth or falsity of the representations made by the Defendants in the Disinformation Conspiracy and would be influenced not to do business with Mosafer as a result of the Disinformation Conspiracy.

112. As a result of Defendants' Disinformation Conspiracy, Mosafer has suffered severe harm, including a loss of sales and goodwill.

113. Through this cause of action, Mosafer requests equitable and injunctive relief prohibiting Defendants from engaging in the conduct and practices alleged herein. Furthermore, Mosafer is entitled to attorneys' fees pursuant to California Code of Civil Procedure § 1021.5.

## THIRD CAUSE OF ACTION

**False Advertising In Violation of Section 43(a)(1)(B) of the Lanham Act**
**(15 U.S.C. § 1125(a)(1)(B)**
**(All Plaintiffs against all Defendants)**

114. Mosafer alleges and incorporates herein each and all of the allegations of paragraphs 1 through 97, inclusive.

115. Under Section 43(a)(1)(B) of the Lanham Act, "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false

or misleading description of fact, or false or misleading representation of fact, which--

. . . (B) in commercial advertising or promotion, misrepresents the nature,

characteristics, qualities, or geographic origin of his or her or another person's goods,

services, or commercial activities, shall be liable in a civil action by any person who

believes that he or she is or is likely to be damaged by such act." 15 U.S.C. §

1125(a)(1)(B).

116.   Defendants knowingly and intentionally spread disinformation regarding

the state of Qatar and Qatari-based businesses (such as Mosafer) in order to mislead

and deceive the public into believing that (1) Qatar and Qatari businesses were

unstable and untrustworthy; (2) the political state of Qatar was extremely unstable,

rendering travel to and through Qatar unsafe; and (3) boycotting Qatar businesses was

necessary to counteract their terrorism funding activities.

117.   Through their Disinformation Conspiracy, Defendants disseminated false

and misleading information through advertisements that were likely to deceive

members of the public throughout the U.S. through the following methods:

    a.   Conventional media advertising, such as print ads and influencers;

    b.   The Internet, including the creation of websites, such as

       Qatarexposed.com, Qatartruth.com, BoycottQatarnow.com, and

       Qatarcrisisnews.com; and

    c.   Creating corresponding social media accounts for each website on

       platforms such as YouTube, Facebook, and Twitter, among other

       social media platforms.

118.   The intent of the Disinformation Conspiracy was to promote the UAE

and UAE-based businesses by disparaging Qatar and Qatari-related businesses.

119.   Defendants knew, or should have known through the exercise of

reasonable care, that these misrepresentations were material and that a reasonable

person would have attached importance to the truth or falsity of the representations

made by the Defendants in the Disinformation Conspiracy and would be influenced not to do business with Mosafer as a result of the Disinformation Conspiracy.

120.   As a result of Defendants' Disinformation Conspiracy, Mosafer has suffered severe harm, including a loss of sales and goodwill.

121.   Through this cause of action, Mosafer requests its actual damages, including future damages, that Mosafer has sustained, or will sustain, due to Defendants' wrongful conduct, as well as equitable relief including disgorgement of all proceeds and moneys wrongfully received by Defendants as a result of their wrongful conduct, and injunctive relief prohibiting Defendants from engaging in the conduct and practices alleged herein.  Furthermore, Mosafer is entitled to attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### Trade libel
### (All Plaintiffs against all Defendants)

122.   Mosafer alleges and incorporates herein each and all of the allegations of paragraphs 1 through 97, inclusive.

123.   Mosafer's travel agency allows customers to book travel to Qatar and other middle eastern destinations by traveling through Qatar.  Moreover, Mosafer's branding, including the branding in its retail stores and e-commerce stores, attempted to make the companies synonymous with Qatar.

124.   Defendants knowingly and intentionally spread false and disparaging information regarding the state of Qatar and Qatari-based businesses—including Mosafer—by using media, websites, and social media platforms in order to mislead and deceive the public into believing that (1) Qatar and Qatari businesses were unstable and untrustworthy; (2) the political state of Qatar was extremely unstable, rendering travel to and through Qatar unsafe; and (3) boycotting Qatar businesses was necessary to counteract their terrorism funding activities.

125.   As a result of Defendants' Disinformation Conspiracy, Mosafer has suffered severe harm, including a loss of sales and goodwill, because customers were deceived into believing that they should not do business with Mosafer.

126.   Through this cause of action, Mosafer seeks special damages for the customers that it lost as a result of the Disinformation Conspiracy.

### FIFTH CAUSE OF ACTION

**Negligence**
**(All Plaintiffs against all Defendants)**

127.   Mosafer alleges and incorporates herein each and all of the allegations of paragraphs 1 through 97, inclusive.

128.   Defendants owed Mosafer a duty of care based on its affirmative conduct in creating a risk and based on its statutory obligations not to make misleading statements and not to violate FARA.

129.   Defendants breached their duty to Mosafer by, in violation of FARA and false advertising laws, knowingly and intentionally spreading disinformation regarding the state of Qatar and Qatari-based businesses (such as Mosafer) by using media, websites, and social media platforms in order to mislead and deceive the public into believing that (1) Qatar and Qatari businesses were unstable and untrustworthy; (2) the political state of Qatar was extremely unstable, rendering travel to and through Qatar unsafe; and (3) boycotting Qatar businesses was necessary to counteract their terrorism funding activities.

130.   Defendants' actions directly and proximately damaged Mosafer, and as a result of these actions and/or omissions, Plaintiffs suffered damages.

131.   Through this cause of action, Mosafer seeks monetary damages of at least $75,000 for Defendants' conduct described herein.

COMPLAINT AND DEMAND FOR JURY TRIAL

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that this Court enters judgment in their favor and against Defendants as follows:

      1.      Compensatory damages in an amount to be proven at trial;

      2.      Attorneys' fees and costs;

      3.      Equitable relief including restitution and/or disgorgement of profits;

      4.      Injunctive relief; and

      5.      Any other relief that the Court may deem just and proper.

DATED:  August 5, 2021                 LARSON LLP

By:  */s/ Stephen G. Larson*
          Stephen G. Larson
          Koren L. Bell
          Paul A. Rigali
          Jonathan D. Gershon
          Attorneys for Plaintiffs MOSAFER
          INC., MOSAFER E-COM, INC.,
          and GOMOSAFER

## DEMAND FOR JURY TRIAL

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury with respect to all issues and claims, asserted by any party, triable of right by a jury, in the above-captioned action.

DATED:  August 5, 2021                    LARSON LLP


By:  */s/ Stephen G. Larson*
          Stephen G. Larson
          Koren L. Bell
          Paul A. Rigali
          Jonathan D. Gershon
          Attorneys for Plaintiffs MOSAFER
          INC., MOSAFER E-COM, INC.,
          and GOMOSAFER

COMPLAINT AND DEMAND FOR JURY TRIAL