1  MCGUIREWOODS LLP
2  KEVIN M. LALLY (SBN 226402)
   ABIGAIL G. URQUHART (SBN 310547)
3  355 S. Grand Avenue, Suite 4200
4  Los Angeles, California 90071-3103
   Telephone: (213) 457-9862
5  Facsimile: (213) 457-9882
6  E-Mail: klally@mcguirewoods.com
   E-Mail: aurquhart@mcguirewoods.com
7
   Attorneys for Defendants and Counterclaim-Plaintiffs
8  Elliott Broidy, Broidy Capital Management, LLC, and Circinus, LLC

9

10                    UNITED STATES DISTRICT COURT

11                   CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 12  MOSAFER INC.; MOSAFER ECOM, INC.; AND GOMOSAFER, <br><br> 14               Plaintiffs, <br> 15          vs. <br><br> 16  ELLIOT BROIDY; GEORGE NADER; BROIDY CAPITAL MANAGEMENT, LLC; CIRCINUS, LLC; THE IRON GROUP INC. D/B/A IRONISTIC.COM; SCL SOCIAL LIMITED; PROJECT ASSOCIATES UK LTD; MATTHEW ATKINSON; AND JOHN DOES 1-100, <br><br> 22               Defendants. <br><br> 24  ELLIOT BROIDY; BROIDY CAPITAL MANAGEMENT, LLC; CIRCINUS, LLC, <br><br> 26               Counterclaim-Plaintiffs, <br><br> 28          vs. | CASE NO. 2:21-cv-06320- MCS-JC <br><br> **COUNTERCLAIMS OF DEFENDANTS ELLIOTT BROIDY, BROIDY CAPITAL MANAGEMENT, LLC, AND CIRCINUS, LLC** <br><br> **Counterclaims for:** <br> **1. Business Conspiracy, Va. Code §§ 18.2-499, 500** <br><br> **2. Abuse of Process** <br><br> **3. RICO Act, Act, 18 U.S.C. §§ 1962(c) and 1964** <br><br> **4. Computer Fraud and Abuse Act, 18 U.S.C. § 1030** <br><br> **5. Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502** |

| | |
|---|---|
| MOSAFER INC.; MOSAFER ECOM, INC.; GOMOSAFER, STATE OF QATAR, ABU ISSA HOLDING WLL, ASHRAF ABU ISSA, NABIL ABU ISSA<br><br>    Counterclaim-Defendants. | **6. Receipt and Possession of Stolen Property, Cal. Pen. Code § 496**<br><br>**7. Invasion of Privacy by Intrusion Upon Seclusion**<br><br>**8. Conversion**<br><br>**9. Stored Communications Act, 18 U.S.C. §§ 2701-12**<br><br>**10. Digital Millennium Copyright Act, 17 U.S.C. § 1201,** *et seq.*<br><br>**11. CA Uniform Trade Secrets Act, Cal. Civ. Code § 3426,** *et seq.*<br><br>**12. Defend Trade Secrets Act, 18 U.S.C. § 1836,** *et seq.* |

Defendants Elliott Broidy ("Broidy"), Broidy Capital Management, LLC ("BCM"), and Circinus, LLC ("Circinus") (collectively, the "Broidy Defendants"), submit the following counterclaims against the Mosafer Plaintiffs, Ashraf Abu Issa, Nabil Abu Issa, and the State of Qatar (collectively, the "Counterclaim Defendants").

## DEFENDANTS' COUNTERCLAIM

Pursuant to Fed. R. Civ. P. 8, 13, 17, 19, 20, and 21, the Broidy Defendants bring the following counterclaims against the Counterclaim Defendants:

## I.    INTRODUCTION

1.     In an extraordinarily bold abuse of the U.S. legal system, Mosafer, an obscure luggage seller, seeks to stand in the shoes of a foreign government to seek an injunction silencing an effective critic of that government.  Mosafer, like the Wizard of Oz, is asking this Court to ignore the obvious and "pay no attention to that man behind the curtain"—the State of Qatar.  This Complaint is nothing more

than Qatar's latest attempt to muzzle one of its most outspoken critics, Elliott Broidy.

2.      Broidy has repeatedly expressed personal concern about Qatar's sponsorship of terrorism and the threat it poses to the national security interests of the United States.  He has publicly criticized Qatar and sought to convince others of this threat.  In response, Qatar wrongfully and unlawfully retaliated against Broidy, pursuing a long running campaign to intimidate, marginalize and ultimately silence him, including a wide-ranging and well-resourced, illegal hacking and public smear campaign. So far, Qatar's efforts have not succeeded in silencing Broidy.

3.      While initially Qatar avoided having to answer in a U.S. court for its unlawful actions by asserting immunity under the Foreign Sovereign Immunity Act,[1] Qatar has now opened the door to Broidy reviving those claims. Counterclaims can be brought against foreign governments when proxies are used if the alternative "would permit the real beneficiary of such an action... to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 629, 632 (1983). As detailed below, Mosafer and its cohorts are all acting at the behest of Qatar. Accordingly, the FSIA affords no protection to Qatar in this action.

4.      Tellingly, the Mosafer complaint is devoid of even a scintilla of evidence that Broidy leveled criticisms against *Mosafer* itself.  This is a case about Qatar; not a virtually unknown luggage company.   Accordingly, Qatar-via-Mosafer seeks a sweeping, permanent, and unlawful injunction that would prohibit the Broidy Defendants from exercising their right of free speech to criticize and call public attention to Qatar's policies and practices that Broidy maintains are

---

[1] *See Broidy Capital Mgmt., LLC v. Qatar*, No. CV 18-2421 JFW, 2018 WL 6074570 (Aug. 8, 2018), *aff'd by Broidy Capital Mgmt., LLC v. State of Qatar*, 982 F.3d 582 (9th Cir. 2020).

hostile to U.S. interests.  Mosafer is a mere puppet with Qatar pulling the strings. Indeed, the true beneficiary is so obvious from the face of the Mosafer complaint that even the media recognized that "Mosafer's lawsuit is the latest grenade in a bitter legal war between Broidy and *Qatar*."[2]  Qatar cannot be permitted to abuse the U.S. legal system by filing suits in others' names in an attempt to strip U.S. citizens of their constitutional rights of free expression.

5.     One of the central allegations made by the Mosafer Plaintiffs relates to two conferences that Broidy supported in 2017, which were hosted and organized by major Washington, DC think tanks about Qatar.  One of Qatar's highest-paid registered agents acknowledged that those conferences—which focused on Qatar's alliance with Iran and its extensive support for the Muslim Brotherhood and terrorist groups—were a key reason why the Qataris decided to go after Broidy in the first place.  It is no surprise that the Mosafer Plaintiffs recycled several excerpts from emails that are only publicly available because they were disseminated in the course of the Qatar-sponsored hack-and-smear operation, whose objective was the same as that of the Mosafer complaint: to thwart Broidy's First Amendment freedoms.

6.     Qatar obviously is the real beneficiary of the extraordinary relief sought in this lawsuit—relief that Qatar could not seek without waiving foreign sovereign immunity. Revealing the true purpose of this lawsuit, the relief sought is in no way limited to statements about the Mosafer Plaintiffs.  Indeed, such a specified injunction would not make sense given the Mosafer Plaintiffs' allegations, which fail to identify a single statement targeted at them.  The only specific party alleged to be the target of the purportedly unlawful statements is Qatar.  *See, e.g.*, Compl. ¶¶ 1, 3, 6, 7.  Qatar is therefore a real party in interest and a required party to this case.

---

[2] https://www.dailymail.co.uk/news/article-9932983/Trump-donor-Elliott-Broidy-accused-running-smear-campaign-against-Qatar-new-lawsuit.html (emphasis added).

7.    Consistent with the request for an injunction that directly benefits Qatar, additional allegations underscore the true benefiting party.  The Mosafer Plaintiffs expressly characterize themselves as being "synonymous with Qatar." *See id.* ¶¶ 4, 31, 32, 63, 123.  Indeed, they even describe themselves as "intimately associated with Qatar."  *See id.*  The effort to prove that they are one-and-the-same with Qatar is the central theme of their complaint.

8.    According to Dr. Yleem D.S. Poblete, an expert in Middle East foreign affairs and related matters, "the Abu Issa brothers, AIH, and the Mosafer Plaintiffs, would not pursue a lawsuit against Mr. Broidy without, at a minimum, first seeking—and then receiving—the blessing of Emir Tamim Al-Thani to do so."  Dr. Poblete further explains that, "it is far more likely that the Abu Issa brothers, AIH, [and the] Mosafer Plaintiffs, were 'asked' by the Emir or someone authorized to speak for the Emir and the State (in the sense that saying 'no' is not an acceptable response), to file the lawsuit against Elliott Broidy."  Dr. Poblete's report is attached as **Exhibit 1** and incorporated in this Counterclaim.

9.    Moreover, this is not Qatar's first foray into using or abusing the U.S. judicial system to seek out its critics.  Qatar has aggressively pursued at least 27 "John Doe" lawsuits in numerous U.S. courts in an effort to force companies to provide identifying information for several of its critics.  Now, Mosafer, acting for the benefit of Qatar, is suing many of those same individuals, using the very same (non-public) information Qatar obtained through that aggressive use of U.S. litigation. This lawsuit is the fruit of the tree planted by Qatar. Having availed itself of the U.S. courts to get what it wants, Qatar cannot now hide behind the FSIA by attempting to silence critics through this case by using the subterfuge of claiming that a virtually unknown luggage store was the victim of critics of Qatari policy and practices.  The disguise is so thin as to be wholly transparent.

## II.   PARTIES AND JURISDICTION

10.   Broidy is a resident and citizen of California.  He is the chairman and CEO of BCM.

11.   BCM is an investment firm based in California.  It is a limited liability company, whose sole member is Broidy.  BCM is a California citizen.

12.   Circinus is a data and open-source analytics firm based in Virginia.  It is a limited liability company, whose members are neither citizens of New York nor citizens of Delaware.

13.   Mosafer Inc. is a Delaware corporation with its principal place of business in New York; it is a citizen of Delaware and New York.  AbuIssa Holding ("AIH") is the registered owner of Mosafer.com.[3]  Further, upon information and belief, many of Mosafer's "employees" are in fact AIH employees.

A.   According to the Mosafer NYC Instagram account, Mosafer maintains a logistical facility in Carlstadt, New Jersey that is run by Mohamad Zaza ("Zaza").  Zaza lists AIH—not Mosafer—as his employer on LinkedIn.[4]

B.   Mosafer's business profile lists Charianne Tomacruz, Kelli Harins, and Malika Raimova as its officers.[5]  Only one of the three employees, Malika Raimova, lists Mosafer as her former employer on her LinkedIn profile.[6]  The other two employees, Tomacruz[7] and Harkins,[8] both list their current and former employer as AIH, respectively, and do not include Mosafer anywhere on their profiles.

---

[3] *See* https://whois.domaintools.com/gomosafer.com
[4] https://www.linkedin.com/in/mohamad-zaza-238ab0123/
[5] *See* Mosafer Inc; Experian Powered Business Data Report, [Replace with link
[6] *See* https://www.linkedin.com/search/results/all/?keywords=Malika%20Raimova&origin=GLOBAL_SEARCH_HEADER&sid=ZTC.
[7] *See* https://www.linkedin.com/in/charianne-liezl-tomacruz/
[8] https://www.linkedin.com/in/kelli-harkins-48666b6//

14.     Mosafer-Ecom is a Delaware corporation with its principal place of business in New York; it is a citizen of Delaware and of New York.

15.     AIH d/b/a Gomosafer is a limited liability company based in Qatar. Upon information and belief, its members are Ashraf and Nabil Abu Issa.  AIH is a citizen of Qatar.  AIH is a real party in interest and a required party to the claims. "Gomosafer" is not a legal entity in either the U.S. or Qatar.  In this litigation, it describes itself as "the online division of Mosafer Travel, a Qatari travel agency," which in turn is "fully owned by Abu Is[s]a Holding, a Qatari company."  ECF No. 4 at 2.

16.     Ashraf Abu Issa, the CEO of AIH, is the registrant for the domain GoMosafer.com.[9]  One of Gomosafer.com's ownership email addresses is "ahmed.altamimi@abuissa.com."[10]  This email evidently belongs to Ahmad Al-Tamimi, the Head of Information and Technology at AIH.[11]  Ashraf Abu Issa is a resident and citizen of Qatar.  He is the chairman and CEO of AIH, and he is a real party in interest and a required party to the claims.

17.     Nabil Abu Issa is a resident and citizen of Qatar.  He is the vice chairman of AIH, and he is a real party in interest and a required party to the claims.

18.     The State of Qatar is a foreign country, as well as a real party in interest and a required party to the claims.

19.     The Court has diversity jurisdiction under 28 U.S.C. § 1332(a), because none of the Broidy Plaintiffs is a citizen of New York, Delaware, or Qatar, whereas the Counterclaim Defendants are citizens of Delaware, New York, and Qatar.  The amount in controversy exceeds $75,000.

20.     The Court also has federal question jurisdiction under 28 U.S.C.

---

[9] *See* https://whois.domaintools.com/gomosafer.com.
[10] *See id.*
[11] *See* https://www.linkedin.com/in/ahmad-al-tamimi-a2047440/.

§ 1331, as the Broidy Defendants' counterclaim arises under federal law.  The Court has supplemental jurisdiction over the Broidy Defendants' state law claims under 28 U.S.C. § 1367, because they are so related to the federal claims that they form part of the same case or controversy.

21.     The Court has jurisdiction over Qatar under 28 U.S.C. §§ 1330, 1605(a)(1), and 1607.

22.     The Court has original jurisdiction under 18 U.S.C. § 1836(c).

23.     The Court has jurisdiction over the Counterclaim Defendants under 18 U.S.C. § 1965.

24.     This Court is the proper venue under 28 U.S.C. § 1391(b)(2) and (3) and 18 U.S.C. § 1965(a).

## III.     QATAR HAS WORKED IN CONSORT WITH THE MOSAFER ENTITES AND ABU ISSA PARTIES TO SEEK INJUNCTION AGAINST BROIDY

### A.     Qatar has used the Mosafer entities to achieve its goal.

25.     Qatar seeks to silence Broidy in this litigation, using Mosafer and others as a proxy, in the context of Qatar's longstanding campaign to silence Broidy, a prominent public critic of Qatar.

26.     Broidy is a civic-minded businessman who has long been a vocal critic of countries, like Qatar, that fund and harbor terrorists.  Over the past 20 years, Broidy has donated his time and resources to government and private organizations focused on the international war on terrorism.  Broidy's motivation for doing so was simple—Broidy viewed Qatar as a major threat to America's national security interests.

27.     Since the current Emir, Sheikh Tamim Al-Thani, replaced his father in 2013, Qatar has become increasingly prominent in the sponsorship of terrorism, even openly hosting organizations such as the Muslim Brotherhood and the Taliban.

28.     Qatar's sponsorship of terrorism is not a merely Broidy's opinion. For example, the U.S. State Department has reported that "entities and individuals within Qatar continue to serve as a source of financial support for terrorist and violent extremist groups."[12]  The U.S. Department of Treasury has sanctioned numerous individuals residing in Qatar for raising funds for Al Qaeda.[13]  Further, reporting in the *New York Times* and elsewhere has established Qatar's support of the Al Qaeda and ISIS affiliates in Syria, known as Nusrah Front and Daesh.[14]

29.     It is publicly reported that Qatar also has permitted Hamas leaders to operate freely within its borders and provided Hamas substantial funding, despite the threat of international political and economic sanctions for such support.[15] Similarly, Qatar has allowed the Taliban to operate and maintain an office in Doha since at least 2014.[16]

30.     For years, Qatar had been able to walk the tightrope of supporting terrorist groups while also aligning with the West—with the prime example of the latter being its hosting of the U.S. Central Command at Al-Udeid air base outside of Doha.  But Qatar's ability to continue playing both sides hinged primarily on the U.S. government turning a blind eye to Qatar's bad behavior.  With Donald J. Trump becoming President in 2017, however, Qatar realized that their bifurcated strategy was in serious jeopardy.

31.     Broidy, a longtime critic of Qatar's support for terrorism, did not shy away from expressing his views as the political crisis in the Middle East unfolded.

---

[12] *See* https://2009-2017.state.gov/documents/organization/258249.pdf.
[13] *See* https://www.treasury.gov/press-center/press-releases/Pages/jl0143.aspx.
[14] https://www.nytimes.com/2014/09/08/world/middleeast/qatars-support-of-extremists-alienates-allies-near-and-far.html?
[15] https://www.timesofisrael.com/liveblog_entry/hamas-leader-addresses-qatar-rally-amid-gaza-fighting-vows-to-ramp-up-attacks/
[16] The Taliban political office in Doha is still operative.  According to an *Al-Jazeera* news reports, the India's Ambassador to Qatar met with top Taliban leaders at its political office in Doha in August, 2021.  *See* https://www.aljazeera.com/news/2021/8/31/india-holds-first-formal-meeting-with-taliban-in-qatar.

In October 2017, he sponsored a conference at the Hudson Institute entitled "Countering Violent Extremism: Qatar, Iran, and the Muslim Brotherhood." Prior to that, Broidy had also sponsored a conference at the Foundation for Defense of Democracies, entitled "Qatar and the Muslim Brotherhood's Global Affiliates: New U.S. Administration Considers New Policies." Additionally, Broidy discussed Qatar's ties to terrorism with then-President Trump, who condemned Qatar in June 2017.[17]

32.     Broidy's efforts presented a potential obstacle to Qatar's approach of staving off opposition among Republicans—especially given his relationship with then-President Trump, having served as a vice chair of the 2016 campaign and then joining the leadership ranks in 2017 of the Republican National Committee.

