# EXHIBIT 1

# Poblete Analysis Group LLC

510 King Street, Suite 340
Courthouse Building
Alexandria, Virginia 22206
P 202.506.0516

Hon. Yleem D.S. Poblete, Ph.D
Yleem.Poblete@pobleteanalysigroup.com

October 6, 2021

Mr. David J Camel, Esq.
Weinstein, Boldt, Halfhide & Camel
841 Apollo Street, Suite #450
El Segundo, CA 90245

Subject:        Expert Opinion from Dr. Yleem D.S. Poblete
                *Mosafer Inc., et al. vs. Elliott Broidy, et al.*, Case No. 2:21-cv-06320

Dear Mr. Camel,

        Thank you for the opportunity to provide expert testimony in the case referenced in the subject line of this cover note. Attached, please find the requested expert opinion in the matter. If you have any questions, please do not hesitate to contact us. Thank you,

                Sincerely,

                *For Poblete Analysis Group LLC*

                Hon. Yleem D.S. Poblete, Ph.D.
                President

Enclosures
        1. Expert Opinion

YDSP/pag1

# EXPERT OPINION OF DR. YLEEM D.S. POBLETE

**Purpose**

I have been asked to provide my opinion about whether the Mosafer Plaintiffs (Mosafer, Inc.,

Mosafer-ECOM, Inc. and GoMosafer.com), as subsidiaries of Abu Issa Holdings and controlled

by the Abu Issa brothers (Ashraf Abu Issa and Nabil Abu Issa) would have filed this lawsuit

without a request from and support of the State of Qatar.

**Opinion**

Based on my experience and a careful review and evaluation of publicly available information,

including the complaint by Mosafer Plaintiffs affirming they are "synonymous" with and

"intimately associated" with Qatar, it is difficult to conceive of a scenario where the Mosafer

Plaintiffs, as subsidiaries of Abu Issa Holdings and controlled by the Abu Issa brothers, would

have undertaken such a high profile legal action in the United States targeting a prominent figure

in political circles, without the full knowledge and support of the State of Qatar and the highest

levels of the Qatari leadership. Plaintiffs would have been well aware of the potentially

significant negative ramifications for their professional endeavors, familial and personal

relationships, of undertaking this action without the consent of the Qatari state.

**Expert's Background**

I have over three decades of experience in the foreign affairs and national security arena, with a

specialization in the Middle East region, terrorism, proliferation, and economic sanctions. For 23

years, I served in the U.S. government and held the highest security clearances, including those

limited to a handful of senior officials and pertaining to highly classified special access programs.

In addition to being unanimously confirmed by the Senate as Assistant Secretary of State, I served in various senior roles on the U.S. House of Representatives Foreign Affairs Committee, including as Staff Director and Chief of Staff of the full Committee and Staff Director of the Middle East Subcommittee.  Throughout my tenure on the Committee, I spearheaded Congressional oversight and investigative efforts, drafted and secured the enactment and implementation of national security laws.

With respect to my work on Qatar, I developed policy initiatives designed to target Qatar's support of state sponsors of terrorism, such as Iran, as well as terrorist groups and individuals; its lack of transparency, corrupt practices, targeting of dissenters or government critics; and other activities that posed threats to U.S. national security and interests or that undermined U.S. foreign policy priorities.

My professional experience includes tenures at the White House, academia, think tanks, and an international financial institution. I serve on non-profit boards such as the Advisory Board of the National Security Institute of the Scalia Law School at George Mason University; am frequently consulted by current and former U.S. officials, as well as private sector representatives on matters about the Middle East; have been a presenter at foreign policy conferences and panel discussions on the region; a guest lecturer at academic institutions, including the National Intelligence University; and have been interviewed by and published in U.S. and foreign media, including on matters relating to the Middle East.

PAG LLC

Throughout my career, I have traveled extensively internationally to engage with senior government officials, civil society, private sector leaders in the respective countries and at international forums. I earned graduate degrees in International Relations with the Middle East as one of my areas of concentration.

