# EXHIBIT 2

MOSAFER INC., ET AL V. ELLIOTT BROIDY ET AL. (2:21-CV-06320)

I, STEPHANIE RICE, being duly sworn, depose and state as follows:

## INTRODUCTION AND SUMMARY

1. I have been retained by counsel for the defendant in the above-captioned litigation to render certain opinions based on my experience and training regarding claims made in the media by Ashraf Abu Issa ("AAI"), who is the chairman and co-owner of AbuIssa Holding ("AIH"), parent company of the plaintiffs, known collectively as the Mosafer Entities.[1] In an interview with the *Daily Mail*, AAI was quoted as saying, "Some banks froze our accounts,"[2] clearly implying that bank accounts held by the plaintiffs or related entities had been subjected to freezing by certain banks as a result of conferences and media stories about Qatar's sponsorship of terrorist groups. The facts and information contained in this affidavit are based on open-source information provided to me by counsel for the Defendant, and my personal knowledge, experience, and training as an investigator with the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC")[3] and as a senior sanctions compliance officer with various global financial institutions, including JPMorgan Chase, Commerzbank AG, and Bank of Tokyo-Mitsubishi.

---

[1] The Mosafer Entities are wholly owned subsidiaries of Abu Issa Holding, which is jointly owned by two brothers, AAI & his brother Nabil Abu Issa.
[2] *See* https://www.dailymail.co.uk/news/article-9932983/Trump-donor-Elliott-Broidy-accused-running-smear-campaign-against-Qatar-new-lawsuit.html
[3] OFAC is an agency within the U.S. Treasury Department that is responsible for administering and enforcing U.S. economic sanctions.

## BACKGROUND

2. I am the Founder and Managing Partner of Vigilance Consulting Group, a consulting firm that advises clients on complex sanctions and financial crimes matters, compliance program development and testing, training, and risk management. I have over thirteen years of public and private sector experience analyzing complex economic sanctions matters as an investigator, bank compliance officer, and consultant.

3. I have a Bachelor of Arts degree from the Elliott School of International Affairs at The George Washington University. From 2007 to 2012, I was a Sanctions Enforcement Investigator with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), where I investigated potential violations of U.S. sanctions programs and pursued enforcement actions against banks, exporters, and other parties in connection with their sanctions-related misconduct. During my time at OFAC, I worked on multi-agency investigations of criminal activity relating to sanctions evasion schemes, terrorism financing, and money laundering, and provided sanctions-related training to other agencies in the U.S. government. A substantial portion of my work at OFAC focused on the Cuban and Iranian sanctions programs, which were the most comprehensive and complex programs in effect at that time.

4. Following my time at OFAC, I held senior positions with several global financial institutions, including (i) Vice President and Manager of Global Sanctions Compliance Advisory at JP Morgan Chase & Co., (ii) Director and Head of Sanctions Compliance at Commerzbank AG, and (iii) Director and Head of U.S. Sanctions Compliance at Bank of

Tokyo Mitsubishi UFJ, Ltd. In these roles, I was tasked with, among other responsibilities, overseeing and executing compliance with U.S. sanctions programs within the Americas and globally, liaising with OFAC, and supervising compliance investigations, screenings, escalations, licensing, and reporting. My curriculum vitae is attached as Appendix A.

5. In addition to my professional work experience, I have participated in numerous seminars, conferences, and trainings, both as an attendee and a speaker/trainer, and subscribe to and read various professional and trade publications covering economic sanctions, financial crimes, anti-money laundering, compliance, anti-corruption, and banking. The sources for these materials are varied but include The Association of Certified Anti-Money Laundering Specialists, and The Association of Certified Fraud Examiners, among others.

6. I have testified and consulted with law enforcement agencies in criminal matters involving Iran sanctions violations and sanctions evasion, including *United States v Mahmoud Reza Banki*. I have served as an expert witness and testified in *Dresser-Rand Company v Petroleos De Venezuela, S.A. et al.*, a matter relating to Venezuela sanctions. Additionally, I have served as an expert witness in *Alizadeh et al v Katebian et al*, a matter relating to Iran sanctions, sanctions evasion, and money laundering.

## RELEVANT INFORMATION

7. On August 5, 2021, the Mosafer Entities sued Elliott Broidy and companies owned, at least in part, by Elliott Broidy ("the Defendant"), allegedly for harm caused by his sponsorship of two think tank conferences in 2017 exposing Qatar's support for terrorism. The Mosafer

Entities argued that the conferences caused travel from the U.S. to Qatar to drop after 2017, thereby causing the plaintiffs to lose business as a result.

