**KASOWITZ BENSON TORRES LLP**
DANIEL A. SAUNDERS (SBN 161051)
dsaunders@kasowitz.com
KEVIN K. KIM (SBN 330635)
kkim@kasowitz.com
2029 Century Park East, Suite 2000
Los Angeles, CA 90067
Telephone:    (424) 288-7900
Facsimile:     (424) 288-7901

JASON S. TAKENOUCHI (SBN 234835)
jtakenouchi@kasowitz.com
101 California Street, Suite 3000
San Francisco, California  94111
Telephone:  (415) 421-6140
Facsimile:   (415) 398-5030

*Attorneys for Defendants and Counterclaim-Plaintiffs*
*Elliott Broidy, Broidy Capital Management, LLC, and*
*Circinus, LLC*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MOSAFER INC.; MOSAFER ECOM, INC.; and GOMOSAFER, <br><br> Plaintiffs, <br> vs. <br><br> ELLIOTT BROIDY, *et al.*, <br> Defendants. <br><br> ELLIOT BROIDY; BROIDY CAPITAL MANAGEMENT, LLC; CIRCINUS, LLC, <br> Counterclaim-Plaintiffs, | CASE NO. 2:21-cv-06320-MCS-JC <br> [Assigned to Hon. Mark C. Scarsi] <br> **COUNTERCLAIM-PLAINTIFFS' OPPOSITION TO MOSAFER AND ABU ISSA COUNTERCLAIM-DEFENDANTS' MOTION TO STRIKE OR DISMISS** <br> Date: January 24, 2022 <br> Time:  9:00 a.m. <br> Courtroom: 7C |

vs.

MOSAFER INC.; MOSAFER ECOM, INC.; GOMOSAFER; STATE OF QATAR; ABU ISSA HOLDING WLL; ASHRAF ABU ISSA; NABIL ABU ISSA,

Counterclaim-Defendants.

# **TABLE OF CONTENTS**

**Page(s)**

I. INTRODUCTION.................................................................................................1

II. BACKGROUND................................................................................................3

    A. The State of Qatar's Campaign Against Broidy and Other U.S. Citizens....................................................................................................3

    B. Qatar and Mosafer Agree to Initiate Proxy Litigation Using Documents Gathered Through Qatar's Prior Lawsuits and Hacking Campaign.........................................................................4

III. LEGAL STANDARD.........................................................................................7

IV. ARGUMENT ....................................................................................................8

    A. The Counterclaim for Abuse of Process is Not Subject to Striking Under the Anti-SLAPP Statute or Dismissal Under Rule 12(b)(6) .......................................................................................8

        1. Counterclaim-Defendants Fail to Make a Prima Facie Showing That the Abuse of Process Counterclaim Arises From Constitutionally Protected Activity .................................8

        2. Even if the Abuse of Process Claim Arises From Protected Activity, Counterclaim-Defendants' Anti-SLAPP Motion Fails Because Broidy Has Sufficiently Pleaded the Cause of Action. ........................................................................10

            a. Broidy's abuse of process counterclaim is properly pleaded..................................................................10

            b. The litigation privilege does not protect Mosafer's bad faith agreement collusion with Qatar .......................13

    B. Broidy Has Sufficiently Pled a Business Conspiracy Under Virginia Law .....................................................................................16

        1. Virginia Law Applies in This Dispute Under California Choice-of-Law Rules........................................................16

        2. Virginia's Civil Immunity Statute Does Not Bar the Business Conspiracy Counterclaim...........................................17

        3.     Broidy's Business Conspiracy Counterclaim is
Sufficiently Pleaded ........................................................... 19

    C.    Broidy's RICO Counterclaim is Sufficiently Pleaded ........................ 22

V.    CONCLUSION ........................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    140 S. Ct. 2082 (2020).................................................................................8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................7

*Barquis v. Merchants Collection Assn.*,
    7 Cal. 3d 94 (1972).........................................................................10, 12

*Booker v. Rountree*,
    155 Cal. App. 4th 1366 (2007).................................................................11

*Broidy Capital Mgmt. LLC v. Muzin*,
    2020 WL 1536350 (D.D.C. Mar. 31, 2020)........................................22

*Coleman v. Gulf Ins. Grp.*,
    41 Cal. 3d 782 (1986) ...........................................................................10

*ComputerXpress, Inc. v. Jackson*,
    93 Cal. App. 4th 993 (2001) ...................................................................15

*DKT Memorial Fund Ltd. v. Agency for Intern. Development*,
    887 F.2d 275 (D.C. Cir. 1989).................................................................8

*Drexler v. Billet*,
    2018 WL 6920117 (C.D. Cal. June 18, 2018), *aff'd*, 784 F. App'x.
    548 (9th Cir. 2019) ................................................................................10

*Dunlap v. Cottman Transmission, LLC*,
    287 Va. 207, 215 (2014).........................................................................20

*Est. of Darulis v. Garate*,
    401 F.3d 1060 (9th Cir. 2005)................................................................16

*Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*,
    No. 20616/2019E.....................................................................................4

*Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*,
   No. 37-2018-00015054-CU-BT-CTL (San Diego County, CA, Mar.
   26, 2018) ............................................................................................. 4

*Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*,
   No. 506934/2018 (Kings County, NY, Apr. 6, 2018) .......................... 4

*Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*,
   No. 511902/2018 ................................................................................. 4

*Grimmett v. Brown*,
   75 F.3d 506 (9th Cir. 1996) ............................................................... 22

*Heck v. Humphrey*,
   512 U.S. 477 (1994) ........................................................................... 11

*Herring Networks, Inc. v. Maddow*,
   8 F.4th 1148 (9th Cir. 2021) ................................................................ 7

*Herzog v. "A" Co.*,
   138 Cal. App. 3d 656 (1982) ....................................................... 13, 15

*Hurtado v. Superior Ct.*,
   11 Cal. 3d 574 (1974) ........................................................................ 17

*JSJ Ltd. P'ship v. Mehrban*,
   205 Cal. App. 4th 1512 (2012) .......................................................... 10

*Kenworthy v. Brown*,
   248 Cal. App. 2d 298 (1967) ............................................................. 16

*King v. Darden*,
   2018 WL 3651590 (E.D. Va. Aug. 1, 2018) ...................................... 21

*Ledesma v. Jack Stewart Produce, Inc.*,
   816 F.2d 482 (9th Cir. 1987) ............................................................. 16

*Maloney v. T3Media, Inc.*,
   853 F.3d 1004 (9th Cir. 2017) .............................................................. 7

*Mansfield v. Bernabei*,
   284 Va. 116 (2012) ............................................................................ 19

*Moore v. Shaw*,
   116 Cal. App. 4th 182 (2004), *as modified* (Mar. 26, 2004)................................8

*Navellier v. Sletten*,
   29 Cal. 4th 82 (2002)................................................................................10

*Odom v. Microsoft Corp.*,
   486 F.3d 541 (9th Cir. 2007)....................................................................23

*OSU Student All. v. Ray*,
   699 F.3d 1053 (9th Cir. 2012)....................................................................7

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   890 F.3d 828 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018)...........7, 10, 14

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)................................................................................24

