**KASOWITZ BENSON TORRES LLP**
DANIEL A. SAUNDERS (SBN 161051)
dsaunders@kasowitz.com
KEVIN K. KIM (SBN 330635)
kkim@kasowitz.com
2029 Century Park East, Suite 2000
Los Angeles, CA 90067
Telephone:    (424) 288-7900
Facsimile:      (424) 288-7901

JASON S. TAKENOUCHI (SBN 234835)
jtakenouchi@kasowitz.com
101 California Street, Suite 3000
San Francisco, California  94111
Telephone:  (415) 421-6140
Facsimile:   (415) 398-5030

*Attorneys for Defendants and Counterclaim-Plaintiffs*
*Elliott Broidy, Broidy Capital Management, LLC, and*
*Circinus, LLC*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MOSAFER INC.; MOSAFER ECOM, INC.; and GOMOSAFER,<br><br>                    Plaintiffs,<br>         vs.<br><br>ELLIOTT BROIDY, *et al.*,<br><br>                    Defendants.<br><br>ELLIOT BROIDY; BROIDY CAPITAL MANAGEMENT, LLC; CIRCINUS, LLC, | CASE NO. 2:21-cv-06320-MCS-JC<br><br>[Assigned to Hon. Mark C. Scarsi]<br><br>**COUNTERCLAIM-PLAINTIFFS' OPPOSITION TO COUNTERCLAIM-DEFENDANT STATE OF QATAR'S MOTION TO DISMISS COUNTERCLAIMS PURSUANT TO RULES 12(b)(1) AND 12(b)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE** |

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

Counterclaim-Plaintiffs,

vs.

MOSAFER INC.; MOSAFER ECOM, INC.; GOMOSAFER; STATE OF QATAR; ABU ISSA HOLDING WLL; ASHRAF ABU ISSA; NABIL ABU ISSA,

Counterclaim-Defendants.

Date:   January 24, 2022
Time:   9:00 a.m.
Courtroom: 7C

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

# **TABLE OF CONTENTS**

**Page(s)**

I.   INTRODUCTION ........................................................................................ 1

II.   BACKGROUND ........................................................................................ 2

III.   LEGAL STANDARD ................................................................................ 3

IV.   ARGUMENT ............................................................................................. 5

   A.   The Court Has Subject Matter Jurisdiction Under the
        Counterclaim Exception (28 U.S.C. § 1607) ..................................... 5

        1.   The Putative Mosafer Complaint is an "Action Brought by
             a Foreign State" Under *Bancec* ................................................. 7

             a.   The Mosafer Parties are Alter Egos of the State of
                  Qatar ................................................................................ 9

             b.   In the Alternative, the Mosafer Parties are Agents or
                  Instrumentalities of the State of Qatar............................ 12

        2.   The Counterclaims Arise Out of the Same Transaction or
             Occurrence as the Mosafer Complaint ...................................... 16

   B.   In the Alternative, the Court Should Permit Broidy to Pursue
        Jurisdictional Discovery and Amend the Counterclaims.................... 19

V.   CONCLUSION ........................................................................................ 23

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alberti v. Empresa Nicaraguense De La Carne,*
  705 F.2d 250 (7th Cir. 1983) ....................................................................... 5

*Arriba Ltd. v. Petroleos Mexicanos,*
  962 F.2d 528 (5th Cir. 1992) ....................................................................... 8

*Broidy Capital Management, LLC et al. v. State of Qatar et al.,*
  Case No. 18-cv-02421-JFW ................................................................. 18, 19

*Cabiri v. Gov't of Republic of Ghana,*
  165 F.3d 193 (2d Cir. 1999) ............................................................... 16, 19

*California Dep't of Water Res. v. Powerex Corp.,*
  533 F.3d 1087 (9th Cir. 2008) ..................................................................... 14

*Crist v. Republic of Turkey,*
  995 F. Supp. 5 (D.D.C. 1998) ...................................................................... 20

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*
  333 F. Supp. 3d 380 (D. Del. 2018) .............................................................. 7

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.,*
  557 F.2d 1280 (9th Cir. 1977) ..................................................................... 21

*DeSoto v. Yellow Freight System, Inc.,*
  957 F.2d 655 (9th Cir. 1992) ....................................................................... 20

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.,*
  322 F.3d 635 (9th Cir.2003) ........................................................................ 13

*Eminence Capital, LLC v. Aspeon, Inc.,*
  316 F.3d 1048 (9th Cir. 2003) ..................................................................... 20

*Filus v. Lot Polish Airlines,*
  907 F.2d 1328 (2d Cir. 1990) ................................................................ 22, 23

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
  462 U.S. 611 (1983), *superseded by statute on other grounds as
  stated in Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ............*passim*

ii

*Foremost–McKesson, Inc. v. Islamic Republic of Iran*,
  905 F.2d 438 (D.C. Cir. 1990)..................................................................23

*Frank v. Commonwealth of Antigua & Barbuda*,
  842 F.3d 362 (5th Cir. 2016)..............................................................4, 19

*Gates v. Victor Fine Foods*,
  54 F.3d 1457 (9th Cir. 1995)......................................................12, 13, 14

*Gilson v. Republic of Ireland*,
  682 F.2d 1022 (D.C. Cir. 1982)...............................................................23

*Great Socialist People's Libyan Arab Jamahiriya v. Miski*,
  683 F. Supp. 2d 1 (D.D.C. 2010)............................................................17

*Greenpeace, Inc. (U.S.A.) v. State of France*,
  946 F. Supp. 773 (C.D. Cal. 1996)..........................................................20

*Kamen v. American Tel. & Tel. Co.*,
  791 F.2d 1006 (2d Cir. 1986)..................................................................20

*Laub v. U.S. Dep't of Interior*,
  342 F.3d 1080 (9th Cir. 2003)....................................................20, 21, 23

*McNatt v. Apfel*,
  201 F.3d 1084 (9th Cir. 2000).....................................................................4

*Meadows v. Dominican Republic*,
  817 F.2d 517 (9th Cir. 1987)...............................................................4, 19

*Moore v. New York Cotton Exchange*,
  270 U.S. 593 (1926) ...........................................................................16, 17

*National City Bank of N.Y. v. Republic of China*,
  348 U.S. 356 (1955) .....................................................................................6

*OBB Personenverkehr AG v. Sachs*,
  577 U.S. 27 (2015) ...................................................................................5, 8

*Patrickson v. Dole Food Co.*,
  251 F.3d 795 (9th Cir. 2001)..............................................................13, 14

*Peterson v. Islamic Republic of Iran*,
  563 F. Supp. 2d 268 (D.D.C. 2008) ........................................................23

