COVINGTON & BURLING LLP
Mitchell A. Kamin (Bar No. 202788)
  mkamin@cov.com
Michael D. Fields (Bar No. 313679)
  mfields@cov.com
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: + 1 424-332-4800
Facsimile: + 1 424-332-4749

David M. Zionts (*admitted pro hac vice*)
  dzionts@cov.com
Alexander A. Berengaut (*admitted pro hac vice*)
  aberengaut@cov.com
Megan M. O'Neill (*admitted pro hac vice*)
  moneill@cov.com
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone:  +1 202 662 6000
Facsimile:  +1 202-662-6291

*Attorneys for Counterclaim-Defendant State of Qatar*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| MOSAFER INC.; MOSAFER E-COM, INC.; AND GOMOSAFER<br><br>    Plaintiffs,<br><br>    v.<br><br>ELLIOT BROIDY; GEORGE NADER; BROIDY CAPITAL MANAGEMENT, LLC; CIRCINUS, LLC; THE IRON GROUP INC. D/B/A IRONISTIC.COM; SCL SOCIAL LIMITED; PROJECT ASSOCIATES UK LTD; MATTHEW ATKINSON; AND JOHN DOES 1-100,<br><br>    Defendants.<br><br>ELLIOT BROIDY; BROIDY CAPITAL MANAGEMENT, LLC; CIRCINUS, LLC, | Civil Case No.:<br><br>2:21-cv-06320-MCS-JC<br><br><br>**REPLY IN SUPPORT OF COUNTERCLAIM-DEFENDANT STATE OF QATAR'S MOTION TO DISMISS COUNTERCLAIMS PURSUANT TO RULES 12(b)(1) AND 12(b)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE**<br><br>**Hearing Date:**  January 24, 2022<br>**Time:**   9:00 a.m.<br>**Courtroom:**  7C<br>**Judge:**  Hon. Mark C. Scarsi |

Counterclaim-Plaintiffs,

v.

MOSAFER INC.; MOSAFER E-COM,
INC.; GOMOSAFER, STATE OF QATAR,
ABU ISSA HOLDING WLL, ASHRAF
ABU ISSA, NABIL ABU ISSA

Counterclaim-Defendants.

1      Broidy has no response to the unprecedented nature of his attempt to subject

2   a foreign sovereign to U.S. jurisdiction.  The FSIA counterclaim exception on

3   which he relies reflects the modest principle that if a foreign state sues in U.S.

4   court, the defendant can assert related counterclaims.  Never has this exception

5   been used to bring a foreign sovereign into litigation based on a private company's

6   lawsuit.  Broidy's novel theory invites courts to probe the relationships between

7   foreign sovereigns and private companies, with destabilizing consequences for

8   international relations that Congress could not have meant to license.

9      Broidy's brief largely abandons the central theory of jurisdiction he

10   attempted to plead in his counterclaims – that the counterclaim exception applies

11   because Mosafer allegedly filed this lawsuit with Qatar's "blessing," or perhaps "at

12   Qatar's behest."  Counterclaims, ECF 46, ¶¶ 3, 8.  Broidy also abandons his

13   reliance on the FSIA's waiver exception.  Instead, Broidy fashions two new

14   theories that are not suggested in, or supported by, his Counterclaims: that Mosafer

15   is Qatar's "alter ego" or state "organ."  Broidy's new theories, like his old theories,

16   fail as a matter of law to establish an exception to Qatar's sovereign immunity.

## ARGUMENT

### I.      The Waiver Exception Does Not Apply.

19      Broidy's counterclaims expressly invoked the waiver exception, 28 U.S.C.

20   § 1605(a)(1), by stating that "[t]he Court has jurisdiction over Qatar under 28

21   U.S.C. §§ 1330, *1605(a)(1)*, and 1607."  Counterclaims ¶ 21 (emphasis added).

22   Qatar therefore explained why the waiver exception is inapplicable.  Qatar's

23   Motion to Dismiss, ECF 102-1 ("Mot.") 17–25.  Rather than respond, Broidy now

24   asserts that he "has not invoked the waiver exception."  Broidy's Opposition, ECF

25   120 ("Opp.") 6 n.4.  While that statement is false, Broidy now concedes that the

26   waiver exception is inapplicable.

