1            UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE MARK C. SCARSI, U.S. DISTRICT JUDGE

4

5    MOSAFER INC.; MOSAFER ECOM, INC.;        )
     and GOMOSAFER,                           )
6                                             ) CASE NO.
                    Plaintiffs,               ) 21-CV-06320-MCS
7                                             )
           vs.                                )
8                                             )
     ELLIOTT BROIDY, et al.,                  )
9                                             )
                    Defendants.               )
10                                            )
                                              )
11   _____)

12

13

14

               REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                  MONDAY, DECEMBER 6, 2021
16
                       9:02 A.M.
17
                  LOS ANGELES, CALIFORNIA
18

19

20

21

22   _____

23            MAREA WOOLRICH, CSR 12698, CCRR
              FEDERAL OFFICIAL COURT REPORTER
24           350 WEST FIRST STREET, SUITE 4311
              LOS ANGELES, CALIFORNIA 90012
25                 mareawoolrich@aol.com

```
 1                      APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS:

 4        LARSON LLP
          BY:  STEPHEN G. LARSON, ESQ.
 5        BY:  KOREN L. BELL, ESQ.
          BY:  JONATHAN D. GERSHON, ESQ.
 6        555 South Flower Street, Suite 4400
          Los Angeles, CA 90071
 7        Telephone: (213) 436-4888

 8

 9    FOR DEFENDANTS ELLIOT BROIDY, BROIDY CAPITAL MANAGEMENT LLC,
      AND CIRCINUS LLC:

10        KASOWITZ BENSON TORRES LLP
          BY:  DANIEL A. SAUNDERS, ESQ.
11        2029 Century Park East, Suite 2000
          Los Angeles, CA 90067
12        Telephone: (424) 288-7900

13

      FOR DEFENDANT IRONISTIC:
14
          AKIN GUMP STRAUSS HAUER AND FELD LLP
15        BY:  HYONGSOON KIM, ESQ.
          4 Park Plaza, Suite 1900
16        Irvine, CA 92614
          Telephone: (949) 885-4100
17
      FOR DEFENDANT GEORGE NADER:
18
          KAISERDILLON PLLC
19        BY:  COURTNEY FORREST, ESQ. (Pro Hac Vice)
          1099 14th Street NW
20        8th Floor West
          Washington, DC 20005
21        Telephone: (202) 640-2850

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

```
1              LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 6, 2021

2                          9:02 a.m.

3                            -oOo-

4

5              THE COURTROOM DEPUTY:  Calling Item No. 1,

6   CV 21-6320, Mosafer, Inc., et al. versus Elliot Broidy, et al.

7              Counsel, state your appearances, please.

8              MS. BELL:  Good morning, Your Honor.  Koren Bell,

9   Stephen Larson, and Jonathan Gershon on behalf of Plaintiff,

10  the Mosafer parties.

11             THE COURT:  Good morning.

12             MR. SAUNDERS:  Good morning, Your Honor.  Daniel

13  Saunders on behalf of Defendants Elliot Broidy, Broidy Capital

14  Management LLC, and Circinus LLC.

15             THE COURT:  Good morning.

16             MS. FORREST:  Good morning, Your Honor.  Courtney

17  Forrest for Defendant George Nader.

18             THE COURT:  Good morning.

19             MR. KIM:  Good morning, Your Honor.  Hyongsoon Kim,

20  Akin Gump, for Defendant Ironistic.

21             THE COURT:  Good morning.

22             So we are here on two motions to strike -- or I'm

23  sorry, three motions to strike.  And I know that there's

24  another motion to strike the counterclaims that's on -- that's

25  on schedule for January 24th.  I was debating deferring this
```

1   hearing until then, but I kind of wanted to hear from the

2   parties.  This is a little bit of a complicated matter.  So I

3   wanted to see if I couldn't make some ground in getting my arms

4   around all the facts.

5           Let me ask -- I guess what I'll do is I'll ask some

6   questions from the plaintiff counsel first and then move over

7   to the defendant's counsel.

8           MS. BELL:  Thank you, Your Honor.

9           THE COURT:  So if you want to take the --

10          MS. BELL:  Okay.

11          THE COURT:  The first thing I wanted to talk about

12   was venue for this action and why this is the appropriate

13   venue.  I know there was some allegation that this is a

14   district where Broidy and BCM reside.  But not all the

15   defendants reside in this district; correct?

16          MS. BELL:  That's correct, Your Honor.

17          THE COURT:  So what's the appropriate basis for

18   venue?  And I know it's not been challenged, but I just wanted

19   to make sure that I understood what the position was.

20          MS. BELL:  Understood, Your Honor.

21          Yes, the Court's correct.  Your Honor, may I remove

22   my mask --

23          THE COURT:  Yes.  My general rule has been when

24   people are talking, they can remove their mask if they want.

25   No one has to remove their mask.  Hopefully we will dig out of

1   this thing soon, and we can all look at each other again.

2          MS. BELL:  Thank you, Your Honor.

3          The Court is absolutely correct in pointing to the

4   Broidy defendants.  They are the lead defendants in this

5   matter.  And in our account, we've alleged that the Broidy

6   defendants indeed spearheaded this campaign.  They were the

7   orchestrators and the principal catalyst behind the campaign.

8   And being based in California, this seemed to be the most

9   appropriate venue to proceed given the crux of those

10  allegations.

11         In addition, as the Court may have seen, the

12  Complaint alleges that the defendants all willfully availed

13  themselves of the laws and protections of California insofar as

14  many of the -- the social media campaign had as its platforms

15  Facebook, Twitter, et cetera, and those platforms are based

16  here in California.

17         Finally, California was a very significant market

18  for our clients.  Our client had intended and planned to open a

19  second flagship store here, and those plans were scuttled on

20  account of the Disinformation Conspiracy that we've alleged.

21         So for all of those reasons, of all the possible

22  venues, the crux of both the conduct and a substantial focus of

23  the harm finds its focus here in California.

24         THE COURT:  Okay.  Is there another venue that is

25  appropriate under the rules that -- I'm just looking at -- so I

1  just want to make sure that there's not an issue with venue

2  here.  I guess it's not been opposed.  But venue is appropriate

3  under 1391.  And what subsection should we be looking at?

4          MS. BELL:  Well, Your Honor, there's 1391(b) and

5  28 U.S.C. Section 84 given that this is the district where, as

6  the Court noted, Broidy and BCM reside and our position being

7  that all defendants given our allegations are subject to the

8  Court's general and/or specific jurisdiction here.

9          And of course, there's the -- in paragraph 14 of our

10  Complaint, we outline the complete diversity of citizenship of

11  the various defendants here.

12          But to the Court's question, yes, for all of the

13  reasons that I stated at the outset, I think this is the most

14  appropriate venue of the choices we would have here.

15          THE COURT:  You say the Broidy defendants

16  spearheaded the acts at issue from California.  What are the

17  allegations that that happened from California other than this

18  is their residence?

19          MS. BELL:  Yes, Your Honor.  Well, our belief is

20  that all of the actions that are alleged as to Broidy took

21  place here in California.  And so that -- those allegations

22  begin on page -- on paragraph 48, and they run through -- all

23  the way through paragraph -- well, 59, and then they continue

24  all the way through paragraph -- well, through the end of the

25  factual allegations.

1           But the crux of the -- kind of outset of the

2    campaign and the planning, certainly all of those allegations

3    through paragraph 66, our understanding is that those were

4    taken by the Broidy defendants, meaning Broidy and BCM, from

5    California.

6           THE COURT:  In the -- I guess the inference there is

7    because Broidy resides in California, then these actions

8    occurred in California.  Because the Complaint itself doesn't

9    necessarily say that they were directed from California; right?

10          MS. BELL:  Your Honor, it -- that's certainly our

11   understanding and I think the necessary implication or what we

12   intended to convey.  And I do believe that the Complaint

13   alleges that across the board, the defendants certainly

14   purposely availed themselves of the laws and protections of

15   California in carrying this out.

16          But yes, Your Honor is correct.  The premise comes

17   from the fact that Mr. Broidy himself and BCM reside here in

18   California.

19          THE COURT:  Then just by way of example, would

20   Washington, D.C. be an appropriate venue here considering the

21   issue with the Washington Post advertisement?

22          MS. BELL:  Your Honor, I don't think that would be

23   the most appropriate venue given all of the factors that we've

24   discussed.  The Washington Post advertisement is simply one

25   example of what we believe to be a much broader campaign that

 1   was perhaps most widely disseminated and most powerfully

 2   disseminated in terms of the reach and the impact to our client

 3   through the social media component of the campaign, not the

 4   print media.

 5             And with respect to that, as previously mentioned,

 6   these social media platforms that were used have their locus

 7   here in California in terms of the company.

 8             THE COURT:  I want to talk a little bit about the

 9   Foreign Agent Registration Act.

10             MS. BELL:  Yes, Your Honor.

11             THE COURT:  So as I understand, your argument is

12   that the anti-SLAPP issues don't come into play here because we

13   are dealing with illegal conduct.

14             MS. BELL:  Correct.

15             THE COURT:  And I know that you -- the Complaint

16   indicates that the defendants violated the -- did you say FARA,

17   or do you say FARA, or is there some -- what do you say?

18             MS. BELL:  Your Honor, I'm not quite sure, but I

19   understand what the Court -- I'm not sure whether there's an

20   appropriate way.  I think every way would work here today.

21   So --

22             THE COURT:  But what are the pleaded facts that give

23   rise to a Foreign Agent Registration Act violation by the

24   moving defendants?

25             MS. BELL:  Yes, Your Honor.  The crux of the