33.     Qatar has a strong incentive to involve itself abroad, including the United States, to maintain its status as host of the 2022 FIFA World Cup.

34.     Because of the controversy surrounding the emirate being named the event's host, Qatar has long faced the risk of losing the 2022 World Cup. It has been broadly alleged that Qatar and affiliates offered millions in bribes to FIFA officials to secure the 2022 World Cup.[18] Corruption in the 2010 bid process has led numerous FIFA officials to be criminally investigated and prosecuted.[19] And corruption surrounding Qatar's bid helped usher in the convictions or guilty pleas of over sixteen individuals.[20]

35.     Since 2010, Qatar's successful bid has faced criticism from an array of top figures in the world of soccer. Qatar has also endured repeated speculation that it might lose the 2022 World Cup hosting rights, highlighting its precarious

---

[17] *See* https://www.nytimes.com/2017/06/06/ world/middleeast/trump-qatar-saudi-arabia.html.
[18] https://www.cnbc.com/2015/05/27/fed-to-announced-charges-of-alleged-fifa-corruption.html.
[19] https://www.theguardian.com/football/2020/apr/07/world-cup-likely-to-stay-in-qatar-despite-new-bribery-accusations-in-us.
[20] https://www.nytimes.com/2020/04/06/sports/soccer/qatar-and-russia-bribery-world-cup-fifa.html.

COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIM-PLAINTIFFS ELLIOTT BROIDY, BROIDY CAPITAL MANAGEMENT, LLC, AND CIRCINUS, LLC

standing in the worldwide soccer community—a community that had never before allowed a Middle Eastern nation to host its premier event.[21]  Holding on to the 2022 World Cup—and the tremendous economic and reputational boost that goes along with it—was a matter of desperate national urgency.

36.     Broidy's vocal criticism of Qatar painted a target on his back, and he soon became a focus of Qatar's efforts in the U.S.  Qatar intended to silence Broidy, including by funding U.S. citizens to engage in criminal hacking conduct.

37.     Beginning in late-2017, Qatar initiated a hack-and-smear operation against Broidy.  It hired a sophisticated cyber-operations company, staffed by former CIA and special forces operatives, to break into computer systems and e-mail accounts belonging to Broidy and BCM, and it stole trade secrets, documents, correspondence, and other information.  Qatar then caused the stolen materials—as well as doctored and forged materials—to be shared with PR firms, which leaked the documents to various media outlets. In March 2018, Broidy sued Qatar and its co-conspirators for this unlawful misconduct. Qatar willingly embraced the protections afforded by foreign sovereign immunity and did not respond to the merits of Broidy's claims, and the District Court dismissed on those grounds.[22] The Ninth Circuit affirmed that decision,[23] and in June 2021, the Supreme Court denied certiorari.[24]

38.     Mosafer takes up the cause of Qatar in pointing to these same conferences as a justification for enjoining Broidy and preventing him from continuing to point out Qatar's relationship with terrorist elements.  *See* ECF No. 1 ¶ 59.

---

[21] *See FIFA World Cup Qatar 2022*, https://www.fifa.com/worldcup/destination/host-country/
[22] *See Broidy Capital Mgmt., LLC v. Qatar*, 2018 WL 6074570 (C.D. Cal. Aug. 8, 2018) (Walter, J.).
[23] *See Broidy Capital Mgmt., LLC v. State of Qatar*, 982 F.3d 582 (9th Cir. 2020).
[24] *See Broidy Capital Mgmt., LLC v. Qatar*, 2021 WL 2194874 (U.S. June 1, 2021).

39.     In this latest salvo, Qatar-via-Mosafer seeks an injunction that would have required it to waive the sovereign immunity that has heretofore shielded it from liability and public exposure for its hack-and-smear operation against Broidy. The timing of the litigation underscores how Qatar is the real beneficiary, given that the Complaint—one based on conduct that was widely covered in the media over *three years* ago—was only initiated a mere *two months* after Broidy's final appeal on sovereign immunity was exhausted.  Thus, on information and belief, Qatar has used longtime beneficiaries of its patronage—the Abu Issas and the Mosafer Plaintiffs—to do the country's litigating.  Qatar should not be permitted to use the U.S. legal system as a sword to cut down an American citizen's constitutional rights while hiding behind the shield of sovereign immunity.

40.     Consistent with Qatar being the true party behind this litigation, Mosafer has continued to act as an effective proxy for Qatar since filing this very lawsuit.  For example, whether directly or through counsel or PR agents, Plaintiffs aggressively promoted this Complaint in the press.  Indeed, a *New York Post* reporter on August 5, 2021 contacted a representative for Broidy, it appears hours *before* the Complaint was available or appeared on PACER.  The reporter had evidently already reviewed the Complaint before contacting Broidy's representative.

41.     This case so clearly advances Qatar's interests that even the *NY Post* headline described the lawsuit as being about a supposed "covert campaign against *Qatar*."[25]

---

[25] Emphasis added; *See* https://nypost.com/2021/08/05/elliot-broidy-accused-of-orchestrating-campaign-against-qatar/

**B.   Qatar and Mosafer have evidently worked together closely on this litigation.**

42.    This lawsuit is not the first instance in which Qatar has taken advantage of the U.S. judicial system to wage its legal and public relations battle against those who dare to speak against it.

43.    Beginning in March 2018, Qatar, through the "Government Communications Office for the State of Qatar," filed more than two dozen "John Doe" lawsuits, which it used as vehicles to issue subpoenas to IT service providers and social media companies regarding websites or internet users who had criticized Qatar. The Government Communications Office is, by its own admission, an instrumentality or part of the sovereign, describing itself as "the communications arm of the State of Qatar…."

44.    At least one such lawsuit was filed within this district, *see Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*, No. 30-2018-00981518-CU-BT-CJC (Orange County Super. Ct. Mar. 22, 2018), while still others were filed elsewhere in California, *see Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*, No. 37-2018-00015054-CU-BT-CTL (San Diego County, CA, Super. Ct., Mar. 26, 2018).

45.    These actions are connected to this lawsuit.  Qatar's lawsuits specifically referenced the exact same four domain names that the Mosafer Plaintiffs reference in this lawsuit: QatarExposed, QatarTruth, BoycottQatarNow, and QatarCrisisNews.  *See* ECF No. 1 ¶ 109(b).

46.    In San Diego, for example, Qatar alleged that the nominal defendants "operated social media and internet accounts under the username BoycottQatarNow."[26]  Similarly, in three lawsuits filed in New York, Qatar alleged that the nominal defendants used Facebook, Twitter, and YouTube to operate

---

[26] *Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*, No. 37-2018-00015054-CU-BT-CTL (San Diego County, CA, Super. Ct., Mar. 26, 2018).

1    under the domain names of QatarCrisisNews,[27] QatarExposed,[28] and QatarTruth.[29]

2        47.    After filing the nominal defendant lawsuits, Qatar issued subpoenas to

3    various tech companies to collect documents and information that would identify

4    the parties behind the domain names.

5        48.    Qatar's efforts to unveil the party behind QatarExposed provides a

6    straightforward example of this:

7            a.  First, Qatar utilized New York's procedural mechanism for suing a

8                fictious entity so as to issue subpoenas to Amazon and WhoisPrivacy.

9                The subpoenas requested, among other things, all "subscriber

10               registration information," "billing information," and "customer contact

11               information" relating to QatarExposed.

12           b.  Next, Qatar domesticated the subpoenas in Seattle, where Amazon and

13               WhoisPrivacy are headquartered, and served those companies with the

14               subpoenas.

15           c.  Finally, by way of affidavit, Qatar's attorney reported back to the New

16               York court that Qatar "received certain information about the identity

17               of Defendants" through the initial subpoenas, but requested a "next

18               round of subpoenas to identify the names" of the parties behind

19               QatarExposed.[30]

20       49.    Qatar utilized this process to identify Ironistic, SCL Social Limited,

21   Project Associates, and Atkinson as the parties behind QatarExposed, QatarTruth,

22   BoycottQatarNow, and QatarCrisisNews.  Upon information and belief, Qatar then

23

24   [27] *Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*, No. 506934/2018 (Kings
     County, NY, Sup. Ct., Apr. 6, 2018).

25   [28] *Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*, No. 20616/2019E (Bronx
     County, NY, Sup. Ct., Mar. 22, 2018).

26   [29] *Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*, No. 511902/2018 (Kings

27   County, NY, Sup. Ct., June 8, 2018).

     [30] *See*

28   https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=EaHJh1drM4IcDBaz1wJ9BA==

-14-

1   conveyed that information—which does not appear to be available in the public

2   domain—to the Mosafer Plaintiffs, which they used to file this lawsuit.

3        50.    All of this was orchestrated by Qatar (and its registered agent,

4   Pillsbury Winthrop Shaw Pittman LLP, which filed its FARA registration within

5   days of initiating the lawsuits[31]) with the goal of obtaining an injunction while

6   simultaneously maintaining sovereign immunity and avoiding exposure to liability

7   for its hack-and-smear campaign against Broidy.

8        51.    This amounts to a clear abuse of the judicial process by Qatar, the

9   Mosafer Plaintiffs, and the other Counterclaim Defendants, by hiding behind

10   shifting identities of convenience to gain the protection of the FSIA while at the

11   same time benefiting from the same U.S. judicial system Qatar claims to be

12   immune from. Qatar can't have it both ways.

13        52.    In this matter, Plaintiffs have not hidden the true beneficiary. Just

14   after the Complaint was filed, Mosafer issued a press release on PRNewswire.com

15   with a headline strikingly similar to the *NY Post*'s headline claiming that their own

16   lawsuit was about an alleged "secret assault against Qatar."[32] Likewise, the lead in

17   the release was **Qatar**—not Mosafer, Mosafer E-Com, or GoMosafer. This appears

18   to be the only time a Plaintiff in this lawsuit has issued a press release through

19   PRNewswire. [33]

20        53.    In part of the press coverage of this litigation, Ashraf Abu Issa

21   likewise made comments about bank accounts being closed, purportedly because

22   of generic conferences about Qatar.  Stephanie Rice, an expert in banking

23   compliance with extensive experience in the U.S. government and on Wall Street,

24

25   [31] *See* https://efile.fara.gov/docs/5198-Exhibit-AB-20180323-44.pdf.

26   [32] https://www.prnewswire.com/news-releases/qatar-based-travel-firm-mosafer-inc-files-lawsuit-against-elliott-broidy-and-george-nader-in-us-federal-court-for-allegedly-illegally-orchestrating-and-executing-secret-assault-against-qatar-and-qatari-businesses-suit-alleges-t-301350282.html.

27   [33] Searches of the website directly and via Google reveal no other releases at PRNewswire.com

28   even *containing* the word "Mosafer."

found this assertion "deeply suspect."  She added, "there is a strong likelihood that the freezing or restricting of bank accounts stemmed at least in part from the fact that [Ashraf Abu Issa's] and related entities' business activities appear to be closely intertwined with the Government of Qatar and its representatives."  *See* expert Decl. of Stephanie Rice, attached as **Exhibit 2** and incorporated into this counterclaim.

### C.   Travel from the U.S. to Qatar increased from 2015 to 2019.

54.     Moreover, the Mosafer Plaintiffs aggressively promoted their lawsuit even though the central premise was obviously false. Because the Broidy Defendants never once mentioned the Mosafer Plaintiffs during their alleged actions, the lawsuit is necessarily based upon the premise that the public educational activities caused travel from the U.S. to Qatar to decline.  Yet for the time frame covered in the lawsuit, 2014-2019, travel from the U.S. to Qatar actually *increased*, according to the State of Qatar's own official data:[34]



55.     Indeed, travel from the U.S. to Qatar increased every single year during the time frame when the Mosafer lawsuit claims such tourism had plummeted.  According to the Qatar Tourism Authority, travel from the U.S. enjoyed "unprecedented" year-over-year growth:[35]

and arrivals of US nationals (127,271 YTD) were up 22%, representing unprecedented annual growth rates

---

[34] 2019 Tourism Performance Report, issued by Qatar Tourism Authority, available at: https://www.qatartourism.com/content/dam/qatar-tourism/2019-Tourism-Performance-Report.pdf.
[35] *IBID*.

56.     Mosafer Inc. could not have suffered losses stemming from reduced travel to Qatar since its now-shuttered retail store in New York City did not book travel.  Mosafer Inc. appears to only have sold luggage and related accessories.

57.     AIH itself likewise represents that Mosafer Inc. is a luggage store, noting that "Mosafer caters mainly High Quality Luggage but also various impressive Travel Accessories," with its full product line detailed as including "Luggage, Backpacks, Country Guides and Books, Rolling Totes, Accessories, Wallets, Pouches, Umbrellas, Small-sized Cosmetics & Perfumes, IPads, IPods, Cameras as well as smartly designed multifunctional Traveler Clothing, Solar System Products & Medical Compartments."[36]

58.     Mosafer Inc.'s LinkedIn profile describes itself as "a travel lifestyle department store that sells international brands and innovative travel-related products."  Likewise, Mosafer's own blog described the company as a "travel luggage consultant and travel accessories expert."

59.     In a November 2016 Mosafer Inc. blog entry titled, "Visit Private Malibu Rocky Oaks Vineyard," the Mosafer Plaintiffs did not direct readers to GoMosafer.com —but rather to a different, unrelated travel agency altogether.[37]

60.     Nor does it appear that any other Mosafer entity has been significantly involved in booking travel from the U.S. to Qatar.   For instance, after GoMosafer's website launched in or around 2012, it appears to have focused on providing travel booking services to the increasing numbers of migrant workers based in Qatar. There is no apparent evidence that GoMosafer has pursued business for U.S. travel to Qatar, as opposed to travel *from* Qatar *to* other foreign destinations.

---

[36] AbuIssa Holding: Partnering with the Future, *See*: https://www.abuissa.com/wp-content/uploads/2019/01/AIH-Profile_1.pdf.

[37] *See* http://web.archive.org/web/20210831000401/https://mosafertravel.wordpress.com/2016/11/27/visit-private-malibu-rocky-oaks-vineyard/.

**D.   Qatar, Abu Issas, AIH and Mosafer are joined at the hip seeking to avoid a waiver of sovereign immunity.**

61.   In selecting the Mosafer entities to bring this lawsuit, Qatar has chosen to rely on persons and entities with family ties that stretch back two generations with the Qatari ruling family. The Abu Issa brothers have shown total fealty to the Emir, and in return, they have enjoyed the Qatari government's support in helping AIH and its subsidiaries generate new business. As demonstrated through their ties to the Qatari ruling family and other government officials, in addition to representing the State of Qatar both domestically and abroad, the Abu Issa brothers regularly operate as proxies of the State of Qatar.

62.   AIH, and its owners the Abu Issa brothers, have complete control over the Mosafer Plaintiffs.

63.   In April 2014, AIH established Mosafer Inc. as a Delaware corporation.

64.   The Mosafer Plaintiffs admit that they are "synonymous with Qatar." ECF No. 1 ¶¶ 4, 31, 63, 123.  The central theme of the Mosafer Plaintiffs' complaint is that they are so "synonymous" as to be joined at the hip, such that criticism of one is criticism of the other.  *See, e.g., id.* ¶ 31. Without the connection between *Qatar* and the Mosafer Plaintiffs, there is no connection between *Broidy* and the Mosafer Plaintiffs. Likewise, a legal claim by one against Broidy is in reality the claim of the other.

65.   The complaint hinges on the Mosafer Plaintiffs' assertion that they are inseparable from Qatar when it comes to the effects of Broidy's criticism. Thus, the Mosafer Plaintiffs also act as Qatar's agents by conducting the country's litigation against Broidy through U.S. entities with no assets to lose.

66.   The Abu Issas have a deep and long-standing relationship with Qatar's ruling family that has spanned multiple generations.  This relationship extends to the ruling family's support of the many businesses operated and

controlled by the Abu Issas, including the Mosafer Plaintiffs, and granting the Abu Issas lucrative business deals.  Indeed, Ashraf Abu Issa has explicitly stated that Mosafer was "the inspiration of His Highness the Emir."[38]  These close relationships have enabled the Abu Issa brothers to become among the most powerful business magnates in Qatar.

67.    In the 1950s, Qatar's then-Emir, Sheikh Ali bin Abdullah Al Thani, commissioned Ashraf and Nabil's uncle, AbdulSalam Mohammed Abu Issa, to take a series of portraits of the royal family and allowed him free reign to photograph the country.[39]  This began a decades-long relationship between the Al Thanis, Qatar's ruling family, and the Abu Issas.  According to a puff profile of the Abu Issa family history in Qatar, AbdulSalam's relationship with the Emir "lead [sic] to royal patronage and connections."[40]

68.    Ashraf and Nabil Abu Issa's father, AbdulRahim, directly enjoyed the benefits of this "royal patronage and connections."  After his brother turned the company over to his sons, AbdulRahim in 1981 spun off from Salam International and founded the retail store Blue Salon, which today is a wholly-owned subsidiary of AIH.  When AbdulRahim Abu Issa died in 1987, his two sons, Ashraf and Nabil Abu Issa, took over the company, which has since grown to 4,000 employees and annual revenues of nearly $1 billion.[41]  This growth depended on the Abu Issas' relationship with the Al Thanis.  It is common to see His Highness Emir Sheikh Tamin Bin Hamad Al Thani supporting one of AIH's high-profile events.[42]

---

[38] *See* https://www.eliteraveler.com/leaders-in-luxury/ashraf-a-r-abu-issa.
[39] *See* https://www.salaminternational.com/who-we-are.
[40] "Family First: The Story of Qatar's Salam International, as told by CEO and Chairman, Issa Abdul Salam Abu Issa," The Edge, December 9, 2012, available at: https://issuu.com/firefly-communications/docs/theedge_39_december/69.
[41] *See* https://www.dnb.com/business-directory/company-profiles.abu_issa_holding.b9327de6a79aa5d7dd8a33a8e9b78e72.html.
[42] *See* https://www.abuissa.com/2020/02/h-h-the-emir-sheikh-tamim-bin-hamad-al-thani-visited-the-blue-salon-pavilion/.