## Expert Opinion

*Overview*

1. Qatar is an absolute neo-patrimonial monarchy.  As of 2013, the head of state has been His Highness Sheikh Tamim bin Hamad Al-Thani, or the Emir of Qatar.  Before his ascension, he had served in several economic, diplomatic, and national security positions and has been credited for spearheading Qatar's successful bid to host the 2022 FIFA World Cup.

2. Power is concentrated in and flows through the Emir, further projected via the ruling family, other elites, and institutionalized clientelism.  His ubiquitous influence cannot be overstated.

3. Because of its combination of outsized wealth and minuscule population, the Qatari state has been able to effectively control all aspects of society via a highly restrictive patronage system, which rewards total fealty and punishes those who do not fall in line. Qatar has a history of utilizing its wealth to counter, curb, or outright suppress, dissent and criticism domestically and abroad.

4. The most recent report on human rights practices issued by the U.S. Department of State documents how Qatari law, despite public pronouncements and its accession to international agreements and commitments such as the International Covenant on Civil and Political Rights: "prohibits residents from criticizing the Amir...criminalizes a broad range of speech

and publishing activities both on and offline with penalties including up to five years imprisonment and a substantial fine."[1]

5.  The Qatari government continued to review, censor, or ban foreign newspapers, magazines, films, and books for objectionable content. "Journalists and publishers continued to self-censor due to political and economic pressures when reporting on government policies or material deemed denigrating" to, among other matters, the ruling family. Qatari law restricts the publication of information deemed to "defame the state" or "prejudice heads of state or disturb relations."[2]

6.  Most of the new wealth created in the past two decades has come from Qatar's exponential increase in its natural gas exports, primarily from the North Field it shares with Iran.  This wealth has enabled Qatar to expand its reach and influence overseas, projecting its agenda in a variety of ways, including via the establishment of Al-Jazeera as a recognized media outlet, significant investments in European and Asian markets, and the presence of satellite campuses of U.S. colleges and universities, as well as U.S.-based think tanks and similar institutions, in Doha.

7.  This constellation of power and interlocking influence centers has further enhanced the Qatari state's ability to control the narrative about its leadership, policies, behavior, and activities.  Qatar has proven quite adept at deflecting attention from negative developments, reframing the narrative and projecting a positive image to the outside world in response to

[1] Available at https://www.state.gov/wp-content/uploads/2021/03/QATAR-2020-HUMAN-RIGHTS-REPORT.pdf (last accessed Sept. 25, 2021).

[2] Id.

*Mosafer Inc., et al. vs. Elliott Broidy, et al.*
Dr. Yleem D.S. Poblete, Page 5 of 21.

public pressure from responsible nations and when economic or business opportunities are at stake.

8. The March 2020 determination by the U.S. Department of Justice (DOJ) regarding the Qatar America Institute[3] and September 2020 DOJ determination regarding Al-Jazeera's online platform are illustrative of the indivisibility between government, media, business, arts and culture, entities labelled as non-governmental organizations, and other sectors in Qatar.  One of several noteworthy revelations in the retroactive FARA filing by the Qatar America Institute, for example, noted how QAI's activities and programs "included appearances by Qatari officials in the U.S. to speak on issues often raised against Qatar...annual forums for cultural events in different U.S. cities, and sponsorship of lectures on a wide variety of topics."[4]  QAI carried out these functions at the direction of the State of Qatar including through the Qatar National Tourism Council.[5]  Months later, following years of Congressional pressure and investigations[6], the DOJ declared that AJ+ "a subsidiary unit of Al Jazeera Media Network, must register under FARA because it engages in 'political activities' on behalf of Qatar's government and is designed to 'influence American perceptions' of 'domestic policy,' among other reasons."[7] The Justice Department letter

---

[3] https://efile.fara.gov/docs/6829-Exhibit-AB-20200529-1.pdf, p. 10.

[4] Id.

[5] Id. p.5.