8. In an article published on August 27, 2021, the Mosafer Entities' co-owner and Chairman, AAI, told the *Daily Mail* that because of the conferences and negative media stories about Qatar supporting terrorism, "some banks froze our accounts."[4]

9. It is my understanding that prior to the lawsuit being filed, the Defendant had never been connected to any public statements, news articles, etc., regarding AAI, his brother Nabil Abu Issa ("NAI"), AbuIssa Holding ("AIH"), or any AIH subsidiary (collectively, "Abu Issa Entities"), including the Mosafer Entities, and the complaint never alleges that the Defendant or the conferences had ever mentioned any of the Mosafer Entities.

10. It is my understanding that there is no documentation available in the public domain or otherwise at this time that would allow me to assess the legitimacy or accuracy of AAI's claim that certain banks froze his accounts.

**FINDINGS**

11. Based on my years of experience dealing with financial crimes compliance regulations both in the U.S. government and as a senior compliance officer with various financial institutions, I find this claim to be deeply suspect. I am not aware of any instance in which a bank has made a determination to "freeze" or restrict the accounts of an individual or

---

[4] *See* https://www.dailymail.co.uk/news/article-9932983/Trump-donor-Elliott-Broidy-accused-running-smear-campaign-against-Qatar-new-lawsuit.html

company strictly based on general media coverage concerning the accountholder's home country.

12. Put differently, in my expert opinion, it is very unlikely that the bank accounts of AAI, AIH, or any subsidiary, including Mosafer Entities, could have been subjected to freezing or restriction by a bank in any jurisdiction adhering to Financial Action Task Force ("FATF")[5] guidelines based exclusively on media reports concerning Qatar's financing of terrorism, that did not in any way implicate one or more of those parties in the alleged conduct.

### A. Banks Use of Adverse Media in Customer Due Diligence Does Not Include Generalized News Reports on the Customer's Home Country

13. While banks may assess adverse media reporting in conducting due diligence on their customers (known as Customer Due Diligence or "CDD"), such adverse media must relate the customer directly in order to add value to the CDD process. General new stories about a customer's home country would not, in my experience, be included in a bank's review of adverse media as part of its CDD program because they do not specifically implicate the customer.

---

[5] According to its website, "the Financial Action Task Force (FATF) is the global money laundering and terrorist financing watchdog. The inter-governmental body sets international standards that aim to prevent these illegal activities and the harm they cause to society. As a policy-making body, the FATF works to generate the necessary political will to bring about national legislative and regulatory reforms in these areas. With more than 200 countries and jurisdictions committed to implementing them.  The FATF has developed the FATF Recommendations, or FATF Standards, which ensure a co-ordinated global response to prevent organised crime, corruption and terrorism. They help authorities go after the money of criminals dealing in illegal drugs, human trafficking and other crimes. The FATF also works to stop funding for weapons of mass destruction." [https://www.fatf-gafi.org/about/whoweare]

14. In jurisdictions that implement FATF guidelines, bank have an obligation to perform CDD in order to meet financial crimes compliance requirements. FATF's "Recommendation 10" identifies certain CDD measures that, at a minimum, each bank should incorporate into its CDD program. These measures are,

> *(a) Identifying the customer and verifying that customer's identity using reliable, independent source documents, data or information.*
>
> *(b) Identifying the beneficial owner, and taking reasonable measures to verify the identity of the beneficial owner, such that the financial institution is satisfied that it knows who the beneficial owner is. For legal persons and arrangements this should include financial institutions understanding the ownership and control structure of the customer.*
>
> *(c) Understanding and, as appropriate, obtaining information on the purpose and intended nature of the business relationship.*
>
> *(d) Conducting ongoing due diligence on the business relationship and scrutiny of transactions undertaken throughout the course of that relationship to ensure that the transactions being conducted are consistent with the institution's knowledge of the customer, their business and risk profile, including, where necessary, the source of funds.*[6]

15. The purpose of CDD measures, such as those outlined above, is to ensure, among other things, that banks are able to build an accurate profile of each customer; monitor accounts for unusual activity or red flags relative to normal or anticipated account behavior; and identify potential compliance risks. As part of a bank's CDD program and on an ongoing basis, banks may screen customer information (such as name and other identifying information) against various databases, including adverse media databases.