*Rogers v. Deane*,
   992 F. Supp. 2d 621 (E.D. Va. 2014), *aff'd*, 594 F. App'x. 768 (4th
   Cir. 2014)..............................................................................................20

*Rosales v. Battle*,
   113 Cal. App. 4th 1178 (2003)....................................................................9

*Silberg v. Anderson*,
   50 Cal. 3d 205 (1990), *as modified* (Mar. 12, 1990)...................................15

*Smith v. Levine Leichtman Cap. Partners, Inc.*,
   723 F. Supp. 2d 1205 (N.D. Cal. 2010)......................................................23

*Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*,
   593 F. Supp. 2d 840 (E.D. Va. 2008)........................................................18

*Spellens v. Spellens*,
   49 Cal.2d 210 (1957)..............................................................................12

*Steele v. Goodman*,
   382 F. Supp. 3d 403 (E.D. Va. 2019)........................................................19

*Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*,
   191 F. Supp. 2d 652 (E.D. Va. 2002)........................................................22

*United States v. Brooklier*,
    685 F.2d 1208 (9th Cir. 1982)................................................................23

*United States v. Feldman*,
    853 F.2d 648 (9th Cir. 1988).................................................................25

*United States v. Verdugo–Urquidez*,
    494 U.S. 259 (1990)..............................................................................8

*Vivian v. Labrucherie*,
    214 Cal. App. 4th 267 (2013)..............................................................15

*Vuyyuru v. Jadhav*,
    2011 WL 1483725 (E.D. Va. Apr. 19, 2011)........................................22

*Wentland v. Wass*,
    126 Cal. App. 4th 1484 (2005).............................................................15

*Werth v. Fire Companies' Adjustment Bureau*,
    160 Va. 845 (1933)..............................................................................20

*William v. Aes Corp.*,
    28 F. Supp. 3d 553 (E.D. Va. 2014).....................................................22

*Younger v. Solomon*,
    38 Cal. App. 3d 289 (1974)..................................................................12

*Yu v. Signet Bank/Virginia*,
    69 Cal. App. 4th 1377 (1999)..............................................................12

**Statutes**

18 U.S.C. § 1343.....................................................................................23

18 U.S.C. § 1961(1).................................................................................23

18 U.S.C. § 1962(d)................................................................................25

Cal. Civ. Proc. Code § 425.16............................................................7, 8

Cal. Civ. Proc. Code § 425.16(b)(1)........................................................8

Va. Code § 8.01-223.2...............................................................17, 18, 19

Va. Code § 18.2-499........................................................................17, 20

vi

Va. Code §§ 18.2-499-500 ................................................................ 16

Va. Code § 18.2-500(A)-(B) ............................................................ 16

**Other Authorities**

California Constitution ...................................................................... 8

Fed. R. Civ. P. 8(a)(2) ................................................................ 11, 23

Fed. R. Civ. P. 12(b)(6) ........................................................... *passim*

Fed. R. Civ. P. 9(b) ...................................................................... 23

U.S. Constitution ...................................................................... 8, 18

Defendants and Counterclaim-Plaintiffs Elliott Broidy ("Mr. Broidy"), Broidy Capital Management, LLC ("BCM"), and Circinus, LLC ("Circinus," and collectively with Mr. Broidy and BCM, "Broidy" or the "Broidy parties"), pursuant to L.R. 7-9 and the Court's Initial Standing Order ¶ 9.B (ECF 10), submit this opposition to the motion to strike or dismiss ("Motion" or "Mot.") filed by Counterclaim-Defendants Mosafer Inc., Mosafer E-Com, Inc., GoMosafer (collectively, "Mosafer" or the "Mosafer parties"), Abu Issa Holdings, Ashraf Abu Issa and Nabil Abu Issa (collectively, "Abu Issa" or the "Abu Issa parties," and collectively with Mosafer, "Counterclaim-Defendants").

## I.   **INTRODUCTION**

The ostensible plaintiffs in this case (Mosafer Inc., Mosafer E-Com, Inc., and GoMosafer) cannot possibly prove that Broidy's criticisms of Qatar—which are fully protected by the First Amendment—have harmed their business.  The Complaint fails to allege any actions taken by Broidy against Mosafer; indeed, there is no allegation that Broidy ever said anything about Mosafer or even knew that it existed.  Nor does Mosafer's Complaint cite any actual evidence that any specific statement by Broidy concerning Qatar's activities is false, instead making only a single conclusory allegation that "Qatar did not support terrorists or provide them with a safe haven" (ECF 1 ¶ 66)—an allegation that is flatly contradicted by Middle East experts and the United States government, and that the purported plaintiffs in this case (including a defunct New York luggage retailer) clearly have no way to know or competently allege, let alone prove.  And the central factual premise of the Complaint—Mosafer's assertion that Broidy's conduct stifled Qatar's tourism business generally, resulting in indirect harm to Mosafer—is demonstrably false, as the Qatar Tourism Authority reports that U.S. tourism to Qatar in fact *went up* during the period in question.  ECF 46 ("Counterclaims" or

1   "CC") ¶ 54.[1]

2        In light of the legal and factual hollowness of the Mosafer parties' claims

3   and the absence of any demonstrable harm *to them*, the filing of the Complaint

4   only makes sense in the context that the Counterclaims provide—*i.e.*, that this

5   lawsuit has been brought by, for, and on behalf of the State of Qatar.  Indeed, this

6   litigation is just the latest attempt by the State of Qatar to use one of its proxies—in

7   this case, an obscure luggage retailer and purported travel agent—to punish and

8   preemptively muzzle protected political speech by United States citizens about

9   Qatar's well-documented and widely recognized links to extremists and terrorists.

10  By using Mosafer as a proxy for its lawsuit and deceiving this Court, Qatar seeks

11  to improperly avail itself of the United States judicial system to silence those

12  critics without waiving sovereign immunity (on which it has previously relied to

13  shield itself from liability for its unlawful acts against Broidy) and subjecting itself

14  to accountability.  No federal court should countenance such abuse of the judicial

15  process.  Nor need this Court do so: the conduct pled in the Counterclaims is not

16  subject to any protections or privileges, particularly because the alleged real party

17  in interest is a foreign country without any First Amendment right of petition (just

18  as the Abu Issa parties and nominal plaintiff GoMosafer are foreign nationals and

19  foreign companies operating outside of the United States that lack any First

20  Amendment rights).[2]

---

22  [1] As noted in the Counterclaims, travel from the U.S. to Qatar increased each year
23  during the relevant period, with "unprecedented" growth in 2019, the year when
    Mosafer's lone U.S. storefront closed.  CC ¶ 55.

24  [2] As alleged in the Counterclaims, brothers Ashraf Abu Issa and Nabil Abu Issa are
25  residents and citizens of Qatar.  CC ¶¶ 16-17.  AbuIssa Holding WLL ("AIH")—
    which is controlled by the Abu Issa brothers—is a limited liability company based
26  in, and citizen of, Qatar.  CC ¶ 15.  Plaintiff GoMosafer is not a legal entity in either
    the United States or Qatar, but is described in the Complaint as "the online division
27  of Mosafer Travel" and "a Qatar-based travel agency."  ECF 1 ¶ 19.  Mosafer
28  Travel, in turn, is—according to Plaintiffs—"fully owned by Abu Is[s]a Holding, a

2

On the merits, Counterclaim-Defendants' attacks on the Counterclaims fail.[3] Broidy's factual allegations—which must be accepted as true for purposes of the Motion—establish that Mosafer, controlled by the Abu Issa parties, is acting purely as a proxy for Qatar, making Mosafer's Complaint just the latest in a long line of attempts by Qatar to hijack the U.S. courts to punish its most vocal critics. This sort of abusive misconduct is not protected by anti-SLAPP law or the litigation privilege. The Counterclaims also sufficiently allege a basis for Broidy's claims of abuse of process, business conspiracy (under Virginia law), and RICO. Accordingly, the Court should deny the Motion in its entirety.