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

*Phoenix Consulting Inc. v. Republic of Angola*,
    216 F.3d 36 (D.C. Cir. 2000)...........................................................................4

*Pochiro v. Prudential Ins. Co. of America*,
    827 F.2d 1246 (9th Cir. 1987)......................................................................17

*Sachs v. Republic of Austria*,
    695 F.3d 1021 (9th Cir. 2012), *on reh'g en banc*, 737 F.3d 584 (9th
    Cir. 2013), *rev'd on other grounds sub nom. OBB Personenverkehr
    AG v. Sachs*, 577 U.S. 27 (2015)..................................................................8

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004)........................................................................4

*Samantar v. Yousuf*,
    560 U.S. 305 (2010) ...............................................................................15, 16

*Transamerica Leasing v. La Republica de Venezuela*,
    200 F.3d 843 (D.C. Cir. 2000)........................................................................8

*Wells Fargo & Co. v. Wells Fargo Express Co.*,
    556 F.2d 406 (9th Cir. 1977)........................................................................20

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*,
    17 F.4th 930 (9th Cir. 2021).....................................................................15, 16

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000)........................................................................3

*Wolfe v. Strankman*,
    392 F.3d 358 (9th Cir. 2004)..........................................................................4

**Statutes**

28 U.S.C. § 1603(a) ............................................................................................12

28 U.S.C. §§ 1603(a), 1607 ................................................................................15

28 U.S.C. § 1603(b) ...........................................................................................12

28 U.S.C. § 1604.................................................................................................5

28 U.S.C. § 1605(a)(1) .......................................................................................6

28 U.S.C. § 1607.......................................................................................5, 6, 19

28 U.S.C. § 1607(b) ........................................................................ 6, 16, 18

Foreign Sovereign Immunities Act ......................................................*passim*

**Other Authorities**

Federal Rule of Civil Procedure Rule 12(b)(1) ...................................... 3, 4

Federal Rule of Civil Procedure Rule 13 .................................................. 17

Federal Rule of Civil Procedure Rule 13(a) ............................................. 18

H.R.Rep. No. 94–1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604 ..................... 5

Local Rule 83-1.2.2 .............................................................................. 18

Local Rule 83-1.3.1 .............................................................................. 18

Restatement (Fourth) of Foreign Relations Law § 453,
    Comment c (2018) ......................................................................... 5

Defendants and Counterclaim Plaintiffs Elliott Broidy ("Mr. Broidy"), Broidy Capital Management, LLC ("BCM"), and Circinus, LLC (collectively, "Broidy" or the "Broidy parties"), pursuant to L.R. 7-9 and the Court's Initial Standing Order ¶ 9.B (ECF 10), submit this opposition to the motion to dismiss ("Motion" or "Mot.") filed by Counterclaim-Defendant State of Qatar ("Qatar").

# I.   <u>INTRODUCTION</u>

The State of Qatar proposes that it is allowed to act through proxies in the U.S. courts to pursue and punish U.S. citizens who criticize it.  Qatar also proposes that, no matter how transparent the proxy relationship, or how blatant its proxies' use of documents and information that were obtained by Qatari-sponsored illegal computer hacking and anonymous lawsuits, Qatar should be forever insulated from counterclaims by the U.S. citizens that it targets.  These proposals contradict the principles and history of the Foreign Sovereign Immunities Act ("FSIA").  The Court should reject them.

The nominal plaintiffs in this lawsuit are an obscure luggage retailer and its related entities—Mosafer Inc., Mosafer E-Com, Inc., and GoMosafer (collectively, "Mosafer" or the "Mosafer parties").  These plaintiffs have filed suit on the ostensible theory that the defendants' public (and constitutionally protected) discussions of Qatar's well-documented relationship with extremists and terrorists—none of which mentioned luggage, tourism, or any of the plaintiffs by name or implication—led to decreased tourism and lower sales.

The Mosafer parties, who have filed a separate motion to dismiss the Counterclaims,[1] do not explain how they decided which entities to sue.  By their telling, it is just a coincidence that they targeted the precise entities that the State of Qatar had identified as its critics through a series of *Doe* lawsuits in various U.S.

---

[1] Mosafer's motion to dismiss is scheduled to be heard contemporaneously with this Motion on January 24, 2022.

courts.  Nor do the Mosafer parties explain why they targeted Mr. Broidy.  Again, under their narrative, it is just a coincidence that they sued an individual whom the State of Qatar has spent years and untold millions targeting with an extensive hack-and-smear campaign in retaliation for his criticisms of the country and in an effort to silence him.

As explained in Broidy's Counterclaims, these were no coincidences. Rather, the Mosafer parties and their owners—Counterclaim-Defendants Abu Issa Holding WLL ("AIH"), Ashraf Abu Issa, and Nabil Abu Issa (collectively, the "AIH parties")—are longstanding proxies for Qatar, with deep ties to the state. Crediting the allegations of the Counterclaims, as the Court must here, the AIH parties and the Mosafer parties (which AIH owns and controls) are acting on direct orders from and as proxies for the State of Qatar, with the purpose of squelching criticism of the regime and punishing its critics as an example to others.  As alleged, Qatar enlisted Mosafer/AIH to file the Complaint on Qatar's behalf for the specific purpose of achieving the State's aim of silencing its critics while preserving its ability to claim sovereign immunity—precisely the tactic that has now come to pass and that Qatar now asks this Court to bless.

In the instant Motion, Qatar asks the Court to adopt an interpretation of the FSIA that would wholly insulate Qatar (and any similar regimes) from liability even as it makes transparent use of proxies to act on its behalf and achieve its ends in U.S. courts.  This is at odds not only with the history and policy of the FSIA, but with common sense.  The Court should deny the Motion.

## II.   BACKGROUND[2]

Mr. Broidy was among many individuals and entities—including multiple

---

[2] To avoid burdening the Court with duplicative briefing, the Broidy parties incorporate by reference the Background section of their recently filed Opposition to Mosafer and Abu Issa Counter-Claim Defendants' Motion to Strike or Dismiss,

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

1  U.S. government agencies, the current National Security Advisor, and the former

2  President of the United States—who criticized Qatar for its documented history of

3  harboring or supporting terrorists and extremists, including the Taliban, Hamas,

4  and the Muslim Brotherhood.  ECF 46 ("Counterclaims" or "CC") ¶¶ 27-29, 112,

5  118.  During the same period, a handful of websites also published information

6  about the regime's ties to extremists.  *Id.* ¶43.