### II.      The Counterclaim Exception Does Not Apply.

27      The counterclaim exception is inapplicable for several independent reasons.

28

1

**A.      Broidy Cannot Invoke the Counterclaim Exception Against Qatar Because Qatar Did Not Sue Broidy.**

Broidy does not dispute that the Mosafer Plaintiffs are private companies. *See* Opp. 2.  He alleges that they are owned by AIH, "a limited liability company based in Qatar."  Counterclaims ¶ 15; *see id.* ¶¶ 13–17, 62, 63.  AIH's members are the Abu Issa brothers, who are not Qatari officials, but are merely alleged to have a "relationship" with the "ruling family," which includes "support" for the Abu Issas' "many businesses" and "lucrative business deals."  *Id.* ¶ 66.  Accordingly, Mosafer's lawsuit is not an "action brought by a foreign state" as required by the counterclaim exception.  28 U.S.C. § 1607.

Under the plain text of the FSIA, the Supreme Court's decision in *Samantar v. Yousuf*, 560 U.S. 305 (2010), and the Ninth Circuit's decision in *WhatsApp, Inc. v. NSO Grp. Techs. Ltd.*, 17 F.4th 930 (9th Cir. 2021), a private company cannot be a "foreign state."  Mot. 8–10.  As the Ninth Circuit recently explained in *WhatsApp*, a "private corporation that provides products and services to sovereigns" was "of course" not a "foreign state," as it "is not itself a sovereign," not "'an organ . . . or political subdivision' of a sovereign," "[n]or is a foreign sovereign its majority owner."  17 F.4th at 940.  Contrary to Broidy's cursory suggestion (Opp. 15 n.11), nothing about the Ninth Circuit's interpretation of "foreign state" was limited to a "specific entity that licensed technology."  Every reason the Ninth Circuit gave for why NSO was "of course" not a foreign state applies to Mosafer.

Broidy's reliance on *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec")*, 462 U.S. 611 (1983), is misplaced, and this Court should reject his invitation to become the first ever to hold that *a private company's lawsuit* can be an "action brought by a foreign state."  Broidy casts *Bancec* as "address[ing] whether an action brought by an entity that is not itself a foreign state can nonetheless be treated as an action brought by a foreign state for

2

1  purposes of invoking the counterclaim exception." Opp. 7. But this is doubly

2  wrong. First, the lawsuit in *Bancec was* brought by a foreign state – Bancec was

3  an instrumentality of Cuba, making it a "foreign state" under the FSIA. 462 U.S.

4  at 620 n.7 (citing 28 U.S.C. § 1603(a)). Second, the Court decided nothing about

5  the counterclaim exception because it was conceded to apply: Citibank

6  counterclaimed against Bancec, *the instrumentality that sued it*; the question was

7  whether Bancec could be held liable for Cuba's acts. *Id.* at 620.[1]

8       More fundamentally, no court has ever applied *Bancec* to hold that a private

9  entity is a "foreign state" for any purpose, much less to hold that a private entity's

10  lawsuit triggers the counterclaim exception. Mot. 10. Broidy says this is

11  "wrong[]," relying on a Ninth Circuit panel opinion addressing the commercial

12  activity exception. Opp. 8 (citing *Sachs v. Republic of Austria*, 695 F.3d 1021 (9th

13  Cir. 2012)).[2] But Broidy does not mention that the *en banc* court *withdrew* that

14  opinion and ordered that it "shall not be cited as precedent by or to any court of the

15  Ninth Circuit." *Sachs v. Republic of Austria*, 705 F.3d 1112 (9th Cir. 2013). The

16  *en banc* court then disagreed on the point for which Broidy cites the panel, holding

17  *Bancec* inapplicable where entities had an alleged agency relationship, but are

18  "entirely distinct" and lack "common ownership" or a "similar legal relationship."