```
 1   allegations there are that the defendants were acting as agents
 2   of the UAE and that they failed to register in accordance with
 3   FARA.  They failed to label -- they failed to make disclosures
 4   in accordance with FARA.  And they failed to label the at-issue
 5   content of the Disinformation Conspiracy pursuant to the
 6   requirements of FARA and that all of that had a deeply
 7   injurious impact which was just what FARA was meant to protect
 8   against; namely, that the public was deceived into believing
 9   that this disinformation was, in fact, authentic, independent,
10   and original content when, in fact, it was false advertising
11   paid for by a foreign principal.
12            THE COURT:  And on this motion that the Court is
13   dealing with, obviously there's -- whether or not the
14   defendants violated FARA is not -- it's not a decision that's
15   been made.  But what's the Court's role as far as if you plead
16   the facts underlying the illegal conduct, is that enough, or
17   does the Court have to make a determination?
18            MS. BELL:  No, Your Honor.  I think at this stage,
19   the Court should accept the well-pleaded allegations as true.
20            Throughout the Complaint, we've been quite specific,
21   not just about our allegation that the defendants violated FARA
22   but the basis for that allegation.  The Court can see that
23   description.  And I'll just lay out by example certain of the
24   paragraphs at issue, but paragraph 6, paragraph 56, paragraphs
25   59 to 60, 64 to 65, 72 to 75, 77 to 79, and 101B.
```

1                In addition, we have the Broidy defendants' answer

2       which, while not squarely at issue today, admits that

3       Mr. Broidy never registered under FARA, admits that Circinus

4       had contractual relations with the UAE and does not dispute the

5       contents of the emails discussed in the Complaint.  And this is

6       Broidy's answer at paragraphs 59 through 64.

7                So this is not an instance where we've just alleged

8       in conclusory fashion the violation of FARA, but we've included

9       substantial detail about the basis for that allegation.  And as

10      the Court has seen, the very crux of our argument is that this

11      Disinformation Conspiracy was designed to conceal and to

12      deceive the public and readers, which extended to our client,

13      as to the true -- well, as to defendants' conduct across the

14      board, both the true nature of this content, its origin, and

15      defendants' actions pursuant to the conspiracy.

16               So I think particularly viewed through the lens of

17      the premise here, which was to deceive and hide the actions,

18      the allegations that I've mentioned that the Court will find in

19      the Complaint are sufficient for this Court at this stage to

20      say, well, the violation of FARA and therefore the premise of

21      illegal conduct is sufficient to defeat step one of the

22      anti-SLAPP analysis.

23               THE COURT:  Does that apply to all of the

24      plaintiff's claims?

25               MS. BELL:  Yes, Your Honor.  Our position is that

1    all of the publications, the at-issue content, that all of that

2    content was undertaken in violation of FARA.

3           Here, none of the defendants at issue today -- whose

4    motions are at issue today registered at all under FARA.  And,

5    again, that's a matter of public record, and it's effectively

6    undisputed -- expressly undisputed by Mr. Broidy -- or by the

7    Broidy defendants in their answer.

8           THE COURT:  And then I want to talk a little bit

9    about the statute of limitations issue.  When did the

10   plaintiffs contend they first learned of the existence of the

11   Disinformation Conspiracy?

12          MS. BELL:  Your Honor, it was -- there were a number

13   of -- there was a number of sort of different information.  It

14   was a bit of a cumulative rolling process.  But I think by the

15   2019, 2020 period certainly a major part of the discovery has

16   its basis in Mr. Broidy's -- the criminal prosecution of

17   Mr. Broidy, the surrounding guilty plea, the prosecutor's

18   statements about what was -- what the government intended to

19   prove up at the sentencing hearing.  So certainly a major part

20   of the understanding came together with those public

21   proceedings.

22          As the Complaint also details, there were

23   disclosures made by the press which also contributed to that

24   understanding.  So it was an evolving process.

25          But certainly by the 2020 plea and subsequent

```
 1    pardon, that was a critical moment in kind of the full

 2    discovery of not just the injury but that the injury was a

 3    product of the wrongdoing and that the wrongdoing was

 4    attributable here to this Disinformation Conspiracy.

 5            THE COURT:  And so where in the Complaint -- if I

 6    was to look for where in the Complaint it indicates when the

 7    plaintiffs found out about the Disinformation Conspiracy, where

 8    would I look?

 9            MS. BELL:  So, Your Honor, the factual allegations

10    regarding discovery, if I may just have a moment -- so the

11    factual allegations regarding the discovery, if the Court looks

12    to paragraph 59 and 90, those are examples where we've

13    explained how we've pieced together -- we've pieced together

14    this conspiracy through essentially a series of revelations

15    that came to light.