69.     The close personal and business relationship between the two families continues today, as exemplified here:



1.     **AIH obtains valuable business deals because of its close ties to the Qatari regime.**

70.     The Abu Issa brothers, through AIH and its subsidiaries, have obtained lucrative business deals as a result of their close relationship with Qatar's ruling family and other Qatari government officials, including contracts related to the 2022 World Cup.

71.     In December 2015, Qatar awarded a contract to AIH's construction subsidiary, Gulf Systems, to build and operate the first stage of the housing project for the 179,000 workers expected to be necessary for the 2022 World Cup. [43]

72.     Gulf System's website indicates that the project includes

---

[43] *See* https://www.thepeninsulaqatar.com/uploads/2016/08/10/pdf/ThePeninsulaDecember042015.pdf.

"Engineering/Design, Procurement, Construction and Operation of a fully supported labor accommodation, 3-star hotel level, mainly including" various buildings, dining halls, a medical facility, a hospital, 14 prayer rooms, a central laundry facility, two mosques, an administration building, and a town center. [44]

73.    The total contract amount for the entire project is nearly half a billion dollars.[45]

74.    Sheikh Abdullah bin Nasser Al Thani, the Prime Minster of Qatar, attended the signing ceremony in person with Nabil Abu Issa, who posted about it on Instagram:



75.    The AIH subsidiary that obtained the lucrative contract, Gulf Systems, is a joint venture ("JV") with a foreign company. Qatari law requires most types of foreign companies seeking to enter the Qatari market to form JVs in which Qatari local partners must own at least 51%. Under this system, foreign partners bring expertise, talent, supply and distribution networks, while the local Qatari "partner" relies upon its connections to Qatar.

76.    According to a company profile available on its own website, most of

---

[44] *See* https://www.gs-qa.com/portfolio-item/fusce-molestie/.

[45] *See* https://www.qatarisbooming.com/article/1st-contract-mega-housing-project-workers-signed.

the AIH "subsidiaries" are JVs with foreign companies, wherein AIH serves as the local partner—and majority shareholder.

77.    Many of AIH's "subsidiaries" are JVs in and adjacent to the construction industry, such as general contracting, architecture, engineering, interior design, groundskeeping, and facilities management—entities that require AIH's close relationship with the Qatari regime to win contracts.  As one example of how AIH benefits from its connections for JV business, it has numerous AIH-led JVs related to the New Doha International Airport: Architecture firm Leo A Daily, IBLS Industrial & Logistics Consultants (JV with IBLS of Greece), Lighting Group Qatar (JV with Lumiere Group of Lebanon), and luxury furnishings company Poltrona Frau Qatar (JV with Poltrona Frau of Italy).  Other AIH subsidiaries that also have business on the New Doha International Airport include Qatar Electromechanical Solutions WLL (QEMS), United Electromechanical International Est. (UEI), and Elite Homes (which provides interior finished products).

### 2.    The Abu Issas and members of the Qatari regime are all part of the influential Qatari Businessmen Association.

78.    AIH's success in being chosen as "local partners" for JV work is likely helped by Abu Issa brothers frequently joining delegations accompanying the Emir and other senior Qatari officials on international travel for meetings with foreign leaders.  These delegations are part of the Abu Issa brothers' roles in the Qatari Businessmen Association ("QBA").

79.    The QBA is a quasi-governmental organization chaired by Sheikh Faisal bin Qassim Al Thani, and its members are generally among Qatar's elite and powerful.  Sheikh Faisal Al-Thani was profiled in May 2021 by *Forbes*, which called him "Qatar's wealthiest businessman, with a net worth of $1.6 billion."[46]

---

[46] https://www.forbesmiddleeast.com/billionaires/arab-billionaires/qatari-billionaire-sheikh-faisal-bin-qassim-al-thani-is-securing-his-legacy-through-his-family-business-and-his-two-museums.

QBA's Chairman also holds the honorific, "His Excellency,"[47] which in Qatar is typically reserved for Ambassadors (which he has not been) and Minister-level government officials.[48] Nabil Abu Issa and Sheikh Abdullah bin Thani Al Thani have both long been active members of the QBA.[49]

80.    One of QBA's central functions is for its leading members, such as the Abu Issa brothers, to accompany the Emir and senior Qatari Ministers on official travels to foreign countries to influence policy and bilateral agreements. In 2017, for instance, Ashraf Abu Issa accompanied the Emir on a visit to Kenya.[50] In that same year, Nabil Abu Issa accompanied Qatar's Foreign Minister Sheikh Mohammed bin Abdul Rahman Al Thani on his trip to Singapore:



81.    The following year, Ashraf Abu Issa was part of QBA's official delegation to the United States, accompanying Emir Tamim Al Thani. During this

[47] https://qataribusinessmen.org/eng/board-members.aspx.
[48] https://www.linkedin.com/pulse/20140728153653-28711372-middle-east-etiquette-of-addressing-royals/.
[49] Ashraf Abu Issa was active in QBA through at least April 2020; See https://www.gulf-times.com/story/659803/QBA-eyes-establishment-of-business-fund-to-support.
[50] See https://nation.africa/kenya/news/billionaires-who-accompanied-qatar-emir-on-nairobi-visit-3849564/.

trip, the Emir had his first White House one-on-one meeting with then-President Trump.[51]

82.     And in early 2019, "QBA participat[ed] in the Qatar-Japan and Qatar-China business forums, which were held on the sidelines of the visit of His Highness the Amir to China and Japan."[52]

83.     Ashraf Abu Issa was among the QBA leaders who joined that delegation to China,[53] accompanying Emir Tamim Al Thani's trip for his official visit with Chinese President Xi Jinping. Shortly after the Emir Al Thani and President Xi signed an agreement to increase the two nations' cooperation on infrastructure projects, Ashraf Abu Issa and other QBA leaders participated in a visit to the headquarters of state-owned Huawei, China's leading exporter of communications and technology infrastructure.[54]

84.     Weeks later, "QBA participated in the Qatari-Austrian Business Forum with a high-level delegation from the Ministry of Commerce and Industry on the sidelines of the visit of His Highness the Amir to Vienna."[55] [56]

85.     Overseas QBA travel has evidently benefited AIH.    In April 2017, for example, shortly after Ashraf Abu Issa and other QBA members had accompanied the Emir on his official trip to Kenya, AIH secured visible assistance from two Qatari Ministers when it entered into a partnership agreement with South Africa's largest tourism group. The deal related to high-end tourism from South

---

[51] *See* http://qatarchamber.com/wp-content/uploads/2018/04/Qatari_Businessmen_Delegation_US.pdf.
[52] https://m.gulf-times.com/story/673285/QBA-continues-to-keep-ties-with-global-partners-amid-pandemic.
[53] *See* https://powerholding-intl.com/2019/02/11/moci-representatives-qatari-businessmen-and-ceos-visit-huawei-headquarters-in-beijing/.
[54] https://www.gulf-times.com/story/621779/MoCI-representatives-Qatari-businessmen-and-CEOs-v.
[55] https://m.gulf-times.com/story/673285/QBA-continues-to-keep-ties-with-global-partners-amid-pandemic.
[56] https://www.moci.gov.qa/en/mec_news/en-austria-mar-3/

Africa to Qatar for the 2022 World Cup. The signing ceremony was attended by Qatar's Foreign Minister Sheikh Mohammed bin Abdulrahman Al Thani and Minister of Economy and Commerce Sheikh Ahmed bin Jassim Al Thani, both of whom peered over Ashraf Abu Issa's shoulder as he consummated the deal:



86.     QBA's leadership also plays host to foreign officials who are visiting Qatar.  According to the *Gulf Times*,[57] "in 2019, QBA received many foreign commercial and economic delegations led by heads of state, foreign ministers" and others from "the US, France, Germany, Canada, Australia, England, Russia, Malaysia, Turkey, Georgia, Armenia, Jordan, Korea, Cuba, Botswana, Bulgaria, Venezuela, and Greece."[58]  In 2018, for example, the Abu Issa brothers and Sheikh Faisal bin Fahad Al Thani met with a French delegation that included France's ambassador to Doha.[59]

87.     The QBA participates with the Qatari government in a number of committees that help the State of Qatar set governmental policies.

88.     The QBA plays a leading role in Qatar's Private Sector Challenges &

---

[57] https://www.gulf-times.com/Static/About.
[58] https://m.gulf-times.com/story/673285/QBA-continues-to-keep-ties-with-global-partners-amid-pandemic.
[59] *See* http://www.ifpinfo.com/qba-french-delegation-explore-ways-to-expand-cooperation/.

Obstacles Committee, "a government initiative that aims to strengthen public and private sector partnership, and the involvement of the Qatari private sector in the state's economic development process."[60]  The Committee was formed by the Qatari Prime Minister and Interior Minister, and it is headed by the Minister of Commerce and Industry.[61]

89.     The Ministry of Commerce and Industry and the QBA established a Joint Follow-up Committee to serve as a direct communication channel between the QBA and government to facilitate cooperation in the implementation of programs and initiatives undertaken by the Ministry and their delivery to the business community.[62]  The Minister of Commerce and Industry, Ali bin Ahmed Al Kuwari, attended the meeting approving the committee's formation, as did Nabil Abu Issa.

90.     When Qatar was itself grappling with the early stages of COVID-19, the Emir in or around April 2020 turned to QBA for the crucial task of setting government policies to respond to the pandemic.  Fulfilling a directive from the Emir, the QBA also joined a "Crisis Committee," whose purpose was "to create a direct link between QBA and the government, and to follow up and co-ordinate with various ministries on ways to allocate the incentives that would support the private sector and compensate affected stakeholders[.]"[63]

91.     QBA has also participated in committees focused on Qatari government strategy and policies with the Ministry of Foreign Affairs. During the QBA's annual board meeting in September 2020, for example, "[t]he board also discussed QBA's participation in… the '2nd National Development Strategy

---

[60] *IBID*.

[61] *See* https://m.gulf-times.com/story/673285/QBA-continues-to-keep-ties-with-global-partners-amid-pandemic.

[62] https://www.24-7pressrelease.com/press-release/469281/ministry-of-commerce-industry-qba-to-set-up-joint-follow-up-committee.

[63] https://m.gulf-times.com/story/659803/QBA-eyes-establishment-of-business-fund-to-support.

Committee 2018-2022' with the Ministry of Foreign Affairs, as well as the 'Organising [sic] Committee of the World Islamic Economic Forum (WIEF),' also with the Ministry of Foreign Affairs."

92.     QBA openly acknowledges that it exists not just to work with the Qatari government, but to actively support and promote the State, which is an absolute monarchy.  QBA's website states that, "We serve of the Mission of Qatar."[64] The quasi-governmental organization's self-description continues: "QBA strives to serve the vision of Qatar by accomplishing ambitious projects that have pushed Qatar forward into the globalization market." Ensuring that there should be no doubt about whose "Mission" and "vision" QBA is "serving," the same paragraph states, "We have been gifted with the enlightened strategic vision of H.H. the Emir Sheikh Tamim bin Hamad bin Khalifa Al Thani, who has accomplished gargantuan steps towards political, economic and social reforms within the State of Qatar."

### 3. Ashraf Abu Issa sits on the board for the Qatar-America Institute, which is a foreign registered agent for Qatar.

93.     Ashraf Abu Issa also sits on the board of directors for the Qatar-America Institute ("QAI").

94.     For years, QAI acted as an agent on behalf of Qatar in the U.S.

95.     In March 2020, the U.S. Department of Justice sent QAI a letter directing it to register as a foreign agent for Qatar.

96.     QAI complied with the DOJ's letter and registered under FARA in May 2020.[65]

97.     QAI's FARA registration identifies "The State of Qatar" as its foreign principal.  The FARA registration also provides that QAI is "operated under the control of its Board of Directors"—the board on which Ashraf Abu Issa sits.

---

[64] https://qataribusinessmen.org/eng/about-us.aspx.
[65] *See* https://efile.fara.gov/docs/6829-Registration-Statement-20200529-1.pdf.

98.     According to the FARA registration, QAI's representation of Qatar in the U.S. includes hosting programs for Qatari officials coming to the U.S. "to speak on issues often raised against Qatar, including . . . terrorism financing[.]"[66] The planned Qatari officials for these events included Qatar's Emir, Prime Minister, Minster of the Interior, and Foreign Minister, among other high ranking Qatari officials.[67]

99.     QAI also hosted events and published media promoting the 2022 FIFA World Cup.[68]

### 4.   AIH's successful art business benefits from the patronage of the Qatari regime.

100.    Ashraf Abu Issa has also "emerged as one of the driving forces behind Qatar's burgeoning arts movement led today by Her Excellency Sheikha Al Mayassa bint Hamad Al Thai, Chairperson of the Qatar Museums Authority (QMA)."[69]

101.    Sheikha Al Mayassa bint Hamad Al Thani is the Emir's sister.  In her role as Chairperson of the QMA, she has been described as "the most powerful person in the art world."[70]

102.    In the 1990s, Ashraf Abu Issa opened a successful art gallery with the backing of Sheikha Al Mayassa bint Hamad Al Thani and another Al Thani family member, Sheikh Hassan bin Mohammed Al Thani, who is also a QMA board member.[71]

103.    More recently, in 2016, Ashraf Abu Issa opened an art auction house in partnership with his close friend and member of the ruling family, Sheikh

---

[66] *Id.* at 10.
[67] *Id.* at 22.
[68] *Id.* at 11, 12, 14, 37, and 42.  *See also* https://efile.fara.gov/docs/6829-Informational-Materials-20200529-3.pdf.
[69] *See* https://www.arabianknightonline.com/Details/1906/Knight-of-Art.
[70] *See* https://www.businessinsider.com.au/most-powerful-person-in-art-2011-11.
[71] *See* https://www.arabianknightonline.com/Details/1906/Knight-of-Art.

Abdulrahman bin Hamad Al Thani.[72]

104.  Sheikh Abdulrahman bin Hamad Al Thani heads Al Jazeera via its parent company, the Qatar Media Corporation ("QMC"), which is "the official broadcasting authority for the State of Qatar."[73]

105.  Last year, the U.S. Department of Justice ordered Al Jazeera's U.S. subsidiary, which falls under Sheikh Abdulrahman bin Hamad Al Thani's control, to register under FARA for acting as an agent of Qatar in the U.S.[74]

106.  During the opening ceremony for the auction house jointly owned by Ashraf Abu Issa and Sheikh Abdulrahman bin Hamad Al Thani, Ashraf Abu Issa "praised the support extended by HE Chairperson of Qatar Museums Sheikha Al Mayassa bint Hamad Al-Thani and thanked Her Excellency for gracing the opening ceremony."[75]

## IV.  BROIDY HAS LONG BEEN A SUPPORTER OF ANTI-TERRORISM CAUSES AND BECAME AN OUSTPOKEN CRITIC OF QATAR IN 2017

107.  Elliott Broidy is a staunch supporter of Israel and a recognized leader in conservative Jewish political circles. He has a long history of investing personal time and resources in anti-terrorist causes.

108.  Broidy served on the Department of Homeland Security's Advisory Council between 2006 and 2009. There, he contributed to the report of the Council's Future of Terrorism Task Force, which called for the elimination of terrorist safe havens throughout the world. Broidy has long provided major funding for the Joint Regional Intelligence Center ("JRIC"), which is a cooperative effort between U.S. federal, state, and local law enforcement agencies to collect, analyze,

---

[72] *See* https://www.arabianknightonline.com/Details/1906/Knight-of-Art.
[73] *See* https://www.qmc.qa/en/p/about.
[74] *See* https://www.wiley.law/alert-DOJ-Directs-US-Affiliate-of-Qatari-Owned-Al Jazeera-to-Register-as-Foreign-Agent.
[75] *See* https://news.artnet.com/market/auction-expansion-middle-east-465614.

and disseminate terrorism-related threat intelligence. The JRIC continues to serve as the Regional Threat Assessment Center for the Central District of California. Although Broidy is a committed Republican, his contributions in the area of counterterrorism and America's national security have been widespread and bipartisan, including his efforts via the America Matters Foundation, American Freedom Alliance, the George Washington University Center for Homeland Security, the Hudson Institute, the Manhattan Institute of New York, the Pacific Council on International Policy, and the Panetta Institute for Public Policy.

109.   As part of those efforts, Broidy has been an outspoken critic and opponent of the State of Qatar because of the country's ties to terrorism.  Broidy's efforts to shed light on Qatar's support for terrorism and its influencing of U.S. foreign policy to be less harsh toward Iran and terrorist groups like Hamas have included, among other things, financial support for think tanks and other non-profits, correspondence with elected and governmental officials, and op-eds in national publications.

110.   Broidy has for years viewed Qatar as a major threat to U.S. Security. He has funded public initiatives, such as conferences, to educate Americans about Qatar's support for terrorism.

111.   Broidy's efforts were particularly prominent in 2017. On May 23, 2017, the Foundation for Defense of Democracies ("FDD") hosted a conference entitled "Qatar and the Muslim Brotherhood's Global Affiliates: New U.S. Administration Considers New Policies."

112.   The speakers at the conference repeatedly argued that Qatar was a state-sponsor of terrorism and that the U.S. should undertake efforts to combat it. For example, Jake Sullivan (the present National Security Advisor) stated that, "we are not placing a high enough priority on the national security threats to the United States that is [sic] emanating from the financing of terror groups by Qatar and other countries.  And we have to be doing more on that."