[6] "State-run propaganda network operating in the U.S. should register as Foreign Agent," Letter from 19 Members of the U.S. House and Senate to the Attorney General, Department of Justice (March 6, 2018) available at https://zeldin.house.gov/sites/zeldin.house.gov/files/3.6_zeldin_gottheimer_cruz_letter_pdf.pdf

[7] "Qatari-Backed Media Still Not Registered Under Foreign Agents Law Despite Justice Department Determination, Senators Want To Know Why," Letter from five U.S. Senators to the Attorney General, Department of Justice (Jul. 1, 2021) available at https://www.grassley.senate.gov/news/news-releases/qatari-backed-media-still-not-registered-under-foreign-agents-law-despite-justice-department-determination-senators-want-to-know-why (last accessed September 27, 2021).

reportedly added that the entity's work is carried out "at the direction and control" of the Qatari leadership,[8] and its employees "are paid by funds originating with the Government of Qatar."[9]

9.   While Qatar appears to rank better than other countries in the region, reliable indicators and data are sparse due to the structure of the government.  Transparency International has underscored the lack of "integrity mechanisms," opaque budgeting and procurement processes, and the use of personal and other connections as an accepted practice, as indicators of systemic breeding for public corruption.[10]  It has also created what U.S. Treasury officials have described as an extremely permissive and conducive environment for the financing of terrorist groups.[11]

*Qatar's intense focus on the U.S.*

10. In the national security and foreign policy arena, it is indispensable to know the actors one is engaging with-- to understand the nature of the government, society, leadership rationale, and modus operandi.  Throughout my over 20 years of U.S. government service, in particular, my lengthy tenure as senior staff on one of the core Congressional national security committees which dates back to the founding of Our Republic, I witnessed both the duality and, at times,

---

[8] "DOJ pressed to enforce Al-Jazeera Foreign Agent ruling," Axios (Mar. 3, 2021); available at https://www.axios.com/doj-enforce-al-jazeera-foreign-agent-ruling-a5a58129-5a12-4aee-8a2b-cbfbb7d8f900.html (last accessed Sept. 30, 2021).

[9] "US Orders Al-Jazeera Digital to Register Under FARA," Global Influence Operations Report: An Intelligence Digest Tracking Influence Operations Worldwide (Oct. 14, 2020); available at https://www.global-influence-ops.com/us-orders-al-jazeera-digital-to-register-under-fara/ (last accessed Sept. 30, 2021).

[10] Available at https://www.transparency.org/en/cpi/2020/index/qat (last accessed Sept. 30, 2021).

[11] Remarks of Under Secretary for Terrorism and Financial Intelligence David Cohen before the Center for a New American Security on "Confronting New Threats in Terrorist Financing", 3/4/2014, available at https://www.treasury.gov/press-center/press-releases/pages/jl2308.aspx (last accessed Sept. 30, 2021).

duplicity of some of our partner countries.  This was (and continues to be) manifested in a

plethora of ways, such as issuing different statements for U.S. and domestic or regional

consumption; while feigning cooperation, showing little to no initiative in addressing threats

or issues of concern to the USG and when steps are taken only at the specific request of the

USG, those actions or policies are mostly cosmetic or ephemeral.

11. Perhaps most troubling, some partner countries play all sides--that is, appeasing, sometimes

cooperating, with the U.S. as they simultaneously engage America's enemies or adversaries

and take actions contrary to their commitments to the U.S.  These governments leverage their

strategic importance to manipulate the U.S. into silence about their problematic policies,

behavior, and practices on other fronts or into granting concessions.

12. Qatar is a case in point.

13. Earlier this year, for example, the Emir approved "elections" for the country's Shura Council

(its parliament).  These are scheduled to be held this month, in October 2021.  Currently, the

Emir appoints the 45 Council members. Under the new construct, the election will select 30

members with the Emir retaining the authority to power the remaining 15.

14. Ostensibly, this is a positive step for the people of the emirate.  As one delves deeper,

however, one finds that relevant provisions in the Qatari law deny electoral participation to

and discriminate against, certain citizens such as the Al-Hofran (Mora) tribe, described as

one of Qatar's largest. This tribe recently regained its citizenship status after it was stripped

in an apparent act of revenge for having supported the current Emir's grandfather when he

was deposed by his son in 1995.  As documented by Human Rights Watch in 2019, this

decision left the Al-Hofran stateless and, in turn, deprived them "of their rights to decent

work, access to health care, education, marriage and starting a family, owning property, and

freedom of movement." They also faced "restrictions on opening bank accounts and acquiring driver's licenses" and were "at risk of arbitrary detention."[12]

15. Just a few weeks ago, international human rights organizations again criticized the laws promulgated in July 2021 regulating Qatar's elections for the Shura Council. Human Rights Watch, for example, affirmed the new laws "will effectively disenfranchise thousands of Qataris,"[13] as under the new electoral regime, Qataris who are categorized as "naturalized" as opposed to "native" are "barred from running as candidates and largely prohibited from voting in the October elections for two-thirds of the seats in the Shura Council."[14]

16. There are many relevant examples of Qatari duality and duplicity; however, none more concerning perhaps, than Qatar's support for terrorist groups and state-sponsors of terrorism.