---

[6] Financial Action Task Force. *Recommendation 10: CDD.* June 2013. https://cfatf-gafic.org/index.php/documents/fatf-40r/376-fatf-recommendation-10-customer-due-diligence. Accessed 10/3/21.

16. When banks do screen their customers against adverse media databases, any results returned by the database will be based on matches or references to the customer's name or personal information. Media that only references a customer's home country but not the customer's data, would not be captured by this screening process.

17. Thus, it is my opinion that general media stories on Qatar's sponsorship of terrorism would be outside the scope of CDD adverse media reviews conducted by banks for AAI's accounts, as neither AAI or his companies were referenced in the stories.

### B. If AAI's Bank Accounts Were in Fact Restricted, This Was Likely Due to his Classification as a Politically Exposed Person ("PEP") or a Government Action

18. If AAI's claims are true, there could be several possible explanations. Without the ability to review additional, non-public documentation, however, it is my opinion that there are two likely reasons banks could have restricted AAI's personal or business accounts:

> (1) the banks classified AIH, AAI, and/or his brother Nabil (co-owner and Vice-Chairman of AIH) as a PEP and were not able to satisfy their enhanced due diligence requirements for the accounts in a way that fit within their acceptable level of risk tolerance;[7] or,

---

[7] According to FATF guidance on Recommendations 12 and 22, "where the level or type of activity in the business relationship diverges from what can be reasonably explained, given the knowledge of the PEP's source of wealth and source of funds, prompt further assessments of the situation should be undertaken. The outcomes of that assessment should determine if the business relationship is to be established or maintained, or whether further steps would be necessary, such as termination of the business relationship[12] and/or filing STRs to the financial intelligence unit (FIU), consistent with Recommendation 20 (reporting of suspicious transactions)." [Financial Action Task Force. *Politically Exposed Persons (Recommendations 12 and 22)*, pg. 14. June 2013. https://www.fatf-gafi.org/media/fatf/documents/recommendations/Guidance-PEP-Rec12-22.pdf. Accessed 10/3/21.]

(2) the banks were required to freeze or block the accounts due to a court order or an action by law enforcement, OFAC, or another government entity.[8]

## C. Background on FATF Guidance Regarding PEPs

19. Banks are generally required to identify customers who are PEPs and apply enhanced due diligence to PEP-associated accounts in order to address the potential higher risk for corruption associated with such persons and entities. In FATF's guidance document on "Politically Exposed Persons (Recommendations 12 and 22)",

> *A politically exposed person (PEP) is defined by the Financial Action Task Force (FATF) as an individual who is or has been entrusted with a prominent public function. Due to their position and influence, it is recognized that many PEPs are in positions that potentially can be abused for the purpose of committing money laundering (ML) offences and related predicate offences, including corruption and bribery, as well as conducting activity related to terrorist financing (TF). This has been confirmed by analysis and case studies. The potential risks associated with PEPs justify the application of additional anti-money laundering / counter-terrorist financing (AML/CFT) preventive measures with respect to business relationships with PEPs.*[9]

20. PEP status extends to not only the individual PEP but also the close relatives and close associates of such persons. According to FATF, "family members and close associates of PEPs should be determined to be PEPs because of the potential for abuse of the relationship

---

[8] If banks were required to freeze accounts pursuant to a court order or an action by law enforcement, this information would not be publicly available or even disclosed to the accountholder.

[9] Financial Action Task Force. *Politically Exposed Persons (Recommendations 12 and 22)*, pg. 3. June 2013. https://www.fatf-gafi.org/media/fatf/documents/recommendations/Guidance-PEP-Rec12-22.pdf. Accessed 10/3/21.

for the purpose of moving the proceeds of crime, or facilitating their placement and disguise, as well as for terrorist financing purposes."[10] According to FATF guidelines,

> *For close associates, examples include the following types of relationships: (known) (sexual) partners outside the family unit (e.g. girlfriends, boyfriends, mistresses); prominent members of the same political party, civil organization, labour or employee union as the PEP; business partners or associates, especially those that share (beneficial) ownership of legal entities with the PEP, or who are otherwise connected (e.g., through joint membership of a company board). In the case of personal relationships, the social, economic and cultural context may also play a role in determining how close those relationships generally are.*[11]

21. FATF has published an extensive list of red flags to assist banks in the detection of misuse of the financial system by PEPs during a customer relationship.[12] When red flags are detected for a PEP account, it is possible that a bank may restrict the account in question while the bank conducts a CDD review or other assessment.