## II.   BACKGROUND

### A.   The State of Qatar's Campaign Against Broidy and Other U.S. Citizens

As alleged in the Counterclaims—and as previously recognized by multiple government agencies, the current National Security Advisor, and the President of the United States—the State of Qatar has a documented history of harboring or supporting terrorists and extremists, including the Taliban, Hamas, and the Muslim Brotherhood. CC ¶¶ 27-29, 112, 118.

When Mr. Broidy and other critics in the United States began publicizing these facts, Qatar responded with an illegal hack-and-smear campaign targeted at U.S. citizens (among others). *See generally id.* ¶¶ 36-37, 124-230. First, Qatar hired a highly sophisticated cyberoperations company to hack into Broidy's

---

Qatari company." ECF 4 at 2. (In their briefing on multiple motions to strike/dismiss their Complaint, the Mosafer parties appear to have acknowledged that GoMosafer is not a legal entity and lacks capacity to sue, and offered to voluntarily dismiss GoMosafer from this action. *See* ECF 51 at 20; ECF 83 at 1 n.1).

[3] The Motion targets only the First Counterclaim (Business Conspiracy under Virginia law), Second Counterclaim (Abuse of Process), and Third Counterclaim (RICO). The remaining Counterclaims (Four through Twelve) are alleged only against the State of Qatar, which is not a party to the Motion.

3

computer systems and email accounts, stealing countless confidential documents and correspondence, including trade secrets. *See id.* ¶¶ 37, 147, 166-83, 282-83, 361-62. Qatari agents then meticulously curated those documents and mixed in clever forgeries to paint Mr. Broidy in an unfavorable light. *See id.* ¶¶ 159-60, 184-91. These stolen and modified files were sent to various media outlets for publication as part of Qatar's campaign to sideline and silence Mr. Broidy. *See id.* ¶¶ 192-224.

Mr. Broidy was not the only target of Qatar's aggressive tactics. Qatar also sought to muzzle and punish anyone associated with numerous websites critical of Qatar, including but not limited to "QatarExposed," "QatarTruth," "BoycottQatarNow," and "QatarCrisisNews." *See id.* ¶¶ 43-45. The registrants and operators for these domain names were anonymous, so Qatar filed more than two dozen "John Doe" lawsuits and issued subpoenas to various tech companies in order to identify these critics. *See id.* ¶ 43.[4] As a result of the subpoenas, Qatar learned that defendant SCL Social Limited was behind the QatarExposed domain name and that defendant The Iron Group Inc. d/b/a Ironistic.com was behind QatarCrisisNews, QatarTruth, and BoycottQatarNow. *See ECF 1* ¶¶ 70, 80.

**B.** **Qatar and Mosafer Agree to Initiate Proxy Litigation Using Documents Gathered Through Qatar's Prior Lawsuits and Hacking Campaign**

Once its *Doe* suits bore fruit, Qatar's next step in silencing its critics was to

---

[4] *See, e.g., Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*, No. 511902/2018 (Kings County, NY, June 8, 2018 (QatarTruth); *Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*, No. 506934/2018 (Kings County, NY, Apr. 6, 2018) (QatarCrisisNews); *Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*, No. 37-2018-00015054-CU-BT-CTL (San Diego County, CA, Mar. 26, 2018) (BoycottQatarNow); *Gov't Comm'ns Office for the State of Qatar v. John Does 1-10*, No. 20616/2019E (Bronx County, NY, Mar. 22, 2018) (QatarExposed); *see also* CC ¶ 46.

weaponize the newly acquired information through litigation in the United States courts. But Qatar knew that it could not sue in its own name without waiving sovereign immunity. *See* CC ¶ 50. In stepped Mosafer.

As described in detail in the Counterclaims, the Mosafer parties and their owners, the Abu Issa parties, are sponsored and controlled by the State of Qatar. *See id.* ¶¶ 61-106. For example, according to a United States banking compliance expert, the Abu Issa brothers are "closely intertwined with the Government of Qatar and its representatives." ECF 46-2 ¶ 30. Likewise, an expert in Middle East affairs, Dr. Yleem D.S. Poblete, confirms that Mosafer (through the Abu Issa parties) has extensive connections to the Qatari state and the ruling Al-Thani royal family. *See* CC ¶ 8; ECF 46-1 ¶¶ 31, 53. And Mosafer itself admits in its Complaint to being "intimately associated" and "synonymous" with the State of Qatar. *See* ECF 1 ¶ 31.

As alleged in the Counterclaims, given their intimate and longstanding association, Qatar enlisted the Abu Issa parties to have Mosafer file this lawsuit on Qatar's behalf to silence Broidy, Ironistic and SCL. CC ¶¶ 39, 249, 263. To that end, on information and belief, Qatar supplied Mosafer with the documents it had obtained through its abusive use of the judicial system and its dozens of subpoenas. *See* CC ¶ 49. These documents apparently identified SCL and Ironistic as the parties behind the four domain names at issue here.[5] *See id.* Mosafer thus used the

_____

[5] The websites targeted by the Complaint—QatarExposed, QatarTruth, BoycottQatarNow, and QatarCrisisNews (ECF 1 ¶ 109)—are not even remotely prominent on the Internet, and not one of them would appear on a Google search for "Qatar" and "terrorism" (which instead yields articles published by the Washington Post, BBC, Reuters, and the like). The Mosafer parties do not allege, and cannot plausibly claim, that they independently discovered and targeted these specific websites and the parties behind them without direction from Qatar itself, which discovered that information through subpoenas in separate "John Doe" lawsuits brought by Qatar. CC ¶¶ 42-49. Indeed, if the State of Qatar was unable to identify the parties behind the four domain names without issuing subpoenas, there appears

fruits of Qatar's *Doe* subpoenas to file this lawsuit on Qatar's behalf against Qatar's critics, based entirely on patently bizarre and fictitious claims of indirect harm to a virtually unknown luggage company about which none of the Defendants is alleged to have ever said a single word.  *See id.*

The nature of the relief sought in this lawsuit further confirms that Mosafer is pursuing this action on behalf of Qatar.  *See id.* ¶ 4.  Mosafer seeks an impermissibly vague and sweeping injunction "prohibiting Defendants from engaging in the conduct and practices alleged herein."[6]  *See* ECF 1 ¶¶ 105, 113, 121.  But the "conduct and practices alleged herein," as referred to in the Complaint, have nothing to do with Mosafer; rather, they include a baseless claim that Mr. Broidy "acted as [an] unregistered agent[] of the UAE in violation of FARA," *see id.* ¶ 56, as well as a generalized grievance about Mr. Broidy exercising his constitutional right to comment on foreign policy issues involving Qatar, *see id.* ¶ 66.  Qatar thus seeks to enlist this Court in its campaign to punish and silence those who criticize and call attention to its terrorism-backing activities (as well as, presumably, to deter other civic-minded United States citizens from doing the same for fear of costly litigation).[7]

---

to have been no way for Mosafer to do so other than by obtaining the subpoenaed information from Qatar.