7  　　　Qatar responded by using agents to hack Mr. Broidy's email accounts.  *Id.*

8  ¶ 37.  Qatar and its agents then mixed those illegally obtained emails with clever

9  forgeries and transferred these packages to public relations firms which, in turn,

10  distributed the deceptive and fraudulent materials to various publications to smear

11  Mr. Broidy.  *Id.* ¶ 37.  Soon after, Qatar filed a series of *Doe* lawsuits in U.S.

12  courts to force social media companies and other third parties to disclose

13  information about the operators of websites that criticized the regime.  *Id.* ¶¶ 43-

14  49.

15  　　　Qatar's campaign culminated in a Complaint, brought in the name of the

16  Mosafer parties, that targets Mr. Broidy, companies with ties to him, and entities

17  that were involved in the websites that criticized Qatar.  *Id.* ¶¶ 49-51.  As alleged in

18  the Counterclaims, the Mosafer parties and AIH parties are closely tied to the

19  Qatar regime and have acted as its proxies in the past.  *Id.* ¶¶ 61-92.  Qatar chose to

20  act through them rather than in its own name for the specific purpose of avoiding

21  exposure to counterclaims through assertions of sovereign immunity.  *Id.* ¶¶ 50-51.

22  ## III.  <u>LEGAL STANDARD</u>

23  　　　A party mounting a Rule 12(b)(1) challenge to the Court's jurisdiction may

24  do so either on the face of the pleadings or by presenting extrinsic evidence for the

25  Court's consideration. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)

26

27  ─────────────────

28  which is scheduled to be heard contemporaneously with the instant Motion.  *See* ECF 114 at 3-6.

("Rule 12(b)(1) jurisdictional attacks can be either facial or factual"). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

In ruling on a Rule 12(b)(1) motion attacking the complaint on its face, the court must accept the allegations of the complaint as true. *See Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009) ("[I]f the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff") (internal quotations and citation omitted); *see also Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (assuming allegations to be true and drawing all reasonable inferences in plaintiff's favor in context of jurisdictional challenge). Courts "favorably view[] the facts alleged to support jurisdiction." *McNatt v. Apfel*, 201 F.3d 1084, 1087 (9th Cir. 2000).

A litigant who sues a foreign state bears the initial burden of showing that one of the FSIA's exceptions applies to that state. *Meadows v. Dominican Republic*, 817 F.2d 517, 522–23 (9th Cir. 1987). "Once the party seeking the exception has assert[ed] at least some facts that would establish the exception, the party seeking immunity bears the ultimate burden of proving the nonapplicability of the exception[] raised by its opponent." *Frank v. Commonwealth of Antigua & Barbuda*, 842 F.3d 362, 367 (5th Cir. 2016) (internal citations omitted); *see also Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) ("In accordance with the restrictive view of sovereign immunity reflected in the FSIA, the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity.") (internal quotations and citation omitted).

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

## IV. ARGUMENT

### A. The Court Has Subject Matter Jurisdiction Under the Counterclaim Exception (28 U.S.C. § 1607)

The FSIA provides that foreign states are subject to the jurisdiction of United States courts if a specific statutory exception to sovereign immunity applies. *See OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 31 (2015); *see also* 28 U.S.C. § 1604. Among other exceptions, the FSIA provides that "[i]n any action brought by a foreign state [] in a court of the United States . . . the foreign state *shall not* be accorded immunity with respect to any counterclaim. . . (b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state." 28 U.S.C. § 1607.

As the Restatement (Fourth) of Foreign Relations Law explains:

> The rationale supporting unlimited recovery for related counterclaims against foreign states, even when the counterclaim could not have been brought in the United States as an original action, is that when a state resorts to courts in the United States to resolve a dispute, it thereby consents to resolution by those courts of all aspects of the dispute. . . . [W]hen a state initiates an action, it subjects itself to the jurisdiction of the court with respect to all claims related to that controversy.

Restatement (Fourth) of Foreign Relations Law § 453, comment c (2018). The legislative history of the FSIA's counterclaim exception is in accord with this rationale: "[I]f a foreign state brings or intervenes in an action based on a particular transaction or occurrence, it should not obtain the benefits of litigation before U.S. courts while avoiding any legal liabilities claimed against it and arising from that same transaction or occurrence." H.R.Rep. No. 94-1487, at 23 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6622; *see also Alberti v. Empresa Nicaraguense De La Carne,* 705 F.2d 250, 254 (7th Cir. 1983) ("The rationale behind the counterclaim exception is the desire to remove the basic unfairness of the situation in which [w]e have a foreign government invoking our law but resisting a claim

against it which fairly would curtail its recovery.") (internal citations omitted).[3]

Indeed, long before the FSIA was enacted, the Supreme Court had acknowledged the fundamental unfairness that the counterclaim exception was designed to prevent.  In holding that the Republic of China, which had sued a United States bank in federal court to recover deposits of a Chinese governmental agency, was properly subject to the bank's counterclaims based on defaulted Chinese treasury notes, the Court reasoned: "The short of the matter is that we are not dealing with an attempt to bring a recognized foreign government into one of our courts as a defendant and subject it to the rule of law to which nongovernmental obligors must bow.  We have a foreign government invoking our law but resisting a claim against it which fairly would curtail its recovery.  It wants our law, like any other litigant, but it wants our law free from the claims of justice."  *National City Bank of N.Y. v. Republic of China*, 348 U.S. 356, 361 (1955).  That "short of the matter" is equally true in this case, and fortunately the FSIA includes an express exception to foreign sovereign immunity to address it.

The Section 1607(b) counterclaim exception applies here—and accordingly Qatar has no immunity from the Counterclaims—because (1) the Mosafer lawsuit is properly defined as an "action brought by a foreign state," and (2) the Counterclaims arise out of the same "transaction or occurrence" that is the subject matter of that action.[4]

---

[3] For these reasons, Qatar's argument that the counterclaim exception cannot apply if the Court grants Broidy's Motion to Strike or Dismiss (Mot. at 16:17-17:2) is meritless.  Qatar cites no authority for the proposition that a stricken complaint does not count as an "action brought" under § 1607, and the rationale for the exception applies equally to a foreign state that tries—and fails—to abuse the system.

[4] Qatar asserts that Broidy has invoked the waiver exception to immunity under 28 U.S.C. § 1605(a)(1), and spends a substantial portion of its brief addressing that issue.  *See* Mot. at 1:9-10, 2:22-3:2, 17:3-25:8.  In fact, Broidy has not invoked the waiver exception and does not do so now.  That provision is immaterial because in

1      1.      The Putative Mosafer Complaint is an "Action Brought by a Foreign State" Under *Bancec*

In *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983), *superseded by statute on other grounds as stated in Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018), the Supreme Court addressed whether an action brought by an entity that is not itself a foreign state can nonetheless be treated as an action brought by a foreign state for purposes of invoking the counterclaim exception.