19  *Sachs v. Republic of Austria*, 737 F.3d 584, 594, 607 (9th Cir. 2013) (en banc),

20  *rev'd on other grounds sub nom. OBB Personenverkehr AG v. Sachs*, 577 U.S. 27

21  (2015). The *en banc* court explained that *Bancec* is about corporate form and veil-

22

23  [1] Notably, the Court never suggested that Citibank, having been sued by Bancec, could have counterclaimed *directly against Cuba*. If Broidy wanted to follow the

24  example of *Bancec*, and he truly believed that Mosafer was an alter ego of Qatar, he would have counterclaimed solely against Mosafer and tried to hold Mosafer

25  liable for Qatar's alleged hack. But Broidy did not plead his hacking claims against Mosafer, tacitly recognizing that Mosafer and Qatar are not the same.

26  [2] Broidy cites three other cases to argue *Bancec* applies to "affiliated domestic corporations," but those don't apply *Bancec* to *private* corporations. Opp. 7–8.

27

28

REPLY IN SUPPORT OF COUNTERCLAIM-DEFENDANT STATE OF QATAR'S MOTION TO DISMISS COUNTERCLAIMS PURSUANT TO
RULES 12(b)(1) AND 12(b)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE

piercing, and "[o]ne cannot pierce a non-existent corporate veil." *Id.* at 594.[3]

Lastly, Broidy does not even address the international relations dangers his novel theory would cause. Mot. 11. Broidy does not dispute that, on his view, foreign sovereigns could be forced to defend the innermost workings of their governments and economies *just to vindicate their immunity from suit.* Such a rule would also have reciprocal consequences for the United States: if litigation abroad is initiated by a U.S. company that receives "lucrative state awarded contracts" (Opp. 14), the United States' own sovereign immunity could be abrogated on Broidy's theory. *See McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 589 (9th Cir. 1983) (the FSIA embodies "the principle of reciprocity," because the United States may lose immunity abroad if U.S. courts do not respect foreign sovereigns' immunity); *Arriba Ltd v. Petroleos Mexicanos*, 962 F.2d 528, 536 (5th Cir. 1992) (*Bancec* inapposite to relationship between Mexican instrumentality and private entity, noting that "[w]e would not allow such generalized conspiratorial allegations against an American government entity to provoke massive discovery" regarding "highly sensitive domestic issues").

**B.** **Even if *Bancec* Were Relevant, Broidy's Allegations Do Not Support Imputing Mosafer's Lawsuit to Qatar.**

**1.** **The Counterclaims Do Not Plead That Mosafer Is Qatar's Alter Ego.**

As described above, *Bancec*'s alter ego analysis does not apply to the relationship between a sovereign and a *private* company, because it reflects the corporate law principle addressing when a corporation "is not to be regarded as legally separate *from its owners*." 462 U.S. at 629 (emphasis added). Broidy does

---

[3] The court went on to hold that separate from the *Bancec* analysis, the commercial activity exception was triggered by "foreign sovereign common carriers that sell tickets in the United States through agents." *Id.* at 593. This holding was particular to the commercial activity exception and its legislative history, and Broidy rightly does not seek to analogize it to the counterclaim exception.

4

1  not allege that Qatar owns Mosafer, so his alter ego argument fails at the threshold.

2       In any event, Broidy's counterclaims do not come close to alleging an alter

3  ego relationship, which is "the rare exception."  *Dole Food Co. v. Patrickson*, 538

4  U.S. 468, 475 (2003).  In *Bancec*, the Court held that an alter ego relationship may

5  exist "where a corporate entity is *so extensively controlled by its owner* that a

6  relationship of principal and agent is created."  462 U.S. at 629 (emphasis added);

7  *see also Doe v. Holy See*, 557 F.3d 1066, 1079 (9th Cir. 2009) (typical agency

8  relationship involving agents acting on behalf of principals and subject to their

9  control did not satisfy *Bancec*).  Juridical separateness is overcome only where a

10 state exercises "*day-to-day*[] *routine involvement*."  *Id.* (emphasis added); *see also*

11 *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1073–74 (9th Cir. 2002).