16            The allegations continue there from paragraph 59.

17    There's paragraph 60.  These --

18            THE COURT:  Let me stop you.  In paragraph 59, I'm

19    looking at the sentence on line 16 on the page, "Their actions

20    were unknown until recently."  Is that -- so is that where

21    you're pleading you weren't aware of the Disinformation

22    Conspiracy until the general time frame of this paragraph?

23            MS. BELL:  There and in many other places,

24    Your Honor.  I think the crux from the very -- even in the

25    introduction is that because the very premise of the
```

1   Disinformation Conspiracy was to conceal and to deceive and

2   therefore these publications were made without the appropriate

3   disclosures, without the appropriate labeling, that as a

4   result, we were only able to really discover the -- not, again,

5   just the injury but the fact that the injury was a product of

6   wrongdoing and that the wrongdoing was in the form of this very

7   sophisticated conspiracy.  Those allegations really run

8   throughout the Complaint.

9          But in terms of what the crux of what that is, why

10  we are saying that, that the Court will find even backing up

11  and starting at paragraph -- for example, paragraph 50

12  discusses Mr. Broidy's plea.  Paragraph 56 discusses the

13  disclosure of hundreds of pages of documents in March and April

14  of 2018.

15         THE COURT:  So let's stop there for a second.

16  Paragraph 56, in March or April of 2018, these documents were

17  made public.  So why doesn't that tip the plaintiffs off?  So

18  why shouldn't that start the statute running?  And then at

19  least some of the claims we have a three-year statute of

20  limitations would seem to be untimely.

21         MS. BELL:  Well, Your Honor, there's no allegation

22  that we knew of or that we saw those publications when they

23  came to light or certainly that we connected them to the injury

24  to our clients and to the sophisticated conspiracy that we've

25  ultimately alleged here.  So that's why I described it as a

1    cumulative sort of -- there was a trickling out of information

2    which really culminated here with the guilty plea of Mr. Broidy

3    and the attendant information that allowed us to piece this all

4    together sufficiently.

5          And, Your Honor, at this stage, I think particularly

6    given the premise of the allegations here, the effort to

7    conceal and deceive and sort of the very nature of the

8    conspiracy alleged, this is really a question of fact that's

9    not appropriate to resolve at this stage.

10         And indeed, our position would be that the motion to

11   dismiss could only be granted on the basis of the statutes of

12   limitations, really an affirmative defense the defendants have

13   raised, if the assertions of the Complaint read again in the

14   light most favorable to our clients would not permit the

15   plaintiffs to prove that the statute was tolled.  And, of

16   course, we've provided a number of different legal bases for

17   the tolling of the statute which really boil down to the

18   concealment, as I've mentioned.

19         And so, in other words, defendants should not be

20   able to avail themselves, certainly not at this pleading stage,

21   of the protections of the statutes of limitations given the

22   allegations that they actively concealed and disguised their

23   conduct.

24         And, second, the continuing violations doctrine and

25   the continuing accrual doctrine, the latter being sort of the

1   weakest of all three of these rationales but nonetheless a

2   rationale that should not prevent us from proceeding to the

3   next phase in these proceedings.

4          THE COURT:  But to be clear, there's nothing clear

5   in the Complaint that says this is the date on which we were

6   aware of the conspiracy.

7          MS. BELL:  That's correct, Your Honor.  Again, it

8   sort of -- it provides the Court with the factual basis for our

9   position that we could not discover the conduct earlier based

10  on defendants' efforts to deceive and conceal.  And this was

11  the cumulative set of disclosures that -- culminating again

12  with the guilty plea which allowed us to piece this together

13  little by little.

14         But the Court is correct.  We don't specifically

15  point to a date certain and say, oh, on this date it all came

16  together.  It's the necessary implication of reading those

17  factual allegations we've just reviewed in terms of the

18  disclosures.

19         THE COURT:  Thank you.  And then I want to get into

20  the commercial speech issue.  So what are the facts in the

21  Complaint that give an inference that the statements constitute

22  commercial speech?

23         MS. BELL:  Yes, Your Honor.  So the very premise of

24  our claims is that this was indeed commercial speech

25  masquerading as independent and authentic and essentially

 1   organic political speech.

 2           And so while the -- while we acknowledge that what

 3   we say, the commercial content here, does not on its face

 4   propose a commercial transaction, the very crux of our

 5   allegation is that the point of this campaign was to drive

 6   business away from Qatar and Qatari businesses to the UAE and

 7   UAE-related businesses and that this content did that precisely

 8   by masquerading as political speech when, in fact, it was

 9   nothing but.

10           And the goal of the Disinformation Conspiracy was

11   precisely to convince the public, to mislead the public into

12   believing that Qatari businesses funded terrorism and that the

13   state itself was extremely dangerous and unstable and that only

14   a boycott of these Qatari businesses could effectuate the goal

15   of essentially undercutting their support for terrorism.  And

16   the entire purpose was, again, to drive -- through that

17   campaign to drive business away from Qatar and to the UAE.  And

18   that allegation is -- again, those allegations run throughout

19   the Complaint.

20           Perhaps the easiest or most clearly stated place

21   where the Court can see that theory in a nutshell is when the

22   Court turns to the causes of action at the end of the

23   Complaint.  For example, just to take the first cause of

24   action, which is the unfair competition law claim, if the Court

25   looks at paragraphs 100 to 101, there there's a discussion of

1    the ways in which defendants' conduct violated the UCL and,

2    again, the first -- 101A is the crux.  It pretty much

3    reiterates what I just stated, again, that there was this kind

4    of threefold purpose.

5            THE COURT:  Any other allegations in the Complaint

6    that these statements that sort of you're basing this on, that

7    they are false statements?

8            MS. BELL:  Are there allegations in the Complaint?

9    Yes, Your Honor.  So there are express allegations in the

10   Complaint that these statements are false.  I believe the

11   most -- so paragraph 66 at the very end is probably the

12   clearest line.  That's line 17 to 18.  That's just one example.

13           But in each case, as we discuss this advertisement,

14   there we say, "This advertisement was intentionally false and

15   misleading.  Qatar did not support terrorists or provide them

16   with a safe haven."  The Court will see that same factual

17   allegation throughout the Complaint.  It's absolutely, again,

18   essential premise of our allegations that these statements were

19   knowingly false, and moreover, they were specifically directed

20   to the tourism industry.

21           So our client being a preeminent provider of travel

22   to Qatar, the reason why this commercial content was

23   foreseeably damaging to our client and really directed at our

24   client was that the whole purpose of this campaign was to

25   essentially tie off not just trade with Qatar but travel to

1   Qatar.

2          And because our client's product and service was

3   essentially selling travel packages to and through Qatar,

4   again, our allegation is that these false statements that the

5   country sponsored terrorism was akin to an attack on and was

6   purposefully and really intentionally directed at Qatari