113. Broidy partly financed the FDD's conference.

114. On October 23, 2017, the Hudson Institute hosted a similar conference entitled "Countering Violent Extremism: Qatar, Iran, and the Muslim Brotherhood."

115. Like the speakers at the FDD's conference earlier in the year, the speakers at the Hudson Institute's conference strongly condemned Qatar's sponsorship of terrorism and argued for policy changes.

116. Broidy partially financed the Hudson Institute's conference.

117. Broidy also supported President Trump's 2016 political campaign, and once Trump took office in January 2017, Broidy continued voicing his strong concerns about Qatar at the highest levels of the U.S. government, including to President Trump.

118. Around the same time, President Trump, with whom Broidy had discussed Qatar, criticized the country as "a funder of terrorism at a very high level." President Trump also publicly denounced Qatar through a tweet and during a Republican National Committee meeting in 2017.

119. During that same month, Qatar's Middle Eastern neighbors were equally unnerved by Qatar's support for terrorist organizations. Saudi Arabia, the UAE, Egypt, Bahrain, and Yemen announced that they were cutting off diplomatic relations with Qatar, and blocking all land, air, and sea travel to and from Qatar.[76]

120. Around this time, Qatar began spending millions of dollars on a public relations campaign to obfuscate Qatar's ties to, and financial and logistical support of, some of the world's worst extremist and terrorist organizations and to change Qatar's image in the United States, including particularly in the Jewish community

---

[76] Anne Barnard & David D. Kirkpatrick, *5 Arab Nations Move to Isolate Qatar, Putting the U.S. in a Bind*, N.Y. Times (June 5, 2017), https://www.nytimes.com/2017/06/05/world/middleeast/qatar-saudi-arabia-egypt-bahrain-united-arab-emirates.html.

in the United States.[77]  This campaign, led by the Qatari Emir's younger brother, Mohammed Bin Hamad Bin Khalifa Al Thani ("MBH") and Ahmed Al-Rumaihi, was aimed at: (1) bolstering the image of the State of Qatar in circles perceived as influential with the Trump Administration; and (2) curtailing the influence of individuals that could undermine Qatar's standing in the United States.

121.  In addition to Broidy's vocal criticism of Qatar outlined above, Broidy and others privately met with American Jewish leaders in an effort to frustrate Qatar's public relations campaign.  For example, on September 28, 2017, Nicolas Muzin,[78] one of Qatar's top D.C. lobbyists, invited American Jewish leaders to meet with the Emir in New York City during the Emir's visit for the United Nations General Assembly later that month. The opposition of Broidy and others to these efforts helped prompt American Jewish leaders to refuse to meet with the Emir at that gathering, thereby frustrating Qatar's plans to win over

---

[77] According to the Center for Responsive Politics, Qatar spent nearly five million dollars on lobbyists and media relations in 2017 in an effort to gain the support of the United States government in Qatar's diplomatic standoff with other Middle Eastern countries.  According to FARA filings, Qatar retained and entered into written agreements with at least the following agents in the second half of 2017 or the first quarter of 2018 in an effort to improve its image in the United States: Avenue Strategies Global LLC ($150,000 per month, increased to $500,000 per month on September 5, 2017, with an additional $250,000 added to the October invoice through a retroactive agreement dated February 28, 2018); Stonington Strategies LLC (August 24, 2017 agreement) at the rate of $50,000 per month, increased to $300,000 per month on November 1, 2017); Ashcroft Law Group (of $2.5 million for a 90-day retainer); Levick Strategic Communications ($54,000 per month); Information Management Services Inc. ($375,000 per month); Gallagher Group ($45,000 per month); Audience Partners Worldwide (undisclosed rate); McDermott, Will & Emery ($40,000 per month); Nelson Mullins Riley & Scarborough LLP ($100,000 per month for three months); Portland PR ($123,195 per month); Mercury Public Affairs ($120,000 per month); Bluefront Strategies ($100,000); Hawksbill Group ($165,000); Vitello Consulting ($10,000); Iron Bridge Strategies ($25,000); Tigercomm LLC ($30,000 per month); Venable LLP ($150,000 per month); Husch Blackwell Strategies ($25,000 per month); SGR Government Relations & Lobbying ($40,000 per month); Pillsbury Winthrop Shaw Pittman LLP (between $500 and $955 per hour); Lumen8 Advisors, LLC ($1,000 per hour); and Ballard Partners ($175,000 per month for one year).

[78] Broidy Defendants sued Muzin separately in the U.S. District Court for the District of Columbia, captioned *Broidy Capital Management, et al. v. Nicholas D. Muzin, et al*, No. 1:19-cv-0150 (DLF). Muzin's motion to dismiss in that litigation was denied in part by the district court, and his interlocutory appeal to the D.C. Circuit Court of Appeals was denied.

Jewish leaders.

122.   Soon after the failure of the United Nations General Assembly initiative, Muzin began to invite American Jewish leaders on all-expense-paid trips to Qatar to further Qatar's public relations campaign.  Broidy and others again encouraged American Jewish leaders to decline the invitations.  These efforts were mostly successful in helping to prompt many American Jewish leaders to decline to participate in the public relations trips to Qatar.

123.   In light of all this, it is only logical for Qatar to view Broidy as a serious threat to its international standing and maintaining its hosting privileges for the 2022 World Cup.

## V.   QATAR'S HISTORY OF TARGETING CRITICS

124.   By the time it launched the hack-and-smear of Broidy in late 2017, Qatar had acted to silence numerous high-profile critics.

### A.   Qatar engaged Americans who used furtive means to win—and then maintain—its position as the 2022 World Cup host.

125.   Qatar for years has acted to target its critics, including FIFA executives and other officials who questioned or outright opposed Qatar hosting the 2022 World Cup—both during the bidding process in 2010 and for years afterwards.

126.   Among the Qatari Enterprise members responsible for most of the unethical and often illegal conduct in helping Qatar win the World Cup rights, two were American.  One was a former Central Intelligence Agency case officer, Kevin Chalker, who shortly before Qatar's winning bid was announced incorporated his company, Global Risk Advisors.  The other American was Ahmad Nimeh, the son-in-law of Amb. Patrick Theros, former U.S. Ambassador to Qatar, who is close with Sheikha Moza bint Nasser Al-Thani, mother of the current Emir.  Nimeh and his father-in-law have worked to advance Qatar's interests in Washington, D.C. since well before 2010.

### 1. Theros has long been central to Qatar's efforts inside Washington D.C.

127.   Since completing his tenure as Ambassador to Qatar approximately 25 years ago, Theros has been deeply involved with advancing Qatari interests inside the Beltway.  Even though he has never registered under FARA as a Qatari agent, Amb. Theros has helped advise and oversee most of Qatar's important "influence" operations in Washington, D.C., such as the Qatar-America Institute ("QAI") and the U.S.-Qatar Business Council.[79]

128.   At the time when Qatar was ramping up its public affairs efforts promoting its World Cup bid in 2009 and 2010, Amb. Theros was on the Board of Directors of the Qatar Foundation International ("QFI"), the U.S. affiliate of the Qatar Foundation, which is used by the Qatari Royal Family to expand its influence inside the U.S.  Notably, QFI described itself as a "special project of Sheikha Moza" dedicated to advancing her "vision."[80]  Underscoring his importance to Sheikha Moza—the mother of Emir Tamim Al-Thani—Theros was a "founding board member" when QFI was established in 2007.[81]

129.   In his own bio, Theros even says that he has done so much to advance Qatar's interests inside the U.S. that "For his services, His Highness the Emir awarded Ambassador Theros the Qatar Gold Star of Merit."[82]

### 2. Theros and Ahmad Nimeh have long worked together advancing Qatar's interests, including its highly controversial World Cup bid.

130.   Amb. Theros and his son-in-law, Ahmad Nimeh, have worked

---

[79] https://www.usqbc.org/news/usqbc-president-retires-after-17-years-of-service .

[80] *See* http://web.archive.org/web/20110811020244/http://www.qfi.org/landing/1/About- (verify quote).

[81] *See* https://web.archive.org/web/20101211173829/http://www.meletefoundation.org:80/?page_id=94

[82] *IBID*.

together since at least the inception of Theros & Theros LLP in 2003.[83]  At that same time, Theros and Nimeh also worked together at the U.S.-Qatar Business Council ("USQBC") until at least 2005.[84]  The two men comprised somewhere between two-thirds and the entirety of USQBC's small staff. [85]

131.   Around the same time that Nimeh was helping Qatar secure its bid for the 2022 World Cup, Theros co-founded and chaired the Melete Foundation,[86] a "soft power"-style non-profit that was ostensibly created to help advance the same cause as his son-in-law.

132.   Melete Foundation's listed office address was the same one where Theros has been located since at least 2003.[87] [88]  Its "Program Manager & Founding Member" was simultaneously working as a "Junior Associate" at Theros' own firm, Theros & Theros.[89]

133.   When Qatar was announced as the host of the 2022 World Cup, the Melete Foundation declared, "The Melete Foundation congratulates Qatar and the Qatar 2022 Bid Team on its success today in Zurich." [90]

134.   The December 2010 statement continued, "On a personal note, The Melete Foundation would like to congratulate the staff of the Qatar 2022 Bid Team, including Melete supporters Ahmad Nimeh, Seth Smith, and Nikos Kourkoulakos.  Your hard work, creativity, and devotion throughout the bid was inspiring."

---

[83] *See*: https://www.justice.gov/nsd-fara/page/file/991576/download.
[84] *See* https://web.archive.org/web/20050204121015/http://usqbc.org:80/staff.html.
[85] *See* https://web.archive.org/web/20050204121015/http://usqbc.org:80/staff.html.
[86] *See* https://web.archive.org/web/20101211173829/http://www.meletefoundation.org:80/?page_id=94.
[87] *See* https://web.archive.org/web/20101211173012/http://www.meletefoundation.org/?page_id=99.
[88] *See* https://efile.fara.gov/docs/5581-Supplemental-Statement-20040430-I65MJL05.pdf.
[89] *See* https://web.archive.org/web/20101211173829/http://www.meletefoundation.org:80/?page_id=94.
[90] *See* https://web.archive.org/web/20101211173444/http://www.meletefoundation.org/?page_id=212.

COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIM-PLAINTIFFS ELLIOTT BROIDY, BROIDY CAPITAL
MANAGEMENT, LLC, AND CIRCINUS, LLC

### 3. Ashraf Abu Issa's close ties with Theros suggest Qatar's involvement with Plaintiffs.

135.    Ashraf Abu Issa has a longstanding relationship with Theros. AbuIssa Holding has been publicly involved with the USQBC since at least 2014, while Theros was still President of the organization.

136.    When Ashraf Abu Issa traveled to the U.S. in June 2018, he met with Theros. In posting a photo of the meeting to his Instagram account, Ashraf Abu Issa wrote that it is "always a learning experience chatting with Ambassador Patrick Theros":



137.    Showing the closeness to the Qatari regime of both Theros and Ashraf Abu Issa, they were assigned seats of prominence next to Sheikha Moza at the "relaunch of Doha Debates," one of several high-brow events that Qatar puts on to appeal to the West, especially the U.S. Ashraf Abu Issa was seated immediately next to Theros, who sat next to Sheikha Moza:

1
2
3
4
5
6
7
8
9
10
11



12   138.   Moreover, as detailed below, Theros' son-in-law Nimeh was

13 responsible for facilitating the $3.9 million paid to two key Qatari agents involved

14 in the hack-and-smear of Broidy just weeks before the hack began.

15   139.   And almost immediately after the first successful breach by the

16 hackers of the BCM servers, Theros had a flurry of communications with Greg

17 Howard, the PR agent who had the most direct contact with the journalists who

18 were working on stories based on the hacked materials.  He did not appear to

19 communicate with Howard in the six months before or after those few days in

20 January 2018.

21   140.   Since at least 2009, Nimeh has reported directly to Ali Al-Thawadi,

22 chief of staff to Mohammed bin Hamad Al-Thani (known by his nickname

23 "MBH"), younger brother to the current Emir, Tamim Al-Thani.  Al-Thawadi has

24 since in or around 2009 also overseen the work performed by Chalker and GRA.

25 Each of the three played key roles in Qatar's successful use of astroturfing and

26 secret influence operations to win the hosting rights for the 2022 World Cup.

27 According to both reporting in the *Sunday Times of London*, Nimeh worked with

28 PR agents, as well as Chalker, in furtherance of Qatar's clandestine operations—

and Nimeh did so under the direct supervision of Ali Al-Thawadi, whom GRA nicknamed "Shep."

141.   Almost immediately upon being announced as the World Cup host in December 2010, Qatar's winning bid has been met with enormous controversy. Chief among the publicly-voiced concerns is that Qatar has been credibly accused of bribery on a massive scale, offering to pay hundreds of millions of dollars to FIFA officials to secure hosting privileges.[91]

**B.   FIFA investigation and criticism of exploitive labor practices threaten Qatar's World Cup as new Emir Takes Power.**

142.   In August 2012, a formal inquiry was launched to investigate Qatar's corrupt winning bid two years earlier by the International Federation of Association Football ("FIFA"), which is the global body governing competitive soccer, including the World Cup. The investigation responded to reports of corruption, including alleged bribery of FIFA executive committee efforts and other troubling conduct.[92]

143.   The investigation that FIFA launched in 2012 documented extensive corruption, including allegations of bribery utilized to support Qatar's effort to win the 2010 bid for the 2022 World Cup, and it was detailed in a 353-page report, known publicly as the "Garcia Report," based on the name of the lead investigator, former U.S. Attorney Michael J. Garcia. Even though the Garcia Report was submitted to FIFA in or around November 2014, it was not released to the public until a German news outlet in June 2017 published a leaked copy of the PDF of the full report.

144.   Qatar also faced international outcry for the wretched conditions, and in some cases deaths, of thousands of migrant workers building stadiums and other

---

[91]  Alon Einhorn, *Qatar Offered FIFA $880 Million For Hosting the 2022 World Cup—Report*, The Jerusalem Post (Mar. 10, 2019), https://www.jpost.com/Middle-East/Qatar-offered-FIFA-880-million-for-hosting-the-2022-World-Cup-582998.

[92] https://digitalhub.fifa.com/m/f0245071165bcbc/original/wnr43dgn3yysafypuq8r-pdf.pdf.

infrastructure in advance of the World Cup.[93]  For example, Amnesty International documented abusive and exploitive conditions in Qatar's construction sector where workers went without pay for months on end, had their passports confiscated so they could not leave the country, and were forced to live in "squalid" accommodations.[94]

145.   In the midst of this growing turmoil, with the World Cup rights potentially in jeopardy, Qatar faced a leadership transition with power passing when the then-Emir, Hamad bin Khalifa Al-Thani, voluntarily abdicated the throne to his fourth son and current Emir, Tamim bin Hamad Al Thani.

146.   Facing the potential threat of losing the World Cup, Qatar turned to GRA and Chalker.

**C.   Qatar used Global Risk Advisors to hack-and-smear critics.**

147.   Global Risk Advisors ("GRA") is a cybersecurity company comprised of former intelligence, national security, and military personnel trained in all levels of deception, disinformation, and cyber warfare.  Founded and led by Chalker, a former CIA officer, GRA employs experienced hackers from the intelligence and military communities.

148.   Qatar initially engaged Chalker to help secure Qatar's status as host. Qatar paid GRA untold millions for its efforts.

149.   GRA's work for Qatar grew to expand beyond the World Cup. GRA was retained in part to target Qatar's political enemies through cyber operations and public relations, to protect Qatar's geopolitical interests. According to former GRA personnel, Qatar retained GRA to execute these larger-scale programs on its behalf and entered into consultancy arrangements with GRA worth at least $100

---

[93] https://www.theguardian.com/football/2013/oct/04/world-cup-2022-fifa-sepp-blatter-qatar-worker-deaths.

[94] Amnesty International, *The Dark Side of Migration: Spotlight on Qatar's Construction Sector Ahead of the World Cup* (Nov. 18, 2013), https://www.amnesty.org/download/Documents/16000/mde220102013en.pdf.

1  million, primarily for covert conduct.

2  150.   For its work targeting political figures, GRA continued coordinating

3  its efforts with Ali Al-Thawadi, the chief of staff to MBH, the Emir's younger

4  brother. GRA frequently provided updates to Al-Thawadi, regarding surveillance

5  activities, including of American citizens.

6  151.   As has been publicly reported Qatar was likely involved in targeting

7  many people and entities via cyberattacks similar to those deployed against Broidy

8  and BCM, including prominent officials from countries like Egypt and the UAE,

9  and the United States, including an American political columnist and activist,

10  Rabbi Shmuley Boteach, all of whom are known as outspoken critics of Qatar.[95]

11  **D.   Qatar targeted other Americans besides Broidy.**

12  152.   One of the targeting projects was highly successful and has particular

13  salience here: GRA's hacking and surveillance of the UAE Ambassador to the

14  United States. In or around April and May 2017, approximately a half-year before

15  it attacked Broidy, GRA conducted similar cyberattacks against the UAE

16  Ambassador, who has extensive interactions with politically active Americans, in

17  an effort to improve Qatar's image with the United States by not only discrediting

18  him, but also intimidating (and ultimately silencing) U.S. government officials and

19  other Americans who were either critics or potential critics of Qatar.

20  153.   As with Broidy, hacked emails were disseminated to the media by an

21  anonymous "source" identified by the media only by an alias— "GlobalLeaks"—

22  in an effort to embarrass not just the primary target, but also politically active

23  associates, ultimately silencing active critics and preventing others from voicing

24  their own criticisms.