17. Shortly after 9/11, the U.S. began the process of moving its Central Command operations from Prince Sultan airbase in Riyadh to Al-Udeid in Doha. In the 20 years since, Qatar's foreign policy has been built on the twin pillars of 1) close, visible ties with the U.S., and, concurrently, 2) financial and marketing support for the Muslim Brotherhood and terrorist groups such as Hamas, Hezbollah, al Nusra and al Qaeda.

18. Qatari banks, charities, and other entities have for years been heavily scrutinized for their links to the funding of terrorism throughout the broader Middle East. Qatar Charity is a case in point.

19. Following investigations and testimony provided to the 9/11 Commission and Congressional committees by an array of sources, in 2008, the U.S. Interagency Intelligence Committee on

---

[12] Available at https://www.hrw.org/news/2019/05/12/qatar-families-arbitrarily-stripped-citizenship (last accessed Sept. 30, 2021).

[13] Available at https://www.hrw.org/news/2021/09/09/qatar-election-law-exposes-discriminatory-citizenship (last accessed Sept. 30, 2021).

[14] Id.

Terrorism (IICT) listed Qatar Charity (at the time "Qatar Charitable Society") as a "priority III terrorism support entity," in light of its demonstrable "intent and willingness" to support terrorist organizations against the U.S. and interests. Qatar Charity is currently part of the Union of Good, a Specially Designated Terrorist Organization (SDGT) sanctioned by the U.S. under an Executive Order "targeting terrorists, terrorist organizations and those providing financial, technological, or material support to terrorists, terrorist organizations, or acts of terrorism."[15]

20. The chairman of Qatar Charity's board is H.E. Sheikh Hamad bin Nasser Al Thani, a member of the royal family.[16]

21. It is also noteworthy, given renaming entities is one of several practices used to evade scrutiny or detection by U.S. and other Western intelligence and law enforcement agencies, that the United Kingdom branch of Qatar Charity renamed itself Nectar Trust in 2017, following a scathing report by the UK Charity Commission on Qatar Charity's connections to the Muslim Brotherhood and Hamas.

22. Increased focus on its history of supporting terrorist groups and promoting extremism, including via Al-Jazeera, has intensified Qatar's focus on the U.S., applying its wealth and network to protect its image and influence policymakers and other key stakeholders.

23. As just one recent example, several members of the House Foreign Affairs Committee (HFAC) in 2017 introduced H.R. 2712 the Palestinian International Terrorism Support Prevention Act (commonly referred to as the Hamas Sanctions bill).

---

[15] U.S. Treasury Dept. Press Release, Treasury Designates the Union of Good, Nov.12, 2008, available at https://www.treasury.gov/press-center/press-releases/pages/hp1267.aspx (last accessed Sept. 30, 2021).

[16] Qatar Charity website, Board, available at https://www.qcharity.org/en/global/qatar-charity-offices/board-of-trustees (last accessed Sept. 30, 2021).

PAG LLC

24. In its legislative findings, the bill made the unremarkable statement that Qatar had for years openly supported Hamas—designated by the U.S. as a Foreign Terrorist Organization.   Even though the bill did not impose sanctions on Qatar (it would have been the Administration's duty to first determine which nations were providing requisite support for Hamas), Qatar fought that bill harder than any other I can recall in my two decades working on Middle East issues on the HFAC and with Members of Congress.

25. Qatar has sought to use its longstanding support for: (a) the Iranian regime, to help mediate between Washington and Tehran on Iran's nuclear program; and (b) the Houthis[17] and Muslim Brotherhood to interject itself as a mediator for a political settlement to the conflict in Yemen.