### D. AAI's and Related Entities' Close Ties to the Qatari Government Satisfy PEP Criteria Under FATF Guidance

22. There are many reasons why banks would identify AAI, NAI, or any of their companies, as PEPs. In reviewing publicly available Information on AAI and NAI, what stands out

---

[10] Financial Action Task Force. *Politically Exposed Persons (Recommendations 12 and 22)*, pg. 14. June 2013. https://www.fatf-gafi.org/media/fatf/documents/recommendations/Guidance-PEP-Rec12-22.pdf. Accessed 10/3/21.
[11] Financial Action Task Force. *Politically Exposed Persons (Recommendations 12 and 22)*, pg. 14. June 2013. https://www.fatf-gafi.org/media/fatf/documents/recommendations/Guidance-PEP-Rec12-22.pdf. Accessed 10/3/21.
[12] *See* Annex 1. Financial Action Task Force. *Politically Exposed Persons (Recommendations 12 and 22)*, pp. 27-31. June 2013. https://www.fatf-gafi.org/media/fatf/documents/recommendations/Guidance-PEP-Rec12-22.pdf. Accessed 10/3/21.

are their close ties to the Emir and his inner circle, their participation in quasi-governmental organizations, their involvement in foreign lobbying efforts on behalf of the Qatari government, and their frequent appearances alongside the Emir on his official visits to foreign countries.

23. AAI and NAI are both involved in the leadership of the quasi-governmental organization Qatari Businessmen Association ("QBA"). The QBA is headed by Sheikh Faisal bin Qassim bin Faisal Al-Thani, a member of the Al-Thani family, and meets regularly with two of the nation's most powerful Ministers to advise the Government of the State of Qatar on implementation of policies relating to the economy and trade.[13] The QBA is a founding member of the Private Sector Challenges & Obstacles Committee" which is an entity formed and led by senior Ministers of the Qatari government.

24. Through their roles with the QBA, AAI and NAI have accompanied Sheikh Tamim bin Hamad Al-Thani, the Emir of Qatar, on official international visits to meet with other world leaders. They participated in delegations alongside the Emir to Kenya (in 2017),[14] the

---

[13] "QBA continues to keep ties with global partners amid pandemic," September 19, 2020, available at: https://m.gulf-times.com/story/673285/QBA-continues-to-keep-ties-with-global-partners-amid-pandemic
[14] "Billionaires who accompanied Qatar Emir on Nairobi visit," April 13, 2017, available at: https://nation.africa/kenya/news/billionaires-who-accompanied-qatar-emir-on-nairobi-visit-384956
[14] http://qatarchamber.com/wp-content/uploads/2018/04/Qatari_Businessmen_Delegation_US.pdf

United States (in 2018, during which Tamim Al-Thani sat down with Trump at the White House),[15] and China (in 2019).[16][17]

25. Through the QBA's participation on various "committees" with the Government of Qatar, AAI and NAI appear to have direct regular contact with senior officials in a manner that suggests the reasonable probability that they are directed by such officials to support the Government of Qatar in promoting certain policies on its behalf.[18]

26. AAI also serves on the board of directors of the U.S.-based Qatar-America Institute ("QAI").[19] Recently, QAI was forced by the Department of Justice to register under FARA as an agent of the State of Qatar.[20] This further suggests that AAI may be acting under the direction or "sponsorship" of the Government of Qatar.

27. Since 2016, AAI has also co-owned the Doha-based luxury art auction house, Al-Bahie, with Sheikh Abdulrahman bin Hamad Al-Thani,[21] he head of the Qatar Media Corporation ("QMC"), the parent company of Al-Jazeera. According to QMC's website, it is "the

---

[15] "Pro-Trump Radio Host Booked Qatari Government Guests After Getting Doha's Cash," June 4, 2020; from article, citing QAI's own FARA filings: "But 'in response to a March 12, 2020, letter from the U.S. Department of Justice, QAI has made the decision to register.'" Available at: https://www.thedailybeast.com/pro-trump-radio-host-booked-qatari-government-guest-after-getting-dohas-cash

[16] MoCI representatives, Qatari businessmen and CEOs visit Huawei headquarters in Beijing," February 11, 2019, available at: https://powerholding-intl.com/2019/02/11/moci-representatives-qatari-businessmen-and-ceos-visit-huawei-headquarters-in-beijing/