[6] In a misguided attempt to hide the unconstitutional nature of their requested relief, the Mosafer parties claimed (in opposing Broidy's motion to strike/dismiss) that they "are only seeking injunctive relief ordering that Defendants (1) take down the illegal publications that are currently still online . . . ." ECF 51 at 21.  That is false. Nowhere in their Complaint do the Mosafer parties even allege that the websites in question remain operational, let alone request that the Court enjoin Broidy to take the websites down.  *See generally* ECF 1.

[7] As Dr. Yleem D.S. Poblete, an expert in Middle East affairs, explains in her declaration appended to the Counterclaim, Mosafer's request for a permanent injunction is "textbook Qatar and in keeping with the Qatari government's practice of silencing, censoring, or punishing critics." ECF 46-1 at ¶ 55.

### III.   **LEGAL STANDARD**

California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16, "allows a defendant to file a 'special motion to strike' a plaintiff's Complaint, and involves a two-step inquiry." *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021). "At step one of the anti-SLAPP analysis, the moving defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech. At step two, assuming that showing has been made, the burden shifts to the plaintiff to establish a reasonable probability that it will prevail on its claims." *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1009 (9th Cir. 2017) (internal quotations and citations omitted).

With respect to the "reasonable probability" prong, where, as here, "an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018). Under Rule 12(b)(6), a complaint need only "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotations and citation omitted). Under Rule 12(b)(6), the court must accept all well-pleaded factual allegations as true and construe them in the light most favorable to plaintiff. *Id.*; *OSU Student All. v. Ray*, 699 F.3d 1053, 1061 (9th Cir. 2012).

## IV.   **ARGUMENT**

### A.   **The Counterclaim for Abuse of Process is Not Subject to Striking Under the Anti-SLAPP Statute or Dismissal Under Rule 12(b)(6)**

#### 1.   Counterclaim-Defendants Fail to Make a Prima Facie Showing That the Abuse of Process Counterclaim Arises From Constitutionally Protected Activity

California's anti-SLAPP statute applies only to causes of action against a defendant "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." Cal. Civ. Proc. Code § 425.16(b)(1). "The Supreme Court has explained the phrase 'arising from' in section 425.16 should not be construed as meaning 'in response to.' The statutory phrase 'cause of action ... arising from' means simply that the defendant's act underlying the plaintiff's cause of action must itself have been an act in furtherance of the right of petition or free speech." *Moore v. Shaw*, 116 Cal. App. 4th 182, 195 (2004), *as modified* (Mar. 26, 2004) (citations omitted). For several reasons, Counterclaim-Defendants have failed to make the requisite prima facie showing that the abuse of process counterclaim arises from protected activity, and their anti-SLAPP claim therefore fails *ab initio*.

*First*, the abuse of process Counterclaim names several foreign persons and entities, including the Abu Issa parties and GoMosafer (as well as the State of Qatar), whose alleged acts occurred entirely outside the United States. "[I]t is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020); *see also United States v. Verdugo–Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections [only] when they have come within the territory of the United States and developed substantial connections with this country."); *DKT*

*Memorial Fund Ltd. v. Agency for Intern. Development*, 887 F.2d 275, 284 (D.C. Cir. 1989) ("[A]liens beyond the territorial jurisdiction of the United States are generally unable to claim the protections of the First Amendment."); *Rosales v. Battle*, 113 Cal. App. 4th 1178, 1186 (2003) ("As a foreign citizen living outside the United States, [plaintiff] is not entitled to constitutional protections."). Because those parties can claim no First Amendment right of petition, Counterclaim-Defendants' conclusory statement that "the Broidy Defendants' allegations arise from and rest solely on Plaintiffs' protected right to petition" (Mot. at 10:13-14) fails as to the Abu Issa parties and GoMosafer, and the motion to strike should be summarily denied as to those parties on that ground.

*Second*, contrary to Counterclaim-Defendants' position in the Motion (Mot. at 10:10-11), the abuse of process claim is not based simply on the filing of the Mosafer lawsuit. Rather, as extensively laid out in the Counterclaims, the abuse of process claim includes, and is based on, a conspiratorial series of actions that preceded and followed that filing. Those actions include, but are not limited to: Qatar using subpoenas in earlier litigation to obtain information that it intended to provide to proxies, CC ¶¶ 43, 47-49; Qatar directing the Abu Issa parties to file a complaint in the name of the Mosafer parties for the purposes of harassing and muzzling a critic of the Qatari regime, *see id.* ¶¶ 1, 4, 39-41; Mosafer working in coordination with Qatar to seed its complaint with non-public information obtained from Qatar's earlier lawsuits, *see id.* ¶ 49; Mosafer filing a sham lawsuit in its own name when it knew the true plaintiff was Qatar, *see id.* ¶¶ 25-106[8]; and Mosafer further using the sham lawsuit to advance Qatar's interests by aggressively

---

[8] As Dr. Poblete explains in her declaration appended to the Counterclaims: "[I]t is far more likely that the Abu Issa brothers, AIH, Mosafer Plaintiffs, were 'asked' by the Emir or someone authorized to speak for the Emir and the State (in the sense that saying "no" is not an acceptable response), to file the lawsuit against Elliott Broidy." ECF 46-1 ¶ 54.

BROIDY OPPOSITION TO MOSAFER/ABU ISSA MOTION TO STRIKE OR DISMISS

promoting the Complaint in the press, see id. ¶¶ 40-41.  That one act in this alleged

coordinated scheme to cause injury to Broidy was the filing of a fictitious

Complaint does not render the entire scheme constitutionally protected, and

Counterclaim-Defendants cite no authority to the contrary.[9]

2.    <u>Even if the Abuse of Process Claim Arises From Protected
Activity, Counterclaim-Defendants' Anti-SLAPP Motion Fails
Because Broidy Has Sufficiently Pleaded the Cause of Action</u>

Even if Counterclaim-Defendants (including the foreign citizen Abu Issa

parties and GoMosafer, who lack any First Amendment rights) were able to

establish that the abuse of process claim arises solely from protected activity—

which they cannot—their anti-SLAPP Motion fails under the second step of the

analysis because Broidy sufficiently alleges an abuse of process claim.  *See*

*Planned Parenthood*, 890 F.3d at 834 (Rule 12(b)(6) standard applies to prong two

of anti-SLAPP analysis where motion challenges legal sufficiency of claim).

a.    <u>Broidy's abuse of process counterclaim is properly
pleaded</u>

"To establish a cause of action for abuse of process, a plaintiff must plead

two essential elements: that the defendant (1) entertained an ulterior motive in

using the process and (2) committed a wilful act in a wrongful manner."  *Coleman*

*v. Gulf Ins. Grp.*, 41 Cal. 3d 782, 792 (1986); *see Barquis v. Merchants Collection*

*Assn.*, 7 Cal. 3d 94, 103-04 (1972) (defining second element as "a willful act in the

---

[9] These circumstances render Counterclaim-Defendants' cited cases easily
distinguishable.  *See Drexler v. Billet*, 2018 WL 6920117, *2 (C.D. Cal. June 18,
2018) (parties agreed filing of lawsuit constituted protected activity; dispute was
only as to whether plaintiff had contractually waived anti-SLAPP protection), *aff'd*,
784 F. App'x. 548 (9th Cir. 2019); *Navellier v. Sletten*, 29 Cal. 4th 82, 90 (2002)
(counterclaim alleged to have been filed in breach of contract found to be protected
activity); *JSJ Ltd. P'ship v. Mehrban*, 205 Cal. App. 4th 1512, 1522 (2012) (lawsuit
alleged to have been filed for retaliatory purpose found to be protected activity).