The plaintiff in *Bancec*, Cuba-based Banco Para El Comercio Exterior de Cuba (also known as Bancec), sued Citibank in federal court to collect on a letter of credit. *Bancec*, 462 U.S. at 613. Citibank counterclaimed against the Republic of Cuba, asserting a right to setoff based on the value of Citibank assets that the Cuban government had seized. *Id.* The Supreme Court held that Cuba was a proper counterclaim defendant, reasoning that a corporate entity is considered an alter ego of a foreign state for purposes of the FSIA when: (1) "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," or (2) under "broader equitable principle[s]," treating the corporation as a separate entity "would work fraud or injustice." *Id.* at 629.[5]

The Ninth Circuit has applied the *Bancec* standard to determine whether a plaintiff's allegations were sufficient to permit jurisdiction over a foreign state based on acts committed by its affiliated domestic corporations. *See Doe v. Holy See*, 557 F. 3d at 1079 (9th Cir. 2009). In doing so, the Ninth Circuit joined the D.C. Circuit and the Fifth Circuit in extending *Bancec*'s analysis to the question of

_____

the present case the Court has both subject matter and personal jurisdiction over Qatar under the counterclaim exception.

[5] Either prong of the disjunctive *Bancec* test can lead to alter ego status. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 396-97 (D. Del. 2018) (citing cases).

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

whether the actions of an affiliated domestic corporation may render a foreign sovereign amenable to suit. *See Transamerica Leasing v. La Republica de Venezuela*, 200 F.3d 843 (D.C. Cir. 2000); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533-36 (5th Cir. 1992).

Qatar wrongly asserts that "[n]o court has extended *Bancec* to hold that a *private entity*, over which the foreign state has no ownership interest, can be treated as 'a foreign state' under the FSIA." Mot. at 10:26-28 (emphasis in original). In fact, in *Sachs v. Republic of Austria*, 695 F.3d 1021 (9th Cir. 2012), *on reh'g en banc*, 737 F.3d 584 (9th Cir. 2013), *rev'd on other grounds sub nom. OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015), the Ninth Circuit applied the *Bancec* standard to determine whether Rail Pass Experts, a private entity over which the foreign state (Austria) had no ownership interest, could be treated as an alter ego of Austria under the FSIA. *Id.* at 1025-26. While the *Sachs* court ultimately decided that, on the specific facts and allegations before it, the connection between the private entity and the foreign state was too attenuated, the court left open the application of the counterclaim exception where a foreign government was "attempting to use a United States court to recover on a claim while at the same time trying to avoid being the subject of an adversary proceeding." *Id.* at 1026 (citing *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1072 (9th Cir. 2002)). The *Sachs* court further made clear that the *Bancec* standard is applicable to the FSIA's jurisdictional provisions regardless of which exception is at issue. *Sachs*, 695 F.3d at 1027.

Here, the *Bancec* standard fully supports the application of the FSIA's counterclaim exception. As alleged in the Counterclaims, Qatar is abusing the United States courts to bring a claim through its proxy while at the same time asserting sovereign immunity over a counterclaim focused on the same subject matter. CC ¶ 3. In this case, as in *Bancec*, giving effect to the corporation's

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

separate juridical status "would permit *the real beneficiary* of [the] action . . . to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity." *Bancec*, 462 U.S. at 632 (emphasis added). Here, as in *Bancec*, allowing Qatar to maintain the fiction of an identity separate from the nominal Plaintiffs "would work fraud or injustice." *Id.* at 629.

        a. <u>The Mosafer Parties are Alter Egos of the State of Qatar</u>

    The Counterclaims—the factual allegations of which must be accepted as true for purposes of this Motion—are more than sufficient to establish an alter ego relationship. As alleged, the Mosafer parties—like their parent company (AIH) and their owners, the Abu Issas—are sponsored and controlled by the State of Qatar. *See* CC ¶¶ 61-106. According to a United States banking compliance expert, the Abu Issa brothers are "closely intertwined with the Government of Qatar and its representatives." CC ¶ 53; ECF 46-2 ¶ 30. Likewise, an expert in Middle East affairs, Dr. Yleem D.S. Poblete, confirms that Mosafer (through the Abu Issa parties) has extensive connections to the Qatari state and the ruling Al-Thani royal family. CC ¶ 8; ECF 46-1 ¶¶ 31, 53. And the Mosafer/Qatar Complaint itself admits that Mosafer is "intimately associated" and "synonymous" with the State of Qatar. ECF 1 ¶ 31.

    As alleged in the Counterclaims, Qatar enlisted the Mosafer and Abu Issa parties to file this lawsuit on its behalf to silence Broidy, Ironistic, SCL, and three others. CC ¶¶ 249, 263, 301. To that end, Qatar supplied Mosafer with the documents it had obtained through its abusive use of the U.S. judicial system. CC ¶ 49. These documents identified SCL and Ironistic as the parties behind the four domain names at issue here. *Id.* Mosafer thus used the fruits of Qatar's *Doe* subpoenas—as well as the documents that Qatar had collected and generated as part of its illegal hack-and-smear campaign against Mr. Broidy—to file this lawsuit on Qatar's behalf against Qatar's critics, based entirely on patently bizarre and

9

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

frivolous claims of commercial wrongdoing against an unknown (and now defunct) luggage retailer.  *See* CC ¶¶ 6, 9, 45-51.

The transparently preposterous nature of the Complaint's allegations itself demonstrates the existence of an alter ego relationship.  The ostensible plaintiffs in this case—Mosafer Inc., Mosafer E-Com, Inc. and GoMosafer—cannot possibly prove that Broidy's criticisms of Qatar have in any way harmed their business. The Complaint fails on its face to allege *any* actions taken by Broidy against the Mosafer parties; indeed, there is no allegation or indication that Broidy ever said anything about Mosafer, or even knew that it existed.  Nor does the Complaint cite any actual evidence that any specific statement by Broidy concerning Qatar's activities is false.  Mosafer offers only one conclusory statement that "Qatar did not support terrorists or provide them with a safe haven" (ECF 1 ¶ 66)—a statement that is flatly contradicted by Middle East experts and the U.S. government, and that Mosafer would clearly have no way to know or competently allege, let alone prove, if it were indeed just a private luggage retailer.  Moreover, the central factual premise of the Complaint—that Broidy's conduct stifled Qatar's tourism business generally, resulting in indirect harm to Mosafer—is demonstrably false, as U.S. tourism to Qatar in fact *increased* each year during the relevant period, with "unprecedented" growth in 2019, the year when Mosafer's lone U.S. storefront closed.  CC ¶¶ 54-55.