12      Broidy does not attempt to plead any day-to-day involvement by Qatar in

13 Mosafer's operations.  While Broidy asserts that the counterclaims "allege[] the

14 Mosafer parties . . . are sponsored and controlled by the State of Qatar" (Opp. 9),

15 the counterclaims in fact allege that "*AIH, and its owners the Abu Issa brothers*,

16 *have complete control* over the Mosafer Plaintiffs" (Counterclaims ¶ 62 (emphasis

17 added)).  Similarly, while Broidy claims "extensive connections" between Mosafer

18 and Qatar (Opp. 9), the cited paragraph alleges only that Mosafer sought "the

19 blessing" of the Emir before it filed suit, or alternatively that it is "likely" the Emir

20 "asked" Mosafer to file suit (Counterclaims ¶ 8).  An allegation that Qatar likely

21 asked Mosafer to take a single action is not routine, day-to-day control.

22      Broidy also invokes alleged connections between the Abu Issa brothers and

23 the Qatari government, but those allegations concern the Abu Issas' personal

24 dealings or businesses they own *other than Mosafer* and are therefore irrelevant.

25 *See* Counterclaims ¶¶ 61–106.  And if a private businessperson could achieve alter

26 ego status merely by having close ties to a country's rulers and receiving business

27 advantages, many companies throughout the world would qualify as alter egos of a

28

5

1    sovereign and be able to claim sovereign immunity.

2         Broidy is also not aided by the fact that Mosafer, a private company, states

3    that *it* "deliberate[ly] attempt[ed] to make Mosafer synonymous with Qatar" as a

4    "branding" strategy, including by "us[ing] elements of the Qatari flag."  Complaint

5    ¶ 31; *see* Opp. 9.  Here too, Broidy's allegation would apply to companies

6    throughout the world; such a marketing strategy does not make a private company

7    an alter ego of a foreign sovereign.

8         Nor do the counterclaims allege facts establishing that respecting corporate

9    form "would work fraud or injustice."  *Bancec*, 462 U.S. at 629.  Again, *Bancec*

10   articulates the "fraud or justice" prong as a corporate law principle, confirming it

11   has no application where there is no corporate relationship.  There are no corporate

12   formalities between Qatar and Mosafer that could be disregarded.  Of equal

13   importance, Broidy stretches this prong of the analysis too far, as it is not a general

14   license to avoid perceived unfairness: "[i]t is not sufficient . . . merely to point out

15   an injustice that would result," but rather a plaintiff "must show how the

16   [sovereign] *manipulated [the] corporate form* to perpetuate a fraud or injustice."

17   *First Inv. Corp. of Marshall Islands v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d

18   742, 755 (5th Cir. 2013) (emphasis added); *see also Gater Assets Ltd. v. AO*

19   *Moldovagaz*, 2 F.4th 42, 50, 56 (2d Cir. 2021).

20        No such abuse is alleged here.  At most, Broidy alleges that Qatar asked

21   Mosafer to file a lawsuit it did not want to file itself.  Broidy alleges that this works

22   a fraud because it allows Qatar to "hide behind the curtain of sovereign immunity."

23   Opp. 11.  But even if it were true that Qatar asked Mosafer to file its suit, there is

24   nothing about Mosafer's *corporate form*, nor any alleged abuse *of that form*, that

25   causes Broidy the purported injustice of having to defend a lawsuit.  Mosafer

26   claims that Broidy injured its own business, and if Broidy is right that Mosafer has

27   no standing to make that complaint, Broidy will win.  An allegation that a

28

REPLY IN SUPPORT OF COUNTERCLAIM-DEFENDANT STATE OF QATAR'S MOTION TO DISMISS COUNTERCLAIMS PURSUANT TO
RULES 12(b)(1) AND 12(b)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE

1  sovereign asked a private company to file a lawsuit bears no resemblance to

2  instances where a court has found that abuse of the corporate form warranted

3  piercing a corporate veil—for example, where a sovereign "dissolved a state-

4  owned oil company" and "replaced it with an under-capitalized state-owned oil

5  company endowed with newly-enacted immunity protection [in order to escape

6  liability]." *Gater Assets Ltd.*, 2 F.4th at 63 (alteration in original) (quoting *EM Ltd.*

7  *v. Banco Central de la República Argentina*, 800 F.3d 78, 95 (2d Cir. 2015)).