7   businesses and at the travel sector again being kind of the

8   crux of these efforts.

9          THE COURT:  Okay.  Just bringing it up at a high

10  level, can political speech be regulated based on the

11  motivation for making the political speech, or is political

12  speech protected just because it's political speech?  In other

13  words, if someone has a political belief about an issue, aren't

14  they allowed to state it regardless of what their motivation is

15  in stating it?

16         MS. BELL:  Well, Your Honor, I think at this stage

17  we've alleged enough to essentially rebut that argument.  And

18  that's precisely the defendants' argument is that this is

19  merely political speech.

20         And what we've said is no, your First Amendment

21  rights are not boundless.  You are not entitled to make

22  publications in violation of FARA.  You are not entitled to

23  make false publications that are purposefully intended to

24  damage the commercial well-being of businesses.  And so it's

25  not enough to simply say, oh, this is about political speech in

1  this particular context where we've said no, it's not about

2  political speech.

3           And, you know, there we go to the *Bolger* factors,

4  and we say the *Bolger* factors should be applied here in

5  assessing whether this content is, as Your Honor says, merely

6  political speech or whether the gravamen is commercial in

7  nature.  And we cite to cases that say the touchstone of the

8  inquiry isn't simply what appears on the face of this

9  publication.  And I think that responds to the Court's point

10 there.

11          MR. LARSON:  Your Honor, I'm sorry.  May I just

12 speak on this one limited point?

13          THE COURT:  Sure.

14          MR. LARSON:  I just have a thought.  Excuse me.

15          First Amendment is very important to us.  Certainly

16 as a federal judge it must be very important to you as well.

17 It's true we do not look at the motivations for why people

18 say -- exercise their political speech.  No question about

19 that.  That would be a rabbit hole that the First Amendment

20 forecloses as far back as the federalist papers.

21          What we have done though from day one up until now

22 is we look at the effects of speech.  We don't just put a blind

23 eye on and say, well, just because someone says it's political

24 or it sounds like political or it's walking like political

25 speech, that we are not going to look at the effects of it.

 1   And we do that whether you are yelling in a theater or

 2   testifying on a witness stand or doing a whole bunch of other

 3   things.

 4          If what's really going on is you are trying to

 5   incite violence or destroy a business or do something with your

 6   speech that's not about the political speech and we can

 7   objectively look at that and look at the factual circumstances

 8   and determine that, then we will take that out of the realm of

 9   political speech.  And there's countless examples where we do

10   it.

11          But to answer your question, because it's an

12   important one, it's not about motivation, but that's not the

13   theory of our case either.

14          THE COURT:  So let me just tease out that with sort

15   of an analogy.  Let's say I have a sneaker company and I make

16   sneakers in the United States.  And I know that one of my big

17   competitors, Nike, sources a lot of their sneakers through

18   China.

19          So I start a campaign about all the issues in China

20   with slave labor and China is a bad country and I'm doing this,

21   you know, because I both hold these beliefs, but I also know

22   that it's going to damage Nike because they are sourced out of

23   China.  Is that the theory of your case?

24          MR. LARSON:  It's a highly fact-sensitive issue, and

25   that's what the courts are going to have to look at and why I

1    don't think it's appropriate now.  I can certainly see an

2    example where you could probably get away with it under the

3    First Amendment if you limited yourself simply to expressing

4    your views, writing op eds, that type of thing.

5            But if what you are doing is falsifying information

6    and orchestrating a media-driven campaign -- a social

7    media-driven campaign to discredit somebody, that's in the same

8    way that can you say that in my opinion somebody is a bad

9    person or can you go out and commit defamation against them.

10   It's kind of commercial defamation.

11           And these are factual issues.  And I can

12   certainly -- I just wanted to avoid the motivation issue

13   because I think that's a trap.

14           THE COURT:  Thank you for that.  I appreciate that.

15           Well, let me let the other side have an opportunity

16   up at the podium.  I'll give you a rest.  And I just want to

17   sort of go through the same issues.

18           I know there's different parties here.  So if

19   somebody wants to take the lead and then others can jump in if

20   they'd like.

21           Just where I started off with Ms. Bell, do we have

22   any issues here with venue?  I know you haven't challenged

23   venue in the papers, but I wanted to see if there are any

24   thoughts you had on that.

25           MR. SAUNDERS:  Your Honor, correct.  We haven't

1  challenged venue, and we've alleged venue in our counterclaims

2  that we filed.  Obviously that's derivative of the main

3  complaint.  There's no issue that Mr. Broidy lives in this

4  district.  I agree with Your Honor.

5           There are zero allegations in the Complaint that the

6  supposed Disinformation Conspiracy was conducted or directed

7  from this district.  That's an inference that the plaintiffs

8  want Your Honor to draw.  It's not in the Complaint.  But there

9  are so many things that are not in the Company in terms of

10  allegations that we can talk about.

11          You know, I see why Your Honor is questioning the

12  issue of venue.  Again, we haven't challenged it.  All I could

13  say is yes, Mr. Broidy is here.  His company -- one of his

14  companies, BCM, is here.  But that doesn't necessarily

15  translate to venue.  I think perhaps the codefendants who are

16  not located in California might have more to say on the venue

17  issue because they are more directly impacted.

18          THE COURT:  And then let's get to the FARA issue.

19  Do you agree that the plaintiffs have at least alleged that

20  your clients violated FARA?

21          MR. SAUNDERS:  No, Your Honor, they haven't.  They

22  certainly haven't pleaded the elements of a FARA violation.

23  They haven't alleged that, much less proved it.

24          But here's the thing.  Even if they alleged it --

25  and I know Your Honor was asking Ms. Bell about the illegal

1  speech exception, which is I would note the only basis on which

2  plaintiffs tried to get out from application of the anti-SLAPP

3  statute.  They don't dispute this was protected speech.  They

4  don't dispute it was speech in a public forum on a matter of

5  public interest which is what is defined in the anti-SLAPP

6  statute as protected speech activity.

7  The only argument that they make on this point is

8  that the entire statute doesn't apply because the speech was

9  illegal because Mr. Broidy and the other defendants supposedly

10  violated FARA.  There are at least two big problems with that

11  argument.

12  First of all, the illegal speech exception that they

13  are seeking to invoke is a very narrow one according to the

14  cases, and it applies -- and this is the *Flatley* and *Harmoni*

15  cases that the plaintiffs themselves cite on page 7 of their

16  opposition brief.  The exception applies only if the evidence,

17  quote, "conclusively establishes," end quote, that the speech

18  or other protected activity was illegal as a matter of law.

19  In other words, it is not sufficient to just allege

20  that somebody violated the law.  Otherwise, any plaintiff could

21  get out from under application of the anti-SLAPP statute simply

22  by throwing an allegation in their complaint that the

23  defendants violated the law, and you'd never have an anti-SLAPP

24  motion.

25  THE COURT:  So you would argue that the Court needs