25  

---

26  [95] *See* Shmuley Boteach, "Qatar's War to Destroy Pro-Israel Jews," Jerusalem Post, Oct. 8, 2018, https://www.jpost.com/Opinion/Qatars-war-to-destroy-pro-Israel-Jews-568942; Eli Lake,
27  "Russian Hackers Aren't the Only Ones to Worry About," Bloomberg, Sept. 18, 2018,
28  https://www.bloomberg.com/opinion/articles/2018-09-18/russian-hackers-aren-t-the-only-ones-to-worry-about [paywall].

154.   And the execution of the two attacks included several tactics in common, such as: (1) use of messages from Gmail accounts that appeared to be official; (2) messages that displayed a correct but redacted phone number for the victim; (3) deployment of evasion tactics to help bypass automatic spam filter and other security alerts; (4) use of private registration services and "throw away accounts" from the Mail.Ru group; and (5) maintenance of multiple phishing sites but hosting them on their own dedicated servers, using different subdomains for different campaigns.

155.   The mastermind behind the Global Leaks operation was GRA employee and former CIA agent Denis Mandich, who oversaw the execution of every phase of the "GlobalLeaks" operation. On information and belief, Chalker as well as GRA's then-employee and former National Security Administration IT expert John Sabin also worked with Mandich in carrying out the campaign. *See Broidy v. GRA LLC, et al.*, No. 1:19CV11861 (S.D.N.Y.), Proposed SAC ¶ 10.

156.   In June 2017, *The Huffington Post* wrote one of the first stories under the headline "Someone Is Using These Leaked Emails To Embarrass Washington's Most Powerful Ambassador."[96]  The article describes " [The UAE Ambassador] Otaiba—[as] an extremely, powerful figure in Washington, D.C., who is reportedly 'in almost constant phone and email contact' with Jared Kushner."

157.   Another article, published in *The Intercept*, was titled "Diplomatic Underground: The Sordid Double Life of Washington's Most Powerful Ambassador"[97] and was clearly designed to embarrass the UAE Ambassador.  The article relied on hacked emails, and notes that the emails "began to dribble out just as a geopolitical row between the UAE and its neighbors in Qatar came to a head."

---

[96] Akbar Shahid Ahmed, *Someone Is Using These Leaked Emails To Embarrass Washington's Most Powerful Ambassador*, The Huffington Post (June 3. 2017).

[97] Ryan Grim, Diplomatic Underground: The Sordid Double Life of Washington's Most Powerful Ambassador, *The Intercept* (Aug. 30, 2017).

158.   An article in *The New York Times*, based on hacked emails, was likewise intended to embarrass the UAE.  The article states: "Anonymous hackers have provided a long series of leaked emails from Ambassador Yousef al-Otaiba's Hotmail account to *The New York Times* and other news organizations over the past two years in an apparent campaign to embarrass the U.A.E. and benefit Qatar."[98]

### 1. "GlobalLeaks" operation shares many common traits with hack-and-smear of Broidy and BCM.

159.   There are striking similarities to the attack on Broidy. Both operations relied on producing highly curated and specifically themed PDFs, which were disseminated to some of the same friendly reporters, including Ryan Grim (*The Intercept*), Bradley Hope (*The Wall Street Journal*), and David Kirkpatrick (*The New York Times*), with stories based on hacked materials still being published well over a year after the publication of the first such article.

160.   There are no publicly known other similar campaigns that disseminated hacked materials via curated, themed PDFs, let alone over many months to those same reporters.

161.   Additionally, an individual from the same public relations team involved in Broidy's smear campaign—Howard—was among the public relations professionals pitching stories based on the hacked material.

162.   Indeed, the similarities were lost on no one. The BBC quoted an unnamed "source familiar" with the hack as saying that the Broidy attack was "rinse and repeat on Otaiba."[99]

---

[98] David D. Kirkpatrick, *Persian Gulf Rivals Competed to Host Taliban, Leaked Emails Show*, N.Y. Times (July 31, 2017).
[99] Suzanne Kianpour, Emails show UAE-linked effort against Tillerson (Mar. 5, 2018). https://www.bbc.com/news/world-us-canada-43281519.

163.   Moreover, the UAE Ambassador hack was successful in silencing certain critics of Qatar. For example, the FDD had consistently criticized Qatar's support for Islamic extremism and terrorism. On May 23, 2017, FDD hosted (with Plaintiffs' involvement) a conference largely focused on exposing Qatar's misdeeds. Less than a week later, after learning that their communications had been intercepted in the UAE Ambassador hack, FDD executive director Mark Dubowitz informed Broidy that the think tank would no longer publicly criticize the emirate because they feared potential Qatari reprisal. Two months later, the only FDD scholar whose work had substantially focused on Qatar left the think tank, and no one was hired or reassigned to replace his work relating to Qatar.

164.   Qatar's numerous cyberattacks have extended over several years and represent a pattern of unlawfully accessing victims' computer systems to extract private information or other items of value with which to attack or damage the enemies of its clients, typically for the purpose of silencing criticisms of Qatar's support for terrorist groups or its abysmal record on human rights.

165.   These cyberattacks are all part of a pattern of racketeering activity in which the conspirators have engaged with the common purpose of silencing critics of Qatar.

## VI.   QATAR'S HACK-AND-SMEAR CAMPAIGN TARGETING BROIDY AND BCM

166.   Given the threat of losing its 2022 World Cup hosting rights—particularly in the context of Donald Trump becoming President in 2017—Qatar had every reason to seek to silence Broidy.  Qatar and its co-conspirators sought to achieve this objective in a clandestine and covert manner to maintain deniability and avoid any official connection to the misconduct which could only further its reputational challenges.

### A.   Qatar Commissioned Chalker and GRA to Hack Broidy and BCM.

167.   When Qatar in 2017 decided to hack and surveil Broidy and BCM, the wealthy emirate turned to its longtime, trusted partners: Chalker and GRA. By that time, Qatar enjoyed an existing business relationship related to GRA and Chalker denigrating Qatar's critics in order to enhance its image and standing in the U.S. and elsewhere more generally. These denigration campaigns were executed in large part by utilizing tradecraft and other clandestine skills that Chalker and various GRA employees acquired while working for the CIA or other arms of the U.S. government.

168.   Given the prior successes of GRA and Chalker in its covert work for Qatar, it only made sense that Qatar would approach Chalker about silencing Broidy and that GRA would use former CIA agent Mandich, who was behind the GlobalLeaks operation, and others similarly capable to conduct a hack-and-smear operation against Broidy and BCM.

169.   Also working with Mandich on the operation was former NSA "hacker" Sabin.  Ultimately working for and under the direction of Chalker, Sabin was identified by the *New York Times* two months before the start of the hack of Broidy and BCM as "a former hacker for the National Security Agency,"[100] and was also described as "now a director of network security at GRA Quantum." (GRA Quantum was affiliated with GRA, and it was also wholly owned by Chalker.)

170.   That same October 2017 article ended with the implication that Sabin himself had actually already managed to circumvent some of the most advanced commercially available encryption technology, including for Gmail: "When asked if he had already circumvented physical multifactor authentication devices like

---

[100] *See* Brian X. Chen & Nicole Perlroth, How Google's Physical Keys Will Protect Your Password, N.Y. Times (Oct. 25, 2018), https://www.nytimes.com/2017/10/25/technology/ personaltech/ google-keys-advanced-protection-program.html.  In addition, GRA's Managing

Google's keys, Sabin would offer only: 'No comment.'"

## B. Qatar Hacks BCM's Server, Resulting in Thousands of Malicious Connections to Broidy's Email Accounts.

171.   Beginning in December 2017, Broidy's family and associates began receiving spearphishing emails.

172.   Qatar, through GRA, first targeted people who were close to Broidy—including his wife and his executive assistant—to obtain their respective log-in credentials to BCM's private server where the confidential documents were stored.

173.   "Spear phishing occurs when a hacker sends a misleading email to an account user in order to deceive that user into providing the hacker with his login credentials, often by inducing the user to click on a link that in turn prompts them to enter the credentials."  *United States v. Khalupsky*, 5 F.4th 279 n.29 (2d Cir. 2021).

174.   Over the next several months, based upon information and belief, GRA successfully obtained login credentials for Broidy, his wife, his executive assistant, and several BCM employees.

175.   For example, on December 27, 2017, four spearphishing emails were sent to Broidy's wife, Robin Rosenzweig, as well as a Broidy associate. In the following week, Rosenzweig and the Broidy associate received at least another dozen spearphising emails.

176.   On or about January 3, 2018, Qatar, through its agents, used the "Mail.ru" service to access and modify Rosenzweig's Gmail account without her consent. "Mail.ru" signifies a Russian email service that publishes an app that can be operated by users physically located around the world, including in the United States, to send and receive emails on Mail.ru or other email services like Gmail. Here, Qatar's agents used the "Mail.ru" to read, send, delete, and manage emails and other documents in Rosenzweig's Gmail account, without her knowledge or consent, which in turn enabled them to obtain her log-in credentials for the BCM

server.

177.   On January 14, 2018, a BCM employee ("BCM employee 1"), received two spearphishing emails, which were similarly disguised to look like security alerts from Google.

178.   By accessing the Gmail accounts of Rosenzweig and BCM employee 1, Qatar obtained the login credentials for the Gmail account of another BCM employee ("BCM Employee 2") and used those credentials to access that employee's Gmail account on January 4.

179.   Through the Gmail accounts of Rosenzweig, BCM Employee 1, and/or BCM Employee 2, Qatar obtained the login credentials for several BCM email accounts.

180.   On January 16, Qatar, through its agents, accessed the BCM server, without authorization, through the BCM email accounts of Broidy, BCM Employee 1, and BCM Employee 2, as well as other BCM employees.

181.   From January 16 to February 25, 2018, BCM's server was subjected to approximately 325,000 malicious connections from 59 unique internet protocol ("IP") addresses.  Two of these connections were traced to a single IP address in Qatar.  These two unlawful and unauthorized intrusions were not masked by VPNs and represent suspected unmasked intrusion signals accessing BCM's network from an IP address in Qatar.

182.   During these attacks, numerous email communications and documents were viewed, stolen, and/or altered without authorization.  These included, among other things, Broidy's personal emails and documents, contacts file, business calendar, business emails and documents, signed contracts, attorney-client privileged communications and documents, attorney-client work product, usernames, and passwords to access other non-Google accounts, including email accounts on the computer network of BCM, including Broidy's corporate email account, financial information, and confidential business process and methods

-46-

information.  The server also contained corporate and personal documents, copyrighted material, contracts, business plans, and other confidential and sensitive proprietary information, to which Qatar had full access.

183.   According to information provided by former GRA personnel, Qatar paid GRA through three offshore entities, Bernoulli Limited ("Bernoulli"), Toccum Limited ("Toccum"), and Global Risk Advisors EMEA Limited, all of which are based in Gibraltar.  The connection between GRA and these three offshore entities is apparent in the New York Department of State's records.  This was done to maintain the clandestine nature of the operations and avoid the appearance of any official connection to Qatar.  However, Ali al-Thawadi—the Chief of Staff to MBH, the Emir's younger brother—was responsible for getting invoices paid.

### C.   Qatar, Through Its Agents, Combined an Excerpt of Hacked Material with Forgeries to Further Smear Broidy.

184.   GRA's first intrusion was into the files of Rosenzweig, which included various legal documents bearing Broidy's signature. Even before amassing all of the Broidy emails for the broader media attack, GRA and its accomplices used the products of the hack to create forgeries in order to discredit Broidy and BCM.

185.   Specifically, they used stolen materials to lend the appearance of legitimacy to a phony news story based on fabricated contracts packaged together, intending to smear Broidy and BCM by "revealing" unsavory business deals they never actually made. The first of the fabricated contracts purported to call for Broidy to provide political consulting services to a sanctioned Russian bank, VTB bank, and the second forgery purported to call for Broidy to manage $40 million in invested funds from the United Arab Emirates and from a Ukrainian bank, ICU. These contracts were entirely falsified, but the Qatari Enterprise packaged them with a third document—a genuine "Beneficial Owner's Declaration" signed by

Broidy that, upon information and belief, GRA had stolen in the hack.  The "Beneficial Owner's Declaration" had nothing to do with the fabricated contracts, or the business dealings reflected in them, but was added to lend credibility to the phony documents.

186.   The metadata from the documents revealed that the fake contracts were created just days after Rosenzweig's Gmail account was accessed by GRA hackers in January 2018.  Broidy's signature on the forged VTB contract appears similar to his authentic signature, and, upon information and belief, was lifted from hacked documents.

187.   The purpose of creating the fake VTB contract was to suggest that Broidy was secretly and unlawfully helping a Russian bank under U.S. sanctions. The fake UAE contract was intended to create the false impression that Broidy's anti-Qatar advocacy was motivated by a secret business relationship with the UAE, and not his true concern for Qatar's sponsorship of terrorism.

188.   The Qatari-funded agents tried to shop these documents to multiple media outlets in the United States but Broidy's representatives were successful in convincing those outlets that the documents were forgeries.

189.   Because the Qatari-funded agents could not find any legitimate news media to publish stories presenting the forged documents as authentic, it resorted to publishing the materials in Qatar's state-owned media outlet, Al Jazeera.

190.   On March 7, 2018, Al Jazeera published an article stating that Broidy was "under scrutiny over alleged deal with sanctioned Russian bank VTB," and speculated that the VTB contract "raise[d] serious questions about whether Broidy [was] in breach of the US Foreign Agents Registration Act (FARA)." As for the contract involving UAE and the Ukrainian bank (ICU), the article claims it "expose[d] [Broidy's] connections with the UAE," and, further, claimed that Ukraine had begun a criminal investigation into Broidy's dealings.

191.   This was all a complete fabrication, but GRA's hack provided the ability to incorporate an electronic copy of Broidy's signature and to intersperse a genuine document among the fake ones, giving the lie a veneer of legitimacy. On information and belief, the primary purpose of this scheme was to falsely show business ties to a sanctioned Russian bank to make Broidy a target of the Mueller Investigation. The fake story remains on Al Jazeera's website today, along with copies of the forged documents.  And, as noted previously, Al Jazeera is overseen by Sheikh Abdulrahman bin Hamad Al Thani, a business partner of Ashraf Abu Issa.

### D.   Qatar's PR team placed the Hacked Materials with Media Outlets to Publish Salacious Stories About Broidy.

192.   Qatar's objective to effectively stifle Broidy's First Amendment freedoms was not complete until the stolen materials could be twisted and publicized to smear Broidy's reputation.

193.   Thus, after the hacking was completed and the materials had been stolen from Broidy and BCM, Qatar, through its agents, carefully packaged the hacked materials into a series of PDFs, each with a unique theme designed to inflict maximum damage through highly precise curation and alteration, then leaked those PDF files to the media, with the help of third parties.

194.   The PR strategist members used by Qatar include, among others, Nicholas Muzin, Joseph Allaham, Gregory Howard, Ahmad Nimeh, BlueFort Public Relations LLC, Spark Digital, Stonington Strategies, and Lexington Strategies.

195.   Through all times relevant here, Nicolas D. Muzin was the Chief Executive Officer of Stonington Strategies LLC, a public relations and lobbying firm incorporated under the laws of Delaware, and a political lobbyist who signed FARA documents on behalf of Stonington as a registered foreign agent for the State of Qatar. On August 24, 2017, he was officially retained by the State of Qatar

for "consulting services," and on September 3, 2017, Stonington registered under FARA as a foreign agent providing "strategic communications" for the State of Qatar. Stonington Strategies has been reorganized into Stonington Global LLC, whose website states that "[i]n launching the new firm, Nick Muzin & his team plan to build on their success representing the State of Qatar."

196.    Joseph Allaham was the co-founder of Stonington Strategies, where he served as partner for all relevant times. He has worked for Qatar, originally as an unregistered foreign agent until he eventually filed a registration statement under FARA on June 15, 2018, in response to a subpoena from Plaintiffs in a related action. He is also the CEO of Lexington Strategies.

197.    Gregory Howard is a media placement expert, an agent who, through his relationships with members of the media, provides information and materials to the media to generate stories desired by the agent's client. In 2017 and 2018, Howard worked as a Vice President and Senior Media Strategist at the firm of Conover & Gould ("Conover"), based in Washington, DC. From July 2017 until January 18, 2018, Howard was a registered foreign agent of Qatar through Conover but continued working for months afterwards placing stories in the media based on Broidy's hacked materials, despite terminating his status as a registered agent of Qatar. Beginning no later than May 10, 2018, Howard worked in Washington, DC, as Vice President of Mercury Public Affairs, a public strategy firm, which he left in April 2019. In each of his positions at Mercury, despite FARA filings that did not mention Qatar, Howard worked as a media placement strategist for Qatar.

198.    Qatar specifically retained Muzin, Allaham, and Howard in an attempt to influence the Republican, American-Jewish community and other conservative supporters of the President, with the end goal of influencing White House policy. Their work included identifying Broidy and other Americans as critics to be silenced.

199.   Muzin began working for Qatar sometime in 2017, and in late August of that year, the Qatari Embassy in Washington, DC, officially retained Stonington and Muzin to influence public opinion regarding Qatar.

200.   Allaham also began working for Qatar in 2017, according to his initial FARA disclosures in his capacity as the CEO of Lexington Strategies. [101] According to his (subsequently filed) FARA registration, he worked directly for the Emir of Qatar, Sheikh Tamim bin Hamad Al Thani, and his brother, MBH. Allaham's FARA filing listed MBH's chief of staff, Ali Al-Thawadi, as his official point of contact responsible for overseeing his work on behalf of Qatar—meaning his supervisor in the chain of command was the same as for GRA.