26. Qatar's ability to play both sides and leverage into an asset for the U.S. those very relationships and activities the U.S. finds objectionable as they endanger national security, is currently on full display concerning the situation in Afghanistan. The emirate has helped charter flights for those fleeing Kabul and has taken in thousands of them, at least temporarily. It had already maneuvered itself into the intermediary position to the Taliban, utilizing its history of hosting the Taliban's headquarters and providing money and luxury accommodations to many Taliban leaders, including those under terrorism sanctions from the U.S. and the United Nations Security Council.   Qatar's approach of playing both sides meant that at the same time Afghans were fleeing Kabul, Taliban leaders were flying in the opposite direction, leaving Doha in private jets to return to Kabul.[18]

---

[17] Until February 16, 2021, Ansarallah (Houthis) was designated as a Foreign Terrorist Organization (FTO) and Specially Designated Global Terrorist (SDGT).

[18] How Qatar Became the Power Broker of Afghanistan, Seth J. Frantzman, August 25, 2021, https://www.meforum.org/62597/qatar-the-power-broker-of-afghanistan (last accessed Sept. 30, 2021).

27. Qatar seeks to capitalize on these recent developments to burnish its image with the Biden administration, other U.S. policymakers and elected officials, and a cross spectrum of American society. To that end, Qatar is not only increasing its lobbying and advocacy (FARA) expenditures but appears to be looking to known quantities—trusted allies such as the Abu Issa brothers (via AIH and Mosafer Plaintiffs)— to suppress even past criticism of its policies, actions, behavior, and in so doing, deter any future dissonance with its image branding.

### *The Ties that Bind*

28. In Arab culture in the Middle East, the informal networks and connections initially rooted in familial or tribal relations and used to overcome or circumvent formal bureaucratic processes to achieve a desired result, is called "Wasta"—that is, intermediary or, referring to the system, nepotism or patronage. Through a Western lens, this is viewed negatively; considered corruption or, at minimum, unethical. In the region and countries such as Qatar, it is considered normal and culturally acceptable (or, even expected) to assist family, friends, partners, connections.

29. Those who have substantial wealth or power inside Qatar achieved it either through birthright or through a combination of affinity and fealty to the Emir or his inner circle.

30. Based on the publicly available information, Ashraf and Nabil Abu Issa would fall into the latter category. Their family's background is Palestinian. This is noteworthy as, in Qatar, the mere fact that their family acquired citizenship is quite significant, as many families live in Qatar for generations without becoming citizens or even enjoying a potential path to do so.

31. Prior to the enactment of Law No. 38 of 2005, the *only* way that a non-Qatari national could gain citizenship was by a decree from the Emir himself.  For the Abu Issa brothers, this would presumably have been facilitated by their uncle's standing as the personal photographer of former Emir Sheikh Ali bin Abdulla Al Thani and familial relations between the ruling royal family and the Abu Issas dating back to the 1950s.  This eventually led to the establishment of Abu Issa Holdings—a Qatari holding company with dozens of subsidiaries and affiliates, including the Mosafer Plaintiffs.  Ashraf Abu Issa and Nabil Abu Issa are the Chairman and Vice Chairman, respectively, of AIH.

### *Joint Ventures with Foreign Companies*

32. The most lucrative business opportunities for the Abu Issa brothers appear to stem from their close ties to the Qatari regime.  Domestic law requires that most traditional businesses must be at least 51% owned by Qataris.[19]  The practical result is that the domestic "partners" chosen for joint ventures by foreign companies or investors are those with the most powerful political ties.

33. Inside a country with very few citizens relative to its enormous wealth, all pertinent high-level decisions relating to contract awards, tenders, permits, etc. are ultimately determined or, at minimum, permitted by the state elites.  Given that Qatar's power depends on fealty to the Emir, this means that foreign companies seeking construction business are likely to select only the Emir's most loyal allies as local joint venture "partners".

---

[19] Available at https://www.export.gov/apex/article2?id=Qatar-joint-ventures; and here:
https://uk.practicallaw.thomsonreuters.com/4-549-2825?transitionType=Default&contextData=(sc.Default) (last accessed Sept. 30, 2021).