[17] "China and Qatar Sign the Agreement between the Government of the People's Republic of China and the Government of Qatar on Strengthening Cooperation in the Field of Infrastructure," February 2, 2019, http://english.mofcom.gov.cn/article/newsrelease/significantnews/201902/20190202834322.shtml

[18] "QBA continues to keep ties with global partners amid pandemic," September 19, 2020, available at: https://m.gulf-times.com/story/673285/QBA-continues-to-keep-ties-with-global-partners-amid-pandemic

[19] Available at: https://qataramerica.org/team/

[20] "Pro-Trump Radio Host Booked Qatari Government Guests After Getting Doha's Cash," June 4, 2020; from article, citing QAI's own FARA filings: "But 'in response to a March 12, 2020, letter from the U.S. Department of Justice, QAI has made the decision to register.'" Available at: https://www.thedailybeast.com/pro-trump-radio-host-booked-qatari-government-guest-after-getting-dohas-cash

[21] Al Jazeera International Limited full accounts made up to 31 December 2017, available at https://beta.companieshouse.gov.uk/company/05233333/filing-history

official broadcasting authority for the State of Qatar."[22] The Qatari Emir owns 100% of QMC,[23] and is responsible for appointing its CEO.[24]

28. The aforementioned activities show substantial evidence of AAI and NAI's business relationships (including joint-beneficial ownership) and joint membership activities with senior officials and members of the al-Thani family, as well as their active participation in official and non-official activities of the Government of Qatar. Taken together these examples easily satisfy the criteria for PEP designation under FATF guidelines[25] and also appear to potentially suggest that the AAI, NAI, or their businesses could be deemed to be under the sponsorship of, or acting as instrumentalities of, the State of Qatar.

29. Accordingly, it is my opinion that the freezing or restricting of accounts associated with one or more of the Abu Issa entities (AAI, his brother NAI, AIH or any AIH subsidiaries), including the Mosafer Entities, most likely would have occurred due to one or more of them being designated as a PEP and banks not being able to satisfy their more stringent requirements or risk tolerance for PEP accounts.

30. This, of course, does not imply that AAI or related parties engaged in any financial wrongdoing, nor does it mean that any banks made determinations to that effect. It simply suggests that banks may have made decisions to restrict accounts based on their internal policies, risk tolerance, or regulatory obligations, as is common within the banking

---

[22] https://www.qmc.qa/en/p/about
[23] Al Jazeera International Limited full accounts made up to 31 December 2017, available at https://beta.companieshouse.gov.uk/company/05233333/filing-history
[24] https://www.gulf-times.com/story/387865/Emir-appoints-CEO-of-Qatar-Media-Corp
[25] *See* Financial Action Task Force. *Politically Exposed Persons (Recommendations 12 and 22)*, pg. 14. June 2013. https://www.fatf-gafi.org/media/fatf/documents/recommendations/Guidance-PEP-Rec12-22.pdf. Accessed 10/3/21.

industry. But assuming AAI's comments were truthful, there is a strong likelihood that the freezing or restricting of bank accounts stemmed at least in part from the fact that AAI and related entities' business activities appear to be closely intertwined with the Government of Qatar and its representatives, as this would have potentially complicated banks' efforts to understand transactional activity on the accounts, or increased banks' perceptions of risk associated with the accounts or the bank's relationship with AAI or related entities.

_____   10/7/21
Stephanie Rice

# NOTARY ACKNOWLEDGMENT

State of Colorado }

County of Eagle }

I, Cinthia Calderon Sanchez, a Notary Public, hereby certify that Stephanie Rice whose name is signed to the foregoing instrument or conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he/she executed the same voluntarily on the day the same bears date.

Given my hand under this day of October 7 2021

_____
Notary Public

Print Cinthia Calderon Sanchez

My commission expires: 02/10/2025

(Seal)

CINTHIA J CALDERON SANCHEZ
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20214005544
MY COMMISSION EXPIRES 02/10/2025

Page 1

## Curriculum Vitae

**Experience**

**Founder & Principal, 2018 – Present**
**Vigilance Consulting Group, New York, NY**
- Provide economic sanctions compliance consulting and investigation services in a wide range of different contexts
- Services include developing or enhancing compliance programs and controls; advising on high risk activities and risk-mitigation strategies; performing sanctions due diligence and risk analysis; providing guidance on sanctions regulations; assisting with voluntary self-disclosures, OFAC license applications, enforcement proceedings, and mandatory reporting; administering general and technical sanctions training; conducting investigations and audits; and remediating compliance issues
- Clients include foreign financial institutions as well as companies in financial services, import/export, tech, medical, petrochemical, and non-profit sectors