10

use of the process not proper in the regular conduct of the proceeding"); *see also Heck v. Humphrey*, 512 U.S. 477, 495 n.2 (1994) (abuse of process is  the "misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish") (citations omitted).  California courts interpret "process" broadly to encompass the "entire range of procedures incident to litigation." *Booker v. Rountree*, 155 Cal. App. 4th 1366, 1371 (2007).

Broidy's Counterclaim for abuse of process adequately pleads the required elements to state a claim.  *See* Fed. R. Civ. P. 8(a)(2) (requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief").  The Counterclaim specifically alleges that Counterclaim-Defendants entertained ulterior motives in using the process, which included both silencing critics of Qatar in violation of their First Amendment rights and using proxy plaintiffs as a ruse to maintain Qatar's claims to sovereign immunity.  *See, e.g.*, CC ¶¶ 248-49.  The Counterclaim further alleges that Counterclaim-Defendants engaged in numerous willful and improper acts in the use of the process, including but not limited to Qatar's precursor *Doe* lawsuits, Qatar's provision of the non-public information gleaned from the *Doe* subpoenas to the nominal Mosafer plaintiffs, Counterclaim-Defendants' use of "evidence" stolen by Qatar-funded hackers and disseminated to the media by Qatar-funded PR agents, Counterclaim-Defendants' efforts to silence Broidy and advance Qatar's interests through a post-filing media blitz, and Counterclaim-Defendants' ongoing conspiracy to hide their proxy relationship and conceal facts that would permit the Court to identify the real party in interest and would threaten Qatar's claim of sovereign immunity.  *See, e.g.*, CC ¶¶ 5, 6, 9, 40-41, 43-49, 52-53, 188-89, 227-30.  Nothing more is required to sufficiently state an abuse of process claim.[10]

---

[10] Although Counterclaim-Defendants contend that "the Broidy Defendants fail to allege that any unjustifiable collateral advantage was obtained through the filing of Plaintiffs' lawsuit," Mot. at 14:14-15, the elements of abuse of process include no

11

Moreover, although irrelevant here because the abuse of process claim is based on much more than just the filing of the Complaint, Counterclaim-Defendants' assertion that "the mere act of filing a lawsuit" cannot give rise to an abuse of process claim (Mot. at 2:3-4) is incorrect. The filing of a lawsuit alone *can* constitute an abuse of process where it is done with knowledge of its impropriety and for an improper purpose. *See, e.g.*, *Barquis*, 7 Cal. 3d at 103-04 (holding that abuse of process claim was properly pled where plaintiffs alleged that defendant collection agency had willfully and knowingly filed actions in an improper county with the intent to impair individuals' rights to defend and thereby obtain inequitable settlements and default judgments); *Yu v. Signet Bank/Virginia*, 69 Cal. App. 4th 1377, 1390 (1999) (finding triable facts on abuse of process claim where defendant banks were alleged to have intentionally sued California cardholders in Virginia, knowing that the Californians would be unlikely to appear, in order to use the default judgments to obtain improper garnishment orders and settlement leverage).

Here, Broidy alleges that Counterclaim-Defendants conspired to use proxies to submit a sham lawsuit to serve the interests of an unnamed real plaintiff in interest—a foreign state seeking to conceal its role in order to preserve its claim to sovereign immunity—for the purpose of silencing that foreign state's critics and thwarting their First Amendment rights. While Counterclaim-Defendants might

---

such requirement. *See Spellens v. Spellens*, 49 Cal.2d 210, 232 (1957) (noting only that "[t]he improper purpose ***usually*** takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself") (emphasis added). Regardless, the abuse of process claim here alleges no "mere vexation or harassment," but, as discussed above, numerous "definite act[s] . . . not authorized by the process or aimed at an objective not legitimate in the use of the process." *Younger v. Solomon*, 38 Cal. App. 3d 289, 297 (1974). These include the collateral advantages of silencing Qatar's critics while maintaining Qatar's claim to sovereign immunity through the use of sham litigation proxies.

BROIDY OPPOSITION TO MOSAFER/ABU ISSA MOTION TO STRIKE OR DISMISS

wish otherwise, that in and of itself is an actionable abuse of process.

b.   The litigation privilege does not protect Mosafer's bad faith agreement collusion with Qatar

Although Counterclaim-Defendants attempt to shield their abuse of process behind a purported "absolute litigation privilege" (Mot. at 11:2-12:11), that attempt fails.  First, as discussed above, Counterclaim-Defendants' reductive insistence that the abuse of process claim "relate[s] to the mere act of filing a Complaint" (Mot. at 12:3-4) misrepresents the allegations in the Counterclaims.  The abuse of process claim challenges not the Mosafer parties' mere filing of the Complaint, but the pre-litigation (and ongoing) conspiracy between the Mosafer parties, the Abu Issa parties, and the State of Qatar to silence Broidy while allowing Qatar to maintain sovereign immunity protections.  Moreover, those allegations encompass extensive pre-litigation communications and conduct that the litigation privilege does not protect, as the privilege "*applies only to litigation contemplated in good faith.*"  *Herzog v. "A" Co.*, 138 Cal. App. 3d 656, 660-61 (1982) (emphasis added); *see also* Restat. 2d of Torts, § 586, cmt. e (pre-litigation communications are protected by litigation privilege only where the proceeding "is contemplated in good faith").

In *Herzog*, the court found that a company's written threat to sue a former employee for breach of a confidentiality agreement if he accepted employment with a competitor "facially exceed[ed] any legitimate purpose"—and therefore found no protection under the litigation privilege—because the confidentiality agreement did not "purport to restrict [the employee's] right to employment" elsewhere.  *Herzog*, 138 Cal. App. 3d at 662.  Similarly, Qatar's latest effort to intimidate and silence one of its most prominent critics through puppet litigation brought in the name of a shuttered and virtually unknown luggage retailer "facially exceeds any legitimate purpose" and is precisely the sort of bad-faith conduct that

13

vitiates any claim to an absolute litigation privilege.