The nature of the relief sought in this lawsuit further confirms that Mosafer is pursuing this action on behalf of Qatar.  Mosafer seeks an impermissibly vague and sweeping injunction "prohibiting Defendants from engaging in the conduct and practices alleged herein."  *See* ECF 1 ¶¶ 105, 113, 121.  But the "conduct and practices alleged herein," as referred to in the Complaint, have nothing to do with Mosafer; rather, they include a baseless claim that Mr. Broidy "acted as [an] unregistered agent[] of the UAE in violation of FARA" (*see id.* ¶ 56), as well as a

generalized grievance about Mr. Broidy exercising his constitutional right to comment on foreign policy issues involving Qatar. *See id.* ¶ 66. The requested injunction is nonsensical given the Mosafer parties' allegations, which fail to identify even a single statement targeted at them. The *only* party alleged to be the target of the purportedly unlawful statements, and the *only* would-be real beneficiary of the extraordinary relief sought in this lawsuit, is the State of Qatar itself. *See, e.g., id.* ¶¶ 1, 3, 6, 7.

Qatar's assertion that "Broidy has not pointed to 'equitable principles' that support treating Mosafer as Qatar" under the *Bancec* standard (Mot. at 12:12-13) is simply wrong. Indeed, the entire thrust of the Counterclaims is that equitable principles support treating the Mosafer parties as real-party-in-interest Qatar so that Qatar cannot attack Broidy and other U.S. citizens while abusing the Mosafer parties' corporate form or status to hide behind the curtain of sovereign immunity.[6] *See, e.g.*, CC ¶¶ 1-9, 25, 36-52, 61, 241, 249, 301. In light of the legal and factual hollowness of the Mosafer parties' claims and the absence of any demonstrable harm *to them*, as shown above, the filing of the Complaint only makes sense in the context that the Counterclaims provide—*i.e.*, that this lawsuit has been brought by, for, and on behalf of the State of Qatar. As such, Qatar is the alter ego of Mosafer, and allowing Qatar to maintain the fiction that the lawsuit is the private act of an obscure luggage retailer to evade accountability under Broidy's Counterclaims "would work fraud or injustice." *Bancec*, 462 U.S. at 629.

---

[6] While Qatar argues that the Counterclaims do not contain a separate allegation stating "that Qatar abused the corporate form by creating a separate legal entity to shield itself" (Mot. at 12:22-24), such an allegation is not necessary, and the facts of the cases that Qatar cites are illustrative rather than exhaustive. The Counterclaims do adequately allege that Qatar is attempting to "inappropriately use[] the separate status of the corporations to its own benefit, as in *Bancec*." *Doe v. Holy See,* 557 F.3d at 1080.

b.   <u>In the Alternative, the Mosafer Parties are Agents or Instrumentalities of the State of Qatar</u>

Even if Mosafer is not the alter ego of Qatar under the equitable prong of *Bancec* (which it is), the Complaint was still brought by a "foreign state" as required for application of the FSIA counterclaim exception because Mosafer and its owner, AIH (d/b/a. GoMosafer)[7], are an "agent or instrumentality" of the State of Qatar under 28 U.S.C. § 1603(b).

The FSIA defines a "foreign state" to include a political subdivision of a foreign state or an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality of a foreign state" is, in turn, defined as any entity: "(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country." *Id.* § 1603(b). "The Act's legislative history suggests that Congress intended the terms 'organ' and 'agency or instrumentality' to be read broadly." *Gates v. Victor Fine Foods,* 54 F.3d 1457, 1460 (9th Cir. 1995).

There can be no dispute that the first and third elements are satisfied here. The Mosafer parties purport to be corporate entities separate from the State of Qatar. One of the Mosafer parties, Gomosafer, is a limited liability company based in Qatar. CC ¶ 15.[8]

---

[7] As alleged in the Counterclaims, nominal plaintiff GoMosafer is a mere d/b/a for AIH and is not itself a legal entity. CC ¶ 15. Even according to Plaintiffs, GoMosafer is "the online division of Mosafer Travel, a Qatari travel agency," which in turn is "fully owned by [AIH], a Qatari company." *See* ECF 1 ¶ 19; ECF 4 at 2.

[8] The other two Mosafer parties, while incorporated in Delaware, are wholly owned and controlled by the Abu Issa parties, including AIH, and many of Mosafer Inc.'s purported "employees" are in fact employed by AIH. CC ¶¶ 13-14, 62-63.

With respect to the second element, the Ninth Circuit delineated what is required to be an "organ" of a foreign state in *Patrickson v. Dole Food Co.,* 251 F.3d 795, 807 (9th Cir. 2001).[9]   In that case, two workers brought a class action suit against a number of companies, including two Israeli companies, for injuries allegedly sustained from exposure to harmful pesticides. The Israeli companies removed the case to federal court pursuant to the FSIA, and argued (among other things) that they should be considered organs of a foreign state under §1603(b)(2). *Id.* at 807.  The court explained that "[i]n defining whether an entity is an organ, courts consider whether the entity engages in a public activity on behalf of the foreign government" (*id.*), and then applied a multi-factor analysis to make that determination.  Among the relevant considerations are "the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law."  *Id.*; *see also Gates,* 54 F.3d at 1461 (noting that "an entity's involvement in commercial affairs does not automatically render the entity non-governmental" for purposes of constituting an "organ" under § 1603(b)(2)).

When an entity's purpose includes carrying out national policy or advancing the state's interest, it may be found to be an organ of the state.  *See EIE Guam,* 322 F.3d at 640-42 (finding entity to be an "organ" of the state where the entity's "purpose is to carry out [] national policy"); *Gates,* 54 F.3d at 1461 (finding entity to be an "organ" where "the purpose of the entity in question is to advance the

---

[9] The fact that Qatar *might* not directly own each of the Counterclaim-Defendant entities—something that can be confirmed only through discovery—does not affect the analysis, as such ownership is only one way to establish the second element of "agency or instrumentality."  *See EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.,* 322 F.3d 635, 639 (9th Cir.2003) (noting that "organ" and "majority of shares" prongs are disjunctive).

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

[state's] interest"). An entity "may be an organ even if it has some autonomy from the foreign government." *Patrickson*, 251 F.3d at 807; *see also Gates,* 54 F.3d at 1461 (entity is an "organ" under government control where foreign state's "laws and regulations narrowly circumscribe the entity's ability to act independently," even if state is not directly involved in the entity's day-to-day activities). Similarly, an entity can be privately created and still be considered an organ of the state. *See California Dep't of Water Res. v. Powerex Corp*., 533 F.3d 1087, 1100 (9th Cir. 2008) (finding that a private firm was an "organ" of the state because the firm's activities were in furtherance of policies adopted by the state and thus were activities pursued for "public purposes").