8             **2.    Broidy's Claim That Mosafer Is a State "Organ" Is Both**
9                    **Wrong and Irrelevant.**

10       Broidy argues "in the alternative" that he can invoke the counterclaim

11  exception against Qatar because Mosafer is an "agency or instrumentality" of

12  Qatar.  Opp. 12–15.  Broidy fails to plead, however, that Mosafer (or even AIH) is

13  an agency or instrumentality because they are plainly not state "organs" under 28

14  U.S.C. § 1603(b)(2), *i.e.*, entities that "engage in a public activity on behalf of the

15  foreign government." *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087,

16  1098 (9th Cir. 2008). *Powerex*, which is Broidy's only purported example of

17  where a "private firm" was held to be an "organ" (Opp. 14), is instructive: it

18  involved "a wholly-owned, second-tier subsidiary of British Columbia, created

19  pursuant to an order of the Province," with "a majority of its directors . . .

20  indirectly selected by the Lieutenant Governor," where it was "immune from

21  taxation," "the government's comptroller overs[aw] its financial operations," "[i]t

22  implement[ed] international agreements at the direction of the government," and

23  "[i]ts profits redound[ed] to the benefit of the Province's citizens." *Powerex*, 533

24  F.3d at 1100.  AIH's alleged "ties" and business support from Qatar are nothing

25  like that: Broidy merely alleges that AIH has close ties to the Qatari government

26  and receives lucrative contracts and business advantages.  Opp. 14.  If that were

27  enough, the leading businesses in many countries would be state organs entitled to

28

REPLY IN SUPPORT OF COUNTERCLAIM-DEFENDANT STATE OF QATAR'S MOTION TO DISMISS COUNTERCLAIMS PURSUANT TO
RULES 12(b)(1) AND 12(b)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE

claim sovereign immunity.  Nor is Broidy's argument bolstered by a corporate presentation that includes the unremarkable statement that AIH's ability to attract international investment is good for Qatar's economy, *see* Opp. 14, a boast that many companies no doubt make about how they are good for their country.

Even if Mosafer were an "agency or instrumentality," but *not* an alter ego as required to "overcome the presumption of separate juridical status for governmental instrumentalities," then the "acts of those entities cannot be attributed to [Qatar] for jurisdictional purposes." *Holy See*, 557 F.3d at 1069. Broidy would *still* need to establish that Mosafer is an alter ego of Qatar for his argument to go anywhere.  Otherwise, all it would mean is that Mosafer has sovereign immunity, the counterclaim exception applies *to Mosafer*, and Broidy could seek to hold Mosafer liable for its own acts.

### C.    Broidy Fails to Establish the Independent Requirement That His Counterclaims Arise Out of the Same Transaction or Occurrence.

Broidy's counterclaims also do not satisfy the counterclaim exception because they do not "aris[e] out of the transaction or occurrence that is the subject matter of" Mosafer's complaint.  28 U.S.C. § 1607(b).  The only FSIA case Broidy mentions in this part of his brief, *Cabiri v. Gov't of Republic of Ghana*, held that to satisfy this standard there must be overlap in "the evidence required to establish" the claim and counterclaim.  165 F.3d 193, 197–99 (2d Cir. 1999).  Broidy ignores that standard, and identifies *no* evidentiary overlap between (i) Mosafer's claim that Broidy harmed it with a disinformation campaign, and (ii) Broidy's claim that Qatar accessed his computer systems without authorization.

Instead, Broidy makes a generic appeal to the "liberal and flexible" Rule 13 standard, and abstractly casts both sets of claims as "focusing on" "Broidy's criticism of the State of Qatar."  But the mere allegation of "some factual relationship" between claim and counterclaim is insufficient.  *Spencer v. Banco Real, S.A.,* 623 F. Supp. 1008, 1011–12 (S.D.N.Y. 1985); *see also Republic Health*

8

1   *Corp. v. Lifemark Hosps. of Fla., Inc.*, 755 F.2d 1453, 1455 (11th Cir. 1985) (one

2   party's "narrow" claim focused on a "legal right to purchase" a hospital, and other

3   party's "wide range of allegations" about efforts to "thwart [its] entry into the acute

4   care market," did not arise out of the "same operative facts").  "[S]haring an

5   underlying, but-for cause is not enough to compel the conclusion that two [claims]

6   arise out of the same transaction or occurrence." *RocketPower, Inc. v. Strio*

7   *Consulting, Inc.*, 2019 WL 5566548, at *7 (D. Minn. Oct. 29, 2019).  For example,

8   the "existence of a contractual relationship between the parties" is insufficient

9   where "factual allegations or theories of liability" are dissimilar.  *Interlabservice,*

10  *OOO v. Illumina, Inc.*, 2017 WL 4217133, at *6 (S.D. Cal. Sept. 20, 2017).