```
 1    to determine whether or not the facts laid out in the Complaint
 2    establish a FARA violation as a matter of law?
 3              MR. SAUNDERS:  The facts laid out in the Complaint
 4    and I believe under anti-SLAPP law they can present evidence,
 5    which they haven't done, to show illegal activity as a matter
 6    of law, conclusively establish it.
 7              THE COURT:  And if I'm looking at that, do I look at
 8    it in the light most favorable to the plaintiff?
 9              MR. SAUNDERS:  Well, you have to look at the
10    allegations in the light most favorable to the complainant,
11    Your Honor.  But looking at allegations in a favorable light
12    does not equate with conclusively establishing something as a
13    matter of law.
14              And what the cases say, the Harmoni case, the
15    Flatley case very clearly state there has to be proof.  It's
16    not just a matter of alleging.  You can't avoid application of
17    the anti-SLAPP statute by simply alleging illegal conduct.
18              And actually the Ninth Circuit specifically
19    addressed that in the Safari Club case.  And it said to find
20    otherwise would eviscerate the anti-SLAPP statute's protections
21    because the plaintiff could preclude the statute's application
22    simply by alleging criminal conduct by the defendant.  That's
23    what they've done here, and that clearly is not sufficient.
24              None of the defendants here has admitted liability
25    under FARA.  And plaintiffs certainly haven't proved any FARA
```

1    violation by uncontroverted and conclusive evidence which is

2    what the cases require.  Merely alleging it as they have done

3    is insufficient to invoke the illegal activity exception.

4         But here's the second problem with the FARA argument

5    that they make.  Even if they had proved or could prove a FARA

6    violation, which they can't, that wouldn't make the speech

7    itself illegal and certainly not as a matter of law.

8         Now, you know, plaintiffs say that the publications

9    cited in the Complaint were made in violation of FARA.  That's

10   nonsense.  That is a complete non sequitur.  FARA doesn't

11   prohibit or criminalize any publications or any speech.  It

12   simply requires that the speaker register and that information

13   be made available to the public so that the public can assess

14   that speech in light of the speaker's associations.

15        There is no such thing as illegal speech under FARA.

16   This is not like shouting fire in a crowded theater.  It's not

17   like incitement or extortion or any other laws, obscenity, that

18   criminalize the speech itself.  FARA criminalizes the failure

19   to register, not the speech of an unregistered person or

20   entity.

21        THE COURT:  But doesn't FARA criminalize the actions

22   of the unregistered -- isn't the action the violation, not

23   necessarily -- so if someone doesn't register as a foreign

24   agent but they act as an agent in violation of FARA, aren't

25   those actions the violations?

1          MR. SAUNDERS:  The action is what triggers the duty

2     to register.  And it's the failure to register from one who is

3     taking those actions is the violation.  It's the Foreign Agents

4     Registration Act.  That's the whole purpose of the act.

5          But the Supreme Court made very clear in the

6     *Meese v. Keene* case that we cite in our brief, they said FARA,

7     quote, "places no burden on protected expression."  It is not

8     an anti-speech statute.  It is not a statute that criminalizes

9     any form of speech.  It simply requires the speaker, the

10    disseminators of material, to make disclosures that enable the

11    public to assess that speech.

12         And there is not, Your Honor -- in any of the

13    opposition briefs filed by the plaintiffs, there is not a

14    single authority that they cite holding that the illegal speech

15    exception to the anti-SLAPP statute, which is a narrow

16    exception, applies to otherwise constitutionally protected

17    speech in a public forum on issues of public interest simply

18    based on the failure to register under FARA.  And they don't

19    cite any such authority because there isn't any.  This would be

20    the first time that a Court has ever found anything like that,

21    and it is completely inconsistent with the statute.

22         So we have made the requisite prima facie showing

23    under anti-SLAPP prong one that this lawsuit arises from

24    protected free speech.  I don't think there can be any dispute

25    about that.  So we are past that.  And that means the burden

1    shifts to them, and they have to show a reasonable possibility

2    that they will prevail on their claims.  And we can discuss all

3    the reasons why they haven't done that.  But I think that

4    addresses the FARA issue that Your Honor raised.

5          THE COURT:  Let's talk about the statute of

6    limitations issue.  Counsel is essentially arguing that

7    although information about the alleged conspiracy was trickling

8    in, they didn't have the ability to put it all together until a

9    period within -- until a time within the period of the statute

10   of limitations.  I'm not sure it's entirely clear what that

11   date is.  But is there a legal problem with that theory

12   assuming that there is an ah-ha date?

13         MR. SAUNDERS:  Yes, Your Honor, there are multiple

14   legal problems apart from the fact that, as Your Honor

15   correctly notes, they haven't alleged any discovery date and

16   they haven't pleaded the elements of the discovery rule for

17   that to apply.

18         But the Complaint itself alleges injury going back

19   to spring of 2017, March, April, and May of 2017.  That's in

20   paragraph 60 to 65 of the Complaint.  That is when the statute

21   of limitations begins to run, when the plaintiff first suffered

22   injury, even if more injury and more damages occur later.

23         There's abundant case law, California and federal,

24   on the discovery rule and on when the statute of limitations

25   runs, that that is when it begins to run, when there's first an

1  injury.

2          And that happens even in the plaintiff doesn't know

3  the identity of the wrongdoer.  It happens when the plaintiff

4  has reason to suspect that someone has done something to harm

5  them, even if they don't know who.

6          THE COURT:  And where again in the Complaint is that

7  allegation of injury?

8          MR. SAUNDERS:  In paragraph 60 -- I'm sorry.  Hang

9  on a second.  60 to 65 is alleging actions that took place in

10 early 2017, and -- I'm sorry.  I'm trying to find the

11 allegation that beginning in 2017 --

12         THE COURT:  Because they would have to have suffered

13 a damage, and they would have to have been aware of it at that

14 time in order for the statute to start running; right?

15         MR. SAUNDERS:  That is correct, Your Honor.  And I

16 apologize.  I know it's here, and I --

17         MS. FORREST:  Paragraph 91.

18         MR. SAUNDERS:  91.  Thank you to my co-counsel.

19         Paragraph 91, here we go.  "The effects of the

20 Disinformation Conspiracy were almost immediate," they allege.

21 "In particular, mostly for sales of travel packages originating

22 in the US for travel to or via Qatar declined significantly

23 from mid 2017 through 2019."  So they are certainly aware --

24         THE COURT:  They are aware they are being damaged.

25 But what I'm wondering is are they aware they are being damaged

1   as a result of some nefarious conduct?  I mean, conduct they

2   would allege is nefarious.

3            MR. SAUNDERS:  If they weren't aware in mid 2017,

4   Your Honor, they were certainly aware in March or April of 2018

5   which is when all of these documents were dumped and all the

6   news articles appeared.

7            And there is actually an Associated Press article

8   that I believe Defendant Nader's counsel raised in the reply

9   brief from May 2018 that basically lays out all of the

10  allegations of this Complaint.  It deals with Mr. Broidy.  It

11  deals with Mr. Nader.  It talks about the supposed connections

12  with UAE and Qatar.  It's the Complaint laid out in an

13  Associated Press article nearly four years ago.

14            Now, you know, if they didn't pick up the paper to

15  read that, that's certainly not the burden to show.  It's when

16  they knew or should have known.  And if there is massive public

17  reporting, as they themselves cite in their Complaint, in March

18  or April of 2018 -- Your Honor pointed out paragraph 56 of the

19  Complaint -- that's more than three years before they filed

20  this Complaint.  That knocks out on its face everything other

21  than the UCL claim which is the only one with a four-year

22  statute of limitations.

23            You know, this Complaint wasn't filed until

24  August 2021.  So it's not sufficient for them to just simply

25  allege that they didn't know this until recently, whatever that