201.   In the fall of 2017, in the weeks leading up to the attack, phone records show that Allaham had five separate phone calls with MBH's chief of staff, Ali al-Thawadi.

202.   Ahmad Nimeh was also working with GRA and Qatar's PR team during this time.  Nimeh is the person behind "Blue Fort PR," which paid Muzin and Allaham at least $3.9 million in a span of three weeks from mid-September through early October 2017.

203.   According to both reporting in the *Sunday Times of London* and someone who has seen Nimeh's communications from during and around 2010, Nimeh worked with PR agents, as well as Chalker, in furtherance of Qatar's "dirty tricks" operations—and Nimeh did so under the direct supervision of Ali Al-Thawadi, aka "Shep."

204.   On or around September 17, 2017, Chalker met with Shep and Hashem in New York City.  Shortly thereafter, Chalker flew to Doha in the first week of October 2017 to have a follow-up meeting with Shep and Hashem.  These meetings coincided with Blue Fort PR's two payments of $1.95 million each to

---

[101] https://efile.fara.gov/docs/6563-Registration-Statement-20180615-2.pdf.

Muzin on September 18 and October 10, 2017, as well as Qatar's payment of $1.45 million in October 2017 to Allaham.

205.   Muzin has admitted that he identified and described Broidy to the Qatari government as an impediment to Qatar's foreign policy interests in the United States.  In connection with his work for Qatar, Muzin or his employees or agents participated in weekly meetings at the Qatari Embassy in Washington, DC, where they discussed with Qatari officials and other Qatari agents the ongoing efforts against Broidy.  Muzin specifically mentioned Broidy in these meetings as an obstacle that needed to be dealt with for his lobbying on behalf of Qatar to succeed.

206.   As plans for the upcoming hack were underway, increased payments flowed to these key public relations strategists. On December 15, 2017, shortly before the hacks on Plaintiffs' computers began, Qatar gave a $500,000 balloon payment to Muzin and Allaham's firm, Stonington Strategies, and increased the monthly retainer from $50,000 to $300,000.[102]

### E.   Qatar's PR Team Pressures Reporters to Publish Damaging Stories About Broidy Based on the Hacked Materials.

207.   Howard's phone calls following the hacking show that he was in close and frequent communication with journalists in the early months of 2018 before those same reporters began publishing stories that relied on information stolen from Plaintiffs' computer systems and servers. In some instances, Howard communicated with journalists for weeks before they published these articles. The intensity of those contacts often increased in the days prior to publication. During this same period, Howard closely communicated with public relations experts, research groups, and registered agents of Qatar to coordinate the media disinformation campaign against Broidy.

---

[102] https://efile.fara.gov/docs/6458-Exhibit-AB-20171221-2.pdf.

208.   Starting on January 7, 2018, just hours after the first sustained hack access of Ms. Rosenzweig's Gmail account (and thus hundreds of confidential documents), Howard engaged in a flurry of calls with his then-colleagues at Conover & Gould and outside public relations professionals, as well as exchanging five phone calls with Amb. Patrick Theros, who is Nimeh's father-in-law and business partner.  In the six months before January 7, 2018, Howard's phone records indicate no calls or text messages with Theros.

209.   From January 18 through at least July of 2018, Howard participated in more than two hundred phone calls with reporters who contributed to stories regarding Broidy and Qatar or regularly covered Qatari-related issues. These included extensive, and at times, almost daily calls with now-former Associated Press ("AP") reporter Tom LoBianco, all leading up to the time he authored several stories regarding Broidy in March and May 2018, based on the contents of Broidy's hacked emails. In addition, in the same time frame, Howard conducted more than 100 calls with the *New York Times*, *McClatchy*, the *Wall Street Journal*, and the *Washington Post*, all of which were focusing on stories regarding Broidy's hacked emails.

210.   Muzin and Allaham were in close contact with high-ranking members of the Qatari government (including GRA contacts Apex (the Emir), Mightier (MBH, the Emir's brother), and Shep (Al Thawadi)) in the weeks leading up to the attack. Muzin then flew to Qatar within a few days of GRA's first successful hack into BCM's systems. Muzin and Allaham's text messages with each other logically suggest their direct and prior knowledge of the hacking and their knowing use of stolen documents.

211.   On January 25, 2018, shortly after the successful hacking of BCM began, Muzin sent Allaham a message on WhatsApp, stating, "It's very good. . . . We got the press going after Broidy. I emailed you."

212.   That same day, prior to the first public reports in the United States of materials stolen from Plaintiffs, Ben Wieder, a reporter for *McClatchy*, a Washington, DC publication focused on politics, emailed Muzin to tell him, "I'm working on a story about Elliott Broidy and was hoping to talk." Muzin, who was still in Qatar, forwarded this message to Allaham and commented, "Time to rock." Less than an hour after sending the email to Muzin, Wieder called Howard, and they spoke for more than 10 minutes. Wieder would go on to write extensively about Broidy on the basis of carefully curated emails and other documents stolen from Broidy's servers.

213.   On March 1, 2018, the contents of emails stolen from Plaintiffs' computer accounts and servers appeared for the first time in media accounts. The *Wall Street Journal* credited its source as "a cache of emails from Broidy's and his wife's email accounts that were provided to the Journal."

214.   Muzin shared the *Wall Street Journal* article with Allaham over WhatsApp that same day. Muzin then commented, "He's finished."

215.   Other media outlets continued to publish more of the stolen emails, including the *Huffington Post* on March 2, 2018, and the BBC on March 5, 2018. The Huffington Post cited "[e]mails and documents an anonymous group leaked to HuffPost."

216.   On March 13, 2018, Muzin remarked to Allaham via WhatsApp that recent news stories about Broidy have "[p]ut[] him in [M]ueller['s] crosshairs." This communication demonstrates one of Qatar's central goals—to portray Broidy as a target of special counsel Robert Mueller's investigation.

217.   That same day, Allaham wrote to Muzin on WhatsApp that a former U.N. official working under contract with the Qatari government, Jamal Benomar, had gone to Qatar prior to the date of the message "to get the emails. That what [*sic*] I think he was doing there [in Qatar]." Muzin responded by referencing Broidy by name.

218.   On March 14, 2018, Muzin told Allaham on WhatsApp that he'd "get some intel about the Broidy event soon." This comment likely refers to a March 13, 2018, Republican fundraiser headlined by the President of the United States, for which Broidy had been listed as an event host.

219.   The next day, on March 15, 2018, Muzin exclaimed to Allaham, via WhatsApp, "Elliott Broidy was not at the fundraiser!" The two were clearly excited at the prospect of having damaged Broidy's political standing.

220.   Multiple additional news stories followed that expressly relied on the stolen documents. On March 21, 2018, the *New York Times* published a front-page article noting that an "anonymous group critical of Broidy's advocacy of American foreign policies in the Middle East" has been distributing "documents, which included emails, business proposals and contracts," belonging to Broidy and BCM. On March 23, 2018, *Bloomberg* published an article about Broidy, which noted that it had "received two separate documents this week purporting to be versions" of materials belonging to Broidy.

221.   On March 25, 2018, a front-page story in the *New York Times* reported extensively on Broidy's fundraising and business activities.  The story reported that Broidy had agreed not to attend the March 13 fundraiser.  The story was based, in part, on "[h]undreds of pages of Broidy's emails, proposals and contracts" received from what the *Times* euphemistically termed "an anonymous group critical of Broidy's advocacy of American foreign policies in the Middle East."  This "anonymous group" is Qatar and its hacking and PR team.

222.   On March 26, 2018, *McClatchy* published a story authored by Ben Wieder that used hacked materials to denigrate Broidy, House Foreign Affairs Chairman Ed Royce, and the Congressman's wife, Marie Royce—just four days before the Senate was scheduled to vote on her appointment to be Assistant Secretary of State for Educational and Cultural Affairs.  Also at that time, Chairman Royce's House Foreign Affairs Committee was attempting to advance

H.R. 2712, known as the "Hamas Sanctions Bill," which specifically named Qatar as a sponsor of Hamas subject to sanctions.  It was only one of a series of articles hostile to Broidy authored by Wieder following contact with Muzin and Howard, who also had extensive communications with Wieder's editor, Viveca Novak.

223.   And on May 4, 2018, in a WhatsApp message to Allaham, Muzin summed up the very obvious objective the Enterprise had pursued for months, stating: "our new friends can make Broidy go away altogether."

224.   Media outlets in the United States and abroad threatened to publish—and continued to publish—materials stolen from Plaintiffs well into 2019.

### F.   Qatar Ultimately Caused Numerous Misleading and Malicious Articles to Be Published Based on the Stolen Materials.

225.   Qatar's extensive hacking and packaging of curated PDFs with hacked materials, as well as its intentional coordination with public relations professionals, ensured that it inflicted maximum damage on Broidy and BCM.

226.   As an example, one news article using the hacked materials appeared on March 1, 2018, in the *The Wall Street Journal*, and was titled "Trump Ally Was in Talks to Earn Millions in Effort to End 1MDB Probe in U.S. Emails indicate Republican donor and wife were negotiating fee if the Justice Department closed its investigation."

227.   A deluge of articles followed, as demonstrated by these examples:

3/2/18 – *Huffington Post*, "Leaked Emails Appear to Show a Top Trump Fundraiser Abusing His Power"

3/3/18 – *The New York Times*, "Mueller's Focus on Adviser to Emirates Suggests Broader . . ."

3/5/18 – *BBC News*, "Emails Show UAE-Linked Effort Against Tillerson"

3/5/18 – *The New York Times*, "A Top Trump Fund-Raiser Says Qatar Hacked His Email"

3/6/18 – *Bloomberg*, "Trump Fundraiser's Email Breach Shows Risks

Before Midterms"

3/9/18 – *Huffington Post*, "Leaked Memo"

3/12/18 – *Hollywood Reporter*, "Mueller Probe Expands to Hollywood as Trump Arrives . . ."

3/21/18 – *The New York Times*, "How 2 Gulf Monarchies Sought to Influence the White House"

3/23/18 – *Bloomberg*, "Trump Fundraiser Offered to Help Lift Sanctions on Russian Firms"

3/29/18 – *Newsweek*, "Top Trump Fundraiser Helped Congressman's Wife Land State Department Job"

4/20/2018 – The Intercept, "Trump Fundraiser Offered Russian Gas Company Plan to Get Sanctions Lifted For $26 Million"

6/24/2018 – The New York Times, "Two Trump Allies, Seeing Unlimited Opportunity, Instead Drew Scrutiny"

8/11/2018 – The Los Angeles Times, "A Tale of Two Scandals, with a Rich Trump Donor, Kickbacks and a Playboy Playmate"

2/12/2019 – RollingStone, "How Trump's Swamp Works Now"

8/13/2019 – The New York Times, "How a Trump Ally Tested the Boundaries of Washington's Influence Game"

228.   The *Huffington Post*'s March 2, 2018 article expressly stated that it was based on "[e]mails and documents an anonymous group leaked."  The same article also included a screenshot of a what purported to be a leaked email.

229.   Similarly, the *BBC News* article from March 5, 2018 admitted that "BBC has obtained leaked emails" from Broidy.

230.   Additionally, *The New York Times* article from March 5, 2018 made assertions based on "three sets of documents that appear to have been hacked from Broidy's personal email."

# VII. COUNTERCLAIM DEFENDANTS AND ITS AGENTS' ACTIONS CAUSED BROIDY DEFENDANTS TO SUFFER SIGNIFICANT HARM AND BUSINESS LOSSES

231. The tortious and unlawful conduct of Qatar has caused Broidy Defendants to suffer significant economic losses in the form of lost contracts, lost business relationships, loss of goodwill, reputational harm, costs to investigate and remedy hacking, attorneys' fees and costs, in addition to other damages to be specified at trial.

232. As a direct and proximate result of Qatar's actions, the Broidy Defendants suffered damages exceeding $1,500,000,000.

233. Damages suffered by the Broidy Defendants include, but are not limited to, lost contracts in the Balkans and Middle East Regions, lost profits, and lost growth opportunity and future contracts, damaged banking and investor relationships, and loss of good will and reputation.

234. In addition, as a result of Qatar's conduct and actions, Broidy has suffered serious actual physical injury, for which he seeks compensation.

## CONTERCLAIM COUNT ONE

### Business Conspiracy, Va. Code §§ 18.2-499, 500
### (All Defendants against All Counterclaim Defendants)

235. The Broidy Defendants incorporate and adopt by reference the allegations contained in each and every preceding paragraph.

236. Circinus is a government contractor headquartered in Fredericksburg, Virginia.

237. Upon information and belief, the Counterclaim Defendants, and each of them, have combined, associated, agreed, and mutually acted together for the purpose of willfully and maliciously injuring Circinus by filing this frivolous lawsuit.

238. Additionally, upon information and belief, the Counterclaim

Defendants, and each of them, have combined, associated, agreed, and mutually acted together for the purpose of willfully and maliciously preventing Circinus from exercising their constitutional right of free speech as to any of the vitally important public issues pertaining to Qatar.

239.   As a direct result of the Mosafer Plaintiffs' lawsuit against it, Circinus, has been injured in their reputation, trade, business, and profession, including the loss of contracts and other work.

240.   Circinus has also had its freedom of expression chilled as a result of this frivolous lawsuit, brought by the Mosafer Plaintiffs at the behest of Qatar, the Abu Issas, and AIH.

241.   The Mosafer Plaintiffs, the Abu Issas, AIH, and Qatar expressly agreed, upon information and belief, to file this lawsuit for the purpose of harming Circinus financially and preventing it from exercising its rights.

242.   Through this frivolous lawsuit, the Counterclaim Defendants also seek to injure Circinus in its business by compelling them to disgorge substantial monies earned from various government contracts.

243.   In undertaking this concerted action to injure Circinus, the Counterclaim Defendants have acted with actual and legal malice.

244.   In accordance with Va. Code § 18.2-500(A), the Broidy Defendants seek compensatory and treble damages in an amount to be determined at trial.

245.   Additionally, the Counterclaim Defendants' willful and malicious conspiracy to injure Circinus has caused, and will continue to cause, irreparable injury, including reputational harm, loss of goodwill and business, and increased risk of harassment.  Such injury cannot be compensated by monetary damages.

246.   Therefore, the Broidy Defendants seek an injunction prohibiting the Counterclaim Defendants from engaging in the unlawful conduct described herein and any conduct designed to silence the Broidy Defendants, in accordance with Va. Code § 18.2-500(B).

## CONTERCLAIM COUNT TWO

### Abuse of Process
### (All Broidy Defendants against Counterclaim Defendants)

247. Broidy Defendants incorporate and adopt by reference the allegations contained in each and every preceding paragraph.

248. Broidy brought the substance of these claims against Qatar in this court previously. Qatar successfully avoided the merits of those claims by invoking the FSIA and claiming immunity. Now, by bringing this suit through its agent Mosafer, Qatar is abusing the authority of this court by acting through another to do what it could not do itself without being subject to the jurisdiction of the court to face the merits of Broidy's claims. As such, Qatar both makes a mockery of the comity accorded to it by the U.S. under the FSIA, and seeks to invoke the authority of this Court under false and fraudulent pretenses.

249. This Complaint is not designed to pursue a legitimate legal cause of action. Instead, Qatar, through the Mosafer Plaintiffs, filed this Complaint with an ulterior motive of stripping the Broidy Defendants of their First Amendment rights to free speech and as part of a broader scheme to retaliate against the Broidy Defendants for criticizing Qatar. This is simply an extension of the State of Qatar's ongoing efforts to harass, oppress, humiliate, and silence the Broidy Defendants.

250. Counterclaim Defendants' conduct was a substantial factor in causing harm to the Broidy Defendants, including reputational harm and loss of business.

251. As a legal result of Counterclaim Defendants' unlawful conduct, the Broidy Defendants suffered substantial economic damage in an amount subject to proof at trial.

252. Counterclaim Defendants engaged in the acts alleged above maliciously, willfully, and oppressively, and with intent to harm the Broidy Defendants.

## CONTERCLAIM COUNT THREE

### Violation of RICO Act, 18 U.S.C. §§ 1962(c) and 1964
### (All Broidy Defendants against All Counterclaim Defendants)

253.   Broidy Defendants incorporate and adopt by reference the allegations contained in each and every preceding paragraph.

254.   The federal RICO statue provides, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

255.   The RICO statute further provides that "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . .."  *Id.* § 1964(c).

256.   At all relevant times, Broidy Defendants and each Counterclaim Defendant are persons within the meaning of 18 U.S.C. §§ 1961(3), 1962(c), and 1964(c).

257.   Counterclaim Defendants are a group of people and entities associated together in fact with several other individuals and entities for the common purpose of carrying out an ongoing criminal enterprise under the payroll and control of the State of Qatar, as described in the foregoing paragraphs (the "Qatari Enterprise"). Specifically, the Qatari Enterprise has engaged in a pattern of illegal and covert operations designed to silence and neutralize people who are perceived to be enemies or critics of Qatar. The State of Qatar architected this scheme, in part, to protect its status as host of the 2022 FIFA World Cup, which was, and continues to be, in serious jeopardy given in part to the country's ties to terrorism and its role in the ongoing Middle East crisis, the precise subject of Broidy's criticism of Qatar.

258.   At all relevant times, the Qatari Enterprise described herein was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

259.   Together, Counterclaim Defendants and their co-conspirators form an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  Each Counterclaim Defendant has knowingly, willfully, and unlawfully participated in the operation or management of the Enterprise, directly or indirectly, as described in the foregoing paragraphs, and as identified further below.