34. Joint ventures, particularly in the realm of construction and public works projects, are just another form of patronage endemic to the Qatari system.

35. Abu Issa Holdings, owned by the Abu Issa brothers, is a collection of dozens of corporations, from IT software companies to retail stores.[20] AIH's first endeavor was the establishment of Blue Salon, a luxury department store. The Emir has publicly reinforced his support and affinity for AIH by visiting the Blue Salon and taking photographs with Ashraf Abu Issa, published in several media.  Just this summer, Blue Salon received FIFA's official license for various products related to World Cup 2022—an award worth many millions of dollars.[21] Considering the normal deference shown by FIFA to the hosting nation, Blue Salon (a subsidiary of AIH) likely secured the coveted license agreement due, in large part, to the Abu Issa brothers' connections to the Qatari state and longstanding ties to the Al-Thani royal family.

36. AIH has joint ventures with various companies involved in almost every aspect of construction, from architecture and engineering to project oversight and facilities management.[22]

37. Illustrative of the linkages between the Abu Issa brothers and the Qatari state is AIH's Starlink joint venture with Ooredoo, Qatar's primarily state-owned telecommunications

---

[20] AbuIssa Holding: Partnering with the Future, page 10, found at: https://www.abuissa.com/wp-content/uploads/2019/02/AIH-Profile-16Oct.pdf (last accessed Sept. 30, 2021).

[21] FIFA Licenses Blue Salon to Sell Qatar 2022 World Cup Merchandise (Jul. 12, 2021), available at https://www.thepeninsulaqatar.com/article/12/07/2021/FIFA-licenses-Blue-Salon-to-sell-Qatar-2022-World-Cup-merchandise (last accessed Sept. 30, 2021).

[22] AbuIssa Holding: Partnering with the Future, found at: https://www.abuissa.com/wp-content/uploads/2019/02/AIH-Profile-16Oct.pdf (last accessed Sept. 30, 2021).

company.  Sheikh Mohammed Bin Abdulla Bin Mohammed Al Thani is the Deputy Group Chief Executive Officer and Chief Executive Officer of Ooredoo.

38. Ashraf Abu Issa also co-owns an art auction house with Sheikh Abdulraheem Al-Thani, who is not only part of the royal family but is the Chief Executive Officer of Al-Jazeera's parent company, Qatar Media Corporation.[23] Al-Jazeera is of critical importance to the Emir and the Qatari government.  By extension, the CEO of the outlet's parent company is a powerful figure and viewed as enjoying the Emir's utmost confidence.

39. In my experience, these types of partnerships, particularly in sectors deemed priorities by the Emir, would be viewed by the U.S. government as indicative of the Abu Issa brothers' standing as insiders and their actions would, in turn, receive greater scrutiny.

40. Throughout my U.S. government service, I witnessed first-hand the symbiotic relationships in a plethora of countries in the broader Middle East.  The same families and friends served in key posts in government, business ventures, chambers of commerce, advisory councils, so-called non-governmental organizations, among others which were, in practice, surrogates for the government.  Only the most trusted and experienced were deployed to engage with U.S. governmental, business, and other private sector representatives.  Qatar epitomized this approach as their surrogates or proxies in or from Qatar (separate from agents registered under FARA) would advance and follow up on meetings with and visits by senior Qatari officials.

---

[23] Arabian Knight, Our Knights and Distinguished Personalities, Knight of Art
https://www.arabianknightonline.com/Details/1906/Knight-of-Art (last accessed Sept. 30, 2021).

*Providing political cover*

41. As previously discussed, fealty is rewarded.  It is also tested, as beneficiaries are utilized as political cover for, or instruments of, the Qatari state.

42. Shortly before Qatar was officially awarded the rights to host next year's World Cup, the Abu Issa brothers registered the domain name GoMosafer.com.[24]  In early 2012, the website became an online travel booking service.[25] Notably, this coincided with the large increase in migrant workers who were arriving in Qatar to build stadiums and complementary infrastructure for this global sports event.