**Director, Head of U.S. Sanctions Compliance, 2017 – 2018**
**Bank of Tokyo Mitsubishi UFJ, Ltd., New York, NY**
- Served as U.S. Sanctions Head and one of two appointed OFAC officers for the firm
- Supervised all aspects of sanctions compliance for BTMU U.S. entities including screening, escalations, advisory, policies/procedures, program development, regulatory exams, investigations, and reporting
- Advised global offices on OFAC related investigations, escalations, and other advisory matters
- Managed team of 18+ employees, including sanctions officers, investigators, and analysts

**Director, Head of Sanctions Compliance, 2015 – 2017**
**Commerzbank AG New York, New York, NY**
- Served as regional Sanctions Head for the New York branch, and OFAC officer for the firm
- Supervised all aspects of sanctions compliance including sanctions screening, payment escalations, advisory, policies/procedures, training, license applications, investigations, and reporting
- Advised Global Sanctions team in Frankfurt on complex OFAC-related matters
- Managed team of five sanctions officers and analysts

**Vice President/ Manager, Global Sanctions Compliance Advisory, 2012 – 2015**
**JPMorgan Chase & Co., Global Financial Crimes Compliance, New York, NY**
- Served as one of two advisors on the Global Sanctions Compliance Advise & Consult team
- Advised on sanctions escalations originating from all lines of business and regions across the firm; supervised mandatory reporting and policy/procedure writing; submitted license applications for the firm; provided training to regional and product sanctions officers and the business; and supported client outreach
- Assigned to Hong Kong for 3 months to train and support the APAC regional financial crimes compliance team, as well as to providing financial crimes training to various business units and correspondent banking clients within the region

**Sanctions Enforcement Investigator (GS 13), 2007 – 2012**
**U.S. Dept. of the Treasury, Office of Foreign Assets Control, Washington, DC**
- Initiated and conducted investigations and brought enforcement actions against banks, exporters, technology companies, and transportation companies for sanctions misconduct
- Worked on large multi-agency investigations involving sanctions evasion networks, terrorism financing, and money laundering
- Provided sanctions training to law enforcement, foreign delegations, and industry associations
- Recipient of three Special Act Awards for personal contribution to the mission of the agency

**Experience (continued)**

### Research Analyst, 2006 – 2007
### Williams Mullen Strategies, Washington, DC
Conducted research on energy and foreign policy matters

### Intern, 2005 – 2006
### Department of the Army, Office of Chief Legislative Liaison, Washington, DC
Assisted in organizing Congressional Delegations and conducted investigations pursuant to Congressional inquiries

### Intern Analyst, 2005
### C4ADS (Center for Advanced Defense Studies), Washington, DC
Prepared analysis and reporting on counterproliferation, organized crime, and environmental crime

**Education**

### The George Washington University, Washington, DC, 2008
### Elliott School of International Affairs/University Honors Program, BA, *suma cum laude*
Degree Majors: Conflict & Security Studies; Concentration: Middle East Studies, Arabic
Recipient of Edward Gnehm Honors Scholarship for Arabic Language Studies

### Georgetown University, Washington, DC, 2007
Intensive Summer Language Institute for Arabic Study
Completed coursework in Levantine Arabic and Advanced Modern Standard Arabic

### American University of Beirut, Lebanon, 2006
Completed Arabic coursework and graduate coursework in Middle East political science studies

### Universität Augsburg, Germany, 2004
Advanced German summer program

**Languages**

German (Native Speaker), Arabic (Advanced), Farsi (Elementary)

**Training**

Letters of Credit and Trade Finance, U.S. Treasury Dept., 2010
Proliferation Networks and Financing, government agency, 2010
Economic Sanctions, government agency, 2010
Arabic and Farsi language courses, Middle East Institute, 2009-2012
Underground Economies, government agency, 2009
Islamic Banking, government agency, 2009
World Oil Markets, government agency, 2009
International Banking Operations, government agency, 2009
Criminal Investigator Training Program, Federal Law Enforcement Training Center, 2009
Banking & Money Laundering, Federal Law Enforcement Training Center, 2008