Accepting the allegations of the Counterclaims as true—as this Court must under the Rule 12(b)(6) standard, which applies equally to the second prong of the anti-SLAPP analysis under *Planned Parenthood*—nominal plaintiff GoMosafer was created by the Abu Issa parties to help the State of Qatar with its ballooning migrant worker class.  CC ¶¶ 15-16, 60.  None of the Mosafer parties appears to have been significantly involved in selling or booking U.S.-to-Qatar travel.[11]  *Id.* ¶¶ 56-60.  And even if Mosafer had sold or booked significant U.S.-to-Qatar trave—which it did not—the Qatari government's own data showing no adverse tourism impact during the time period of Broidy's alleged activities flatly refutes Mosafer's assertion of indirect harm.  *Id.* ¶¶ 54-55.  Rather than being based on any actual commercial injury, the Complaint is the result of Qatar conspiring with the Abu Issa parties (who are intimately associated with the Qatari ruling family, *see generally* CC ¶¶ 61-106) to use the Mosafer parties to target Broidy and other U.S. critics of the Qatari regime through a sham lawsuit that would seek to punish and muzzle those critics while still allowing Qatar to evade liability for its misconduct (including State-ordered hacking of U.S. citizens) under the Foreign Sovereign Immunity Act.  *See generally id.* ¶¶ 1-9, 147-206.  The conspirators further used this lawsuit to advance Qatar's interests by issuing a press release claiming a "secret assault on Qatar" and disseminating a "deeply suspect" claim made by Counterclaim-Defendant Ashraf Abu Issa that U.S. conferences about Qatar had caused banks to freeze his accounts.  CC ¶¶ 40-41, 53-54; *see* ECF 46-2 ¶ 1.  This alleged concerted action "facially exceeds any legitimate purpose,"

---

[11] As alleged in the Counterclaims, Mosafer Inc. did not book travel at all, but only sold luggage and related accessories.  CC ¶¶ 56-58.  On information and belief, Mosafer Ecom is a subsidiary of Mosafer Inc, that was incorporated in 2018 (well after the "disinformation conspiracy" alleged in the Complaint) and has no independent business operations or revenues.

*Herzog*, 138 Cal. App. 3d at 662, and involves numerous bad-faith communications that find no refuge in the litigation privilege.

Moreover, California courts have declined to apply the litigation privilege when the policies behind that privilege—including "promot[ing] access to the courts, truthful testimony or zealous advocacy"—are not furthered by its application in a particular case. *Wentland v. Wass*, 126 Cal. App. 4th 1484, 1494 (2005); *see Vivian v. Labrucherie*, 214 Cal. App. 4th 267, 276 (2013) ("Application of the privilege requires consideration of whether doing so would further the policies underlying the privilege."). Here, allowing Counterclaim-Defendants to avoid Broidy's abuse of process claim would undermine, rather than advance, the policies underlying the litigation privilege. As the allegations in the Counterclaims make clear, this case has nothing to do with affording Mosafer the "freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Silberg v. Anderson*, 50 Cal. 3d 205, 213 (1990), *as modified* (Mar. 12, 1990). Quite the opposite. It is Qatar—through the Abu Issa parties—that is seeking to compel Broidy into silence by manufacturing a false narrative and sham allegations of damages supporting a Trojan horse plaintiff (Mosafer). Nothing in the litigation privilege prevents courts from evaluating whether a party is manipulating the privilege (and abusing the judicial process) to advance improper interests unrelated to the litigation, or requires courts to turn a blind eye to such conduct. *See ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1014 (2001) (noting that the purpose of the abuse of process tort is "to preserve the integrity of the court").

Because Broidy states a sufficient and cognizable claim for abuse of process under applicable law, Counterclaim-Defendants' motion to strike that cause of action under the anti-SLAPP statute or to dismiss it under Rule 12(b)(6) should be denied.

BROIDY OPPOSITION TO MOSAFER/ABU ISSA MOTION TO STRIKE OR DISMISS

### B.   Broidy Has Sufficiently Pled a Business Conspiracy Under Virginia Law

Counterclaim-Defendant raise three challenges to the Counterclaim for Business Conspiracy in violation of Va. Code §§ 18.2-499-500.  They argue that: (1) Virginia law does not apply; (2) the Counterclaim is barred by Virginia's civil immunity statute; and (3) Broidy has not pled the elements of the Counterclaim. Each of these arguments rests on misstatements of law and fact, and, as a result, they all fail.

### 1.   Virginia Law Applies in This Dispute Under California Choice-of-Law Rules

California's choice-of-law rules apply to diversity cases such as this one. *Ledesma v. Jack Stewart Produce, Inc.*, 816 F.2d 482, 484 (9th Cir. 1987). California applies a three-part governmental interest test under which the courts (1) "assess whether the foreign state law actually differs from the law of California"; (2) "then consider each state's interest in having its own law applied to this case to determine whether there is a 'true conflict' between their interests"; and (3) "if each state has a legitimate interest, [] compare the extent to which each state's interests will be impaired if the other state's law is applied."  *Est. of Darulis v. Garate*, 401 F.3d 1060, 1062 (9th Cir. 2005).  Each part of the test favors the application of Virginia law here.

*First*, Virginia law differs from California law with respect to business conspiracy claims.  Virginia law includes a special cause of action for business conspiracy and provides for both treble damages and injunctions prohibiting violators from engaging in such misconduct.  Va. Code § 18.2-500(A)-(B); *see* CC ¶¶ 244-46.  In contrast, California has no cause of action for business conspiracy. *See Kenworthy v. Brown*, 248 Cal. App. 2d 298, 301 (1967) ("There is no cause of action for civil conspiracy itself; an actionable wrong that is the *subject* of the conspiracy must be alleged in order to state a cause of action." (emphasis in

---

16

original)).

*Second*, Virginia alone can claim an interest in the application of its law to the allegation of business conspiracy against one of its citizens (Circinus, a government contractor headquartered in Fredericksburg, Virginia, *see* CC ¶ 236, ECF 1 ¶ 23), as Virginia law provides a specific cause of action for business conspiracy while conspiracy of any sort is not even an independent cause of action in California.  The dramatically different approaches that the two states' courts and legislatures have taken to protecting businesses against conspiracy shows that Virginia's interest in applying its law clearly outweighs California's.  *See Hurtado v. Superior Ct.*, 11 Cal. 3d 574, 580 (1974) ("When one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, there is no real problem; clearly the law of the interested state should be applied."  (internal quotations and citation omitted)).

*Third*, were Broidy prevented from relying on Virginia law, Virginia's interest in protecting the security of businesses in the Commonwealth through the laws enacted by its Legislature would be undermined.  A choice-of-law analysis that allows business conspirators to ensure their Virginia-based business targets cannot file claims under Virginia law merely by initiating lawsuits elsewhere would significantly harm Virginia's interest and would do nothing to further California's minimal or nonexistent interest.  Accordingly, Virginia law properly applies to the business conspiracy Counterclaim.