As alleged in the Counterclaims, AIH has been closely intertwined with and dependent on the ruling family of Qatar for the two generations since its founding. CC ¶¶ 61-77. In return for its loyal service, AIH receives tremendous financial support from government officials, including with visible royal patronage and partnership in various so-called "joint ventures" with foreign businesses, as well as with lucrative state awarded contracts for massive public infrastructure projects that further advance the State of Qatar's interest. *See* CC ¶¶ 70-77. AIH engages in public activity on behalf of the State of Qatar, and AIH's officers regularly serve as representatives of AIH while simultaneously acting as proxies for Qatar and assisting with its sovereign functions. *Id.* ¶¶ 78-92. Moreover, Qatar's laws and regulations narrowly circumscribe AIH's ability to act independently (ECF 46-1 ¶¶ 32- 50), and AIH's own Company Profile describes its mission as including "supporting the overall economy and gross domestic product (GDP) of the state of Qatar."[10] Thus, much if not all of AIH's work is pursued for "public purposes." *Powerex*, 533 F.3d at 1100. For these reasons, AIH d/b/a GoMosafer and the other

---

[10] https://www.abuissa.com/wp-content/uploads/2019/02/AIH-Profile-16Oct.pdf, at p.7.

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

Mosafer parties are properly deemed "organs"—and thus "agenc[ies] or instrumentalit[ies]—of the State of Qatar, providing an alternative basis to find that the Mosafer Complaint constitutes an "action brought by a foreign state." *See* 28 U.S.C. §§ 1603(a), 1607.

Qatar's reliance on *Samantar v. Yousuf*, 560 U.S. 305 (2010), is misplaced. In *Samantar*, the defendant, a former Somali government official, asked to be considered a foreign state under the FSIA in order to be immune from suit. *Id.* at 308. The court held that the defendant failed to meet the required standard, reasoning that "the terms Congress chose simply do not evidence the intent to include individual officials within the meaning of "agency or instrumentality." *Id.* at 316. *Samantar* did not, as Qatar asserts, deal with the question of whether an *entity* can be treated as an agency or instrumentality of a foreign state when it acts on behalf of a foreign state. *See* Mot. at 10:28-11:2. Rather, the *Samantar* court addressed only whether an *individual foreign official*, sued for conduct undertaken in his official capacity, is an "agency or instrumentality of a foreign state" entitled to immunity from suit within the meaning of the FSIA. *Samantar*, 560 U.S. at 315. Indeed, the *Samantar* court distinguished its facts by noting that "the types of defendants listed [in the FSIA] are *all entities*." *Id.* at 317 (emphasis added). Accordingly, the Ninth Circuit has recently made clear that an *entity* that falls within the statutory definition of a foreign state *can* be treated as a foreign state, distinguishing *Samantar* as dealing only with individuals or natural persons (which are not even mentioned in the FSIA). *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 17 F.4th 930, 938-39 (9th Cir. 2021).[11]

---

[11] Contrary to Qatar's description, *WhatsApp* did not categorically hold that a "private company allegedly acting as an agent of a foreign state cannot 'meet[] the FSIA's definition of "foreign state."'" (Mot. at 9:23-25). Rather, the court solely addressed whether a *specific entity* that licensed technology to a foreign government and that did not fall within the FSIA definition of "foreign state" (including an "agency or instrumentality" thereof) could nevertheless claim sovereign immunity

2.   <u>The Counterclaims Arise Out of the Same Transaction or</u>
<u>Occurrence as the Mosafer Complaint</u>

Given that the Mosafer lawsuit constitutes an "action brought by a foreign state," as shown above, the only remaining question for application of the counterclaim exception is whether the Counterclaims "aris[e] out of the transaction or occurrence that is the subject matter of the claim of the foreign state." 28 U.S.C. §1607(b).

"To construe 'transaction or occurrence' in § 1607(b), we look for guidance to cases that construe the same phrase in [Federal Rule of Civil Procedure] 13(a)." *Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 197 (2d Cir. 1999). As the Supreme Court observed in *Moore v. New York Cotton Exchange*, 270 U.S. 593 (1926), "'[t]ransaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Id.* at 610. In *Moore*, the Court found the standard satisfied where there was "one circumstance without which neither party would have found it necessary to seek relief" and "essential facts alleged by [the plaintiff] enter[ed] into and constituted in part the cause of action set forth in the counterclaim." *Id.* Importantly, the Court observed that the fact that the claims "are not precisely identical, or that the counterclaim embraces additional allegations, . . . ***does not matter***. To hold otherwise would be to rob this branch of the rule of all serviceable meaning, since the facts relied upon by the

---

under common law principles. *WhatsApp*, 17 F.4th at 940. The court answered this limited question in the negative. *Id. WhatsApp* in fact reaffirmed that private entities that meet the standard of "organ" or "agent or instrumentality" of a "foreign state"—a term that the court recognized "is defined broadly"—***do*** constitute the "foreign state" under FSIA. *Id.* at 938-40. Moreover, neither *WhatsApp* nor *Samantar* even mentioned *Bancec*, let alone purported to disturb the *Bancec* standard for when a private company acting as the alter ego of a foreign state can meet the FSIA's definition of a "foreign state."

16

plaintiff rarely, if ever, are, in all particulars, the same as those constituting the defendant's counterclaim." *Id.* (emphasis added); *see Pochiro v. Prudential Ins. Co. of America,* 827 F.2d 1246, 1249 (9th Cir. 1987) (noting that Ninth Circuit has given Rule 13 "an increasingly liberal construction," and analyzing "whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit").

Here, the transactions and occurrences alleged in the competing pleadings easily meet this liberal and flexible standard. The *Mosafer* Complaint focuses on the defendants' criticism of the State of Qatar. *See* ECF 1 ¶¶ 1-13, 61-66. The Counterclaims have the same focus—they target Qatar's ongoing attempts to use proxies and unlawful conduct to retaliate against and silence Broidy's criticism of the State of Qatar. *See* CC ¶¶ 2, 9, 25, 246, 249, 257, 260-63. Put simply, Broidy's public criticism of Qatar is "the one circumstance without which neither party would have found it necessary to seek relief."[12] *Moore,* 270 U.S. at 610.