11  Indeed, even "a partial overlap in issues of law and fact" does not necessarily meet

12  the standard; the issues must be "*largely the same* and . . . *substantially the same*

13  evidence [must] support or refute both claims." *Marais v. JPMorgan Chase Bank,*

14  *N.A.*, 676 F. App'x 509, 513 (6th Cir. 2017) (citations omitted).

15        Thus, Broidy's view that both sets of claims stem from a general enmity

16  between Broidy and Qatar is insufficient.  The evidence required to prove that

17  Broidy's disinformation campaign economically harmed Mosafer does not even

18  partially coincide with the evidence needed for Broidy to succeed on his claims

19  that Qatar directed a hacking-and-dissemination campaign.  The problem is not

20  that "the claims 'are not precisely identical, or that the counterclaim embraces

21  additional allegations.'"  Opp. 16.  It is that "the evidence required to establish"

22  that Qatar committed cyberespionage against Broidy does "not concern" whether

23  Broidy engaged in a disinformation campaign.  *Cabiri*, 165 F.3d at 198.[4]

24

25

26  ───────────────

    [4] Broidy admits that claims based on "initiation of the lawsuit itself" do not arise
    out of the same transaction or occurrence.  Opp. 17 n.12.  He objects that none of
    his claims are based only on the filing of the lawsuit, but that is plainly what
27  Counts 1 and 2 (and most of 3) are about, Mot. 15–16, and apart from referencing
    some vague "ongoing conspiracy," he does not say what those counts *are* about.

28

**D.     The Counterclaim Exception Could Not Apply If The Court Strikes Mosafer's Complaint.**

Broidy baldly asserts that the counterclaim exception "applies equally" to a stricken complaint, Opp. 6 n.3, but he does not dispute that such a complaint is a legal nullity, or explain how there is an "action brought by a foreign state" if the complaint purporting to bring that action is a nullity.  Mot. 16–17.  Broidy asked the Court to strike Mosafer's complaint; he cannot also wield it as a sword.

**III.    Broidy's Requests for Leave to Amend or Jurisdictional Discovery Should Be Denied.**

Broidy is not entitled to leave to amend because he has not identified additional allegations he can make to establish jurisdiction.  If a plaintiff cannot "explain what [he] can add to the complaint to overcome the fatal obstacles that exist," then amendment simply "amounts to a pure delay in the final disposition of the case." *Brown v. Option One Mortg. Corp.*, 2010 WL 1267774, at *5 (N.D. Cal. Apr. 1, 2010).  Broidy is also not entitled to jurisdictional discovery, which in FSIA cases "should be ordered circumspectly" and "only to verify allegations of specific facts crucial to an immunity determination." *Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*, 899 F.3d 1081, 1094 (9th Cir. 2018).  The only specific topic of jurisdictional discovery Broidy raises is "whether Qatar provided the Mosafer parties with the information obtained from its *Doe* lawsuits and directed Mosafer as to what parties to sue."  Opp. 21.  But his counterclaims already make that allegation, Counterclaims ¶ 49; Qatar explained why that allegation, even if true, does not support any exception to immunity, Mot. 24; and Broidy does not respond or explain what relevance this allegation could have to the counterclaim exception.  Qatar further addresses Broidy's request for jurisdictional discovery in its Reply in Support of a Motion to Stay.

**CONCLUSION**

Qatar's Motion to Dismiss (ECF 102) should be granted.

10

Dated:  January 5, 2022

Respectfully submitted,

COVINGTON & BURLING LLP


By:  */s/ Mitchell A. Kamin*
MITCHELL A. KAMIN
*Attorney for Counterclaim-Defendant*
*State of Qatar*

11