```
 1    means, if their Complaint on its face alleges that the injury
 2    began in 2017 and by early 2018, there was massive
 3    international news reporting laying out the precise activities
 4    by the precise defendants who they named three-plus years later
 5    in their Complaint.
 6              THE COURT:  Do you agree that there's allegations in
 7    the Complaint that the statements that are complained about are
 8    false?
 9              MR. SAUNDERS:  There is that one statement that
10    Ms. Bell pointed to where they say -- it's not true.  It's
11    basically the Liar Liar Pants on Fire statement.
12              But here's the thing with that, Your Honor.  What we
13    know -- and it's stated in the briefs, and the Court can
14    certainly take judicial notice of the fact that Qatar's ties to
15    terrorism, its human rights record, these have all been the
16    subject of numerous mainstream newspaper articles, *New York*
17    *Times*, *Washington Post* and others.  There are books that have
18    been written about it.
19              We cite the current national security advisor,
20    Jake Sullivan, who said in 2017, right when this supposed
21    conspiracy was happening and my client was making these
22    statements alleged against him, the national security advisor
23    said, quote, "We are not placing a high enough priority on the
24    national security threat to the United States that is emanating
25    from the financing of terror groups by Qatar and other
```

1  countries."

2          Robert Gates, the former defense secretary, also

3  said in 2017, quote, "Qatar has long had the welcome mat out

4  for the Muslim brotherhood."  President Trump in 2017, when

5  discussing a blockade that had been initiated against Qatar by

6  several gulf countries, stated, quote, "The nation of Qatar

7  unfortunately has historically been a funder of terrorism at a

8  very high level."  That's the president of the United States.

9          And as the Complaint itself alleges in paragraph 59,

10  the chairman of the house foreign affairs committee introduced

11  legislation to condemn Qatar as a terrorist-supporting state.

12          So with that background, how can they allege that a

13  Delaware corporation with its principal place of business in

14  New York that sells luggage and claims to be a nongovernmental

15  actor can allege, let alone prove, that Qatar is not, in fact,

16  a sponsor of terrorism?  That's simply a conclusory allegation.

17  There's absolutely zero way they can ever allege let --

18  competently allege let alone prove.

19          They say, you know, this was intentionally false and

20  misleading because Qatar did not support terrorists or provide

21  them with a safe haven.  It's not enough for them to simply

22  conclusorily claim in their Complaint it's not true, and that

23  is all that they do.  There is no way for them to competently

24  plead and prove that those alleged statements are factually

25  untrue, much less that the Broidy defendants knew that they

1  were factually untrue contrary to everything being said by

2  multiple high-level officials in the government including the

3  president of the United States.

4        THE COURT:  Thanks, Counsel.  Let me see if any of

5  your co-counsel want to be heard.  We've only got a few minutes

6  left.

7        MR. SAUNDERS:  I did want to address the commercial

8  speech issue, Your Honor, that you addressed with Ms. Bell, but

9  I can leave that to co-counsel or perhaps address it

10 afterwards.

11        THE COURT:  Do you want to -- I'll give you another

12 minute or two.

13        MR. SAUNDERS:  Okay.  You know, Your Honor, I'm

14 sorry -- yeah.  Well, first of all, the Virginia Pharmacy test

15 is speech that does no more than propose a commercial

16 transaction.  That's what we have for commercial speech.

17        In close cases only, the Court looks at the *Bolger*

18 factors that include whether the speech was in an advertising

19 format, it wasn't; whether it referenced a specific product, it

20 didn't; and whether the speaker had an underlying economic

21 motive.  They've made nothing but conclusory allegations at

22 even one of those factors.  But, again, we don't even get to

23 those factors.

24        And even if they satisfy the *Bolger* factors, the

25 speech is still noncommercial as a whole if it's inextricably

1    intertwined with noncommercial speech.  Those are three

2    separate hurdles they have to get over, and they don't reach

3    any one of them.

4             THE COURT:  But don't we look at the impact of the

5    speech, though, the impact of the speech on the commercial

6    activity?

7             MR. SAUNDERS:  If the impact, Your Honor, is so

8    speculative and remote as what we are talking about here --

9    again, there's not even any legitimate causation alleged.  They

10   claim that some of their customers might have seen some ad in

11   the *Washington Post*, some editorial ad that said bad things

12   about Qatar, and because they brand themselves with the crimson

13   of the Qatari flag, some of those customers who might have seen

14   that ad but aren't named or identified might have decided not

15   to do business or to cancel trips or something with the

16   defendant -- with the plaintiffs and as a result they might

17   have lost money.

18            That is basically equivalent to saying that anybody

19   who criticizes the United States could be sued by American

20   Airlines because American uses the word American and they brand

21   themselves with the red, white, and blue of the American flag.

22            And they could say, well, if you are bringing the

23   U.S. into disrepute by criticizing the U.S., somebody might

24   think that anything called American or branding itself with

25   red, white, and blue is bad and stop doing business with us.

1          There's no complaint in history that has survived

2   that kind of speculative association and series of unfounded

3   inferences, especially when we are dealing with what again is

4   unquestionably protected political speech on an issue of public

5   interest.  This is what the anti-SLAPP statute was made for,

6   Your Honor.

7          THE COURT:  Thank you, Counsel.  Let me hear from

8   the other defendants' co-counsel.

9          MS. FORREST:  Thank you, Your Honor.  I will try to

10  be brief and not repeat the points that were made by

11  Mr. Saunders, all of which I strongly agree with.

12          A quick point on the illegal speech exception.  I

13  believe the Court asked whether plaintiffs had sufficiently

14  alleged that there was a FARA violation.  And I just wanted to

15  be clear that the standard for what they have to show for the

16  illegal speech exception is different from the simple 12(b)(6)

17  standard on the sufficiency of the claims where they just have

18  to state a plausible allegation.

19          To show the illegal speech exception applies, which

20  again is a very narrow exception to the anti-SLAPP statute,

21  they have to prove it with evidence.  Allegations alone in the

22  Complaint are not enough.  And this Court has said that as

23  recently as 2019 in the *Harmoni* case.

24          And if you look at the *Harmoni* case, the party

25  opposing the SLAPP motion there presented multiple documents

1    and affidavits as evidence of their contention.  The contention

2    there was that the speech was fraudulent.  And even then the

3    Court said that the evidence presented was not enough to

4    conclusively prove that there had been a criminal violation.

5         Here the plaintiffs have presented no evidence at

6    all.  All we have are allegations that is as a matter of law

7    not sufficient to invoke the illegal speech exception.

8         On the -- oh, on FARA, itself, and as the resident

9    attorney from DC, I'll say we pronounce it FARA in DC.  I don't

10   know if it's the same everywhere, but that's what we say inside

11   the beltway.  In terms of the question of whether it's the acts

12   that are the FARA violation or the failure to register, it is