260.   The Qatari Enterprise consists of, at least, the State of Qatar, the GRA and its employees and principals, Howard, Muzin, Shep, Hashem, Nimeh, Ashraf Abu Issa, Nabil Abu Issa, His Highness Emir Tamim bin Hamad Al Thani, Jassim Al Thani, MBH, Ali Al-Thawadi and numerous other known and unknown individuals, including cyber hackers, public relations professionals, lobbyists, political actors, individuals representing the Qatari government, and members of the Qatari government.

261.   Counterclaim Defendants and their co-conspirator members of the Qatari Enterprise have functioned, and continue to function, as a unit in carrying out their multi-year, ongoing pattern of racketeering activity through a campaign to neutralize critics of Qatar.  The scheme, orchestrated and funded by the State of Qatar, involved a widespread hack-and-smear campaign of Broidy Defendants. This campaign is instrumental to the Qatari Enterprise's common purpose—to silence Broidy Defendants.  The Abu Issa Brothers, AIH, and Mosafer Defendants furthered the State of Qatar's scheme by filing a frivolous lawsuit against Broidy Defendants to continue to defame and harass Broidy.

262.   Crossclaim Defendants' co-conspirators each helped manage and direct different aspects of the Qatari Enterprise in pursuit of the same common objective: to silence Qatar's critics.  Qatari Enterprise Members' specific roles

involved funding and directing agents to identify individuals who were perceived to be threats to Qatar's standing in the world community; instructing Qatar's agents to conduct cyberattacks on those targets; obtaining the confidential information stolen by the GRA; instruct Qatar's agents to manipulate and falsify that content; instructing Qatar's agents to disseminate it widely to members of the national and international media for the purpose of harming Broidy Defendants and other victims of the Qatari Enterprise's cyberattacks; and filing a frivolous lawsuit against Broidy Defendants.

263. All Crossclaim Defendants and their co-conspirators have worked together, and continue to work together, to develop, orchestrate and implement their plans to silence and neutralize individuals who criticize Qatar and thereby threaten its standing in the world community.

264. The Qatari Enterprise is an enterprise under the RICO Act that is separate and distinct from Crossclaim Defendants and their co-conspirators. The activities of the Qatari Enterprise are separate and distinct from the ordinary and legitimate business operations of the individual Defendant entities and those of their co-conspirator entities, as well as the ordinary business operations of the State of Qatar, AIH, Ashraf Abu Issa, Nabil Abu Issa, Mosafer Inc., Mosafer E-Com, and other individual participants in the racketeering activity who also happen to work for a Counterclaim Defendant entity and/or serve in an officer, director or beneficiary capacity for such an entity.

265. Crossclaim Defendants, their co-conspirators, and their agents committed the above and below-described tortious and criminal acts as part of a common purpose to serve the Qatari Enterprise. These actions were separate and distinct from any lawful work Counterclaim Defendants may have performed at Qatar's direction and/or lawful work performed under contract for Qatar.

266. The Qatari Enterprise engaged in tortious conduct that crossed state and international lines, spanning from Qatar to California, New York, and

Washington, DC, among other areas.

267.   Broidy Defendants hereby allege and set forth the following predicate racketeering activities as defined under 18 U.S.C. § 1961.  Crossclaim Defendants jointly and individually committed each separate set of predicate acts alleged below.

268.   Qatar, Qatari officials, and/or Qatari agents each participated in the "pattern of racketeering activity" described in the foregoing paragraphs within the meaning of 18 U.S.C. §§ 1961(1) & (5).  They committed multiple acts of wire fraud, in violation of 18 U.S.C. § 1343; multiple acts of criminal money laundering, in violation of 18 U.S.C. § 1957; multiple misappropriations of trade secrets, in violation of the DTSA, 18 U.S.C. §§ 1832(a)(1) and (a)(5); multiple acts of economic espionage, in violation of 18 U.S.C. §§ 1831(a)(1) and (a)(5).  These predicate acts are not isolated incidents but instead form a continuous, related pattern of racketeering activity with the common purpose of conducting covert and illegal operations to silence and neutralize Qatar's critics.

269.   Together, these numerous predicate acts are part of an open-ended, multi-year scheme of racketeering that continues through the present.  The Qatari Enterprise has inflicted numerous injuries against many victims over a period of multiple years.  Its campaign to silence its critics is ongoing, and it continues to commit acts of racketeering to shield Qatar from public scrutiny.  Media organizations are still to this day relying on information stolen from Broidy's computer systems and email servers to publish stories to damage his image.  For example, media outlets have continued to falsely claim that Broidy was a target in the investigation of special counsel Robert Mueller into Russian interference in U.S. elections, whereas in reality he was never interviewed by Mueller's team and does not appear once in the Mueller Report.  If left unchecked, the Qatari Enterprise presents a distinct threat of long-term racketeering activity.

270.   Alternatively, the predicate acts outlined herein are part of a multi-

year closed-ended scheme of racketeering that began no later than April 2017 and ended no earlier than August 5, 2021, the date the Complaint was filed.

271.   Federal law imposes criminal penalties on "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."  18 U.S.C. § 1343.

272.   As described in detail above, from December 2017 through February 2018, Qatari agents engaged in multiple spear phishing attempts, followed by unauthorized access to Broidy Defendants' computers and networks.  The spear phishing attempts were efforts to obtain access to Broidy and BCM's computers and networks, under fraudulent pretenses, to steal Broidy Defendants' confidential information.  The operations were conducted in furtherance of the Qatari Enterprise's purpose of silencing Qatar's political opponents.

273.   Qatari agents sent numerous fraudulent spear phishing emails to Broidy Defendants, its employees, and individuals close to Broidy Defendants including but not limited to an email to Rosenzweig's Gmail account on or around December 27, 2017 and an email to Broidy's Executive Assistant on or around January 14, 2018.  These spear phishing emails used interstate wires and these transmissions crossed state lines.

274.   Qatari agents used the above-described spear phishing emails to make material misstatements with the specific intent that the targeted individuals would rely on those false representations to their detriment and surrender their valuable login credentials so that they could then use those credentials to hack into Broidy Defendants' computer systems.  Qatar paid its agents, the GRA, to engage in these acts while contemplating the harm that they would cause these targets and

1   ultimately cause Broidy Defendants.  They succeeded.

2       275.   Having fraudulently obtained those credentials through material

3   misstatements, Qatari agents commenced an illegal cyberattack against Broidy and

4   BCM's computer systems and servers.  Counterclaim Defendants thereby obtained

5   Broidy Defendants' valuable electronic information, including but not limited to

6   emails, private information, contracts, trade secrets, and business plans.  Qatar

7   directed its agents to launch the spear phishing attempts with the specific intent of

8   fraudulently depriving Broidy Defendants of their valuable property.

9       276.   Qatari agents perpetrated several acts of wire fraud by committing and

10  supervising the spear phishing efforts against associates of Broidy to obtain their

11  valuable login credentials to BCM's computer systems and email servers.

12      277.   As detailed above, Qatar and Qatari agents' actions have directly and

13  proximately caused Broidy Defendants to suffer injury to their business or

14  property, including (without limitation) damage resulting from harm to Broidy

15  Defendants' computers, servers, and accounts; loss in the value of Broidy

16  Defendants' trade secrets and confidential business information; and harm to

17  Broidy Defendants' business, in an amount to be proven at trial.

18      278.   Under certain defined circumstances, federal law imposes criminal

19  liability on any person who "knowingly engages or attempts to engage in a

20  monetary transaction in criminally derived property of a value greater than $10,000

21  and is derived from specified unlawful activity."  18 U.S.C. § 1957(a).  A

22  "monetary transaction" means the "deposit, withdrawal, transfer, or exchange, in

23  or affecting interstate or foreign commerce, of funds or a monetary instrument …

24  by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1). "Criminally

25  derived property" means "any property constituting, or derived from, proceeds

26  obtained from a criminal offense." 18 U.S.C. § 1957(f)(2).  The term "specified

27  unlawful activity" includes any act or offense that constitutes "racketeering

28  activity" under 18 USC § 1961(1), such as each of the various predicate acts

1    identified herein.  *See* 18 U.S.C. § 1957(f)(3).

2    279.   As outlined above, in furtherance of the Qatari Enterprise, Qatari

3    agents engaged in a pattern of racketeering activity that included multiple acts of

4    wire fraud.  By intentionally and knowingly making multiple fraudulent

5    misrepresentations, the Qatari government and/or their agents paid GRA millions

6    of dollars to induce individuals to provide their log-in credentials to Broidy

7    Defendants' computers and servers, and then used those credentials to hack into

8    and steal Broidy Defendants' confidential material and others significant funds to

9    assassinate Broidy Defendants' character using that stolen information.

10   280.   The DTSA imposes criminal penalties against anyone who

11   "knowingly . . . with intent to convert a trade secret, that is related to a product or

12   service used in or intended for use in interstate or foreign commerce, to the

13   economic benefit of anyone other than the owner thereof, and intending or

14   knowing that the offense will, injure any owner of that trade secret, knowingly . . .

15   steals, or without authorization appropriates, takes, carries away, or conceals, or by

16   fraud, artifice, or deception obtains such information;. . . [or] without authorization

17   copies, duplicates, sketches, draws, photographs, downloads, uploads, alters,

18   destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates,

19   or conveys such information; [or] receives, buys, or possesses such information,

20   knowing the same to have been stolen or appropriated, obtained, or converted

21   without authorization."  18 U.S.C. § 1832(a).

22   281.   The DTSA also imposes criminal penalties on "whoever . . . conspires

23   with one or more other persons" to violate § 1832(a)(1).  *Id.* § 1832(a)(5).

24   282.   Through their hacking of Broidy's and BCM's computers and

25   networks, Qatar, through its agents, repeatedly violated the DTSA, 18 U.S.C. §

26   1832, *et seq.*  The BCM servers stored trade secrets including but not limited to

27   highly confidential business plans and proposals; research supporting those plans

28   and proposals, including cost proposals and service projections; vendor lists;

requests for proposals and responses thereto; information concerning business strategies and opportunities; and contacts for important business relationships. BCM is a sophisticated investment management and services firm that possesses and uses its trade secrets to serve its customers and create a competitive market advantage.

283.   Moreover, Broidy Defendants' emails contained confidential information involving contracts, business proposals, and cost estimates involving Broidy Defendants' and their clients.  These contracts, proposals, and estimates contained sensitive information about Broidy Defendants' clients and confidential technology and methods.

284.   These trade secrets are of substantial value to Broidy Defendants, and they were used and intended for use in relation to products and services in interstate and foreign commerce.

285.   Broidy Defendants take and have taken reasonable measures to keep this information secret.  For example, Broidy Defendants have always maintained their information on secured servers that are protected by passwords, firewalls, and antivirus software.

286.   Broidy Defendants' trade secrets derive independent actual and potential economic value from not being generally known or available to the public or other persons who can obtain economic value from their disclosure or use.

287.   Broidy Defendants' trade secrets have significant value, resulting from significant investment of time and resources.

288.   Broidy Defendants' have made, and continue to make, efforts that are reasonable under the circumstances to maintain the secrecy of their trade secrets.

289.   Qatar, through its agents, unlawfully and without authorization appropriated, obtained, and stole Broidy Defendants' trade secrets.  They knew that BCM's servers contained trade secrets and intended to steal them to harm Broidy Defendants and economically benefit both Qatar.  Qatar paid its agents

substantial amounts to misappropriate and publish Broidy Defendants' trade secrets, and Qatar hoped to use those trade secrets to its economic benefit.  Qatar thereby committed multiple violations of the DTSA.

290.   Qatar knowing and intentional violation of the DTSA has materially injured Broidy Defendants.  It has deprived them of valuable trade secrets and caused them to expend resources to defend against further cyberattacks.

291.   The Qatari Enterprise's misappropriation of Broidy Defendants' trade secrets began in January of 2018 and is ongoing.

292.   As detailed above, Qatar's actions have directly and proximately caused Broidy Defendants to suffer injury to their business or property, including (without limitation) damage resulting from harm to Broidy Defendants' computers, servers, and accounts; loss in the value of Broidy Defendants' trade secrets and confidential business information; and harm to Broidy Defendants' business, in an amount to be proven at trial.

293.   Federal law provides that "[w]hoever, intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent, knowingly—(1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains a trade secret . . . [or] (3) receives, buys, or possesses a trade secret, knowing the same to have been stolen or appropriated, obtained, or converted without authorization" violates 18 U.S.C. § 1831(a)(1).

294.   Federal law also imposes penalties on "[w]hoever . . . conspires with one or more other persons to commit" a violation of § 1831(a)(1).  *Id.* § 1831(a)(5).

295.   Qatar and its agents unlawfully and without authorization took, appropriated, and obtained Broidy Defendants' trade secrets through the cyberattack against Broidy Defendants' computers and servers.  Qatar, its agents, and other members of the Qatari Enterprise knew that BCM's servers contained

trade secrets and intended to steal them to harm Broidy Defendants.  Qatar directed its agents to misappropriate Broidy Defendants' trade secrets for its own benefit.

296.   Qatari agents used an artifice and fraud—the fake Gmail spear phishing emails—to take, appropriate, and obtain Broidy Defendants' trade secrets.

297.   Qatari agents used fake spear phishing emails to induce targets to surrender their valuable login credentials.  Multiple targets did provide their login credentials in reliance on these false material statements.

298.   As detailed above, Qatar and its agents' actions have directly and proximately caused Broidy Defendants to suffer injury to their business or property, including (without limitation) damage resulting from harm to Broidy Defendants' computers, servers, and accounts; loss in the value of Broidy Defendants' trade secrets and confidential business information; and harm to Broidy Defendants' business, in an amount to be proven at trial.

299.   The Qatari Enterprise has substantially affected interstate commerce by (1) committing multiple acts of wire fraud and money laundering involving transactions that cross state and international lines, as described above; and (2) causing damage to Plaintiffs and other victims of these attacks by harming property and business, including loss of valuable electronic information, business plans, contracts, vendor lists, requests for proposals, consumer good will, and substantial expense in protecting Broidy Defendants' and other victims' computer systems and email servers from additional cyberattack.  Broidy Defendants regularly conduct business in interstate commerce, and Qatar and its agents' cyber-hacking has substantially disrupted that business.

300.   The State of Qatar and/or its agents operated the affairs of the Qatari Enterprise and engaged Muzin, Allaham, Stonington Strategies, Howard, and others known and unknown to implement a media disinformation campaign against Broidy Defendants (the "Qatari PR Agents").  The Qatari PR Agents acted in concert to manage and direct the placement of damaging stories about Broidy,

derived from stolen and hacked information from Broidy Defendants' servers, in the media.  The State of Qatar paid the Qatari PR Agents significant funds to exercise responsibility and management over the enterprise's affairs.

301.   The State of Qatar then enlisted Mosafer Plaintiffs, AIH, and the Abu Issa brothers to file this lawsuit in Qatar's stead to further Qatar's campaign to attack and defame Broidy.

302.   As a direct and proximate result of Counterclaim Defendants' racketeering activity, Broidy Defendants incurred substantial and concrete financial loss and damage to their business and property.  Counterclaim Defendants' racketeering activity has further directly and proximately caused loss to Broidy Defendants' business by deliberately and foreseeably harming the confidence and trust of its existing and potential clients in Broidy Defendants' ability to maintain the security and secrecy of client data.  Broidy Defendants' business involves sensitive work in the government contract space where discretion and security are critical.  A highly public hacking scheme like this one has naturally caused significant lost revenue and other harm.  In other words, Counterclaim Defendants' racketeering activity has directly and proximately caused damage to Broidy Defendants' goodwill and business relationships, causing loss to the value of Broidy Defendants' business and lost profits, among other damages.

303.   Broidy Defendants are entitled to treble damages and attorneys' fees under 18 U.S.C. § 1964(c).

### CONTERCLAIM COUNT FOUR

**Computer Fraud and Abuse Act, 18 U.S.C. § 1030**
**(All Broidy Defendants against State of Qatar)**

304.   The Broidy Defendants incorporate and adopt by reference the allegations contained in each and every preceding paragraph.

305.   On information and belief, State of Qatar, by itself and/or through its

-71-

agents, accessed or caused to be accessed BCM's servers, and emails and documents physically located on those servers, at BCM's offices in Los Angeles, California, as well as Google servers located in California, specifically by accessing or causing to be accessed accounts associated with Broidy and other BCM employees.

306.   Qatar on its own and/or through its agents first compromised Rosenzweig's personal email account by a targeted spearphishing email in December 2017, and thereafter, beginning on or about January 16, 2018, and without authorization, accessed BCM's servers, and emails and documents physically located on those servers, including the accounts of Broidy and other BCM employees. Qatar acted with knowledge that it was accessing these accounts without authorization.

307.   Qatar on its own and/or through its agents engaged in deliberate spearphishing attacks on Rosenzweig, Mowbray, and Broidy's executive assistant (as well as attempted spearphishing attacks on Mowbray) and used information gained from the attacks on Rosenzweig and Broidy's Executive Assistant to obtain unauthorized access to BCM's servers, and emails and documents physically located on those servers located in Los Angeles, California. Qatar and/or its agents also implemented identifiable obfuscation techniques to engage in ultimately unsuccessful efforts to hide the origin of their spearphishing attacks and unauthorized access to the servers, and emails and documents physically located on those servers and the servers of Google.

308.   On information and belief, by engaging in this conduct, Qatar accessed "protected computers," defined by 18 U.S.C. § 1030(e)(2)(B) as computers "used in or affecting interstate or foreign commerce or communication."

309.   Upon information and belief, as a direct result of Qatar's actions, the Broidy Defendants suffered damage, including harm to the integrity or availability of their California-based servers, and emails and documents physically located on

those servers.