43. Most adult citizens in Qatar hold public sector jobs marked by "high salaries and luxury work conditions," pay no income taxes and receive generous subsidies for everything from housing to health care.  GoMosafer's marketing is incongruous to a society of economic comforts, as it targets travelers seeking deep discounts, with its website prominently marketing "cheap flights," and its blog offering travel tips for "budget backpacker hostels" and "local homestay experiences" (staying in a family's spare bedroom.)[26]

44. It became apparent that GoMosafer's strategy was to focus its travel booking services on the increasing numbers of migrant workers based in Qatar. GoMosafer's homepage (from at least 2016 through 2018) promoted "cheap flight booking" for "Doha-Manila," "Doha-

---

[24] Domain history report, GoMosafer.com, available (for purchase) at DomainTools.com.

[25] http://web.archive.org/web/20120113151344/http://www.gomosafer.com/mosafer (last accessed Sept. 30, 2021).

[26] How To Find Cheap (and Free Travel) Accommodations? (Jan. 20, 2020) available at http://web.archive.org/web/20200930155012/https://blog.gomosafer.com/how-to-find-cheap-and-free-travel-accommodation/ (last accessed Sept. 30, 2021).

Kathmandu" and "Doha-Kochi."[27] [28] (Kochi is located in the Indian state of Kerala). Given a large number of the migrant workers in Qatar hail from the Philippines, Nepal, and India, such suggestions would no doubt be very helpful for those laborers seeking to visit or simply return home.

45. GoMosafer's website also recounts how it chartered a plane during the COVID pandemic in June 2020 to return over 150 migrant workers to Kerala.[29] The fact that GoMosafer was able to secure the necessary permissions in Qatar during a pandemic and coordinate with a foreign government for returning so many migrant workers to their home country—all for an effort that would qualify as a classic governmental function—suggests that GoMosafer was created by Mosafer Plaintiffs (AIH, Abu Issa brothers), in order to help the State of Qatar with its ballooning migrant worker class who has been utilized to prepare for hosting the World Cup.

46. It is important to note that the Ministry of Tourism and the Qatar National Tourism Council ("Tourism Council") are integral components of the Qatari government and instrumental to the Qatari leadership's broader agenda for economic diversification. The Tourism Council is led by Sheikh Nawaf Bin Jassim bin Jabor Al Thani and includes Sheikh Abdullah Bin Nasser bin Khalifa Al Thani as "key principal."[30] Tourism has been identified as one of five

---

[27] http://web.archive.org/web/20160426194932/http://www.gomosafer.com/index.aspx (last accessed Sept. 30, 2021).

[28] http://web.archive.org/web/20180324020100/http://www.gomosafer.com/index.aspx (last accessed Sept. 30, 2021).

[29] The Fastest Repatriation Flight: How It All Happened?, available at http://web.archive.org/web/20210121170529/https://blog.gomosafer.com/the-fastest-repatriation-charter-flight-how-it-all-happened/ (last accessed Sept. 30, 2021).

[30] https://www.dnb.com/business-directory/company-profiles.qatar_national_tourism_council.00cf2edf479b850b93bd5cfdd285bc2f.html#contact-anchor

priority sectors to achieve "the Next Chapter's targets."[31] and the Qatari state has been consumed with the destination branding of Qatar, augmenting its profile to investors and travelers alike, particularly as the World Cup draws near.  The Qatari leadership would rely on and seek assistance from, trusted actors such as the Abu Issa brothers (personally and via AIH and its subsidiaries such as Mosafer, Inc.) to serve as force multipliers in remedying issues that present challenges and reputational risks for the country and could prejudice against the leadership, such as conditions for the migrant workers.

47. In 2015, as Qatar was facing withering international condemnation from human rights organizations such as Amnesty International for the deaths of thousands of migrants toiling in the desert heat, under conditions often equated to "slave labor,"[32] to build stadiums and related infrastructure for the 2022 World Cup, the emirate engaged in a media offensive— first, denying allegations, arguing from the narrow premise that no worker had died specifically on World Cup construction sites, and then, dismissing the number of deaths concerning the large migrant worker population in the country as unremarkable.

48. It realized it needed to engage in "damage control" and issued tenders for the construction of camps for the migrant workers—housing with modest amenities to create the appearance of "communities" for the workers.