    2.    <u>Virginia's Civil Immunity Statute Does Not Bar the Business Conspiracy Counterclaim</u>

Counterclaim-Defendants' assertion that Virginia's anti-SLAPP statute (Va. Code § 8.01-223.2) applies here is baseless.  While that statute allows for the possibility of "immun[ity] from civil liability for a violation of § 18.2-499 [business conspiracy]," it does not—contrary to the Motion's claim (Mot. at

17

16:12)—create absolute immunity.  Rather, the statute applies only to claims that are "solely" based on "statements" that are either: (1) "regarding matters of public concern that would be protected under the First Amendment"; or (2) "made at a public hearing before the governing body of any locality or other political subdivision, or the boards, commissions, agencies and authorities thereof, and other governing bodies of any local governmental entity concerning matters properly before such body."  Va. Code § 8.01-223.2.  Construed according to its plain text, *see Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*, 593 F. Supp. 2d 840, 846-47 (E.D. Va. 2008), this does not preclude the business conspiracy Counterclaim for the same reasons discussed in Section IV.A.1 above, including that: (1) the Abu Issa parties and GoMosafer have no rights under the U.S. Constitution, and their "statements" are therefore not "protected under the First Amendment"; and (2) the Counterclaim is not based only on the filing of a lawsuit, but rather on a conspiratorial series of actions preceding and subsequent to that filing (including but not limited to the Mosafer and Abu Issa parties' pre-litigation coordination with Qatar, use of materials obtained through Qatar's subpoenas and illegal hack-and-smear operation, and post-filing media blitz to further Qatar's interests).  *See id.* at 846-47 (rejecting affirmative defense under Va. Code § 8.01-223.2 where defendants' conduct involved more than statements made "solely" at public hearings).  Moreover, the protections of the Virginia statute do not extend to "any statements made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false," Va. Code § 8.01-223.2, and Broidy has clearly alleged that Counterclaim-Defendants' prelitigation and litigation efforts in this case were conducted with knowledge that the allegations of the Complaint were false and intended to deceive

18

as to the identity of the real party in interest—Qatar.[12]  *See, e.g.*, CC ¶¶ 6, 248.

*Steele v. Goodman*, 382 F. Supp. 3d 403, 426-27 (E.D. Va. 2019), is instructive.  In finding an insufficient record to grant a motion to dismiss business conspiracy and other claims under Va. Code § 8.01-223.2, the district court found that the complaint was "replete with assertions that [defendant] made the multitude of statements with actual knowledge of their falsity," and that those allegations "plausibly support a conclusion that [defendant] made the statements with knowledge of their falsity or with a reckless disregard as to their veracity."  *Id.* at 427.  Noting that deference to a plaintiff's allegations is required at the motion to dismiss stage, the court concluded that the plaintiffs had pled "sufficient facts to show that [defendant] cannot avail himself of the protections of the Immunity Provision" for purposes of a Rule 12(b)(6) motion.  *Id.* at 428.  Because Broidy has similarly and adequately alleged that Counterclaim-Defendants conspired and prepared and filed the Mosafer lawsuit "with knowledge of [its] falsity or with a reckless disregard as to [its] veracity," *id.* at 427, Va. Code § 8.01-223.2 provides no basis for dismissal of the business conspiracy Counterclaim.

### 3.   Broidy's Business Conspiracy Counterclaim is Sufficiently Pleaded

Finally, the Motion's assertion that the Counterclaim fails to allege a business conspiracy is baseless.

Virginia law defines a conspiracy to injure another's business as "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert

---

[12] Counterclaim-Defendants' footnoted assertion that Virginia's litigation privilege applies to the Counterclaim (Mot. at 17 n.10) is meritless for the same reasons that the California litigation privilege does not apply.  *See* Section IV.A.2.b, *supra*.  As in California, the Virginia privilege applies to pre-filing communications only where the proposed judicial proceeding is contemplated in good faith—demonstrably not the case here.  *See Mansfield v. Bernabei*, 284 Va. 116, 125 (2012).

together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act."  Va. Code § 18.2-499.  As acknowledged in the Motion (Mot. at 17:18-21), the required elements of a business conspiracy claim are "(1) concerted action between two or more people; (2) legal malice towards Plaintiff's business; and (3) that the conspiratorial actions caused Plaintiff's business damages."  *Rogers v. Deane*, 992 F. Supp. 2d 621, 635 (E.D. Va. 2014) (citations omitted), *aff'd*, 594 F. App'x. 768 (4th Cir. 2014).  Virginia law *does not*, as the Motion asserts, require that "the pleading party . . . sufficiently allege a separate actionable tort."  Mot at 18:5-7.  Rather, "actions for . . . statutory business conspiracy lie [] if a plaintiff sustains damages as a result of an act that is itself *wrongful **or** tortious*."  *Id.*  (quoting *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 215 (2014)) (citations omitted) (emphasis added).  Thus, while Broidy's counterclaim for abuse of process provides an independent tort that underlies and supports the business conspiracy claim, Virginia law merely requires an assertion of damages as a result of a *wrongful* act, not only a *tortious* act.  *Id.*; *Werth v. Fire Companies' Adjustment Bureau*, 160 Va. 845, 855 (1933) ("To give action there must not only be conspiracy, but conspiracy to do a wrongful act.").

Counterclaim-Defendants' only argument that the abuse of process claim does not provide an adequate independent tort is that Broidy has failed to state a claim for abuse of process.  Mot. at 18:10-14.  As shown above in Section IV.A above, that argument is baseless.  But even if the abuse of process claim were improper—and it is not—Broidy has clearly alleged a conspiracy to commit wrongful conduct on the part of Counterclaim-Defendants.  As alleged in the Counterclaims, Qatar, the Abu Issa parties, and the Mosafer parties agreed to work

together in order to willfully and maliciously injure Circinus.  CC ¶ 237.  Their conspiracy included the Abu Issa and Mosafer parties agreeing to have Mosafer act as Qatar's proxy and to use the fruits of Qatar's illegal hacking and the subpoenaed records from Qatar's *Doe* lawsuits in an attempt to punish and silence Broidy, all while concealing Qatar as the real party in interest in an effort to preserve its claim to sovereign immunity.  *See generally* CC ¶¶ 6, 40, 49.

Counterclaim-Defendants' argument that the business conspiracy Counterclaim fails to allege injury (Mot. at 20:8-27) is equally baseless.  Indeed, Counterclaim-Defendants admit that the Counterclaim alleges injury to defendant Circinus.  Mot. at 20:8-9 ("the business conspiracy claim alleges an injury [] to Circinus").  Those alleged harms are to the business itself, "not merely [Mr. Broidy] himself or his reputation."  *King v. Darden*, 2018 WL 3651590, at *6 (E.D. Va. Aug. 1, 2018).  The Counterclaim describes the alleged harm to Circinus in the form of injury to its "reputation, trade, business, and profession, including the loss of contracts and other work" and chilling of its freedom of expression, as well as Counterclaim-Defendants' efforts to "prevent[] it from exercising its rights" and compel it "to disgorge substantial monies earned from various government contracts."  CC ¶¶ 239-242.  Moreover, although Counterclaim-Defendants assert that injury is alleged only as to Circinus and not as to Mr. Broidy or BCM (Mot. at 20:8-10), the business conspiracy Counterclaim expressly incorporates allegations of harm caused to all of the Broidy parties by the alleged tortious and unlawful conduct, including but not limited to "significant economic losses in the form of lost contracts, lost business relationships, loss of goodwill, reputational harm, costs to investigate and remedy hacking, attorneys' fees and costs" (CC ¶ 231), "lost contracts in the Balkans and Middle East Regions, lost profits, and lost growth opportunity and future contracts, damaged banking and investor relationships, and loss of good will and reputation" (*id.* ¶ 233), and as to

Mr. Broidy, "serious actual physical injury" (*id.* ¶ 234).