The Complaint and Counterclaims are further logically related in that the Counterclaims allege that the Complaint and attendant media blitz were merely a continuation of the years-long Qatari-sponsored campaign to silence Broidy's criticisms of Qatar. *See* CC ¶¶ 1-6, 25-41. Indeed, the continuity of this campaign—and therefore the relatedness of the transactions and occurrences pursuant to it—is amply demonstrated by the fact that almost the entirety of the *Mosafer* Complaint's factual assertions regarding Broidy are simply excerpts from

---

[12] *Great Socialist People's Libyan Arab Jamahiriya v. Miski*, 683 F. Supp. 2d 1 (D.D.C. 2010), does not alter this analysis. *See* Mot. at 15:25-16:3. Unlike the counterclaim-plaintiff in that case, Broidy does *not* seek relief stemming from the simple initiation of the lawsuit itself. Rather, he seeks relief from a continued and ongoing conspiracy and pattern of racketeering activity designed to silence his criticism of Qatar—the same criticism that provides the entire purported basis for the Complaint.

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

hacked materials purloined during the very Qatari-sponsored hack-and-smear operation at the heart of Counts 4-12—hacked materials that Qatari agents had disseminated to various media outlets with the intent to intimidate and silence Broidy's criticisms. *See* CC ¶¶ 5, 37, 166-230; *see also* ECF 1 ¶¶ 56-59, 64-65.

There is also a clear logical connection between the relief sought in the Complaint and the Counterclaims, which are flip sides of the same coin. The *Mosafer* Complaint seeks damages and a sweeping and permanent injunction that would prohibit Broidy and the other defendants from exercising their free speech rights to criticize and call public attention to Qatar's policies and practices. *See* ECF 1 at ¶¶ 13, 105, 113, 121. The Counterclaims, conversely, seek damages and injunctive relief to prevent Qatar and its proxies from attempting to silence and retaliate against Qatar's critics in the United States. *See* CC ¶¶ 2-7, 240-46.

Qatar's reliance on Judge Walter's Order Denying Transfer of Related Cases is unavailing. Mot. at 15:18-20; *see* ECF 50. Notably, Mosafer itself filed the Notice of Related Case in this matter. ECF 49. In exercising his discretion to decline the transfer, Judge Walter found that under Local Rules 83-1.2.2 and 83-1.3.1 the instant case was not related to *Broidy Capital Management, LLC et al. v. State of Qatar et al.*, Case No. 18-cv-02421-JFW ("*Broidy v. Qatar*") because they involve different claims and different parties. Qatar cites no authority for the proposition that the standard for determining relatedness under Local Rules 83-1.2.2 and 83-1.3.1[13] also applies to the liberally construed Section 1607(b) of the FSIA or Rule 13(a) of the Federal Rules of Civil Procedure. Moreover, even a

---

[13] Local Rule 83-1.2.2 asks whether an action alleges "the same or essentially the same claims, involving the same or essentially the same parties." Local Rule 83-1.3.1 applies whenever two civil cases (a) arise from the same or a closely related transaction, happening, or event; (b) call for determination of the same or substantially related or similar questions of law and fact; or (c) for other reasons would entail substantial duplication of labor if heard by different judges.

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

finding that the Counterclaim here involves different claims and parties from *Broidy v. Qatar* would plainly not be determinative of the relevant question under Section 1607—whether the Counterclaims are logically related to the claims in the Complaint *in this case*.

Qatar's reliance on *Cabiri* is also misplaced. *Cabiri* involved a series of counterclaims, some that met the "logical relationship" standard and some that did not. *See Cabiri*, 165 F.3d at 195. For example, the court found that the plaintiff's breach of contract claim was logically related to his eviction because "the core issue in both claims is whether Cabiri's employment was lawfully terminated." *Id.* at 198. Here, as in *Cabiri*, the Complaint and Counterclaims share a common "core issue"—*i.e.*, whether the defendants are allowed to criticize the Qatari regime without being targeted and retaliated against by that regime in the United States.

In sum, accepting the Counterclaims' allegations as true for purposes of this Motion, Broidy has amply demonstrated that (1) the action in this case is one brought by a foreign state, and (2) the Counterclaims bear a logical relationship to, and therefore arise out of the same transactions or occurrences as, the claims in the Complaint. Accordingly, Broidy has met the burden of asserting "at least some facts" supporting application of the counterclaim exception to the FSIA applies. *See Frank*, 842 F.3d at 367; *Meadows*, 817 F.2d at 522-23. Because Qatar has not met its "ultimate burden of proving the nonapplicability of the [counterclaim] exception," *Frank*, 842 F.3d at 367, Qatar's Motion should be denied.

## B. In the Alternative, the Court Should Permit Broidy to Pursue Jurisdictional Discovery and Amend the Counterclaims

Alternatively, should the Court not deny Qatar's Motion in its entirety based on the counterclaim exception to the FSIA, Broidy requests leave to amend the Counterclaims to state additional facts supporting subject matter jurisdiction. *See*

19

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (district courts should freely provide leave to amend on the granting of a motion to dismiss unless it is clear that the complaint could not be saved by amendment); *DeSoto v. Yellow Freight System, Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (same).

Moreover, Broidy should be permitted to conduct jurisdictional discovery to uncover additional facts supporting the Court's exercise of jurisdiction. *See Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (holding that jurisdictional discovery is appropriate when it is "useful to establish federal subject matter jurisdiction"). Indeed, if it is "possible" that the plaintiff could demonstrate the requisite jurisdictional facts under the FSIA if granted jurisdictional discovery, then "[i]t is an abuse of discretion to dismiss for lack of subject matter jurisdiction without giving [a] plaintiff reasonable opportunity" to conduct discovery to show subject matter jurisdiction under the FSIA. *Greenpeace, Inc. (U.S.A.) v. State of France*, 946 F. Supp. 773, 789 (C.D. Cal. 1996); *see also Crist v. Republic of Turkey*, 995 F. Supp. 5, 11 (D.D.C. 1998) ("[S]overeign immunity is a critical preliminary determination of subject matter jurisdiction and [] the parties should be permitted a fair opportunity to engage in jurisdictional discovery so as to adequately define and submit to the court facts necessary for a thorough and complete consideration of the issue."); *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977) (holding that district court abused its discretion in refusing to grant jurisdictional discovery). This is particularly true when the facts demonstrating jurisdiction are peculiarly within the knowledge of the party against whom discovery is sought. *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).