13   indeed the failure to register and not the speech itself that

14   is criminalized.

15        And it might be easier to think of it if you think

16   of it in terms of lobbying.  If I as a private citizen call my

17   member of congress and ask them to vote a certain way on a

18   bill, there's nothing wrong that.  It's perfectly acceptable,

19   it's my exercise of free speech.

20        If I do the same thing but I have not disclosed that

21   I'm being paid by Coca-Cola Corporation to make that call, I

22   may have failed to register under the Lobbying Disclosure Act,

23   and that registration may be an offense, but the call to the

24   member of congress is still an act of protected free speech,

25   and it's not the content of the speech that is criminal there.

1          THE COURT:  Now, is there a good case or source to
2   go to that makes that distinction clear?
3          MS. FORREST:  I did not find one, Your Honor.  But
4   in all candor, I was planning on focusing today on points
5   that -- to emphasize the grounds on which the plaintiffs could
6   not cure their Complaint through amendment.  And so I did not
7   focus on that particular issue, but we'd be happy to submit
8   supplement briefing on it if you would like.
9          I had one other point I wished to make on this
10  timeliness question.  Plaintiffs appear to be relying on the
11  discovery rule claiming that the statute of limitations didn't
12  begin to run until they knew that there was this supposed
13  conspiracy.  But that's not actually how the discovery rule
14  works.
15         So under the discovery rule, the applicable statute
16  of limitations begins to run when the plaintiff knows or should
17  suspect that an injury was caused by wrongdoing.  And so if you
18  look at paragraph 56 in their Complaint, they discuss press
19  reports that reported on hundreds of documents about Mr. Nader
20  and Mr. Broidy's suppose involvement in a Disinformation
21  Conspiracy, and that was in March 2018.
22         In paragraph 57 there is a quote from a *New York*
23  *Times* article which plaintiffs did not provide.  But if you
24  Google that phrase, you will get an article that was published
25  on March 21, 2018, in the *New York Times*.  It's called "How two

 1  gulf monarchies sought to influence the White House."  And if

 2  you look at that article, it is essentially a roadmap to

 3  plaintiff's Complaint.  They are pulling the same allegations,

 4  the same e-mails.

 5          And if you also look at the Associated Press article

 6  that we cited in our reply brief, I believe on page 8 at

 7  footnote 9, again, if you pull up that article, again, it is an

 8  exact roadmap to plaintiff's Complaint here.  And I'm not

 9  saying that those allegations are true.  In fact, we are

10  clearly stating that they are not true.

11          But plaintiffs didn't have to know with certainty

12  the theory of their case.  This put them on notice, and they

13  haven't pled that they exercised diligence after being on

14  notice, nor were they diligent.

15          So the statute of limitations began to run no later

16  than March 2018 if it didn't run when they were first injured

17  in mid 2017.  Again, that knocks out all of their claims except

18  for possibly the UCL claim which fails for other reasons, no

19  knowing falsity, commercial speech -- no commercial speech,

20  et cetera.

21          I think those are all the points I wanted to follow

22  up on.  But if you have any other questions, I'd be happy to

23  take them.

24          THE COURT:  Thank you.

25          Counsel, do you have anything to add?

1           MR. KIM:  Thank you, Your Honor.  On behalf of

2    Ironistic, I can be brief because there's just about nothing in

3    this Complaint about my client.

4           If you look at the Complaint -- and I'm not going to

5    repeat the points of my co-defendants' counsel, all of which I

6    completely agree.  There are two paragraphs in this Complaint

7    that describe anything that Ironistic has done, paragraphs 82

8    and 83.  Those paragraphs are the sum total of any statements

9    that are in any way, even vaguely attributed to Ironistic.

10          And those paragraphs, Your Honor, I would submit,

11   are the very definition of political speech.  There cannot be

12   anymore classic example of political speech.

13          And if I understand plaintiff's argument, the

14   argument here is, well, even though, when you look at this

15   speech, it clearly is about a country that somehow the

16   incidental impact of that speech, if that incidental impact may

17   extend to some business, then that transforms political speech

18   into commercial speech.

19          There is no case, Your Honor, that says that.  And

20   for good reason.  Because if there was such a doctrine, the

21   amount of political speech that could be swept into a case like

22   this simply by benefit of an allegation that the speech was

23   made for some commercial purpose or had some tangential

24   commercial impact would be endless.  There would be no limit to

25   that doctrine.

1          But fortunately that is not the law.  We've stated

2    in our papers why we think the *Bolger* factor should not apply

3    because this is not a close case.  This is clearly political

4    speech.

5          But even if Your Honor were to choose to apply the

6    *Bolger* factors, none of those factors say political speech

7    becomes commercial if some incidental impact of that speech is

8    commercial.  None of those factors also say if political speech

9    is made for the purpose of impacting some business, that that

10   transforms political speech into commercial speech.

11         There is no such factor.  There is no such case.

12   We've cited cases to the contrary, but there is no case

13   supporting plaintiff's position whatsoever.

14         On the position -- on the issue of venue very

15   quickly, Your Honor is correct our client is in Virginia.  And

16   we have made not with respect to venue but with respect to

17   extraterritoriality the point that plaintiff's claims, at least

18   with respect to the UCL and the FAL, cannot apply here because

19   there is no -- the case law makes very clear whether a UCL or

20   an FAL claim can be brought against an out-of-state entity

21   depends on whether the conduct in question occurred here.

22         And here there is no allegation, nor could there be,

23   that the supposed representations were actually created -- even

24   assuming that Ironistic is responsible for these

25   representations -- that they were created here in California.

 1          And plaintiff's response is, well, Ironistic is

 2   alleged to have been part of a conspiracy.  Let's put aside the

 3   fact that there are literally zero allegations that connect

 4   Ironistic to any of the other defendants.  It's just all

 5   conclusory.  Even if there was a conspiracy, allegations about

 6   conspiracy by themselves are insufficient to provide

 7   extraterritorial effect under the UCL and FAL.

 8          THE COURT:  From the Complaint, there are no

 9   allegations that Ironistic acted in California at all; correct?

10          MR. KIM:  None.  The only allegation, Your Honor,

11   which I think plaintiff's counsel referred to, is that I think

12   Twitter and Facebook servers are in California and therefore

13   Ironistic availed itself of California.  Again, if that were

14   sufficient, any communication made anywhere on Twitter and

15   Facebook automatically triggers extraterritorial applicability

16   which, of course, is not the case.

17          And, Your Honor, I -- as with my co-defendants'

18   counsel, I don't want to spend a lot of time on the issues

19   relating to 9(b) and the failure to plead.  It's evident in

20   this Complaint that there really is nothing substantive against

21   Ironistic.  But I believe Your Honor doesn't need to get to

22   that point.

23          And that actually leads me to my point on venue

24   which is yes, Your Honor, there are other venues that could be

25   appropriate for this case.  I don't think Your Honor needs to