310.   On information and belief, as a direct result of Qatar's actions, the Broidy Defendants also suffered loss, including but not limited to the investigation costs associated with identifying the cyber-attacks and repairing the integrity of their servers after the attacks, including by hiring forensic investigators and data security experts, and attorneys, among other losses, in an amount to be proven at trial, but in any event, in excess of $5,000 and, together with the other alleged damages, in excess of $75,000, exclusive of interest and costs.

311.   Upon information and belief, Qatar intentionally caused such damage to the Broidy Defendants.

312.   The Broidy Defendants further seek a declaration that Qatar's conduct is a violation of the CFAA.

## CONTERCLAIM COUNT FIVE

### Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502
### (All Broidy Defendants against State of Qatar)

313.   The Broidy Defendants incorporate and adopt by reference the allegations contained in each and every preceding paragraph.

314.   On information and belief, Qatar, acting by itself and/or through its agents, violated § 502(c)(2) by knowingly accessing and without permission taking and making use of programs, data, and files from the computers, computer systems or computer networks of the Broidy Defendants and Google, all of which were located in California.

315.   On information and belief, Qatar violated § 502(c)(4) by knowingly accessing and without permission altering the Broidy Defendants' data, which resided in computers, computer systems or computer networks of Google and the Broidy Defendants, all of which were located in California.

316.   On information and belief, Qatar violated § 502(c)(6) by knowingly

and without permission providing or assisting in providing, a means of accessing computers, computer systems or computer networks of Google and the Broidy Defendants, all of which were located in California.

317.    On information and belief, Qatar violated § 502(c)(7) by knowingly and without permission accessing, or causing to be accessed, computers, computer systems or computer networks of Google and the Broidy Defendants, all of which were located in California.

318.    On information and belief, Qatar violated § 502(c)(9) by knowingly and without permission using the Internet domain name or profile of another individual in connection with the sending of one or more email messages and thereby damaging the computers, computer systems or computer networks of Google and the Broidy Defendants, all of which were located in Los Angeles, California.

319.    On information and belief, Qatar knowingly and unlawfully accessed or caused to be accessed computers, computer systems or computer networks at BCM and Google, all of which were located in California. Qatar knew that at the time that it did not have the authorization to take such action. This knowledge is demonstrated by Qatar's use of spearphishing attacks and attempted spearphishing attacks, as well as identifiable obfuscation techniques in an attempt to hide the origin of their cyber-attacks.

320.    On information and belief, Qatar engaged in these actions as part of a targeted attack on Broidy, who is an outspoken critic of the Qatari government.

321.    On information and belief, as a direct and proximate result of Qatar's unlawful conduct, the Broidy Defendants have been damaged in an amount to be proven at trial, but in any event, in excess of $75,000 exclusive of interest and costs, including but not limited to the investigation costs associated with identifying the cyber-attacks; verifying the integrity of the computers, computer systems or computer networks, computer programs and/or computer data, and/or

data; and repairing the integrity of their computer systems after the attack, including by hiring forensic investigators and data security experts. The Broidy Defendants are also entitled to recover their attorneys' fees pursuant to § 502(e).

322.   Additionally, Qatar's actions were willful and malicious, such that the Broidy Defendants are also entitled to punitive damages under § 502(e)(4).

323.   The Broidy Defendants further seek a declaration that Qatar's conduct is a violation of the Comprehensive Computer Data Access and Fraud Act.

## CONTERCLAIM COUNT SIX

### Receipt and Possession of Stolen Property, Cal. Pen. Code § 496
### (All Broidy Defendants against State of Qatar)

324.   The Broidy Defendants incorporate and adopt by reference the allegations contained in each and every preceding paragraph.

325.   On information and belief, Qatar, acting by itself and/or through its agents, received property, including private communications, documents, trade secrets and intellectual property housed on servers belonging to Google and the Broidy Defendants, and in emails and documents physically located on those servers, all of which were located in California, and were stolen from the Broidy Defendants in California or otherwise obtained from the Broidy Defendants in California in a manner that constitutes theft.

326.   Upon information and belief, in at least some instances, Qatar's agents were in the United States when they received or possessed.

327.   Upon information and belief, at least some instances of the unlawful receipt and possession of the Broidy Defendants' stolen information occurred in the United States.

328.   On information and belief, as a result of Qatar's actions, the Broidy Defendants have been damaged in an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs, and are entitled to treble

damages, the costs of bringing this suit, and attorneys' fees under § 496(c).

329.   The Broidy Defendants further seek a declaration that Qatar's conduct violated Cal. Pen. Code § 496.

## CONTERCLAIM COUNT SEVEN

### Invasion of Privacy by Intrusion Upon Seclusion
### (All Broidy Defendants against State of Qatar)

330.   The Broidy Defendants incorporate and adopt by reference the allegations contained in each and every preceding paragraph.

331.   The Broidy Defendants have a legally protected privacy interest in their personal information, including in information contained on servers belonging to them and to Google, and in emails and documents physically located on those servers, all of which were located in California, and had a reasonable expectation that their information would remain private. The Broidy Defendants' accounts were password protected, and at no time did the Broidy Defendants provide those passwords, or the contents of their emails, to the public.

332.   On information and belief, Qatar, acting by itself and/or through its agents, hacked, stole, doctored, and disseminated to others the personal and private information of the Broidy Defendants. Qatar clearly did so without permission and with deliberate intent to access and obtain the Broidy Defendants' personal and private information. At no point did the Broidy Defendants authorize Qatar to hack, steal, doctor, or disseminate their personal and private information. Upon information and belief, at least some of the unlawful disseminations of the Broidy Defendants' personal information occurred completely within the United States.

333.   On information and belief, Qatar's intentional intrusion upon the Broidy Defendants' seclusion was highly offensive to the Broidy Defendants and would be unjustifiable and highly offensive to an ordinary, reasonable person.

334.   The public disclosure of the Broidy Defendants' personal information

has caused, and will continue to cause, the Broidy Defendants injury, including reputational harm, an increased risk of further theft, and an increased risk of harassment.

335.   The Broidy Defendants will continue to suffer this injury as long as their personal information is available to Qatar and, subsequently, to media organizations and the world at large.

336.   The public disclosure of the Broidy Defendants' personal information has also caused them to suffer monetary damages, at an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs. Because Qatar's actions are intolerable in a civilized community, the Broidy Defendants also seek punitive damages.

337.   The Broidy Defendants further seek a declaration that Qatar's conduct constitutes an invasion of privacy.

## COUNTERCLAIM COUNT EIGHT

### Conversion
### (All Broidy Defendants against State of Qatar)

338.   The Broidy Defendants incorporate and adopt by reference the allegations contained in each and every preceding paragraph.

339.   The Broidy Defendants had ownership of and the right to possess their property, including private communications, documents, trade secrets and intellectual property, all of which were located in California.

340.   Qatar, acting by itself and/or through its agents, converted or disposed of the Broidy Defendants' property, including the rights to that property, by unlawfully accessing, or at a minimum receiving, that property, including private communications, documents, trade secrets, and intellectual property, with knowledge that it had been unlawfully taken, and disseminating that property to the media in the United States and abroad.

341.   Upon information and belief, some instances of unlawful access and theft of the Broidy Defendants' property occurred completely within the United States.

342.   Upon information and belief, at least some of the unlawful receipt and dissemination of the Broidy Defendants' personal information occurred completely within the United States.

343.   The Broidy Defendants did not provide permission to access, receive or disseminate their exclusive personal and private information.

344.   The public disclosure of the Broidy Defendants' personal information has also caused them to suffer monetary damages, at an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

345.   Additionally, Qatar's actions were willful and malicious, such that the Broidy Defendants are also entitled to punitive damages.

346.   The Broidy Defendants further seek a declaration that Qatar's conduct amounted to conversion.

## CONTERCLAIM COUNT NINE

### Stored Communications Act, 18 U.S.C. §§ 2701-12
### (All Broidy Defendants against State of Qatar)

347.   The Broidy Defendants incorporate and adopt by reference the allegations contained in each and every preceding paragraph.

348.   The Broidy Defendants are "persons" within the meaning of 18 U.S.C. §§ 2510(6) and 2707(a).

349.   Qatar willfully and intentionally accessed without authorization a facility through which an electronic communication service is provided, namely, BCM's computer systems, including its email servers, as well as Google's servers, thereby obtaining access to wire or electronic communications while they were in electronic storage in such systems, in violation of 18 U.S.C. § 2701(a).

350.   As a result of Qatar's willful and intentional violations, the Broidy Defendants have suffered damages and, as provided for in 18 U.S.C. § 2707, are entitled to an award of the greater of the actual damages suffered or the statutory damages, punitive damages, attorneys' fees and other costs of this action, and appropriate equitable relief.

351.   The Broidy Defendants further seek a declaration that Qatar's conduct violated the SCA.

## CONTERCLAIM COUNT TEN

### Digital Millennium Copyright Act, 17 U.S.C. § 1201, *et seq.* (All Broidy Defendants against State of Qatar)

352.   The Broidy Defendants incorporate and adopt by reference the allegations contained in each and every preceding paragraph.

353.   The Broidy Defendants' computer networks and files contained information subject to protection under the copyright laws of the United States that were illegally accessed by Qatar without authorization. These materials included, but were not limited to, presentations, proprietary business plans and proposals, and strategic correspondence.

354.   Access to the copyrighted material contained on the Broidy Defendants' computer networks and email accounts was controlled by technological measures, including firewalls, antivirus software, and measures restricting access to users with valid credentials and passwords.

355.   Qatar conducted a targeted attack to circumvent these technological measures by stealing usernames and passwords from authorized users. Qatar sent spearphishing emails containing links to malicious websites designed to trick users into providing usernames and passwords. Qatar used the information they obtained from their spearphishing attacks to gain unauthorized access to the Broidy Defendants' computer networks and email accounts.

356.   Qatar's conduct caused the Broidy Defendants significant damages, including, but not limited to, damage resulting from harm to the Broidy Defendants' computers, loss in the value of their trade secrets and proprietary business information, and harm to the business.

357.   As a result, the Broidy Defendants are entitled to the greater of their actual damages or statutory damages as provided by 17 U.S.C. § 1203, in an amount to be proven at trial. The Broidy Defendants are further entitled to attorneys' fees and costs as provided by 17 U.S.C. § 1203.

358.   The Broidy Defendants further seek a declaration that Qatar's conduct violated the DMCA.

## CONTERCLAIM COUNT ELEVEN

### CA Uniform Trade Secrets Act, Cal. Civ. Code § 3426, *et seq.*
### (All Broidy Defendants against State of Qatar)

359.   The Broidy Defendants incorporate and adopt by reference the allegations contained in each and every preceding paragraph.

360.   The California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 et seq., prohibits the misappropriation of any "trade secret."

361.   Qatar misappropriated a "trade secret" as defined by the CUTSA to include "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code. § 3426.1(d).

362.   The BCM server stored trade secrets including but not limited to highly confidential business plans and proposals, research supporting those plans and proposals including costs and service projections, information concerning business strategies and opportunities, and contacts for important business

relationships. These trade secrets are of immense value to the Broidy Defendants.

363.   The Broidy Defendants take and have taken reasonable measures to keep this information secret. For example, the Broidy Defendants have always maintained their information on secured servers that are protected by passwords, firewalls, and antivirus software.

364.   The Broidy Defendants' trade secrets derive independent actual and potential economic value from not being generally known or available to the public or other persons who can obtain economic value from their disclosure or use.

365.   The Broidy Defendants' trade secrets have significant value, resulting from significant investment of time and resources.

366.   The Broidy Defendants have made, and continue to make, efforts that are reasonable under the circumstances to maintain the secrecy of their trade secrets.

367.   Qatar improperly disclosed the Broidy Defendants' trade secrets without their consent when Qatar widely disseminated those trade secrets to media organizations for publication and, at the time of such disclosure, knew or had reason to know that the information disclosed consisted of trade secrets.

368.   As a direct consequence of Qatar's misappropriation, the Broidy Defendants have suffered damages, which include, but are not limited to, damage resulting from harm to their computers, servers, and accounts, loss in the value of their trade secrets and business information, and harm to the business, in an amount to be proven at trial.

369.   As a direct consequence of Qatar's unlawful misappropriation, Qatar has unjustly benefited from their possession of the Broidy Defendants' trade secrets.

370.   In misappropriating the Broidy Defendants' trade secrets, Qatar acted willfully and maliciously. The Broidy Defendants are thus entitled to exemplary damages under Section 3426.3(c) of the Civil Code, as well as reasonable

attorneys' fees and costs under Section 3426.4 of the Civil Code.

371.   The Broidy Defendants further seek a declaration that Qatar's conduct violated CUTSA.

## CONTERCLAIM COUNT TWELVE

### Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*
### (All Broidy Defendants against State of Qatar)

372.   The Broidy Defendants incorporate and adopt by reference the allegations contained in each and every preceding paragraph.

373.   The materials that Qatar stole from computer systems and servers of the Broidy Defendants and Google include trade secrets within the meaning of 18 U.S.C. § 1839.

374.   The BCM server stored trade secrets including but not limited to highly confidential business plans and proposals, research supporting those plans, proposals including costs and service projections, information concerning business strategies and opportunities, and contacts for important business relationships. These trade secrets are of immense value to the Broidy Defendants.

375.   The Broidy Defendants take and have taken reasonable measures to keep this information secret. For example, the Broidy Defendants have always maintained their information on secured servers that are protected by passwords, firewalls, and antivirus software.

376.   The Broidy Defendants' trade secrets were related to products or services used in, or intended for use in, interstate or foreign commerce.

377.   Qatar acquired the Broidy Defendants' trade secrets knowing or having reason to know that the trade secrets were acquired by improper means. Qatar also disclosed, or aided in the disclosure of, the trade secrets on multiple occasions by sharing those trade secrets with media organizations, as discussed herein, while knowing or having reason to know that the trade secrets were acquired by improper means.

378.   As a direct consequence of Qatar's misappropriation, the Broidy Defendants have suffered damages, which include, but are not limited to, damage resulting from harm to their computers and servers, loss in the value of their trade secrets and business information, and harm to their business, in an amount to be proven at trial.

379.   Furthermore, as a direct consequence of Qatar's unlawful misappropriation, Qatar has unjustly benefited from its possession of the Broidy Defendants' trade secrets.

380.   In misappropriating the Broidy Defendants' trade secrets, Qatar acted willfully and maliciously. The Broidy Defendants are thus entitled to exemplary damages under 18 U.S.C. § 1836(b)(3).

381.   In misappropriating the Broidy Defendants' trade secrets, Qatar acted willfully and maliciously. The Broidy Defendants are thus entitled to exemplary damages and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3).

382.   The Broidy Defendants further seek a declaration that Qatar's conduct violated the DTA.

## PRAYER FOR RELIEF

The Broidy Defendants repeat and re-allege the allegations contained in each and every preceding paragraph.  WHEREFORE, Broidy Defendants pray for the entry of judgment in each of their favor as follows:

1. Grant judgment in favor of the Broidy Defendants and against the Counterclaim Defendants;

2. Deem AIH, Ashraf Abu Issa, Nabil Abu Issa, and the State of Qatar as plaintiffs, counter-defendants, and real parties in interest in this action pursuant to Fed. R. Civ. P. 13(h), 17, 19, and 20.

3. Declare that the Counterclaim Defendants' conduct constitutes violations of the statutes and common law cited herein;

4. Grant all appropriate injunctive relief;

5.  Award the Broidy Defendants an appropriate amount in monetary damages as determined at trial, including pre- and post-judgment interest, and any treble damages to which Plaintiffs are entitled by the statutes cited herein;

6.  Award the Broidy Defendants punitive damages under 18 U.S.C. § 2707, 18 U.S.C. § 1836(b)(3), Cal. Civ. Code § 3426.3(c), and Cal. Pen. Code § 502, as well as under the Broidy Defendants' claims for invasion of privacy by intrusion upon seclusion, conversion, and business conspiracy;

7.  Award the Broidy Defendants attorneys' fees and the costs of bringing this action; and

8.  Grant the Broidy Defendants such other relief as is just and appropriate.

Dated: October 7, 2021

Respectfully submitted,

McGuireWoods LLP

 *s/ Kevin M. Lally*
Kevin M. Lally
Abigail G. Urquhart
355 S. Grand Avenue, Suite 4200
Los Angeles, California 90071-3103
Telephone: (213) 457-9862
Facsimile:  (213) 457-9882
E-Mail: klally@mcguirewoods.com
E-Mail: aurquhart@mcguirewoods.com

George J. Terwilliger III (*Pro Hac Vice*)
Michael Francisco (*Pro Hac Vice*)
McGuireWoods LLP
888 16th Street NW, Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Telephone: (202) 857-1700
Facsimile: (202) 857-1737

COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIM-PLAINTIFFS ELLIOTT BROIDY, BROIDY CAPITAL MANAGEMENT, LLC, AND CIRCINUS, LLC

E-Mail: gterwilliger@mcguirewoods.com
E-Mail: mfrancisco@mcguirewoods.com
Brooks H. Spears (*Pro Hac Vice*)
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Telephone: (703) 712-5000
Facsimile: (703) 712-5050
E-Mail: bspears@mcguirewoods.com

Attorneys for Defendants and Counterclaim-Plaintiffs ELLIOTT BROIDY
BROIDY CAPITAL MANAGEMENT, LLC
CIRCINUS, LLC

COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIM-PLAINTIFFS ELLIOTT BROIDY, BROIDY CAPITAL
MANAGEMENT, LLC, AND CIRCINUS, LLC

# CERTIFICATE OF SERVICE

I certify that, on October 7, 2021, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notice to all counsel

of record.

*s/ Kevin M. Lally*
Kevin M. Lally

COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIM-PLAINTIFFS ELLIOTT BROIDY, BROIDY CAPITAL
MANAGEMENT, LLC, AND CIRCINUS, LLC