49. The Abu Issa brothers were awarded a presumptively lucrative contract from the first tender in December 2015.[33]  The public announcement was made by the Prime Minister (who also

---

[31] State of Qatar, Tourism - Government Communications Office, available at
https://www.gco.gov.qa/en/focus/tourism/ (last accessed Sept. 30, 2021).

[32] The 2022 World Cup: Forced Labor of Migrant Workers, by Sarah Hamill, January 15, 2019, found at:
https://www.traffickingmatters.com/the-2022-world-cup-forced-labor-of-migrant-workers/ (last accessed Sept. 30, 2021).

[33] https://www.qatarisbooming.com/article/1st-contract-mega-housing-project-workers-signed (last accessed Sept. 30, 2021).

PAG LLC

serves as the Interior Minister), Sheikh Abdulah Bin Nasser Al Thani, indicative of the importance of this effort to the Qatari leadership and one they would entrust only to those with a close relationship to the ruling elite, such as the Abu Issa brothers.[34]  Nabil Abu Issa appeared in photographs with the Prime Minister at the signing ceremony, posting one of the photos to his personal Instagram account.[35]

### Emir personally engages on U.S. political decisions

50. Particularly since the start of the Trump Administration and continuing into the Biden Administration, the Qatari leadership has prioritized and spent millions of dollars in building its relationships with U.S. political figures and burnishing its image in the U.S.  The Qatari media also reflects this dynamic, focusing extensively on U.S. politics in its news coverage.

51. Any well-connected Qatari businessman, such as the Abu Issa brothers, who enjoy longstanding ties to the senior echelons of the leadership in Doha and extensive contacts with private sector leaders worldwide, including in the U.S.; who are frequently profiled in global trade magazines; whose powerful amalgamation of companies and subsidiaries, AIH, has been featured on the website of the U.S.-Qatar Business Council, for example, would have known that the State of Qatar had been sued by Elliott Broidy for hacking and disseminating the hacked materials to the media.   It is also worth noting that, days after Mr. Broidy sued Qatar (on March 26, 2018), Ashraf Abu Issa traveled with a delegation accompanying the

---

[34] Id.

[35] Nabil Abu Issa, Instagram https://www.instagram.com/nabilabuissa/?hl=en (last accessed Sept. 30, 2021).

*Mosafer Inc., et al. vs. Elliott Broidy, et al.*

Emir of Qatar to the U.S.—stopping first, in Miami, and then traveling to Washington, D.C. for Emir Tamim Al-Thani's first White House meeting with then-President Donald Trump.

52. Even if Ashraf Abu Issa and Nabil Abu Issa had somehow not heard about the hack against Mr. Broidy or his lawsuit against Qatar, someone in their position would not risk upsetting the Emir or potentially undermining efforts underway by the State of Qatar by proceeding with a suit of this magnitude involving a prominent figure in American politics and business such as Mr. Broidy. Mr. Broidy held a senior position in the Republican Party and the 2016 Trump presidential campaign, placing him in a unique role with the future President and other Republican elected officials.

### *Conclusion*

53. In my expert opinion, the Abu Issa brothers, AIH, Mosafer Plaintiffs, would not pursue a lawsuit against Mr. Broidy without, at a minimum, first seeking—and then receiving—the blessing of Emir Tamim Al-Thani to do so.

54. Based on a review of the record and given the nature and power structure of the Qatari system, and how Qatar has dealt in recent years with dissent and criticism the emirate's leadership views as a threat, it is far more likely that the Abu Issa brothers, AIH, Mosafer Plaintiffs, were "asked" by the Emir or someone authorized to speak for the Emir and the State (in the sense that saying "no" is not an acceptable response), to file the lawsuit against Elliott Broidy.

55. The "Mosafer" lawsuit, with its request for a permanent injunction against Mr. Broidy's free speech rights, appears to be textbook Qatar and in keeping with the Qatari government's

PAG LLC

practice of silencing, censoring, or punishing critics, particularly if their criticism prejudices state relations.

56. The State of Qatar will greatly benefit from any judgement silencing Mr. Broidy in this lawsuit, as the State of Qatar could weaponize such a judgement against critics and dissenters in the U.S., in Qatar, and beyond.