Thus, Counterclaim-Defendants' assertion that the business conspiracy allegations are conclusory and lacking in factual support (Mot. at 19-9-10) is easily rejected. Unlike the cases cited in the Motion, which involved mere conclusory recitation of the elements, *see, e.g.*, *Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 663-64 (E.D. Va. 2002); *Vuyyuru v. Jadhav*, 2011 WL 1483725, *14 (E.D. Va. Apr. 19, 2011), Broidy's Counterclaim for business conspiracy—which incorporates 234 preceding paragraphs of factual allegations—details with all requisite specificity the elements of the Counterclaim, including (as specifically as possible in advance of any discovery) "some details of time and place and the alleged effect of the conspiracy." *William v. Aes Corp.*, 28 F. Supp. 3d 553, 574 (E.D. Va. 2014) (internal quotations and citation omitted). These allegations are sufficiently particular to allege a business conspiracy under Virginia law.

## C.   Broidy's RICO Counterclaim is Sufficiently Pleaded

Finally, Broidy has sufficiently alleged that Counterclaim-Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, *et seq.*[13]  The elements of a civil RICO claim are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996).  While predicate acts of

---

[13] As a threshold matter, the Motion's repeated references to *Broidy Capital Mgmt. LLC v. Muzin*, 2020 WL 1536350 (D.D.C. Mar. 31, 2020) are wholly irrelevant and designed to mislead the Court.  Much of the conduct alleged in the Counterclaim in support of allegations of ongoing racketeering activity had not even occurred at the time the First Amended Complaint in that action was filed.  But in any event, a case decided nearly two years ago by a different judge in a different district based on different facts alleged in different pleadings—pleadings that Counterclaim-Defendants do not even present to the Court—has no bearing on the adequacy of the allegations pled in *this* Counterclaim.

fraud underlying a RICO claim must meet Rule 9(b)'s particularity requirement, that rule "is satisfied if the complaint identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Smith v. Levine Leichtman Cap. Partners, Inc.*, 723 F. Supp. 2d 1205, 1215 (N.D. Cal. 2010) (citation omitted); *see Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) ("While the factual circumstances of the fraud itself must be alleged with particularity, the state of mind—or scienter—of the defendants may be alleged generally."); *Smith*, 723 F. Supp. at 1215 ("[T]he particularity requirements of Rule 9(b) must be read in harmony with the [Fed. R. Civ. P. 8(a)(2)] requirement to make out a 'short and plain' statement of the claim.").

Here, Broidy has sufficiently pleaded each required element in a detailed Counterclaim that includes 50 paragraphs of allegations spanning over 11 pages (not including the extensive incorporated allegations). *See* CC ¶¶ 253-303. The Counterclaim alleges an association-in-fact enterprise coordinated by Qatar that includes all Counterclaim-Defendants and is "designed to silence and neutralize people who are perceived to be enemies or critics of Qatar." *Id.* ¶¶ 256, 259-60. It alleges several predicate acts that constitute racketeering activity, including but not limited to wire fraud in violation of 18 U.S.C. § 1343. CC ¶¶ 268, 271-77, 279; *see* 18 U.S.C. § 1961(1) (wire fraud constitutes "racketeering activity"). It alleges that the racketeering acts are "continuous" and related to each other by a "common purpose of conducting covert and illegal operations to silence and neutralize Qatar's critics," thereby constituting a "pattern." CC ¶ 268; *see United States v. Brooklier*, 685 F.2d 1208, 1222 (9th Cir. 1982) (RICO pattern "may be established by showing two or more acts that constitute offenses, conspiracies, or attempts of the requisite type, as long as the defendant committed two of the acts and both of them were connected by a common scheme, plan or motive"). And it alleges that the enterprise's pattern of racketeering activity has caused injury to Broidy's

business and property, including significant lost revenue, damage to goodwill and business relationships, and loss to the value of Broidy's business.  CC ¶¶ 298, 302.

Contrary to Counterclaim-Defendants' argument (Mot. at 22:24-27), Broidy has alleged at least two predicate acts on the part of the Mosafer parties.  As alleged in the Counterclaim (including its incorporated allegations), the Mosafer parties—at a minimum—engaged in separate acts of wire fraud by: (1) causing the electronic filing of their fraudulent lawsuit on behalf of Qatar while concealing their proxy relationship; and (2) issuing a press release on PRNewswire.com containing the same fraudulent allegations and falsely alleging a "secret assault against Qatar," all for the purpose of defrauding Broidy and other defendants out of money.  *See, e.g.*, CC ¶¶ 1, 39, 52, 248-51; *see also* ECF 1 ¶¶ 97, 121, 125-26, 131, Prayer for Relief (seeking compensatory damages and claiming losses of "hundreds of millions of dollars").[14]  Similarly, Counterclaim-Defendants' argument that the Mosafer parties are not alleged to have joined the enterprise until the filing of this lawsuit (Mot. at 24:2-5) is both immaterial and false.[15]  Even if the Mosafer parties only joined the enterprise in preparation for the sham litigation that

---

[14] Counterclaim-Defendants' argument that there is no allegation that the Mosafer parties "participated in the operation or management of the enterprise" (Mot. at 23 n.12) is equally baseless.  "[T]he word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  Contrary to Counterclaim-Defendants' position, the Counterclaim does not allege that the Mosafer parties were passive followers of the enterprise's directives, but rather that they entered into an agreement to file the lawsuit for the purpose of causing harm and took it upon themselves to aggressively promote the lawsuit in the media to serve the enterprise's interests.  *See, e.g.*, CC ¶¶ 40, 51-52, 54, 241, 261-63.

[15] Tellingly, the Mosafer parties in their Motion challenge the sufficiency of the RICO allegations ***against Qatar*** (Mot. at 24:2-3)—a curious position indeed for parties that claim not to be proxies for Qatar and to have nothing to do with Qatar.

they later filed in this Court, and then continued the work of the enterprise by pursing that litigation and publicizing various false claims against Broidy to serve the enterprise's interests, that would be sufficient for RICO liability as to the Mosafer parties. *See United States v. Feldman*, 853 F.2d 648, 659 (9th Cir. 1988) ("[C]ontinuity does not require that each member of the enterprise participate in it from beginning to end.").[16]

## V.   CONCLUSION

For all of the above reasons, the Court should deny the Motion in its entirety. Should the Court grant any portion of the Motion, Broidy respectfully requests leave to amend.

Dated:        December 20, 2021

**KASOWITZ BENSON TORRES LLP**

By:_____
        Daniel A. Saunders, Esq.
        dsaunders@kasowitz.com
        2029 Century Park East, Suite 2000
        Los Angeles, California 90067
        Telephone: (424) 288-7900
        Facsimile: (424) 288-7901

        *Attorneys for Defendants and*
        *Counterclaim-Plaintiffs*
        *Elliott Broidy, Broidy Capital*
        *Management, LLC, and Circinus, LLC*

---

[16] Should the Court find that any of the above allegations are not sufficiently clear in the context of the RICO Counterclaim, that is easily cured by amendment, including by amending the Counterclaim to allege RICO Conspiracy under 18 U.S.C. § 1962(d).

25

**CERTIFICATE OF SERVICE**

I certify that, on December 20, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

*/s/ Daniel A. Saunders*
Daniel A. Saunders