In its concurrently filed Motion to Stay Discovery, Qatar claims that jurisdictional discovery is inappropriate here because the instant Motion does not dispute Broidy's factual allegations, but argues only that any FSIA exceptions are

inapplicable as a matter of law.  ECF 103-1 at 8:13-15, 8:24-27.  This characterization of Qatar's Motion is demonstrably false, as the Motion is replete with denials of critical jurisdictional allegations that the purported "Mosafer" Complaint was in fact brought by Qatar.[14]  But even were the facts undisputed, Broidy would not be precluded from obtaining jurisdictional discovery on that ground, as such discovery "may appropriately be granted where pertinent facts bearing on the question of jurisdiction are controverted *or* where a more satisfactory showing of the facts is necessary."  *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977)) (citations omitted) (emphasis added); *see also Laub*, 342 F.3d at 1093 (stating that jurisdictional discovery should be granted where "the jurisdictional facts are contested *or* more facts are needed," and reversing district court's decision not to permit discovery "[b]ecause additional discovery would be useful to establish federal subject matter jurisdiction" (emphasis added)).

As but one of many possible examples, discovery regarding whether Qatar provided the Mosafer parties with the information obtained from its *Doe* lawsuits and directed Mosafer as to what parties to sue would unquestionably bear on both the alter ego analysis and the agency/instrumentality analysis above.  Qatar

---

[14] *See, e.g.,* Mot. at 2:2-3 ("Qatar emphatically denies the allegation that it is somehow behind Mosafer's lawsuit, just as it continues to deny the underlying allegations."); *id.* at 2:12-13 ("[T]his action was brought by private companies—not a 'foreign state.'"); *id.* at 3:17-18 ("Mosafer disputes Broidy's allegations about its relationship with Qatar."); *id.* at 8:7-8 ("[T]his suit filed by private companies is not an 'action brought by a foreign state,' as required by the exception."); *id.* at 11:15-16 ("To be clear, Qatar denies that Mosafer is its 'proxy' or that it filed this action 'at the behest of Qatar.'"); *id.* at 12:24-25 ("The Mosafer companies are private entities that . . . seek to recover for their own economic losses."); *id.* at 14:11-12 ("[N]o 'foreign state' has made a 'claim' in this case."); *id.* at 19:21 ("There Has Been No Action by a 'Foreign State.'"); *id.* at 22:24-23:1 ("[I]t is clear that Qatar did not 'directly contact,' 'direct[ly] engage,' or make any 'direct request' whatsoever of, a U.S. court.").

speculates in its Motion that the Mosafer parties *could have* gotten *some* information about *some* of the defendants through means other than Qatar.  Mot. at 24 n.9.  In Qatar's telling, the Mosafer parties could have stumbled upon a filing at the International Court of Justice that identified Haitham Al Mussawi, an official at the United Arab Emirates' Embassy in the United States, in connection with the registration of the domain names qatartruth.com and qatarexposed.com; could then have further stumbled onto a profile of defendant Ironistic on the webpage of internet marketing company Design Rush; could have seen in that profile that the UAE is identified as an Ironistic client; and could then have simply assumed that Ironistic must have been behind the qatartruth.com and qatarexposed.com websites because the United Arab Emirates—a wealthy nation with interests around the globe—must have used only one company for all of its website work.  *Id.*  Qatar's strained—in fact, ludicrous—theory about the Mosafer parties' pre-Complaint investigation does nothing to address how the Mosafer parties would have known that Ironistic was involved in *all four* website domains, not just the two mentioned in the ICJ pleading.  Nor does it explain how the Mosafer parties learned about defendants SCL, Project Associates, and Atkinson.  But more importantly, Qatar should not be permitted to provide the Court with speculation about where the Mosafer parties *could have* learned the information that led to their Complaint while simultaneously arguing that there should be no discovery into how the Mosafer parties *actually* learned that information.

*Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990) is instructive.  In that case, survivors of passengers killed in an airplane crash brought a negligence suit against the USSR, which had allegedly designed and serviced the aircraft.  The USSR filed a motion to dismiss based on sovereign immunity, and plaintiffs responded by seeking discovery regarding possible commercial activity that could bring the defendants within one of the FSIA exceptions.  The USSR,

like Qatar here, contended "that if the court lacks jurisdiction over it, it cannot be subjected to discovery." *Id.* at 1332.  Acknowledging that tension, the *Filus* court concluded that the plaintiff was to be allowed discovery with respect to the jurisdictional issue, but would not be entitled to other discovery until she had shown a reasonable basis for assuming jurisdiction. *Id.* at 1332.[15]

Here, the Counterclaims contain more than sufficient factual allegations to justify jurisdictional discovery. *See Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268, 274 (D.D.C. 2008) (jurisdictional discovery should be granted if the plaintiff presents non-conclusory allegations that, if supplemented with additional information, will materially affect the court's analysis with regard to the applicability of the FSIA).  If the Court were to have questions as to whether the counterclaim exception applies, Broidy would seek discovery relating to several specific jurisdictional facts crucial to the immunity determination, including but not limited to the relationship between Qatar and the Mosafer and Abu Issa parties, communications between Qatar and the Mosafer and Abu Issa parties concerning the subject matter of the Complaint and Counterclaims, and documents concerning whether the Mosafer parties obtained pre-filing information about the defendants from Qatar.  All of these inquiries involve specific jurisdictional facts that could be "useful to establish federal subject matter jurisdiction." *Laub*, 342 F.3d at 1093.

## V.    CONCLUSION

For all of the foregoing reasons, the Court should deny the Motion in its entirety.  Alternatively, should the Court not be prepared to deny the Motion on

---

[15] *See also Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) (reversing denial of motion to dismiss because a dearth of fact-finding); *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1026 (D.C. Cir. 1982) (reversing dismissal of plaintiff's claims for lack of jurisdiction under the FSIA because "the facts as alleged—and generously interpreted—[made] a dismissal at least premature in light of the dearth of fact-finding done by the district court" (emphasis added)).

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

1  this record, Broidy respectfully requests leave to conduct jurisdictional discovery

2  and amend the Counterclaims.

3

4  Dated:          December 29, 2021              **KASOWITZ BENSON TORRES LLP**

5

6                                                 By:

7                                                    Daniel A. Saunders, Esq.

8                                                    dsaunders@kasowitz.com
                                                     2029 Century Park East, Suite 2000
9                                                    Los Angeles, California 90067
                                                     Telephone: (424) 288-7900
10                                                   Facsimile: (424) 288-7901

11

12                                                  *Attorneys for Defendants and*
                                                    *Counterclaim-Plaintiffs*
13                                                  *Elliott Broidy, Broidy Capital*
                                                    *Management, LLC, and Circinus, LLC*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS

## CERTIFICATE OF SERVICE

I certify that, on December 29, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.


*/s/Daniel A. Saunders*
Daniel A. Saunders

BROIDY OPPOSITION TO QATAR'S MOTION TO DISMISS