```
 1   look at those issues.  I think the issues that are presented in
 2   this Complaint are really very simple.  With respect to all
 3   defendants and certainly with respect to Ironistic, this is
 4   political speech.  That's it.
 5          With respect to the anti-SLAPP cases and with
 6   respect to the UCL, the FAL, trade libel, false advertising, if
 7   you look simply at the content of the speech the plaintiffs are
 8   alleging, there cannot be a more classic version of or
 9   definition of political speech.  That's what this case is
10   about.
11          And if this Complaint is allowed to move forward in
12   any capacity, the doors that that would open to the types of
13   political speech that could be swept into the courts simply
14   through an allegation that a defendant was motivated somehow,
15   it had some commercial motivation, or that the speech had some
16   tangential commercial impact, that type of allegation could
17   apply to just about any political speech, Your Honor.  And that
18   simply is not the law.
19          THE COURT:  Thank you, Counsel.
20          MR. KIM:  Thank you, Your Honor.
21          THE COURT:  I'll give Ms. Bell, if you want, a few
22   minutes to respond to anything you think you'd like to respond
23   to, and then we'll move on.
24          MR. SAUNDERS:  I do have the FARA cite for
25   Your Honor if you would like it.  I know you were asking
```

1    earlier.

2              THE COURT:  Yes, please.

3              MR. SAUNDERS:  I referenced it during argument.

4    It's *Meese v. Keene.*  It's 481 U.S. 465 at 480.  It's a 1987

5    case.  And the Supreme Court said with regard to FARA, quote,

6    "Congress did not prohibit, edit, or restrain the distribution

7    of advocacy materials in an ostensible effort to protect the

8    public from conversion, confusion, or deceit.  To the contrary,

9    Congress simply required the disseminators of such material to

10   make additional disclosures that would better enable the public

11   to evaluate the import of the propaganda."  And they said,

12   therefore, FARA, quote, "places no burden on protected

13   expressions."

14             THE COURT:  Thank you, Counsel.

15             Ms. Bell, you can address that or I'll give you five

16   minutes.  I know there was a lot thrown at you.  Go ahead.

17             MS. BELL:  Thank you, Your Honor.  I appreciate

18   that.

19             I'll start right there.  Your Honor, this is a

20   complete red herring, this argument that somehow the content of

21   the disinformation campaign is not itself illegal under FARA.

22   The Court can look at the statute itself, 22 U.S.C. 612, and

23   the elements of a criminal violation.

24             The third element makes clear that not only

25   willfully failing to file a true and complete FARA registration

1  within ten days of becoming an agent of the foreign principal

2  can suffice for a criminal violation, but also violating --

3  quote, "violating, reporting, labeling, or document retention

4  provisions of the act can suffice."

5          Of course, here, and the Court can -- I think this

6  is most clearly stated in the recitation of our claims at the

7  end.  But our allegation is not just that defendants violated

8  the registration requirement of FARA but that the content

9  itself was violative of FARA insofar as it did not comply with

10  the requirements of reporting and labeling -- most importantly

11  labeling -- of this content.

12          And that is really what gives rise to the harm to

13  the public who are deceived into believing that this is organic

14  and legitimate political speech when, in fact, what it is, it's

15  commercial content, and that's the very crux of our arguments.

16          As to the other three issues that were addressed,

17  these really -- much of what the defendants have said boils

18  down to factual arguments which are inappropriate at this

19  stage.

20          I would note that under the anti-SLAPP formulation,

21  they very well could have challenged the factual sufficiency of

22  our allegations.  They chose not to.  So we are here to argue

23  just about the legal sufficiency of those allegations.

24          So these arguments that were made about the

25  discovery date, what the discovery date is, taking judicial

1    notice of comments by the current national security advisor,

2    trying to impute some type of knowledge to our clients based on

3    those public statements, those are fact-based arguments in

4    terms of the harm, Your Honor.

5              Of course, under California law -- and this is the

6    *Ward v. Westinghouse Canada* case -- knowledge of an injury and

7    its cause does not necessarily imply that wrongdoing has

8    occurred or that anyone is to blame.  And I think the Court

9    made this point.  And that's exactly our position, that it

10   wasn't -- it's not enough to feel the injury which I think is

11   what defendants were suggesting.

12             Similarly, the arguments that were made about

13   whether we have sufficiently alleged for purposes of this stage

14   of the proceedings false statements, again, the Complaint is

15   replete with those allegations.

16             But I did want to point the Court in particular to

17   paragraph 65.  It's lines -- let's see -- I believe 1 to 2.

18   But in any event -- yes, it's on page 16 here, lines 1 to 2

19   where we quote from an e-mail that Mr. Broidy sent where he is

20   telling Mr. Nader that Circinus has been, quote, "involved in

21   information and disinformation campaigns using the Internet and

22   social media."

23             And that's quite a specific factual allegation there

24   that what we are dealing with is not, you know, merely

25   conclusory allegations of false information but an express

1  admission by the lead defendant in this case that Circinus was

2  perpetrating disinformation campaigns.  That's, of course, the

3  crux of our allegation.

4         And, finally, on the commercial speech issue, we've

5  discussed, again, the *Bolger* factors at length.  I just wanted

6  to be clear that there was a suggestion that somehow our

7  argument boils down to, well, you should look at these -- this

8  political speech, and you should somehow, you know, construe it

9  as an advertisement because our client used the Qatari flag.

10        No.  Our argument is that our client was really at

11  the center of the bull's-eye of the UAE's campaign against

12  Qatar and Qatari businesses in connection with the boycott, the

13  economic boycott that began in 2017 and that its product and

14  service was actually travel to the country.

15        And so that by attacking the country itself, this

16  was very foreseeably attacking the tourism industry.  Who is at

17  the center of the tourism industry?  Our client.  Thank you,

18  Your Honor.

19        THE COURT:  I just had a very quick question for

20  you.

21        MS. BELL:  Yes.

22        THE COURT:  Turning to paragraph 57, counsel pointed

23  out that the statement in paragraph 57 comes from an article,

24  and that's mentioned in the paragraph, from a *New York Times*

25  article.  Is it fair game for the Court to pull up that

1    article?  I mean, is it essentially incorporated by reference

2    by quoting it here?

3            MS. BELL:  Yes, I certainly think that the Court

4    could pull up the article.  I would just say that, again, our

5    allegations are that there's a much broader -- you know, we

6    weren't meaning to say that sort of the campaign was limited to

7    these examples.  These are some examples of what we have been

8    unable to uncover thus far.  But, of course, this was much more

9    broader and more persuasive.

10           And the point was made, I believe by Mr. Saunders,

11   that there were many public statements in the media and that

12   even Mr. Sullivan had alluded to certain of these public

13   statements.  Of course, our argument is that this entire -- all

14   of these statements that might -- you might point to to say,

15   oh, well, there's -- this is not false information in fact were

16   a product of this very Disinformation Conspiracy that funneled

17   readers into this vortex of negative information.

18           So yes, of course there's -- there may be

19   information out there that goes beyond what we -- and we

20   believe there to be, but in our assessment, it's all part of

21   this campaign.

22           THE COURT:  Thank you, Counsel.

23           Thank you, Counsel.  Appreciate it.

24           The Court will consider this and may or may not

25   issue something before the hearing on the 24th.  We'll see.

```
 1              MR. LARSON:  Thank you, Your Honor.

 2              MS. BELL:  Thank you, Your Honor.

 3              MR. SAUNDERS:  Thank you, Your Honor.

 4              (At 10:08 a.m. the proceedings adjourned.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4

5            I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT

7    FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY

8    THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE

9    THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT

12   IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL

13   CONFERENCE OF THE UNITED STATES.

14

15

16            DATED THIS  22ND  DAY OF DECEMBER, 2021.

17

18

19            /S/ MAREA WOOLRICH

20            _____
              MAREA WOOLRICH, CSR NO. 12698, CCRR
              FEDERAL OFFICIAL COURT REPORTER
21

22

23

24

25